Karra J. Porter
Karra.Porter@chrisjen.com
Kelly H. Macfarlane
Kelly.Macfarlane@chrisjen.com
Phillip E. Lowry, Jr.
Phillip.Lowry@chrisjen.com
Sarah E. Spencer
Sarah.Spencer@chrisjen.com
**CHRISTENSEN & JENSEN, P.C.**
15 West South Temple, Suite 800
Salt Lake City, Utah  84101
Telephone:    801-323-5000
Facsimile:    801-355-3472

Gregory A. Miles
GMiles@RoyalMilesLaw.com
Nevada Bar No. 4336
**ROYAL & MILES LLP**
1522 W. Warm Springs Road
Henderson, NV 89014
Telephone  702-471-6777
Facsimile:  702-531-6777

*Attorneys for Defendants:   Blue Streak Processing, Inc., Business First, Inc.*
*Cloud Nine Marketing, Inc., Cold Bay Media, Inc. CPA Upsell, Inc., Diamond J Media, Inc.*
*EBusiness Success, Inc., Elite Debit, Inc. Funding Success, Inc., Hooper Processing, Inc.*
*I Works, Inc., Internet Economy, Inc. Internet Fitness, Inc., Market Funding Solutions, Inc.*
*Money Harvest, Inc., Monroe Processing, Inc. Net Commerce, Inc., Premier Performance, Inc.*
*Pro Internet Services, Inc., Revive Marketing, Inc. Success Marketing, Inc., Summit Processing, Inc.*
*Tran Voyage, Inc., TranFirst, Inc., Unlimited Processing, Inc., eCom Success, Inc., **and Relief***
***Defendants:** Sharla Johnson, Barbara Johnson, Kerry Johnson, KB Family Limited Partnership, KV*
*Electric, Inc., Orange Ct Investments, LLC, Zibby, LLC, and Zibby Flight Service, LLC*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

FEDERAL TRADE COMMISSION,

          Plaintiff(s),

v.

JEREMY JOHNSON, et al.

          Defendant(s).

Case No.:    2:10-cv-2203-MMD-GWF

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FTC's MOTION FOR SUMMARY JUDGMENT AGAINST ALL CORPORATE LIABILITY DEFENDANTS (DE 1235; 1280)**

**CITATION FORM**

The following citation forms are used in this memorandum:

References to the FTC's memorandum are to the number at the top of the page.

Depositions are cited by Exhibit number, deponent name, then page(s):line numbers.

Declarations are cited by Exhibit number, declarant name, then paragraph number.

Expert reports are cited as "[expert name] Rept.," then the page number(s).

**SCOPE OF CITED MATERIALS**

Under F.R.Civ.P. 56(c)(1), the moving party on a motion for summary judgment "must support the assertion by: (A) citing to particular parts of materials in the record...."  In response, the non-moving parties may show that "the materials cited do not establish the absence or presence of a genuine dispute ...."  *Id.* § -(B).  While the FTC has filed several complete depositions, declarations, etc., pursuant to Rule 56(c)(1), defendants have responded only to the "particular parts of materials" cited by the FTC.  Thus, for example, if the FTC cites ¶ 5 of a declaration, the defendants have responded to, objected to, or otherwise addressed only ¶ 5.

**SUMMARY JUDGMENT STANDARD**

As the moving party, the FTC bears the burden of showing that there are no genuine issues of material fact.  *FTC v. Gill*, 71 F. Supp. 2d 1030, 1037 (C.D. Cal. 1999), *aff'd*, 265 F.3d 944 (9th Cir. 2001).  Facts are construed in the light most favorable to the nonmoving party.  *Kaiser Cement Corp. v. Fishbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

**TABLE OF CONTENTS**

CITATION FORM ...................................................................................................ii

SCOPE OF CITED MATERIALS .........................................................................ii

SUMMARY JUDGMENT STANDARD ...............................................................ii

MEMORANDUM IN OPPOSITION TO FTC'S MOTION FOR SUMMARY
JUDGMENT AGAINST ALL CORPORATE DEFENDANTS ..............................1

THE FTC HAS NOT ESTABLISHED THE ABSENCE OF ISSUES OF MATERIAL
FACT, AS REQUIRED TO DEPRIVE THE DEFENDANTS OF A TRIAL ......................6

I.      COUNTS I, II, AND VI (grants) ..............................................................6

        A.      Factual Background of IWorks' Grant Program. ..........................6
        B.      The FTC's allegations ..............................................................7
                1.      Numerous government grants are available for personal needs ......11
                2.      "Likelihood" of obtaining "government grants for personal
                        expenses" ...........................................................15
                3.      The Grant-A-Day Testimonials were substantiated and not
                        misleading ..........................................................16

II.     THE FTC HAS NOT ESTABLISHED THE ABSENCE OF ISSUES OF
        MATERIAL FACT ON COUNT III ("Google Adwords/Adsense" products) ........18

III.    COUNTS IV, V, and IX ........................................................................22

                1.      Notice of the allegedly prohibited conduct was not provided ...........23
                2.      The law does not require disclosures on landing pages ..............24
                3.      Disclosures on the order pages were not deceptive ..................24
                4.      Other evidence suggests that the disclosures were adequate ...........27
                        a.      Cancellation rates ...................................................27
                        b.      FTC witness Chris Cox ..........................................28
                        c.      Chargeback rates ...................................................28
                        d.      Adverse inferences .................................................28
                                i.      Camtasia videos .........................................28
                                ii.     Modified copies ..........................................29
                                iii.    Litigation hold ...........................................29
                                iv.     Failure to ensure consumer preservation of
                                        documents ..............................................29

Response to FTC's "facts" ..............................................................................32

IV.  **COUNTS VII AND VIII (positive articles, blog posts, reputation managers)** ........ 35

V.  **COUNT X ("violations of the Electronic Fund Transfer Act and Regulation E" (Am.Compl. ¶¶ 473-479)** ................................................................................. 40

VI.  **THERE IS A DISPUTE OF FACT REGARDING IWORKS' LEGAL RESPONSIBILITY FOR ACTIONS OF THIRD-PARTY BROKERS** ................. 40

A.  **Introduction regarding affiliate marketing** ....................................... 40
B.  **Merchants are not vicariously liable for the alleged unlawful acts of third party advertisers or marketers absent an agency relationship arising from actual or apparent authority** ............................................ 41
C.  **IWorks's brokers and marketing partners who hosted websites advertising IWorks's core products and upsells were not agents of IWorks and did not act within the scope of their authority if they allegedly violated the law** ........................................................................ 42
    i.   Brokers and affiliates who created and hosted landing and order pages for the sale of IWorks's core products ................................. 42
    ii.  Marketing partners who sold IWorks's products as upsells in connection with the marketing partner's own core product ............. 46
D.  **There is a genuine dispute of material fact regarding whether IWorks utilized reasonable compliance efforts with respect to its affiliates and marketing partners** ........................................................................ 47

VII.  **THE FTC'S OTHER "INDICIA" OF FRAUD ARE DISPUTED** .......................... 50

A.  **Chargeback rates** .................................................................................. 50
B.  **Processing companies** .......................................................................... 53
C.  **BadCustomer.com** ............................................................................... 54

VIII.  **AN ISSUE OF FACT EXISTS AS TO WHETHER THE DEFENDANTS RELIED ON THE ADVICE OF COUNSEL OR OTHERWISE LACKED AN INTENT TO VIOLATE THE ACT** ................................................................. 56

IX.  **THE FTC MUST SHOW THAT A REPRESENTATIVE SAMPLE OF CONSUMERS RELIED ON EACH ALLEGED MISREPRESENTATION** ........ 61

A.  **The "fraud on the market" theory upon which the claimed reliance presumption is based is unsupported and in jeopardy** ..................... 61
B.  **The FTC has not shown that specific misrepresentations were "widely disseminated" in any event** ................................................................. 64

X.  **THE FTC'S REQUESTED MONETARY RELIEF IS UNSUPPORTED AND UNREASONABLE** ................................................................................ 65

iv

**XI.    ISSUES OF FACT EXIST ON THE FTC'S "COMMON ENTERPRISE" CLAIMS**.............................................................................67

**CONCLUSION** .................................................................................70

## TABLE OF AUTHORITIES

**Cases**

*1-800 Contacts, Inc. v. Lens.com*, Inc., 722 F.3d 1229 (10th Cir.2013)....................................45
*American Home Products Corp. v. FTC*, 402 F.2d 232 (6th Cir. 1968) ....................................13
*Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138 (9th Cir. 2009) ..............................64
*Barnett v. Network Solutions, Inc.*, 38 S.W.3d 200 (Tex. App. 2001) ......................................26
*Basic Inc. v. Levinson*, 485 US 224 (1988).......................................................................62, 63
*Big Dipper Entm't, LLC v. City of Warren*, 641 F.3d 715 (6th Cir.2011) ..................................1
*Blackie v. Barrack*, 524 F. 2d 891 (9th Cir. 1975)...........................................................62, 63
*Blackie v. Barrack,* cert. denied, 429 U. S. 816 (1976) ............................................................62
*Bott v. Vistaprint USA Inc.*, 392 F. App'x 327 (5th Cir. 2010) ...............................................24
*Burcham v. Expedia, Inc.*, 4:07CV1963 CDP, 2009 WL 586513 (E.D. Mo. Mar. 6, 2009).......26
*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474 (9th Cir.2000) .................41
*Chainani v. Bd. of Educ.*, 87 N.Y.2d 370 (1995)....................................................................43
*Feldman v. Google, Inc.*, 513 F. Supp. 2d 229 (E.D. Pa. 2007) ...............................................26
*Ford Motor Co. v. Pearson*, 40 F.2d 858 (9th Cir. 1930)........................................................22
*Frankl v. HTH Corporation*, 650 F.3d 1334 (9th Cir.2011)....................................................41
*Frankl v. HTH Corporation, cert. denied*, 132 S.Ct. 1821 (2012) ..........................................41
*FTC v. Enforma Natural Products*, 362 F.3d 1204 (9th Cir. 2004) .........................................3
*FTC v. Figgie Int'l, Inc.,* 994 F.2d 595 (9th Cir.1993)......................................................61, 63
*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011)....................................3, 50
*FTC v. International Diamond Corp.*, 1983-2 Trade Cases Par. 65,506 (N.D. Cal. 1983) ..............................................................................................................61, 62, 63
*FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282 (D.C.Minn.1985) ..........................................63
*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ..........................................3
*FTC v. Publishers Business Solutions*, 2:08-cv-00620-PMP-GWF ..........................................65
*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir.2009).....................................................................41
*General Electric Co. v. EPA*, 53 F.3d 1324 (D.C. Cir. 1995) ...................................................23
*Hussein v. Univ. & Cmty. Coll. Sys. of Nevada*, 304-CV-0455 JCM RAM, 2007 WL 4592225 (D. Nev. Dec. 28, 2007)....................................................................................................2
*In re Vistaprint Corp Mktg. & Sales Practices Litig.*, MDL 4:08-MD-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009).................................................................................................24
*N. Am. Broad., LLC v. United States*, 306 F. App'x 371 (9th Cir. 2008) ..................................3
*NLRB v. Donkin's Inn, Inc.*, 532 F. 2d 138 (9th Cir.1976)......................................................42
*Pacific Can Co. v. Hewes*, 95 F.2d 42 (9th Cir.1938) ............................................................41
*People v. Direct Revenue, LLC*, Index No. 401325/06 (N.Y. Sup. Ct., May 20, 2008)..............43
*Rice v. Fox Broad. Co.*, 330 F.3d 1170 (9th Cir. 2003)..........................................................65

*Sanford v. Memberworks*, 625 F.3d 550 (9th Cir. 2010) ............................................. 40
*Stillwater Mining Co. v. Federal Mine Safety & Health Review Comm'n*, 142 F.3d 1179
   (9th Cir. 1998) ......................................................................................................... 23
*Sun Microsystems, Inc. v. Hynix Semiconductor Inc.*, 622 F.Supp.2d 890 (N.D.Cal.2009)........ 41
*Tiffany Inc. v. eBay Inc.*, 600 F.3d 93 (2nd Cir.2010) ................................................. 45
*U.S. v. Approximately 64695 Pounds of Shark Fins*, 520 F.3d 976 (9th Cir. 2008).................... 23
*U.S. v. Cyberheat, Inc.*, 2007 WL 686678 (D.Ariz. 2007) ..................................... 44, 45

**Statutes**
15 U.S.C. § 1693m............................................................................................................ 39

**Other Authorities**
2A C.J.S. Agency § 133..................................................................................................... 41
FTC Guides Concerning the Use of Endorsements and Testimonials in Advertising, 16 CFR
   Part 255 ................................................................................................................... 38
*Restatement (Second) of Agency* § 7 ............................................................................. 41
*Restatement (Second) of Agency* § 8 ............................................................................. 41
*Restatement (Second) of Agency* §§ 26-27 ................................................................... 41
*Restatement (Third) of Agency* § 2.01 ........................................................................... 41
Restatement (Third) of Agency § 2.03 ............................................................................. 41

**Rules**
F.R.Civ.P. 26(a)(1)(A)(ii) .................................................................................................. 28

vi

**MEMORANDUM IN OPPOSITION TO FTC'S MOTION FOR SUMMARY
JUDGMENT AGAINST ALL CORPORATE DEFENDANTS**

**Introduction**

Early in this case, after reviewing the FTC's preliminary injunction evidence – most of which is repeated in the FTC's current motion – and IWorks' response, Judge Hunt observed:

THE COURT:  [L]et me just advise the parties that the Court is ruling and will enter the order that the Preliminary Injunction will issue.

Just, I guess, a couple of comments with respect to that.  That does not preclude for the defendants – well, let me say this first and then let me make that comment.  [FTC] Counsel suggested that this likely was a summary judgment case.  From what I've heard today, the Court, quite frankly, finds it unlikely that this is a matter that can be resolved by summary judgment.  There appears to me that there are going to be a lot of factual issues that are contested in this matter, particularly with respect – well, both with respect to liability and with respect to damages ultimately.  There could be, will be issues there. *[DE 184, 161:8-22]*

That observation is even more true now, where depositions and expert testimony have exposed material flaws in the FTC's case.  The FTC claims to have "overwhelming" evidence. Of course, the amount of evidence is irrelevant on a motion for summary judgment – it is whether the evidence is *undisputed* that matters.  As the Ninth Circuit has stated, "The amount of evidence required to avoid summary judgment is 'minimal,'" and evidence adduced by a non-moving party must be assumed true.[1]

In any event, however, the FTC's characterizations are simply not true.  To a great extent, the FTC conflates hyperbole with undisputed evidence.  Dismissive pronouncements that the defendants "bilked" and "duped" consumers add nothing to the debate.  *Big Dipper Entm't, LLC v. City of Warren*, 641 F.3d 715, 719 (6th Cir.2011) ("[T]he better practice is usually to lay out the facts and let the court reach its own conclusions.").

---

[1] *Teutscher v. Riverside Sheriffs Ass'n*, 492 F. App'x 719, 720 (9th Cir. 2012); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012).

1

The FTC should, in fact, have a perfect case.  Consider:

•        The FTC spent years investigating IWorks, beginning in 2008, most of that time without IWorks' knowledge[2];

•        Two FTC investigators were assigned to IWorks for one to three years, during which time they were assigned to only one other case[3];

•        The FTC had access to IWorks' servers for months before the lawsuit – access so direct that it could contact customers immediately after purchases[4];

•        The FTC was secretly working with an IWorks employee and an IWorks consultant while they were still working with (and being paid by) IWorks[5];

•        As part of this years-long investigation, the FTC had access to what it says are "nearly 3,000" Better Business Bureau or Attorney General complaints (out of more than 10 million customers), and it contacted consumers from those complaints;

•        Since the preliminary injunction, the FTC has been able to obtain material from the Receiver without the constraints of following the Rules of Civil Procedure[6];

---

[2] In October 2008, FTC investigator Menjivar studied sites featuring IWorks products, submitted information to a site offering a Grant Funding Solutions kit, printed pages, etc.  (Exh. 1800, Menjivar depo., pp. 14:25-15:6; 52:19-53:15.)  Mr. Menjivar said his investigation began as a Do Not Call inquiry, but that in the course of such investigation, he would look for any potential FTC Act violations.  (*Id.*, pp. 98:7-101:2; pp. 108:22-109:15.)

[3] Exh.1801, Jacobsen depo., p. 43:7-12; DE 1241-1, Exh. 1655, Tyndall depo., p. 48:16-18.

[4] Exh. 1802, Melton depo., pp. 17:20-18:11; DE 1241-1, Exh. 1655, Tyndall depo., p. 214:4-9.

[5] DE 1240-1, Exh. 1642, Marker depo., pp 26:21-27:7;  Exh. 1803, Porter depo., pp. 28:9-30:7.

[6] While it might be convenient for the FTC to obtain material this way, there is a cost, *i.e.,* the documents are not self-authenticating.  *Hussein v. Univ. & Cmty. Coll. Sys. of Nevada*, 304-CV-0455 JCM RAM, 2007 WL 4592225 at *1–2 (D. Nev. Dec. 28, 2007) ("To authenticate a document through production during discovery, the Ninth Circuit requires: 1) the producer of the document be identified; *and* 2) the party producing the document admit its production. . . . Accordingly, the documents defendants claim

2

•     For most of the case, the FTC did not have the inconvenience of opposing counsel.[7]

So, what does the FTC actually have?  It began the case with the declarations of 16 out of some 10,000,000 customers (0.0000016, or 0.00016 percent).[8]  Of those, the FTC no longer claims that three have any relevance; that leaves 13.[9]

Of the 13 remaining consumers, three purchased from a website that the FTC knows was not an "IWorks" website; that leaves 10.[10]

Of the 10 remaining consumers, fewer than half testified that they could say with

---

were authenticated by production during discovery, and which plaintiff neither admits production nor authenticity, are inadmissible." (Emphasis in original).)  A receiver, of course, is not a party or representative of any party, *N. Am. Broad., LLC v. United States*, 306 F. App'x 371, 373 (9th Cir. 2008), and the FTC's informal method of seeking material does not include the procedural protections that warrant self-authentication when material is produced by a party:  For example, the defendants would have had no knowledge of what material was requested, where it came from (if it was provided), its original format, etc.

[7] In many, if not most, FTC cases, defendants are unable to mount a meaningful defense. Cases often begin with asset freezes, after which defendants often cannot find or afford legal representation.  Thus, for example, in many of the FTC cases cited by the FTC, consumer declarants were not deposed, liability experts were not retained or deposed, etc. *See, e.g., FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1136 (9th Cir. 2010); *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011).  In a sense, FTC case law is recursive: A decision is issued without a meaningful defense presented. That decision is then cited in another FTC case, again for which no defense is presented, producing another ruling that is then cited in another case, etc. The same would have been true in this case had the FTC not brought in family members near the end, allowing some corporations to also become represented.  This case thus presents a rare instance in which the FTC's evidence is actually being tested. *See, e.g., FTC v. Enforma Natural Products*, 362 F.3d 1204 n.14 (9th Cir. 2004) (distinguishing prior FTC case in which FTC's expert testimony had been uncontroverted).

[8] DE 1262-1, Exh. 1426, Vigil Rept. Ex 11 (IW Rog 13 Final 06-16-10.xlsx).

[9] The three consumer-declarants not cited in the FTC's memorandum are Beatriz Redd, John Merrell, and Vincent Valenti.

[10] In his deposition, FTC investigator Jacobsen admitted that the FTC could not tie purchases on "GotBody.com" to IWorks.  Indeed, Mr. Jacobsen admitted that he chose not to attach or even produce the FTC's credit card records relating to GotBody because they "did not support the FTC's allegations." Exh. 1801, Jacobsen depo., pp. 143:20-148:21; pp. 150:8-151:21; *see also* 221:7-25 (did not include GotBody in list of sales figures allegedly attributable to IWorks-related sites).

certainty that there were no disclosures on the websites they visited.  Indeed, several testified that they did remember seeing disclosures, or that they believed the disclosures were "likely" there.[11]  Others testified so differently from their declarations (all drafted by FTC investigator Reeve Tyndall) as to invite substantial cross-examination at trial not only of the declarants, but of Mr. Tyndall.[12]

Given the dearth of customers to support its case, what about ex-employees?  IWorks had hundreds of employees, surely a smorgasbord for a governmental agency investigating a "massive . . . far-reaching . . . scheme."[13] This is what the FTC came up with:

• one ex-employee (Sara Marker), who lied on her resume, whose friend was fired by IWorks, who considers herself a witness for the government in the criminal case against

---

[11] *See* fn. 65, *infra*.

[12] For example, in two declarations, Mr. Tyndall wrote that an "IWorks"-related charge had put the consumers into their overdraft, which the consumers testified was not true (DE 1237-1, Exh. 1600, Bachman depo., pp. 95:2 - 97:14; 100:5 - 102:5; Exh. 1647, Miller depo., pp. 54:4 - 58:16).  In one declaration, Mr. Tyndall wrote that the witness said "I could not find any personal grants that I qualified for," but the witness testified that she was not actually interested in grants and did not attempt to look for any, Exh. 1804, Blohm depo., pp. 35:9 - 36:15, 40:16-21; pp. 42:7 - 43:15; 44:6-24.  In another declaration, Mr. Tyndall wrote that the witness was unemployed when she bought an IWorks CD and struggled to pay bills every month, but the consumer said she was only on a few weeks' leave from her long-term employer at the time, did not struggle every month, and in fact had no debt, DE 1238-4, Exh. 1620, Huffman depo., pp. 13:21-14:5; 24:17-25:10; 32:13-34:4.  In another declaration, Mr. Tyndall wrote that pages similar to the website viewed by the witness were attached, but the witness testified that Mr. Tyndall simply sent him webpages and he had no idea if they were similar, Exh. 1805, Cienfuegos depo., pp. 20:14-21:12.  In another declaration, Mr. Tyndall wrote that the witness had incurred charges after buying a product from an IWorks-related website, but the witness indicated she had actually bought it from some telemarketer, Exh. 1806, Redd depo., pp. 59:17-24; 40:16 - 48:23; 83:21-24; 91:4-92:18.  In another declaration, Mr. Tyndall wrote that FedGrantUSA had made unauthorized charges on the witness's credit card, but the witness was really a victim of an identity thief who had purchased many products from many different vendors, all of which was omitted by Mr. Tyndall, Exh. 1807, Merrell depo., pp. 31:1-14; 37:9-15.  As Mr. Merrell put it, Mr. Tyndall's draft of his declaration stated things more strongly than the witness believed, and Mr. Tyndall was "adding statements that weren't necessarily accurate."  *Id.*, pp. 25:6 - 26:11.

[13]      http://www.ftc.gov/news-events/press-releases/2010/12/ftc-charges-massive-internet-enterprise-scamming-consumers-out (FTC press release), accessed January 15, 2014.

4

IWorks – yet who admitted in her deposition that the order pages for IWorks products usually did have valid disclosures, contrary to the FTC's allegations[14];

•        another ex-employee (Tracey Kramm) who worked in the same department as her friend Ms. Marker, who lacked personal knowledge of most of IWorks' operations, who was so angry at being fired that she considered suing IWorks, and who turned another company in to the FTC after it did not hire her[15];

•        another fired employee (Chris Cox), hurriedly contacted by the FTC near the end of discovery, who agrees that the FTC correctly identified him as a "disgruntled" ex-employee – yet who also confirms that IWorks' order pages had valid disclosures, and that the one IWorks product with which he was familiar (AdWords) was a good product with which consumers could make money.  *See* p. 20, *infra*.

•        one other briefly mentioned ex-employee, Devan Partridge, who testified before a grand jury that he felt "intimidated" by the FTC in connection with his declaration.  DE-1000, Exh. B, § 19.

That is it for IWorks ex-employees.  So, what about experts?  The FTC offers two:

•        Dr. David Bauer regarding grants – who admits that all of his opinions hinge on a definition of "grant" that is completely inconsistent with how ordinary consumers use the word (a definition so narrow that even the well-known "Pell Grant" would not be considered a grant), and who ran illogical searches for grants.  (For example, in the context of credit card bills, he ran a search for "*re*payment" and not "payment" – but who has ever said, "I need to

---

[14] DE 1240-1, Exh. 1642, Marker depo., pp. 43:18-25;  18:11-12;  28:5-8;  39:9–41:2;  265:25-267:14.

[15] DE 1239-7, Exh. 1638, Kramm depo., pp. 37:4-2; 38:24.

*re*pay my credit card bill today?")  *See* p. 12-14, *infra*.

• Dr. Nathaniel Good regarding web site design – who admits that all of his opinions involve only "best practices" ideals, and who advised vendors in 2007 to put disclosures on the order page, not the landing page – contrary to what the FTC now argues.  *See* pp. 24, 30, *infra*.

The FTC's case is thus weak even before considering the defendants' expert witnesses, who thoroughly refute the FTC's allegations – largely without contradiction.  *See infra*.

## THE FTC HAS NOT ESTABLISHED THE ABSENCE OF ISSUES OF MATERIAL FACT, AS REQUIRED TO DEPRIVE THE DEFENDANTS OF A TRIAL.

## I.      COUNTS I, II, AND VI (grants)

The FTC's memorandum combines Counts I, II, and VI from its Amended Complaint; accordingly, these defendants do the same.

### A.      Factual Background of IWorks' Grant Program.

IWorks developed and marketed a grant program to fill a need, an inability to identify grants for which a consumer might be eligible among the thousands of public and private resources available.[16]  It distilled hundreds of thousands of pages of information on government (federal, state, and local), foundation and other private and corporate grants into a searchable grant database.   IWorks' idea was innovative:   At the time, there was no other resource available online that offered this scope of information.[17]

---

[16] DE 97, Payne dec., ¶ 3; see also DE 1240-2, Exh.1647, Miller depo., pp. 13:9-14:9 (was interested in online help to find grants because she had made inquiries and  no one knew where to tell her to start).  It also provided a service in rural areas, where grant resources such as Foundation Center books were prohibitively expensive for small libraries.  (Exh. 1803, Porter depo., pp. 127:23 - 128:20; Exh. 1808, Browning Rept., p. 5.)

[17] Exh. 1808, Browning Rept, p. 6.  The FTC says that, at one point, IWorks "illegally" imported Foundation Center material into part of its database.  Whether that occurred or for what period is

Unlike faux grant programs targeted by the FTC, IWorks invested substantial resources in its product.  It retained the services of Dr. John Porter, a certified grant writer and Executive Director of the American Grant Writers' Association.  Among the things that Dr. Porter was responsible for was regularly updating the site with information about grants available in the United States, and he did so.[18]

IWorks' grant program offered an instructional CD and enrollment in a member site with a searchable database, step-by-step instructions for completing grant applications, tips for successful applications, online assistance in the form of a chat feature, grant application templates, and other resources.[19]  In return for his services, IWorks paid Dr. Porter a salary from April 2007 through October 2010, in total, approximately $153,750.[20]

IWorks' member site offered a valuable service, one that Dr. Porter believed that IWorks could have charged $600 for, "definitely worth" $39 per month or more while a customer was searching for information.[21]

**B.    The FTC's allegations.**

The FTC's memorandum devotes the most attention to what it calls "IWorks' grant product scheme."  The FTC claims two types of deceptive practices:  1) "IWorks represented

---

immaterial:  the FTC has no standing to litigate potential copyright disputes.  The only relevance of its statement to this case is that, if true, it would reflect a broad scope of information in the database.

[18] *E.g.*, Exh. 1803, Porter depo., p.  160:11-20  (current as of September 18, 2007), p. 190:2-11 (May 17, 2008), p. 192:1-8  (September 9, 2008), pp. 190:23 - 192-23 - 193:5; p. 206:1-24 (late July-early August 2009).  Some resources periodically changed, as application periods expired, links changed, etc., but the site was kept reasonably up to date throughout this period.  *Id.*, and pp. 207:9 – 208:16.

[19] DE 097 Payne dec § 5; Exh. 1803, Porter depo., pp. 10:17 - 17-25.

[20] DE 097 Payne, ¶ 5; Exh. 1803, Porter depo., p. 202:4-12.

[21] Exh. 1803, Porter depo., p. 166:12-15, citing depo. exh. 926; p. 232:12-17, citing depo exh. 941.

that government grants were generally available for personal expenses and that consumers using its grant product were likely to obtain such grants," which representations "were false"; and 2) "IWorks Represented that consumers were likely to obtain grants such as those described in its testimonials," which representations "were false."

From the inception of this case, the FTC's claims have hinged on a contention that, to quote the FTC's expert, "there are no government grants to pay personal expenses."[22]  Given this focus, the FTC's motion challenges only websites that exclusively promoted government grants.  Stated differently, the FTC's memorandum does not challenge websites that promoted government *and private* grants.  (*See* FTC Mem., pp. 3-14.)

Because it cannot challenge sites that mention private grants (among other things, it would require an untimely amendment to its Complaint and expert designations) the FTC asks the Court either to ignore those sites, or to find that there were none (its memorandum is unclear on this point).  The FTC states (at p. 18:4, fn. 53):

> None of the active IWorks, Inc. grant product sales websites produced by third party PVI referenced "private" grants – the PVI sites focused entirely on government grants. See supra notes 47-48.  Similarly, of the ten grant websites captured by Federal Trade Commission investigators and the Better Business Bureau, only two included a reference to "private" grants in a central position – and one of those sites was Government Money Secrets.  See supra note 37.

Apart from the lack of foundation for PVI materials (*see* Objection, pp. 2-4), there are several problems with the FTC's assertion:-

First, the FTC's statement that only two of the pages captured by FTC investigators mention private grants "in a central position" would be amusing were the stakes not so serious: As noted below, FTC investigators admitted in their depositions that they were selective in what

---

[22] DE 026, Bauer dec., ¶ 3.

documents they printed or captured, the main criterion appearing to be whether it supported the FTC's allegations.  *See* fn. 45.  In other words, the FTC's citation to the websites it "captured" amounts to no more than, "Of the websites we chose to capture because they were favorable to the FTC, all were favorable to the FTC."  Indeed, the only reason why two of them were not was because, back in 2008, an earlier investigator (Mr. Menjivar) with a different philosophy about record-keeping, printed – and kept – websites that mentioned government and private grants on their face.[23]

This same defect exists with the FTC's claim of websites "captured" by the Better Business Bureau.  Again disregarding the lack of foundation for these documents (*see* Objection, p. 4), this assertion is perplexing:  the only BBB testimony in this case is from its Las Vegas representative, who said that the BBB conducts no investigations; it therefore seems unlikely that it would be capturing websites.[24]  If what the FTC really means is that, by combing through the "nearly 3,000" BBB complaint files, it was able to find and capture only a couple of websites that it liked, that ratio speaks volumes.

The FTC's decision to focus only on "government grant-only" sites, and not others from which purchases were made, explains the undisputed fact that – out of all of the brokers with whom IWorks contracted over the years, the FTC singled out and sought websites from only one of them, PVI.  Investigator Jacobsen admits that there were "reasons" for this, but that he "can't recall" what they were.[25]

Regardless of whether this type of outcome-oriented investigation by a powerful

---

[23] Exh. 1800, Menjivar depo., p. 51:2-12; 56:14-57:6, citing DE 26-0, Exh. 36, Att. B, pp. 1-3.

[24] Exh. 1809, Mettler depo., pp. 19:9-20:17; 62-73.

[25] Exh. 1801, Jacobsen depo., pp. 216:4-219:24.

9

governmental agency is appropriate, it does nothing to negate the existence of issues of fact. Although the number would have to be determined at trial, there is evidence that many, if not most, grant sales were from unchallenged websites (*i.e.*, sites that included "private" grants). This evidence includes:

•    As noted, in 2008, FTC investigator Menjivar visited websites advertising IWorks' grant product.  Those pages promoted both government and private grants.[26]

•    Although the FTC has not laid foundation for them (*see* Objection, pp. 2-4), web pages that the FTC itself gave its expert and used as exhibits say "private and federal grants".[27]

•    Several consumers sent FTC investigator Tyndall the grant CD that they received, which on its face was titled "Your Federal and Private Grant CD".[28]

•    If the FTC is permitted to use privileged documents in this case (*see* pp. 55-60, *infra*), numerous other examples of government "and private" sites are available.[29]

Because the FTC does not challenge sales from government+private sites, and has not established as a matter of law the absence of such sales (and in fact, the contrary is true), the FTC's motion must be denied.  It must also be denied for another, perhaps more fundamental reason:  The use of the word "government" on a grant website did not matter to consumers.  The grant consumers in this case testified – and told investigator Tyndall – that they did not care

---

[26] Exh. 1800, Menjivar depo., pp. 51:2-12; 56:14-57:6.

[27] *See, e.g.*, DE 1266-2, GR5; DE 1266-6, GR6; DE 1266-7, GR7; DE 1266-8, GR8; DE 1267-4, GR 17; DE 1267-5, GR 18; DE 1268-2, GR 42; DE 31-3, Exh. 116; DE 31-4, Exh. 117; DE 31-5, Exh. 118; DE-31-7, Exh. 120; DE 31-8, Exh. 121A; DE 31-9, Exh 121B, DE 32-0, Exh. 121C; DE 32-1, Exh. 121D, DE 32-3, Exh. 123A; DE 32-6, Exh. 124; DE 32-7, Exh. 125; DE 32-9, Exh. 127.

[28] DE 1241-1, Exh. 1655, Tyndall depo. pp. 105:23–106:5; 142:17-143:3.

[29] Exh. 1089: pp. 23, 179, 184; Exh. 1090: pp. 22-23, 28, 29, 37, 38, 39, 58, 71, 77, 141-142, 144, 146, 159, 160, 161.

about the source of a grant:  government, private, it did not matter to consumers.[30]

The FTC Act is violated only by material misrepresentations.  While the FTC sometimes argues that every statement is material (a circular proposition), that is clearly not the case when consumers say it was not.  Where all evidence is to the contrary, an issue of fact obviously exists as to materiality of the reference to "government."

Finally, there is a problem with the FTC's own record citation.  While the FTC says that "more than 400,000" sales were made from challenged websites (not taking into account cancellations, refunds, etc.), the actual record citation says, in the column for the websites accompanying those sales, "original unknown."[31]

1.    **Numerous government grants are available for personal needs.**  Apart from the foregoing, even the select websites challenged by the FTC do not support the FTC's claims.  The FTC's entire case (regarding the grant product) depends upon its mantra that "there are few, if any, government grants for personal expenses," that no government grants are "available for personal assistance," etc.  That is simply untrue:  There are billions of dollars, and thousands of government grants available and awarded to millions of individuals in the United States for personal needs, including education, home improvements, rental assistance, car repairs, medical needs, utilities, phone bills, energy savings, learning English, starting businesses in rural areas, help to individuals following a disaster, help to refinance a home mortgage, stipend for

---

[30] Exh. 1800, Menjivar depo., pp. 43:6-12; 50:7-11; 51:4-12 (websites printed off in 2008 included government and private grants); DE 1238-3, Exh 1619, Hong depo., p. 109:3-22; DE 1237-1, Exh. 1600, Bachman depo. pp. 62:7-63:1; Exh. 1804, Blohm depo., p. 45:11-20; DE 1238-4, Exh. 1620, Huffman depo., p. 42:11-23; Exh. 1810, Kizzie depo., pp. 41:18-24, 44:19-23; DE 1240-2, Exh. 1647, Miller depo., pp. 13:13, 14:19, 16:7-17; DE 1241-3, Exh. 1658, Waite depo., pp. 27:4 - 30:8; *see also* DE 1241-1, Exh. 1655, Tyndall depo., p. 130:17-23 (admitting that consumers told him they did not care where a grant came from).

[31] Exh. 1811, IW-14-00008 (IWorks spreadsheet responding to CID Interrogatory 14).

attendance at GED courses, grants for individuals studying or practicing the creative arts, etc.[32]

The only way the FTC can deny this reality is by using a technical definition of "grant" that is inconsistent with the common understanding of the word.  All witnesses in the case – including consumers and the FTC's own investigators – agree that ordinary people use the word "grant" broadly to mean money that does not have to be repaid, such as scholarships, or money saved (*e.g.,* low-interest loans), etc.[33]

Despite this undisputed evidence, however, the FTC insists that IWorks should have used a narrow definition that is known only to professional grant experts (and that applies *only* to federal grants).[34]  Every one of the FTC's factual assertions and references to opinions of Mr. Bauer, Donna Davis, John Porter, etc., all hinge upon this strained definition.  (*See* FTC Mem., pp. 19-22.)  But it is misleading for the FTC to say that Dr. Porter, for example, told IWorks there are no government grants for individual needs, without disclosing Dr. Porter's explanation that all such assertions were based on the technical meaning of grant – which he agrees is quite different from the ordinary consumer's definition.[35]  The same is true when the FTC cites to in-

---

[32] *E.g.,* Exh. 1808, Browning Rept., pp. 7-16; Exh. 1839, Browning depo., pp. 112:1-4.

[33] *E.g.,* DE 1237-1, Exh. 1600, Bachman depo. pp. 54:23-55:6 (grant would be monies given to you with no repayment required); DE 1238-3, Exh. 1619, Hong depo. pp. 67:19-68:9; 108:8-109:2 (includes subsidized loan); DE 1240-2, Exh. 1647, Miller depo., pp. 13:13-16:7 (money to help achieve her goal, including assistance or loans); Exh. 1810, Kizzie depo., pp. 44:24-45-3; pp. 51:23-52:2 (including Pell grant or other college funding); DE 1241-3, Exh. 1658, Waite depo., p. 28:4-14 (any federal assistance, including low-interest loans); *see also* Exh. 1808, Browning Rept., pp. 2-4 and Exh. 1812, Browning Rebuttal Rept., p. 2 (from interacting with more than 1,000 grantseekers, consumers construe "grant" broadly; federal government also uses broader definitions); DE 1241-1, Exh. 1655, Tyndall depo., pp. 128:10-129:2.

[34] The FTC says:  "A federal grant is an award of financial assistance from a federal agency to a recipient to carry out a public purpose of support or stimulation authorized by a law of the United States."

[35] Exh. 1803, Porter depo. pp. 72:5-13–74:8; 233:2-25; 291:8-21.

house counsel Mr. Gubler, who was himself referring only to the FTC's position.  (*Id.*, p. 21.)

In an unusual twist, the FTC seeks to penalize IWorks for using the commonly understood meaning of a word instead of a hypertechnical definition – a definition so narrow that even the well-known "Pell Grant" would not count as a grant.[36]  Words in advertisements must be judged by their ordinary meanings[37], and the FTC's position is baseless.

In its zeal to pursue IWorks, the FTC is also forced to take other positions that a factfinder could find patently unreasonable, such as:   1) Refusing to count anything that consumers in this very case were actually interested in and considered "grants", such as scholarships, low-interest loans, utility assistance, assistance with a start-up business in a rural area, etc.; and 2) refusing to count re-grants (disposition of federal money to another entity, which then administers it) as government grants – even though the FTC's expert admits that these re-grants are and should be considered federal grants.[38]

Armed with the FTC's counterintuitive definition of "grant," investigator Tyndall ran some searches on IWorks' member site while it was still live.  Unfortunately, what searches he ran is unknown, because for reasons that are undisclosed (but may be surmised), Mr. Tyndall chose to keep a record only of some of his searches.[39]

---

[36] DE 1237-2, Exh. 1601, Bauer depo., p. 75:10-19.

[37] *American Home Products Corp. v. FTC*, 402 F.2d 232, 236 (6th Cir. 1968) (FTC's "technical" definition of hemorrhoid was unrealistic; broader definition "is what the term means to the average person, and it is the average person with whom we are here concerned.")  By relying on this definition, the FTC is also forced to take a position that is both untenable and anti-consumer, i.e., that by definition, federal grants cannot help people with personal needs because doing so would not serve any "public purpose".   But any suggestion that helping individuals with education, job training, heating bills, accessibility, etc., does not serve a public purpose is untrue, *see* Exh. 1808, Browning Rept, p. 7.

[38] DE 1237-2, Exh. 1601, Bauer depo., pp. 68:4-69:11.

[39] DE 1241-1, Exh. 1655, Tyndall depo., pp. 70:20-71:19; 74:9-75:13.

What little information Mr. Tyndall can provide about his searches present cross-examination fodder for Mr. Tyndall at trial.  For example, when Mr. Tyndall's first search produced a grant for mobility improvements for disabled veterans (clearly a personal need), he did not then run any additional searches for "mobility," "improvement," "disabled," "handicap," or "handicapped," or even "veteran."[40]  He might have run searches for "aid" or other words, he admits, but if so, he did not keep the results.[41]

The FTC then hired a grant expert (David Bauer) who, by his own admission, focuses on grants for schools and has no experience with grants for individuals.[42]  Mr. Bauer ran a few searches on the IWorks site – unfortunately, with input on search terms from Mr. Tyndall.[43]  These searches included conjunctive phrases not commonly used by consumers, such as "credit card repayment," "debt reduction," and "medical expense repayment," none of which were mentioned by any consumers in this case.[44]   (For unknown reasons, Mr. Tyndall did not ask Dr. Bauer to run searches for subjects described by the consumers here; it can be inferred that Mr. Tyndall had already run such searches and decided they were not helpful to the FTC's case.[45])

---

[40] *Id.*, pp. 131-133:14-23.

[41] *Id.*, pp. 141-142:15-15.  This is important because, once the case began and a preliminary injunction was entered, IWorks' servers were seized and new searches could not be run, rendering it impossible to verify Mr. Tyndall's "investigation."

[42] DE 1237-2, Exh. 1601, Bauer depo. pp. 25:15–26-4, and DE 26-3, Ex. 40, Att. A (Bauer Resume).

[43] DE 1237-2, Exh. 1601, Bauer depo., pp. 63:8-64:7.

[44] DE 1237-2, Exh. 1601, Bauer dec, ¶ 38a.  Had Mr. Bauer run searches more consistent with consumers' described interests, he would have found, for example, udner "medical," 4,399 grants; "healthcare," 284; "housing," 1,110; "utilities," 18; and "bills," 46.  DE 097, Payne dec. ¶ 47.

[45] This inference is not speculative.  While Mr. Tyndall offers no explanation for why he chose not to retain search results on the grant site and other important aspects of his investigation, DE 1241-1, Exh. 1655, Tyndall depo., pp. 70:20-71:19; pp. 74:9-75:13, his colleague Mr. Jacobsen openly admits that he felt no reason to retain, or provide to the court, evidence that he uncovered that was not favorable to the

14

1

2        **2.    "Likelihood" of obtaining "government grants for personal expenses."**  The

FTC alleges that "IWorks, Inc. marketed its grant product through websites, blogs, and emails –

3

all designed to give consumers the impression that they were *likely* to get a government grant

4

for personal expenses if they signed up for the grant CD."  (FTC Mem., p. 10:16; emphasis

5

added.)  The FTC's only cite for that statement:  An admission by IWorks that "some of the

6

IWorks, Inc. grant websites represent that government grants *may* be available to pay certain

7

personal needs."  *Id.* (Emphasis added.)

8

        "May" is not "likely."  Nor, for that matter, are "needs" necessarily "expenses."  But no

9

matter how many times the FTC says – while citing the same few websites over and over – that

10

websites were "rife" with "bold statements" that "government grants are available for personal

11

needs," two facts remain true:  First, such statements are true (*see* pp. 11-14).  Second, even

12

early sites criticized by the FTC (for which foundation is lacking; *see* Objection at pp. 2-4) do

13

not support the FTC's allegations:   the sites say that purchasers "may qualify" for free

14

government funding, the government allocates billions each year to American citizens, that the

15

grant site included information (at that time) about more than 1,500 government grants, etc.

16

(FTC Mem., pp. 15-17.)  Those statements are true, and do not represent the likelihood of an

17

individual purchaser qualifying.  (Indeed, IWorks did not know individuals' circumstances or

18

interests.)  *Id.*

19

        In any event, except for the handful of examples acknowledged above, the FTC

20

produces no sites that say what the FTC wishes they said; the sites state, truthfully, that a

21

22

23

24

25

26

27

FTC.  Exh. 1801, Jacobsen depo. pp. 78-80, 85, 144:15-20; 147:1-148:10; 165:2-15; 178:2-24; 189:7-
191:25; 233:9-16.

28

purchaser may qualify.[46]   Absent such evidence, the FTC relies heavily on Grant-A-Day

testimonials for this and other claims (*e.g.*, FTC Mem., pp. 10-15), which is meritless – as

discussed below, such testimonials clearly indicated what they represented.  They were an

opportunity for members to win something; they did not purport to address the likelihood of

getting a government grant.

3.     **The Grant-A-Day Testimonials were substantiated and not misleading.**  In

Count VI, IWorks alleges that IWorks misled consumers into believing that they were likely to

obtain grants like the ones found in testimonials.  (FTC Mem., pp. 16-18.)  The FTC does not

dispute that most of the testimonial it researched were, in fact truthful recipients of the "Grant-

A-Day" program.[47] That program was established as a benefit to members of the IWorks grant

site, developed through a strategic partnership with a local non-profit organization, New

Frontiers for Families.  IWorks customers who purchased a grant membership were eligible to

apply for a grant from the Grant-A-Day Program, and given access to an online application.  As

the name suggests, a grant recipient was selected every day.[48]

From August 2007 to January 2010, the Grant-A-Day program awarded 836 different

grants totaling over $700,000.  These grants provided critical resources to struggling families

and the elderly.   For example, grants were awarded to help a disabled man pay for

chemotherapy (Grant No. 332); to help struggling families purchase heating oil (Grant Nos.

442, 830), avoid foreclosure on their homes (Grant Nos. 81, 100, 133,134, 144, 146, 314, 315,

---

[46] The FTC's memorandum, again, is challenging (and citing to) only those few sites that mentioned exclusively government grants, not those that also included private grants.

[47] The only testimonial mentioned by a consumer in this case was an image of a person indicating that grants (scholarships) were available for college.  DE 1238-3, Exh. 1619, Hong depo. pp. 80:20-25.

[48] DE 097, Payne dec., ¶ 15.

322 etc.) and pay medical bills (Grant Nos. 33, 35, 45, 60, 61, 65, 510, 511, 516, 585, 601, etc.); to fund a crisis center for battered women (Grant Recipient No. l3); and to help a single mother of three children to provide children's beds, stove and furniture (Grant Recipient No. 32).[49]

The FTC dismisses this valuable program by claiming that only .04% of IWorks site members received Grant-A-Day awards. This calculation is unsupported: The FTC appears to be using all purchasers as a denominator, regardless of whether they canceled during the trial period or ever applied for Grant-A-Day.[50] Moreover, Grant-A-Day testimonials typically said "Grant-A-Day," explained that the grants were only given to "one member" per day, and made clear that they were a selling point.[51] For example:

> **Exclusive to our Members: The Grant-A-Day Program!**
> This amazing program delivers a grant to one of our members EVERY DAY! We're the only Grant program that can do this. As a member of our site you are automatically eligible for the **Grant-A-DayTM** program.
> These are just some of the people we've been able to help. They're regular people just like you whom we've helped get money for bills, mortgages, tuition, home repairs and a variety of personal needs.[52]

Another landing page touted, "We guarantee at least one member of the Grant Search Assistant[TM] program will be awarded a personal needs grant every single day."[53]

There are numerous issues of fact as to the FTC's allegations about testimonials (which,

---

[49] DE 097, Payne dec, ¶ 16.

[50] If the FTC is going to assume that 100 percent of membership purchasers applied for Grant-A-Day, then it must also assume that 100 percent of membership read and understood the Grant-A-Day Program's provisions.

[51] DE 097, Payne dec, ¶ 16.

[52] *Id.*, exh. 5.

[53] *Id.*, exh. 4.

notably, are not supported by a single consumer in the case).   Furthermore, IWorks made reasonable efforts to police the use of testimonials by its brokers[54], raising additional issues of fact.  *See* pp. 40-49, *infra* (addressing (non)liability for broker websites).

## II.   THE FTC HAS NOT ESTABLISHED THE ABSENCE OF ISSUES OF MATERIAL FACT ON COUNT III ("Google Adwords/Adsense" products)

IWorks offered instructional programs to generate income through advertising in connection with search engines such as Google (collectively, the "Adwords" programs).  This program taught customers to create ads using AdWords and AdSense, provided guidance on ad placement, gave tips on driving online traffic through their websites to other sites, and offered similar advice.[55]  (AdWords and Adsense were, and are, advertising programs operated through Google; for example, AdWords pays commissions to web publishers in exchange for allowing Google to run ads for its advertising clients on those sites.)

The content for the Adwords program sold by IWorks was developed by Steven Holdaway, a search engine marketing expert who is certified as a Google advertising professional, a Yahoo search marketing ambassador, and is the author of *G Money Pro* and *G Money Pro 2: How to Get Rich With Google Adwords* (G Money Pro 2010).[56]

IWorks purchased the rights to host Mr. Holdaway's system on its member site, which Mr. Holdaway regularly updated.  Customers who paid the monthly subscription rate for web access received not only the program but also live customer support.  In total, IWorks paid Mr.

---

[54] *See, e.g.*, B. Payne email to all marketing partners, April 29, 2008 at Ex. 61 ("Testimonials must be verified and approved").

[55] DE 097, Payne dec. ¶ 20.

[56] Exh. 1813, Holdaway Rept., pp. 1-2.

Holdaway $210,000.[57]

Interestingly, the FTC's memorandum does not cite a single consumer who claims to have seen one of the challenged AdWords ads, who purchased from one of the challenged sites, or who is complaining about IWorks' AdWords product.  Although the FTC claims it has a relaxed burden of causation (*but see* pp. 61-65), the defendants are unaware of any FTC cases in which the FTC has failed to introduced evidence from a *single* consumer of the product.

This evidentiary gap is especially troubling because most of the program landing pages that were presented to consumers made no specific earnings claims at all.[58]  The few ads that actually did state earning potential are not known, as the "screenshots" the FTC has produced lack the foundation to purport to be accurate representations of what was ever produced by IWorks or its brokers.[59]

Assuming that the screenshots were accurate representations of the websites, there are two reasons that even the highest representations of income made on the screenshots were not misleading.  First, the FTC's record citation (fn 6) lacks foundation:  It is a statement made by FTC investigator Tyndall, who claims no experience with the online marketing tools provided by Google AdWords, and no foundation to opine whether the statements made regarding the AdWords programs were true.  Second, IWorks has detailed – and uncontroverted – testimony that the challenged representations were in fact true.  For example, Mr. Holdaway testified that:

       •    He had substantial training and expertise in working with Google

---

[57] DE 097, Payne, ¶ 21; DE 108, Exh 22, Mar. 22, 2007 email.

[58] DE Payne, ¶19; DE109, Exh 23.

[59] The problem with the images begins—and ends—with FTC investigator Tyndall.  In both his declaration submitted to support the FTC's motion and in his original declaration supporting the motion

AdWords.   This included being a Certified Google Advertising Professional, a Google AdWords Certified Partner and a Level 9 Official Google.com support user;

•        In high school, he made about $150 per week using Google AdWords. This increased to $3,000-$5,000 per week in college.   After college, he realized profits of between $30,000-$90,000 per month;

•        He distilled his principle of success into a handbook, and later into a program marketed by IWorks under various iterations, all deemed by the FTC as the "make-money" program;

•        Representations of income ranging from $200-$943 per day were reasonable, based on his experience and IWorks' years-long interaction with users of the product;

•        The results claimed in the solicitations were achievable by any individual capable of surfing and making a purchase on the internet;

•        "Anyone" could achieve such results, that is, it is "within the expectation of a reasonable consumer to make the amount of revenue stated within a reasonable time";

•        The term "Start Making Money Today" is accurate, as Holdaway had customers report making a profit the very first day.[60]

Mr. Holdaway's testimony underscores the value of the IWorks AdWords products and the accuracy of the representations concerning them.   Moreover, Chris Cox, an FTC witness and IWorks ex-employee, testified that he was familiar with the product, and that it was a good one

---

for preliminary injunction, Tyndall simply cites to IWorks sales numbers without properly associating those numbers with any actual website viewed by the public.

[60] *See* DepEx 1401, Holdaway Report, pp. 1-8;  Exh 1814, Holdaway Depo., pp. 36:14-37:24.

that consumers could make money with.[61]

Representations regarding the programs' potential were thus both substantiated and true. Tellingly, the FTC has no evidence to the contrary.  If the FTC could not locate an unhappy AdWords purchaser, surely it could have found an expert to rebut Mr. Holdaway's testimony – indeed, running a search for AdWords on Amazon.com produces *20 pages* of results.

Lacking any substantive basis to challenge Mr. Holdaway and the technical feasibility and reasonability of the representations made in the alleged websites, the FTC instead embraces a red herring and attacks testimonials.  Significantly, the FTC does not claim that the testimonials are false, but rather, implicitly, that there are too few of them.  (*See* FTC Mem., pp. 27-28.)  But testimonials are not required to vouch the truthfulness of marketing; they are simply one of many marketing tools.

Having failed to rebut Mr. Holdaway's testimony, the FTC finishes its unmerited attack with a miscitation of Mr. Holdaway's testimony, claiming that he could not "identify a single individual, other than himself, who made the type of earnings advertised on IWorks' sites." (FTC Mem., p. 21.)  That is not what Mr. Holdaway said.  He actually stated that he did not collate all of the information from those individuals who communicated with him, did not form relationships with them, and could not remember specific individuals' names.  Mr. Holdaway explained that he had visualized and formed his conclusions based on the numerous interactions he had with users of the product, even though he could not recall in the deposition the exact identity of the individuals with whom he communicated.[62]  If the FTC does not believe Mr. Holdaway's testimony that he interacted with hundreds of consumers, that is an issue that will

---

[61] DE 1237-5, Exh. 1608, Cox depo at 59:15–60:7; 140:11-15.

[62] Exh. 1814, Holdaway depo., pp. 168:20-169:25, p. 204:2-14.

1   need to be tried – but summary judgment is inappropriate.

2   **III.   COUNTS IV, V, and IX**

3

4   Counts IV, V, and IX allege "deceptive" and "unfair" practices based on alleged non-

5   disclosure or inadequate disclosure of offer terms.[63]

6   Analysis of this issue must begin with two basic concepts:  First, the FTC Act does not

7   override the general freedom of contract, or the long-recognized duty to read the terms of a

8   contract.  Rather, the FTC Act is implicated only by the exception to this rule, when a person

9   has been prevented, by "some fraudulent trick or device," from reading them.[64]

10   The FTC began this case by claiming that order pages for IWorks products (the pages on

11   which consumers enter their credit card information) did not disclose the terms of the offers,

12   particularly monthly charges.  DE 043, p. 25.  That contention has been debunked (or, at a

13   minimum, an issue of fact exists).[65]

14

15

16   ───────────────────────────────

17   [63] Counts IV and V claim "deception" based on disclosure of continuity/negative option programs for
18   IWorks products sold on brokers' websites.  Count IX alleges "unfair" practices involving IWorks
     products that third-parties sold as upsells on their websites.  The claims are similar, except that, with
19   "unfair" practices, the FTC must show not only that the consumer acted reasonably, but that the alleged
     harm could not be avoided.

20   [64] *Ford Motor Co. v. Pearson*, 40 F.2d 858, 867-68 (9th Cir. 1930) ("It is a fundamental rule that a
21   person in possession of all his faculties, who signs an instrument for the purpose of giving effect thereto,
     cannot evade the consequences of the document by merely neglecting to read it. If his signature is
22   secured by some fraudulent trick or device as to the context thereof, which prevents him from reading
     the document he signs, he may by proper action avoid the consequences which would otherwise result
23   from such instrument.")

24   [65] An FTC investigator made "undercover buys," and in each instance the order page had clear
25   disclosures.  *See* Exh. 1801, Jacobsen depo., pp. 108-123; 126:2-25; 127:23; 134-148, and Exhs. 964-
     968; *see also* DE 1240-1, Exh 1642, Marker depo., pp. 265:25-267:14 (order pages were usually
26   compliant); DE 1237-5, Exh. 1608, Cox depo., pp. 29:13-25; 89:25–90:22;  89:23–91:6 (order pages had
     disclosures; could almost always pull up actual order pages and show consumers the disclosures), and
27   Exh. 1266 (most order pages were similar to this page); Exh. 1815, Good Report, p. 21 (96 of 100 order
     pages provided by FTC had disclosures); *See e.g.*, DE 1237-6, Exh. 1609, DeWitt depo. pp. 31:17-32:24;
28   50:5-17, 24 (went back to website shortly after purchase and saw that disclosures were there); DE 1240-
     2, Exh. 1647, Miller depo., p. 67:1-17 (knew she had to read (and did read) and accept the terms and

That leaves the FTC with two weaker theories:  1) that the disclosures should have been on the landing page (the first page of a website on which a visitor "lands"); or 2) that the disclosures on the order page were inadequate.  Before addressing these contentions, however, the threshold issue of notice must be addressed.

**1.      Notice of the allegedly prohibited conduct was not provided.**  Before civil or criminal liability may be imposed upon a defendant, as a matter of due process, a government agency must first show that the defendant was on "fair notice of what conduct is prohibited," *i.e.*, that "a person of ordinary intelligence [has] a reasonable opportunity to know what is prohibited so that he may act accordingly."[66]

Both the FTC's and the defendants' experts have confirmed, in different ways, that a reasonably prudent vendor would not have had fair notice of what conduct was prohibited with respect to the content or placement of negative option disclosures, both before and after the FTC publication "DotCom Disclosures" was issued in 2009.  Defendants' expert Jeffrey Bloom opines that prohibited conduct was not discernable prior to 2009, and that DotCom Disclosures did not shed any badly needed light on the subject.[67]  The FTC's expert also confirms that a reasonable vendor could not, and cannot, discern what is required or not required for effective disclosures – at least not without conducting user studies and empirical evaluations, the very

---

conditions before she clicked on the submit button); DE 1241-3, Exh. 1658, Waite depo., p. 37:2-14 (believes disclosures were likely there); DE 25-6, Exh. 35 (IWorks website reviews noting appropriate disclosures on order pages); Exh. 1801, Jacobsen depo., pp. 189:13-190:16 (acknowledging IWorks website reviews noting appropriate disclosures).

[66] *See Stillwater Mining Co. v. Federal Mine Safety & Health Review Comm'n*, 142 F.3d 1179, 1182 (9th Cir. 1998); *U.S. v. Approximately 64695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008); *General Electric Co. v. EPA*, 53 F.3d 1324, 1328-29 (D.C. Cir. 1995).

[67] *See* Exh. 1816, Bloom Rept., pp. 3, 6, 7 and Exh. 1817, Bloom depo., pp. 35:13-22, 50:13-53:14.

23

1    need for which confirms the lack of notice.[68]

2         **2.    The law does not require disclosures on landing pages.**   Faced with evidence

3    that order pages for IWorks products nearly always had disclosures, the FTC now argues that

4    the disclosures should have appeared on website landing pages.   Although disclosures did

5    appear on about half of the landing pages[69], any contention that it was legally required is

6    factually and legally insupportable:  The FTC's own expert, Dr. Good, stated in a 2007 FTC-

7    sponsored conference that disclosures should be on the page where consumers enter their

8    financial information (*i.e.*, the order page); putting disclosures before then is too early for

9    consumers.[70]   The defendants' expert, Jeffrey Bloom, agrees:   placing negative option

10   disclosures on a landing page would be contrary to industry norms and consumer expectations.[71]

11        **3.    Disclosures on the order pages were not deceptive.**   With respect to the

12   adequacy of disclosures on a website, it bears reminding that the FTC Act prohibits only

13   *deceptive* advertising; it does not prohibit could-be-improved, or could-be-more-prominent, or

14   could-be-bigger, or could-be-a-different-color ads.  If disclosures are there, and are not (literally

15   or figuratively) concealed, vendors are entitled to assume that consumers will read them.

16        This principle is illustrated by *In re Vistaprint Corp Mktg. & Sales Practices Litig.*,

---

[68] Exh. 1421, Good 2007 remarks.  Dr. Good admits that, even applying his "best practices" approach, "it is a difficult question" of how to reach the ideal situation of notice; in 2007, he urged the government to "establish[] guidelines for notice construction and implementation based on empirical research[.]"  *Id.*, p. 3.

[69] DE 1239-7, Exh.1638, Kramm depo., p. 106:1-20; DE 1240-1, Exh. 1642, Marker depo., pp. 265:25-267:14.

[70] Exh. 1421, Good 2007 remarks, pp. 3-4.  Dr. Good admits that, even applying his "best practices" approach, "it is a difficult question" of how to reach the ideal situation of notice.

[71] Exh. 1816, Bloom Report, pp. 5-6 (explaining why placing negative continuity disclosures on landing page would be unreasonable, inconsistent with visitor expectations, and inconsistent with e-commerce standards), and p. 8.

MDL 4:08-MD-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009) aff'd sub nom. *Bott v. Vistaprint USA Inc.*, 392 F. App'x 327 (5th Cir. 2010).

In *VistaPrint*, consumers who made an initial purchase were directed to a page with a prominent offer for a $10 rebate. A boxed area provided space for consumers to enter their email address, in some cases, to answer two or three "survey" questions. The box also included a large "YES" button and a reference to "Offer Details" elsewhere on the page, *e.g.*, "By clicking 'Yes' I have read and agree to the Offer Details displayed to the left and authorize VistaPrint to securely transfer my name, address and credit card information to VistaPrint Rewards, a service provider of VistaPrint." Only by reading the "Offer Details" outside and adjacent to the boxed did area did the VistaPrint consumer learn that clicking "Yes" would enroll her in a negative option plan—a 30-day free trial membership, with fees of $14.95 per month thereafter. (An 8 ½ x 11" image of the VistaPrint website follows on the next page.)

As with iWorks's upsell enrollment process, VistaPrint consumers were not required to re-enter their credit card numbers for the additional item. Nor were the upsells the most prominent feature of the enrollment page—the $10 rebate offer and, on some pages, survey questionnaires, occupied the main content. Some consumers filed suit and multi-district class actions were certified on behalf of thousands of VistaPrint's alleged victims. *Id.*

The forum state had adopted the FTC Act as its standard for deceptive practices and, without deciding whether they would be binding, the trial court compared the FTC's "DotCom Disclosures" to the website. Among other things, the plaintiffs complained that the terms of the offer were to the left of instead of immediately above the submit button, were smaller print than other text on the page, were less prominent than other features on the website, etc. The district



**VistaPrint Rewards**

A special thank you with your purchase from ⟩⟩(| VistaPrint

**Thank You... please complete your survey and claim your reward —**

**$10.00 CASH BACK ON YOUR ORDER TODAY!**

Thank you for your purchase from VistaPrint today! Complete your 2006 Consumer Survey and VistaPrint Rewards™ registration to claim your $10.00 Cash Back Award on the VistaPrint.com purchase you made today (Click here for $10.00 Cash Back details). Plus, get all the money-saving benefits of VistaPrint Rewards, a premier entertainment savings program!

**MEMBER REWARDS**

   **Shopping and entertainment** — 20% Savings on gift cards purchased through VistaPrint Rewards for leading retailers such as Barnes & Noble, BLOCKBUSTER®, Circuit City® and many others — for a savings of up to $1,000 per year. Benefit Details

   **Dining** — 20% savings on gift cards/certificates purchased through VistaPrint Rewards for popular family restaurants, including Red Lobster®, Olive Garden® and more — for a savings of up to $160 per year. Benefit Details

   **Movie savings** — Movie tickets for $5.50. You may purchase up to 100 tickets annually through VistaPrint Rewards for many popular theaters. (For tickets redeemed in Manhattan, NY, it's up to $2.50 extra at the door.) Benefit Details

   **Online Travel Agency** — Up to 30% off hotel stays and car rentals, hundreds of dollars in airfare savings plus other great vacation deals through our exclusive Online Travel Agency.

**Offer Details:**
Simply click "Yes" to activate your trial membership and take advantage of the great savings that VistaPrint Rewards has to offer plus claim your $10.00 Cash Back. The membership fee of $14.95 per month will be charged by VistaPrint Rewards to the credit card you used today with VistaPrint after the 30-day FREE trial and then automatically charged each month at the then-current monthly membership fee so long as you remain a member. Of course, you can call toll-free at 1-866-243-6135 and speak to a VistaPrint Rewards member representative within the first 30 days to cancel – you will have paid nothing and owe nothing. Please note that by agreeing to these Offer Details you are authorizing VistaPrint to securely transfer your name, address and credit card information to VistaPrint Rewards, a service provider of VistaPrint. No matter what, the FREE $10.00 Cash Back is yours to claim! Remember, you can call to cancel at any time and you will no longer be charged.

**$10.00 CASH BACK!**

**2006 Member Survey**
Please complete your Survey below. Click on the answers you want and complete your information to claim your $10.00 Cash Back just for trying VistaPrint Rewards FREE for 30 days.

How do you make most of your travel-related purchases?
☉ Online   ○ Offline   ○ Both

Do you dine out at least once a month?
☉ Yes   ○ No   ○ Sometimes

Do you go to the movies at least once a month?
☉ Yes   ○ No   ○ Sometimes

Please enter the e-mail address you used to order from VistaPrint:

By clicking "Yes" I have read and agree to the Offer Details displayed to the left and authorize VistaPrint to securely transfer my name, address and credit card information to VistaPrint Rewards, a service provider of VistaPrint.

E-Mail
[          ]

Confirm E-Mail
[          ]

**Yes**

Click ONCE and wait.

No Thanks

⟩⟩(| **VistaPrint Rewards**

1 Participating vendors are neither sponsors, co-sponsors nor affiliates of VistaPrint Rewards. Gift card/certificate savings are an exclusive offer of VistaPrint Rewards and are valid only on gift cards/certificates purchased through VistaPrint Rewards. Please see back of gift card/certificate for terms and conditions of use. All vendor trademarks and copyrights remain the property of the individual vendor. VistaPrint Rewards uses vendor names, logos and any other vendor material by permission of each vendor. Please visit the VistaPrint Rewards website or call Member Savings for complete terms and conditions related to participating vendors.

2 Barnes & Noble is not a sponsor or co-sponsor of this promotion. Please see back of gift card for terms and conditions of use. Barnes & Noble is not liable for any alleged or actual claims related to this offer.

3 All travel is arranged by World Choice Travel. World Choice Travel is registered as a California Seller of Travel (Registration No. 2053272-50. Registration as a seller of travel does not constitute approval by the State of California); Nevada Seller of Travel (Registration No. 2004-0114); Florida Seller of Travel (Registration No. ST34200); and Washington Seller of Travel (Registration No. 602 119 764).

Confidential & Privileged:
Non-Public Information

Privacy Policy | Terms and Conditions

©2006 VistaPrint Rewards. All Rights Reserved.

**EXHIBIT** 34

court held that the disclosures satisfied FTC Act requirements, and on *de novo* review the Fifth

Circuit agreed.  As stated by the district court:

> "[A] a consumer may not decline to read clear and conspicuous terms that are provided "on the same webpage in close proximity to the location where the consumer indicates his agreement to those terms and then claim that the webpage, which the consumer has failed to read, is deceptive."

*VistaPrint, supra*; *see also Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236-37 (E.D. Pa.

2007) (electronic agreement enforceable where sufficient notice afforded); *Barnett v. Network*

*Solutions, Inc.*, 38 S.W.3d 200, 204 (Tex. App. 2001) (electronic agreement enforceable where

plaintiff had an "adequate opportunity to read and understand" the agreement); *Feldman v.*

*Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007) ("[F]ailure to read an enforceable

clickwrap agreement . . . will not excuse compliance with its terms."); *Burcham v. Expedia,*

*Inc.*, 4:07CV1963 CDP, 2009 WL 586513, at *2 (E.D. Mo. Mar. 6, 2009) (noting that failure to

read an online agreement "will not excuse compliance with its terms.").

The FTC's *own* examples – those it provided to Dr. Good and obtained through

"undercover buys," show that the disclosures were not deceptive.  *See, e.g.*, fn. 27, 65.  (In the

real world, of course, the text would be larger and viewed on a computer screen wider than 8-

1/2 inches.)     In all of these examples, the negative option disclosures were displayed in close

proximity to the submit button, and usually within the same boxed area as the submit button and

order information. (In virtually all other instances, the disclosures were directly adjacent to it.)[72]

The disclosures generally included (i) the fact of the trial program enrollment, (ii) the length of

---

[72] The FTC's own "DotCom Disclosures" state that the terms need only be "in proximity to" the submit button.  *See* Exh. 1818.  The FTC appears to now be attempting to replace the phrase "in proximity to" – upon which IWorks and other defendants relied – with the words "immediately above."  That is unfair – if the FTC intended "immediately above," why didn't it say that?  Allowing the FTC to retroactively rewrite its own guidelines is the antithesis of providing notice of prohibited conduct.

trial period, (iii) the fact that the consumer would be charged "thereafter" if she chose not to cancel, (iv) the amount of the charges, (v) the fact that the charges were monthly, and (vi) the fact that the charges would be billed to the same credit/debit card.

The disclosures were there, are in plain language, and a reasonable consumer cannot decline to read them and then complain that the website was deceptive.  (Of course, in this litigation, there are few, if any, consumers actually making such a complaint.)

The same is true of disclosures challenged in Count IX, those dealing with IWorks products sold on third-party websites.  While there might have been isolated incidents in which disclosures did not meet IWorks' standards, in the vast majority of instances when a product was paired with an upsell, the order page's terms and disclosures identified (i) the name of the upsell program, (ii) the length of trial period, (iii) the fact that the consumer would be charged "thereafter" if he chose "not to cancel," (iv) the amount of the charges, (v) the fact that the charges were monthly, and (vi) the fact that the charges would be billed to the same credit or debit card used for the shipping and handling charge.  And the upsell programs were highlighted in other ways. The order pages contained prominent call-out boxes with the names and logos for the upsell programs and a brief one-to-two-paragraph description.  In many cases, these call-out boxes repeated the length of the trial and the price of the membership.[73]

**4.**      **Other evidence suggests that the disclosures were adequate.**

**a.**      **Cancellation rates:**  A high percentage of purchasers (over 25% overall) canceled their memberships during the trial period.  As explained by the defendants' expert, this

---

[73] The FTC cannot show as a matter of law that the alleged harm was unavoidable by consumers.

figure extrapolates into a very high likelihood that a majority of others saw the disclosures.[74]

Indeed, the percentage of purchasers who cancelled their upsell programs during the trial period

was 29.1%, *higher* than the in-trial cancellation rate for the core (non-upsell) programs.[75] The

upsells were not secretly buried in the offer terms.

> **b.      FTC witness Chris Cox:**  Mr. Cox also confirms high cancellation rates
> (up to 80%) during trial periods, indicating to him that people saw the disclosures.  He testified
> that, while he was in customer service, customers called in seeking extensions of their trial
> periods, called in stating they had used the site and were willing to pay but were now calling to
> cancel because they were done; and called in admitting that they knew about the trial deadline
> but simply forgot to call.[76]

> **c.      Chargeback rates:**  The FTC has argued that allegedly high chargeback
> rates are evidence of nondisclosure.  While that assertion is factually inaccurate – *see* pp. 50-53,
> *infra* – if the FTC's own argument is applied, then the converse is also true.  *See id.*

> **d.      Adverse inferences:**  IWorks will be entitled to seek certain adverse
> inferences at trial:

> > **i.      Camtasia videos.**  The FTC recorded five "undercover buys"
> > using software called Camtasia that makes video of what was shown on screen.  This would
> > have shown how the order page looked, how the disclosures appeared on a live screen, the size
> > of the FTC's screen, where the so-called "fold" was, etc.  The FTC did not disclose this video in

---

[74] DE 1262-1, Exh. 1426, Vigil Rept., pp. 10-17.  Of course, there were consumers who complained that they did not understand the disclosures, but some high number of complaints was inevitable in light of the sales volume, no matter how clear the disclosures were.

[75] *Id.*, pp. 11-12.

[76] DE 1237-5, Exh. 1608, Cox depo., pp.37:22-38:18; 86:14-87:7.

its Initial Disclosures, thus indicating that the video did not support its claims (*see* F.R.Civ.P. 26(a)(1)(A)(ii).)  In July 2013, in the middle of the deposition of FTC investigator Jacobsen, the FTC disclosed for the first time that Mr. Jacobsen had made these Camtasia recordings and that the FTC had irretrievably "lost" them.[77]  It is a reasonable inference, both from the FTC's nondisclosure of these Camtasia videos and its failure to preserve them, that the videos would have been favorable to IWorks.

ii.     **Modified copies.**  In reproducing web sites, the FTC shrank the pages with a program called "snag-it," rendering them less legible, "blurry," etc.[78]  This is a serious misstep in a case where the appearance of such pages is highly relevant.  These pages can no longer be viewed in their original format; consequently, an adverse inference should be granted that the pages as originally viewed would have been favorable to IWorks.

iii.    **Litigation hold.**  On February 26, 2010, the FTC issued a litigation hold to IWorks.  DE 020.  For undisclosed reasons, however, the FTC did not issue its own internal litigation hold until nearly five months later, July 22, 2010.[79]  In the interim, FTC personnel failed to preserve information and documents, such as search results, etc.

iv.     **Failure to ensure consumer preservation of documents.**  FTC investigator Tyndall did not ask consumers to check their browser histories to pull up the actual websites they had visited, even when contacting them shortly after a purchase.  The FTC also did not tell consumer-declarants to retain documents; in one instance, because Mr. Tyndall had

---

[77] Exh. 1801, Jacobsen depo., pp. 27:25-28:1-5, 22-24, 29:2-17.

[78] Exh. 1800, Menjivar depo., pp. 125:18-130:9 (admitting that FTC's Snag-It program shrank images) and Exh. 1837, FTC-IWORKS 16169-16172 (comparing FTC's Snag-It image vs. FTC's printout of same page); Exh. 1801, Jacobsen depo., pp. 106:10-108:15.

not contacted him again for a year, the consumer threw away parts of his file that he had not sent to Mr. Tyndall.[80]  An adverse inference should be recognized as to the content of consumers' unpreserved browser histories and files.

The FTC cites to an expert, Dr. Nathaniel Good, for the proposition that disclosures for IWorks products were inadequate.  (FTC Mem., p. 34.)  However, there are several problems with that:

1.     Dr. Good admits that all of his opinions are from a perspective of "best practices," *i.e.,* creation of an "ideal" website experience, a "better" interface, etc.[81]  That is irrelevant:  not even the FTC claims that a company is required to adopt best practices.  Dr. Good also admits that, even now, it is a "difficult question" as to when a disclosure is effective. Indeed, he says there are different schools of thought on these subjects even among professionals ("we argue constantly").[82]

2.     Proper foundation has not been laid for most of the images reviewed by Dr. Good.  *See* Objection, pp. 2-4.

3.     Even assuming foundation, the "124 web sites" that Dr. Good claims to have reviewed were, in fact, just a couple of dozen websites printed over and over, with only minor changes in each version.[83]  There is undisputed testimony that a review of 50 or fewer (or even

---

[79] Exh. 1801, Jacobsen depo., pp.72:25–73:7.

[80] DE 1238-3, Exh. 1619, Hong depo. p. 45:9-24.

[81] Exh. 1819, Good depo., pp. 26:13; 27:1-10; 78:18; 141:12 - 143:13; 156:3.

[82] *Id.*, p. 153:4-13.

[83] See DE 1266-1277, Good Exhs GR1 – GR177 (numbers are not consecutive).

100) websites is "not even close" to a statistically significant sample[84] (and, of course, it was not random – the pages were chosen by the FTC).

4.     Dr. Good's attempted "recreations" of images given him by the FTC were all based upon a screen resolution of 1024x768, but Dr. Good's own cited source reveals that a significantly higher percentage (approximately 50%) of internet viewers used higher resolution at the time – which would bring more text above the outmoded "fold".[85]   Additionally, Dr. Good assumes that, back in 2009-2010, consumers had small screens and commonly used dual monitors; but that is not supported by consumer testimony in this case.[86]

5.     Dr. Good bases his opinions regarding best practices on two studies by one firm, the (un)reliability of which provides substantial cross-examination fodder.  The first of these studies is, by Dr. Good's own admission, a 2001 "dinosaur" (*e.g.*, using Netscape Navigator, 10-12 total participants typing in URLs because Google did not exist).  A follow-up study in 2011 involved another small sample and conditions that Dr. Good admits are inconsistent with real life consumer experience, and that failed to address the effect of iPhones and tablets on consumer expectations regarding scrolling.[87]

6.     The defendants' expert, Jeffrey Bloom, challenges Dr. Good's methodology, analysis, and conclusions.  Among other things, Mr. Bloom opines that:  In the examples cited by Dr. Good, the disclosures were prominently and conspicuously displayed, especially

---

[84] DE 1262-1, Exh.1426, Vigil depo., pp. 248:3-5.

[85] www.w3counter.com/globalstats.php?year=2009&month=1, cited in Exh. 1815, Good Rept., p. 15 n.20**,** accessed January 15, 2014.

[86] *E.g.*, Exh. 1819, Good depo. p. 89:4-11.  *See e.g.*, Exh. 1805, Cienfuegos depo., p. 28:3-8; DE 1237-6, Exh. 1609, DeWitt depo. pp. 13:23 - 14:17; Exh. 1802, Melton depo. p. 26:11-16.

[87] Exh. 1819, Good depo. pp. 53:2-8, 55:13-56:2, 56:18-57:1, 60:17-61:18, 86:1-5, 104:16–105:15.

compared to the common e-commerce practice of requiring a consumer to click on a separate "terms and conditions" link; that any suggestion that disclosures should be placed on landing pages misunderstands the purpose and consumer expectations of landing pages; and that Dr. Good is suggesting a "shopping cart-type" standard for negative options that would "depart[] from accepted and dominant market practice, and would not meet the 'Clear and Conspicuous' requirement and might very well confuse the consumer."[88]

### Response to FTC's "facts"

It is not possible within page limits to respond individually to every page and line of the FTC's text and 271 footnotes.  The defendants' evidence in itself shows an issue of fact.  However, many of the FTC's facts are also unsupported or unfair.  For example:

•     In several instances, the FTC conclusorily describes text on an image as "small, hard-to-read," "cramped," etc.  (*E.g.*, FTC Mem., pp. 31:12, 34:3, 33:1, 34:3.)  However, the FTC shrank its images, and in two different ways:  first, with their "Snag-It" software, and then to fit on 8 ½ x 11 sheets of paper.[89]

•     The FTC says that, "In numerous instances, IWorks, Inc. knew from its Compliance Team's Website Reviews that its forced upsells were not adequately disclosed." (FTC Mem., p. 37:9.)  The record citation for these "numerous instances" involves a single broker, who was terminated by IWorks.  More egregious, however, is that Mr. Jacobsen stated (repeatedly) in his declaration that IWorks reviewers "acknowledge[d]" that disclosures were inadequate, while admitting in his deposition that he knew the reviewers were applying purely

---

[88] Exh. 1816, Bloom Rept., pp. 10, 11, 18; Exh. 1816, Bloom depo., 35:2-12, 76:24–77:18, 92:2–96:8.

[89] *See* fn. 78, *supra*.

internal IWorks criteria, that might be "far above" what the law required.[90]

• The FTC claims that "consumer declarants confirmed that the upsells were not disclosed." (FTC Mem., p. 31:3.)  This statement is wholly unsupported: Three of the four consumers cited (Cienfuegos, Easterwood, and Melton) purchased from *GotBody.com*, which the FTC knows is not an alleged "IWorks" site.[91]  (*See* fn 10.)  The fourth (Ellis) testified that she remembered nothing about the website, its appearance, where she entered her information, whether there were boxes of information next to the submit button, or what the terms of the free trial were.[92]

• The FTC states several times as fact that consumers "had no choice," or "no way to decline," upsells.  (FTC Mem., 31:7, 36:16.)  But that presupposes one of the issues to be tried – whether the upsells were disclosed – which is hotly disputed.

• The FTC says that, of the approximately three million consumers who requested a cancellation or refund, IWorks noted that one-third of those "were 'not aware of the monthly charges.'"  (FTC Mem., p. 35:3.)  That is unsupported:  Mr. Tyndall admits that he does not know what the cited customer service codes meant, or the types of communications that would fall within this event code and, of course, someone seeking a refund may believe he is more likely to get one by claiming lack of knowledge than by admitting he changed his mind or was negligent.[93]

• The FTC says that "Mr. Gubler [IWorks' in-house counsel] also testified that the

---

[90] Exh. 1801, Jacobsen depo., pp. 194:14–197:3; 199:3–202:12; 209:16–210:16; 211:25–213:12.

[91] Exh. 1821, Ellis depo., pp. 11:11 – 12:11; 23:19 – 24:9.

[92] Exh. 1805, Cienfuegos depo., pp. 20:14 – 21:12; Exh. 1820, Easterwood depo., p. 14:6-10; Exh. 1802, Melton depo., p. 13:13-16.

most typical complaint from I Works, Inc. customers was that they did not see the disclosure, which meant they did not know they had purchased the product." (FTC Mem., p. 35:12.) That is not supported by the record cites.[94]

• The FTC says that disclosures are sometimes the "smallest font" on the page. (FTC Mem., 34:18.) The FTC does not explain whether other text is also the same size (for example, all text on a newspaper is "the smallest" when compared to the headline). Nor does the FTC claim that this is an uncommon – or even improper – business practice: The defendants invite the Court to examine any 10 random commercial websites – or 100, or 1,000 – to determine how many, if any, present information regarding terms the same visually as other material. The FTC's position is inconsistent with consumer expectations.[95]

• Finally, the FTC quotes Ryan Riddle, who stated that the use of negative options was "I Works, Inc.'s business model," and that the company "ma[d]e our money off of the clients that forget to call in to cancel, or simply don't take the time to read the disclosures and thank-you emails." (FTC Mem., p. 32:5) To some extent, that is true: Although negative

---

[93] DE 1241-1, Exh. 1655, Tyndall depo., pp. 40:2-41-10.

[94] Mr. Gubler actually said he did not recall receiving reports about customer service on a regular basis, wasn't asked to review customer service calls, and did not remember what kind of complaints customer service representatives might have been dealing with. DE 1238-1, Exh. 1617, Gubler depo., p. 260:4-22. Another cited witness, Ms. Kramm, testified that she never heard any customer service calls, and the "customer service" reports she purports to cite were actually the longest calls of the day, not typical calls. (DE 1239-7, Exh.1638, Kramm depo., pp. 50:3, 273:3-274:11, 245:11; DE 1240-1, Exh. 1642, Marker depo., pp. 246:1-249:3 (longest calls of the day). Mr. Jacobsen's cited declaration does state that he had access to "nearly 3000" consumer complaints – but (1) he fails to mention that this is actually a very small ratio of approximately .000008; (2) he does not identify what any of the complaints said; (3) the Better Business Bureau's own representative freely admits that "people lie," that no effort is made to verify or investigate BBB complaints, and that the filing of a complaint does not mean that a consumer has their facts right or acted reasonably; and (4) even Mr. Tyndall would not draft a declaration relying solely on a BBB complaint. (DE 1241-1, Exh. 1655, Tyndall depo., p. 222:18-22.)

[95] *See* Exh. 1817, Bloom depo. pp. 20:18-21, 72:9-17. (explaining how consumer expectations are formed in consideration of dominant e-commerce practices).

34

options are a convenience for purchasers, it is true that some consumers do forget to cancel, or disregard their duty to read disclosed terms.  This is really more a complaint by the FTC about negative options as a business model, but it is a *legal* business model – the same model used by Amazon.com, Ancestry.com, Audible.com, BeenVerified.com, Dropbox.com, eFax.com, EntertainmentWeekly.com, ESPN.com, GoToMeeting.com, Hulu.com, Lifelock.com, Match.com, Merriam-Webster.com, Microsoft.com, Netflix.com, NewspaperArchive.com, Realplayer.com, RealtyTrac.com, SiriusXM.com, Spotify.com, WeatherChannel.com, WeightWatchers.com, and virtually every other subscription or membership site on the internet.

Litigation is not a substitute for regulation – if the FTC wants to ban the negative option business model, it should ask Congress or go through the rule-making process.  It cannot ask this Court to do so.

**IV.     COUNTS VII AND VIII (positive articles, blog posts, reputation managers)**

In Counts VII and VIII, the FTC claims that IWorks violated the FTC Act by allegedly misrepresenting to consumers that certain "positive articles and other webpages" discussing IWorks' products were "independent reviews" and "endorsements" from consumers who used IWorks' products.[96]   Additionally, the FTC asserts that IWorks acted improperly by hiring third-party consultants to assist IWorks in managing information stated about it online.[97]

To support its motion, the FTC cites to only three pieces of evidence: the deposition and declaration of former employees Sara Marker and Tracey Kramm, and a single letter that was

---

[96] *See* Am. Comp. at ¶¶ 463-469; FTC Mem. DE 1280 at pp. 38-39; 58.

[97] *See* FTC Mem., DE 1280 at pp. 38-39, fn. 137-142.

sent to Visa on three separate occasions by IWorks and once by Jet Processing.[98]   As shown below, summary judgment should be denied because the FTC has failed to carry its burden of establishing that IWorks violated the FTC Act by publishing "positive articles and other webpages," hiring reputation management services, or posting in online forums, and there are genuine disputes of material fact regarding these issues.

IWorks hired reputation management company Reputation Hawk in the late fall of 2008.[99]   Reputation Hawk promotes online companies, including the goods and services offered, by providing truthful and positive commentary about the products and services in various online forums.[100]   Contrary to the FTC's implication, it is not unlawful to utilize reputation management services, nor does the FTC cite any authority so holding.   Indeed, reputation management is common in the online industry and well-known companies such as Disney use online reputation management to control online publicly available information.[101]

IWorks retained the services of online reputation management companies partly because IWorks did not market its products through search engine optimization.   As a result, negative online comments about IWorks were the first and usually only results that appeared if someone

---

[98] *See id.*, FTC Mem., DE 1280 at pp. 31-32, fn. 137-142.

[99] DE 1238-5, Exh. 1622, A. Johnson Depo., pp. 76:5-81:4; Exh. 1641, DE 1239-10, Exh. 1641, Leavitt Depo., pp. 60:10-61:17, and DepoExh. 1332; DE 1240-6, Exh. 1653, Riddle Depo., pp. 70:4-22; 142:10-143:10; Exh. 1822, IW-P-0013112 (December 15, 2008 email from Reputation Hawk).

[100] DE 1240-6, Exh. 1653, Riddle Depo. pp. 70:4-71:15; *see also*, Exh. 1823, Martin dec. ¶ 3 (""We were not asked or instructed to post false information. We were asked to write about grants and include the names of certain sites they own within the content. We received no instruction or information from IWorks to market any product or service."); Exh. 1824, Declaration of Josh Stanley at ¶¶ 3-4 (never "received instructions to produce false statements of supposed customers of IWorks ….   All companies (including some very prominent companies I have worked for) are forced to actively counter negative, misleading and false information on the Internet.")

[101] DE 1240-4, Exh. 1649, Muir Depo., pp. 69:18-69:19; DE 1240-6, Exh 1653, Riddle Depo., pp. 70: 4-9; 70:23-75:6.

36

was looking for information online about IWorks or its products.  IWorks wanted positive discussions to appear in those results as well.[102]

The FTC notes that IWorks "generated periodic reputation search reports that would track online comments about its products."[103]  That hardly seems surprising:  An online business – or any business – would be foolish not to monitor its online reputation.

The FTC also says that certain IWorks employees were "instructed not to click on any negative posts" and were only "permitted to click on positive posts" so that negative information would not be listed higher in search engine results.  *Id*. at fn. 141.  How is failing to make negative reviews more prominent unlawful?

Online postings generally provided no opportunity to fix claimed issues because identifiable client contact information was usually not provided.[104]  As such, it was easy for persons with pure or impure motives (customers, competitors, disgruntled ex-employees) to submit negative postings without a fair opportunity for the company to respond.  IWorks had legitimate and non-deceptive reasons for attempting to control its reputation online, and for attempting to decrease visibility of negative online content, or issues of fact exist in that regard.

The FTC also claims that Reputation Hawk "generate[d] fake blogs and news articles praising IWorks' products," and FTC witness Kramm goes so far as to speculate that IWorks specifically hired Reputation Hawk for that express purpose.[105]  These assertions are plainly

---

[102] DE 1240-6, Exh. 1653, Riddle Depo. pp. 70:32-72:23-75:6; *see also*, Exh. 1825, Kent Depo., pp. 12:14-17 ("Search engine optimization is configuring one's Web site, and links pointing to the Web site, to try to rank well in search results, such as Google search results.")

[103] FTC Mem., DE 1280 at fn. 140.

[104] *See* DE 1240-6, Exh. 1653, Riddle Depo., pp. 81:15-82:10.

[105] *See* FTC Mem., DE 1280 at 39, fn. 139.

disputed.  First, despite its years-long investigation, the FTC fails to adduce a single phony positive review, blog posting, or news article to substantiate its allegations.  More importantly, IWorks has adduced evidence that IWorks never instructed Reputation Hawk to make false or unsubstantiated statements about its products.  *See* fn. 100.

The FTC also has not attempted to adduce evidence of any relevant timeframes regarding the alleged articles, blogs, and website postings.  Timeframes are important on this issue because prior to December 1, 2009, the FTC had not issued any guidelines governing the use of testimonials or positive reviews.  On such date, its "Guides Concerning the Use of Endorsements and Testimonials in Advertising" (hereinafter "Endorsements Guidelines") went into effect.[106]  Sara Marker testified that, as soon as the guidelines were issued, employees were instructed to comply with them, and they did so.[107]

Citing solely to the deposition testimony of Ms. Marker, the FTC also argues that "some of I Works, Inc.'s positive posts were actually written by its own employees - a fact that IWorks, Inc. failed to disclose in these posts."  (FTC Mem. at 39, fn 142.)   That mischaracterizes the cited evidence and impermissibly draws inferences in the FTC's favor.

---

[106] *See* FTC Guides Concerning the Use of Endorsements and Testimonials in Advertising, 16 CFR Part 255.  The contents of the guide are not technically rules. According to the FTC's press release, they are "administrative interpretations of the law intended to help advertisers comply with the Federal Trade Commission Act; they are not binding law themselves."  *See* http://www.ftc.gov/news-events/press-releases/2009/10/ftc-publishes-final-guides-governing-endorsements-testimonials.  For the first time, the FTC suggested that bloggers or other individuals who "endorse" a product or service online may be liable for civil penalties if they make false or unsubstantiated claims about a product or fail to disclose "material connections" between themselves and an advertiser.

[107] DE 1240-1, Exh. 1642, Marker depo., pp. 232:3-233:7.  Notice of the FTC's Endorsements Guidelines was issued on October 5, 2009, and the guides became effective December 1, 2009.  Thus, to the extent IWorks was allegedly responsible for web content that did not comply with the Guide (which the FTC has not demonstrated), IWorks still was not violating the law.  In other words, if the conduct was already illegal, why would the new Endorsements Guidelines go into effect only prospectively?

Ms. Marker actually testified that IWorks employee Lara Clements was not posting her own "positive reviews," but rather she was "going in and making a comment on someone else's thread," identifying herself by her own name, and then "encourag[ing] people to call" in to IWorks' customer service line to voice any concerns with a purchase.[108]   There is a material difference between Ms. Clements fabricating "positive web pages" and simply accessing other people's existing negative online comments to ask them to call IWorks' customer service.[109]

The FTC has also failed to show any evidence of the breadth of dissemination of alleged positive articles, blogs, and web postings.  Under its own theory, the FTC must prove that any alleged misrepresentations were widely disseminated to the public at large (*see* p. 64, *infra*).  It has not adduced any evidence of how many (if any) consumers ever saw the articles, blogs or postings before making a purchase.[110]

In a similar vein, the FTC's allegations and minimal evidence on these counts are not tied to any specific IWorks products, and the FTC does not attempt to differentiate whether the articles, blogs and postings were tied to IWorks' grant or AdWords products.  The FTC also fails to identify any alleged monetary harm that it claims resulted from this conduct.  Summary judgment is, again, inappropriate.

**V.      COUNT X ("violations of the Electronic Fund Transfer Act and Regulation   E"**

---

[108] DE 1240-1, Exh. 1642, Marker Depo., pp. 191:22-192:19.

[109] Notably, the FTC omits the fact that Ms. Clements was authorized to pull up every negative link and, where possible, post a statement from IWorks General Manager Ryan Riddle stating that IWorks would resolve any concerns or issues if client would simply call in.  When she would post online, Lara would additionally provide a cell phone number that IWorks established specifically to take calls from negative posts.  It was Lara's job to answer the phone, check the voicemails and respond on IWorks' behalf to resolve the issues of consumers who posted concerns regarding purchases in online forums. *See* DE 1240-6, Exh. 1653, Riddle Depo. pp. 81:1-84:3.

[110] None of the FTC's consumers testified that they relied on articles, blogs, or website postings information in making a purchase.

39

**(Am.Compl. ¶¶ 473-479).**

With respect to the Electronic Fund Transfer Act (EFTA) and its Regulation E, the Amended Complaint appears to cite these only as a standard of conduct for which a claim might be pursued under the FTC Act.  In other words, the Complaint does not appear to assert violations of the EFTA *as an EFTA action under the EFTA.  See* Am.Compl. ¶¶ 473-479.  (The EFTA has its own enforcement mechanism.  *See* 15 U.S.C. § 1693m.)  Under no circumstances, then, can a judgment be entered against any defendant under the EFTA.  Additionally:

1.     The EFTA's requirements do not apply to credit card transactions.  *Sanford v. Memberworks*, 625 F.3d 550 (9th Cir. 2010).  In discovery, the FTC admitted that 99.5% of the challenged transactions in this case were processed via credit cards,[111] so an issue of fact obviously exists as to whether the FTC is entitled to judgment on at least 99.5% of Count X.

2.    The FTC's arguments regarding EFTA requirements assume the same lack of disclosures that is disputed above.

## VI.     THERE IS A DISPUTE OF FACT REGARDING IWORKS' LEGAL RESPONSIBILITY FOR ACTIONS OF THIRD-PARTY BROKERS.

### A.     Introduction regarding affiliate marketing.

IWorks marketed its products through "affiliate marketing":  A vendor (IWorks) contracts with third parties called "network brokers."  The network brokers, in turn, recruit and contract with "affiliates."  A broker receives a commission if a purchase is made by someone referred by one of its affiliates, who most commonly send traffic to merchant sites from their own websites, blogs, etc.  Affiliate marketing is used by thousands of online merchants such as

---

[111] *See* Exh. 1827, Plaintiff's Responses to Elite Debit's Interrogatories, #5, pp. 11-12.

1   Amazon.com, Target, Wal-Mart, Land's End, Best Buy, Home Depot, Microsoft, etc.[112]

2   **B.    Merchants are not vicariously liable for the alleged unlawful acts of third party advertisers or marketers absent an agency relationship arising from actual or apparent authority.**

The Ninth Circuit has not had the opportunity to consider the unique aspects of an internet-based business's liability for alleged violations of the FTC Act arising from websites that are created, hosted and controlled by independent third-parties.  However, the court has held generally that an entity is subject to vicarious liability for an agent's violations of the FTC Act performed in furtherance of the agency relationship.  *See FTC v. Stefanchik*, 559 F.3d 924, 930 (9th Cir.2009) ("[U]nder the FTC Act, a principal is liable for the misrepresentations of his agent acting within the scope of the agent's actual or apparent authority.")  The existence and scope of an agency relationship is generally a question of fact on which the plaintiff bears the burden of proof.  *Pacific Can Co. v. Hewes*, 95 F.2d 42, 46 (9th Cir.1938); *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir.2000).

Two principal forms of authority give rise to an agency relationship: actual authority and apparent authority.  "'[A]ctual authority refers to the power of an agent to act on his principal's behalf when that power is created by the principal's manifestation to him.  That manifestation may be either express or implied.'"  *Frankl v. HTH Corporation*, 650 F.3d 1334 (9th Cir.2011), *cert. denied*, 132 S.Ct. 1821 (2012); *Restatement (Second) of Agency* § 7 (defining authority); §§ 26-27 (standard for actual authority); *Sun Microsystems, Inc. v. Hynix Semiconductor Inc.*, 622 F.Supp.2d 890, 899 (N.D.Cal.2009) (federal common law of agency is guided by principles set forth in the *Restatement*).  "Actual authority consists of powers which a principal directly confers upon an agent, as well as those the principal causes or permits the agent to believe he or

---

[112] Exh. 1828, Kent Rept., p. 4.

1  she possess."  2A C.J.S. Agency § 133; *see also Restatement (Third)*, *supra*, § 2.01.

2      A distinct form of agency arises from apparent authority, which is "the power to affect

3  the legal relations of another person by transactions with third persons, professedly as agent for

4  the other, arising from and in accordance with the other's manifestations to such third persons."

5  *Restatement, supra*, § 8.  It arises when a third party, distinct from the principal or agent,

6  reasonably believes that the putative agent had authority to act on behalf of the principal and

7  that belief can be traced to the principal's own manifestations.  *See Id*. § 2.03 & cmts. c, d;

8  *NLRB v. Donkin's Inn, Inc*., 532 F. 2d 138, 141 (9th Cir.1976).

9

10      **C.   IWorks's brokers and marketing partners who hosted websites advertising
         IWorks's core products and upsells were not agents of IWorks and did not
         act within the scope of their authority if they allegedly violated the law.**

11

12

13          i.   Brokers and affiliates who created and hosted landing and order pages for
               the sale of IWorks's core products.

14

15      The FTC's memorandum (RP. 30-36) discusses claimed violations of the FTC Act that

16  are based upon an alleged failure to disclose or adequately disclose the material terms of offers.

17  As the FTC acknowledges, however, after 2007, the vast majority of the websites that marketed

18  and sold IWorks's core products were not created, hosted, or operated by IWorks; rather, third

19  party brokers and their affiliates who had no direct relationship with IWorks maintained control

20  over those sites.   The FTC's memorandum presumes, without analysis, the imposition of

21  vicarious liability upon IWorks for the conduct of these third parties.

22      Apart from the FTC's failure to brief the threshold element of agency (which would be

23  unfair to address for the first time in a reply), issues of fact would exist in any event.  IWorks

24  contractually prohibited the network brokers, and in turn, the affiliates from violating applicable

25  legal requirements and IWorks's own compliance standards.  IWorks provided information to

26  network brokers regarding the marketing message, the advertising content and the product,

27

28

including what was and was not permitted to be stated about the product. IWorks also maintained a commercially reasonable monitoring program to make sure that brokers/affiliates were following its requirements. *See* pp. 46-49, *infra*.

To the extent any sales sites lacked adequate disclosures and/or contained representations that the FTC alleges to be deceptive, such alleged deficiencies were the result of brokers or affiliates failing to follow IWorks' guidelines. In affiliate marketing, vendors can demand, encourage, and penalize, but they ultimately do not have the ability to control what pages are presented to consumers through the brokers' servers.

Nor are they automatically liable for the acts of non-agent independent contractors. Rather, courts decline to hold a principal responsible for unauthorized, uncontrolled acts of its independent contractors, and especially for its "even more remote subcontractors." *People v. Direct Revenue, LLC*, Index No. 401325/06 (N.Y. Sup. Ct., May 20, 2008). In *Direct Revenue*, for example, a producer of software that generated pop-up ads geared to a particular consumer's internet usage contracted with third party distributors for those pop-ups, who then in turn arranged for subcontractors to disseminate the ads. The court found these distributors to be "independent contractors," and reasoned that a "principal is generally not liable for the acts of an independent contractor because of the lack of control over how the contractor's work is performed." Slip. Op. at 9 (citing *Chainani v. Bd. of Educ.*, 87 N.Y.2d 370, 380-81 (1995)).

The court further stated that "[n]either may the principal be charged with the conduct of even more remote subcontractors." *Id*. Direct Revenue was "not authorized or obligated to control" the work of the third parties, "particularly since many of them additionally acted as distributors for various other contractors." *Id*. at 9-10. And even though the pop-up ads were all initially generated by Direct Revenue, "mere participation in the installation [of the software]

43

is insufficient [to establish liability], absent proof of involvement in the original deceptive conduct which induced the installation." *Id.*

Moreover, "allegations that [Direct Revenue] had general and/or constructive knowledge of some distributors' wrongful practices [were] insufficient to impose liability." *Id.* (*citations omitted*). The court recognized Direct Revenue's efforts to remedy problems caused by its contractors and subcontractors, appreciating that "in those few instances in which [Direct Revenue] obtained actual knowledge of a distributor's misconduct, it took significant steps to modify its procedures." Merely because Direct Revenue "may have benefited financially from its relationship with the distributors before remedial measures were implemented," *id.* at 11, did not make it liable for the acts of the third parties.

In *U.S. v. Cyberheat, Inc.*, 2007 WL 686678 (D.Ariz. 2007), the Department of Justice "on behalf of the Federal Trade Commission" sued Cyberheat, Inc., alleging violations of the CAN-SPAM Act of 2003 arising out of emails that contained sexually explicit images and content. The Government sought summary judgment, arguing that Cyberheat was liable for the conduct of certain marketing affiliates who sent the allegedly the emails and received commissions from Cyberheat. *Id.* It argued that Cyberheat "did not screen affiliates, supplied affiliates with pornographic promotional materials, did not monitor or oversee its affiliates' promotional activities, and did not readily terminate affiliates after complaints of uninvited sexually explicit spam." *Id.*

Cyberheat argued that there were questions of fact regarding whether the affiliates were in fact agents for whose conduct it was vicariously liable. Cyberheat cited evidence of disputes regarding "whether it actually allowed its affiliates to use its marketing tools in illegal emails, reflecting direct evidence of knowledge/intent; whether any terminated affiliates were ever

44

reinstated; whether it was feasible for Defendant to monitor the activities; and, whether there was affirmative consent to 21 of the purportedly violative emails." *Id.* at *11.

The court agreed with Cyberheat, noting that "Cyberheat's ability to control, monitor and supervise affiliates is a fact question." *Id.* at *12. "The question of agency is a factual matter," the court observed, "and, if any legally sufficient evidence of an agency relationship is produced, it must be submitted to the fact-finder." *Id.* at *13. Issues of fact also existed as to whether Cyberheat had "[n]otice of the violations …and whether [Cyberheat's] response to the notice of the affiliates' violations was reasonable under the circumstances[.]" *Id.* at *14. Summary judgment was denied even though the Government adduced evidence "that Cyberheat received information that the affiliates were violating the Statute and then did not follow their own promise to terminate violating affiliates." *Id.*

Further guidance regarding liability for affiliate marketers' actions was recently provided in *1-800 Contacts, Inc. v. Lens.com*, Inc., 722 F.3d 1229 (10th Cir.2013). In that case, Lens.com sold contact lenses online competing with other online vendors such as the plaintiff 1–800 Contacts, Inc. Like IWorks, Lens.com used affiliate marketing to send customers to Lens.com's website. 1-800 Contacts later sued Lens.com for alleged trademark violations based on some affiliate marketers' use of allegedly proprietary keywords in various online advertisements. The trial court granted summary judgment to Lens.com, holding that it was not responsible for its affiliates' claimed misconduct.

The Tenth Circuit affirmed, noting that "[v]icarious liability arises when common-law principles of agency impose liability on the defendant for the infringing acts of its agent." *Id*. at 1249. 1-800 Contacts argued that the affiliates were agents of Lens.com, and Lens.com conversely argued that "that its affiliates "ha[d] no authority, apparent or actual, to act on behalf

of Lens.com," but the Court declined to resolve the issue.  "The issue is not whether [the affiliate] had authority to act on Lens.com's behalf at all, but merely whether he had actual authority to publish an ad" that violated the law by infringing upon a trademark.  *Id.* at 1251. Even assuming *arguendo* that the affiliates were agents of Lens.com, they did not have specific authority from Lens.com to violate 1-800 Contact's trademark, the court concluded, and Lens.com could not be held liable for the claimed violation.  *See also Tiffany Inc. v. eBay Inc.*, 600 F.3d 93 (2nd Cir.2010) (eBay's general knowledge that its service was being used to sell counterfeit goods was insufficient to impose liability, even though eBay received commissions on sales; question was whether eBay took steps upon being notified of specific violations).

The defendants' expert has opined that, if the factfinder finds true at trial Iworks' cited evidence of monitoring – not perfect, but reasonable – then IWorks met the standard of care in the industry.  *See* fn. 125, *infra*.  Issues of fact exist as to whether actual or apparent agency existed, which the FTC must prove individually for each challenged broker.

>    ii.    Marketing partners who sold IWorks's products as upsells in connection with the marketing partner's own core product.

Like its contracts with the network brokers, IWorks's agreements with the marketing partners required websites and advertisements to comply with the law and with IWorks's internal standards, which IWorks understood to be more stringent than legally required.[113]  (As noted below, brokers and sales agents frequently complained that IWorks's standards were unnecessarily stringent.[114])

Marketing partners had independent businesses and products of their own that were

---

[113] *See e.g.* Exh. 1084 pp. 1-7 (Skunk Works marketing agreement); 8-11 (addendum to Skunk Works marketing agreement); *see also* pp. 59-60, *infra* (IWorks believed its standard exceed the law).

[114] *Id.*

46

distinct from IWorks's products.  Thus, for example, the FTC's cited consumers described purchasing products such as dietary supplements (including acai berry pills (DeWitt and Ellis) and EstroPause (Easterwood)), health bars (Melton), and sports hydration drinks (Cienfuegos), none of which are claimed to be IWorks products.  The fact that IWorks's marketing partners operated their own businesses and sold unrelated vendors' products undercuts any contention that IWorks controlled the marketing partners' sites.

The FTC cites to evidence that, for certain marketing partners who sold IWorks's products as upsells, IWorks provided merchant processing and customer service for the marketing partner's product.  But the fact that a company is able to sell its customer service services does not mean the company is now controlling the buyer.  Under the FTC's theory, vendors would be unable to market services to entities who also happen to be third-party marketers for fear of suddenly imposing liability on themselves that would not otherwise exist.

Moreover, as the FTC concedes, IWorks did not perform customer service or merchant processing for all of its marketing partners; it had numerous marketing partners between 2006 and the cessation of its business, but the FTC cites only two marketing agreements.  It has not met its burden of showing an undisputed agency relationship between IWorks and each of its marketing partners.

> **D.    There is a genuine dispute of material fact regarding whether IWorks utilized reasonable compliance efforts with respect to its affiliates and marketing partners.**

Three of the main network brokers with whom IWorks contracted were: V.O. Media, Cathexis and PVI.[115]   IWorks did not pay its affiliates directly or even know who they were;

---

[115] DE 1238-8, Exh. 1626, J. Johnson depo., 251:1-7

IWorks paid the network brokers, and the brokers paid their affiliates.[116]  IWorks' typical broker contracts provided that the broker or affiliate had the responsibility for its own website, and that IWorks bore no such responsibility; similarly, IWorks' agreements with marketing partners who sold IWorks' products as upsells typically provided that the upseller would abide by all federal and state laws, rules and regulations.[117]

As discussed further below, IWorks maintained a compliance team headed by in-house attorney Philip Gubler.  IWorks communicated its expectations regarding compliance to brokers on an ongoing basis, through marketing agreements, frequent email communications, telephone and in-person discussions, and a document called IWorks Compliance Rules.  IWorks also sent research regarding the FTC Act, the FTC's "DotCom Disclosures," and relevant FTC releases as well as case law interpreting the FTC Act.[118]

In 2008, IWorks launched an inventive tool for policing brokers and marketing partners: IWorks required these entities to place a JavaScript tracking pixel on their landing and order pages; if a customer placed an order through the website, the corresponding URL would then be automatically forwarded to IWorks.  IWorks employees could then access the URLs and review the sites, notifying brokers and marketing partners of concerns the same day and in bi-weekly

---

[116] *Id.*, 40:22-25

[117] Exh. 1829, Marketing Agreement Addenda (CJ-IWORKS-0986-87, 1005-08) (PVI, Cathexis and Virgin Offer addendums prohibit changes or affiliates from violating the law, and impose responsibility on brokers and affiliates for website content.)

[118] DE 1238-8, Exh. 1626, J. Johnson Depo., 76:18-77:6; 81:5-82:21 and Depo.Exh. 1289 (compliance rules); DE 1238-1, Exh. 1617, Gubler depo., 17:17-19:9.  IWorks felt it was necessary to provide this level of detail because when brokers and affiliates contended that IWorks was being too strict and that its requirements went beyond what the law required, IWorks wanted to show them why it was requesting changes.  *Id.*

summaries.[119]

IWorks generally imposed phased penalties for brokers who violated, or allowed their affiliates to violate, IWorks requirements. It would seek voluntary compliance, then issue written warnings, withhold payment, reject sales, and finally, terminate the relationship.[120] For example, Jeremy Johnson personally spoke to the owner of one broker, Cathexis, and asked him to resolve some reported IWorks' concerns. When that did not occur to Mr. Johnson's satisfaction, IWorks terminated the relationship with Cathexis.[121] IWorks also terminated marketing partner Viable upon learning of problems with its website, unilaterally cancelling tens of thousands of viable sales.[122] On another occasion, IWorks learned that another marketing partner ("That's It Media") was showing pages to IWorks that were consistent with IWorks' standards, but then materially changing them after receiving approval. IWorks denied payment and terminated the contract.[123]

"There is a practical limit to what a merchant can do to 'police' their affiliates." No merchant with any significant affiliate marketing program (*e.g.*, Amazon has 2 million affiliates) can be expected to control all of the activities of its advertising partners.[124] It can

---

[119] *See, e.g.*, Exh. 1830, D. Partridge (IWorks) email to J. Lund (V.O.), Mar. 26, 2009 [IW027505-13].) Ironically, the FTC criticizes IWorks because brokers did not always meet this requirement, but as FTC investigator Jacobsen said, he was not aware of any other vendor even attempting this voluntary type of monitoring program. Exh. 1801, Jacobsen depo., pp. 176:17-177:3.

[120] DE 1238-8, Exh. 1626, J. Johnson depo., pp. 87:15-88:19; DE 1238-1, Exh. 1617, Gubler depo., pp. 125:21-127:6.

[121] DE 1238-8, Exh. 1626, J. Johnson depo., pp. 88:10-90:15.

[122] *Id.*, 55:24-59:4; 88:10-18; 104:11-105:8; Exh. 1294; DE 1238-1, Exh. 1617, Gubler depo., p. 26:15-23.

[123] DE 1238-8, Exh. 1626, J. Johnson depo., pp. 122:24-123:20 and Exh. 1302.

[124] Exh. 1828, Kent Report at p. 7; Exh. 1825, Kent depo., pp. 113:14-114:1.

49

only be expected to reasonably try, and to take reasonable steps when it learns of a violation. The defendants' online marketing expert has testified, without contradiction, that the efforts described above would be reasonable under the circumstances and under relevant industry standards[125], and summary judgment is inappropriate.

## VII.   THE FTC'S OTHER "INDICIA" OF FRAUD ARE DISPUTED.

The FTC asserts some additional facts that it does not claim to violate the FTC Act, but instead offers as "indicia" of fraud.  In this sense, the FTC seems to be premature; this type of evidence is typically more appropriate for trial than a motion for summary judgment.  But in any event, the FTC's facts are disputed.

### A.   Chargeback rates

The FTC cites *FTC v. Grant Connect, LLC,* 827 F. Supp.2d 1199, 1222 (D. Nev. 2011) – one of the cases in which no contrary evidence was offered by the defendants – for the proposition that a chargeback rate exceeding a standard voluntarily adopted by card associations (1%) is an indicium of fraud.  Regardless of whether that is so, the FTC's argument is flawed:

The FTC uses percentages from narrow windows of time and falsely implies that the percentages were the same throughout the challenged period (January 2006-December 2010). Thus, for example, the FTC fails to mention that, in 2005-2007, IWorks' overall chargeback rate was under 1% for nearly this entire period.  Even through the end of 2008, the overall chargeback rate remained at 1.4%.  In 2008, when the level of credit card fraud was at its steepest incline, chargebacks still did not exceed 3.34% overall.[126]

---

[125] Exh. 1828, Kent Report at p. 9; Exh. 1825, Kent depo., 116:15-117:14.

[126] Exh. 1831, Payne Second Dec., ¶¶  5-6, and ex. C and D (chargeback history); DE 1262-1, Exh. 1426, Vigil Report, p. 19 (Summary of Total Chargebacks Compared to Total Gross Revenue).

Even in the periods where chargeback rates crept higher than 1%, to a great extent it was caused by growth in certain types of fraud, well known in the internet marketing industry, that are unrelated to the clear and conspicuous nature of website disclosures. Those included:

1. "Credit card" fraud: Credit cards are often tested by identity thieves by making small online purchases, such as the shipping and handling charge on an IWorks CD, the verify whether the credit card is working. These fraudulent charges then often escalated to chargebacks from customers who were unaware of even the initial purchase, let alone the monthly membership accompanying that purchase[127]

2. "Affiliate" fraud: Affiliates provide credit cards to individuals to make purchases, thereby generating commissions for the affiliates. These hired purchasers then not only request a cancellation or refund, but also do a chargeback so that the credit card retains its balance for additional purchases. These purchases were often evidenced by a "customer" who would buy every product sold by IWorks within a short period of time, or repurchase the same product after obtaining a refund.[128] Throughout 2009, approximately 60% of IWorks' chargebacks were attributable to affiliate fraud.[129]

3. "Friendly" fraud: With inaptly named "friendly" fraud, consumers who knowingly made purchases – and who had even used the product or service – took advantage of a change in credit card chargeback procedures whereby cardholders could now dispute any charge by simply clicking one button. With this change, friendly fraud chargebacks rose

---

[127] DE 1240-6, Exh. 1653, Riddle depo., p. 59:3-16; *see, e.g.,* Exh. 1807, Merrell depo., pp. 28:5-13, 33:2-36:15 (victim of identity theft did not know about any purchases).

[128] DE 1240-6, Exh. 1653, Riddle depo. pp. 95:15-96:25; Exh. 1828, Kent Rept., p. 11.

[129] DE 97, Payne Dec. ¶32.

1    dramatically throughout the online industry.[130]

2          It was only when these types of fraud escalated in the online industry in late 2008-2009

3    that IWorks' chargeback rate really exceeded levels that were unworkable, and it became

4    evident that brokers and affiliates simply could not be controlled in this market without

5    separating each product into its own processing account in order to identify brokers and

6    affiliates who were causing the most chargebacks.[131]

7          The FTC's citation to chargeback figures is also misleading in other ways:

8          1.     The FTC's figures artificially inflate rates for products involving monthly

9    memberships or charges:  With a single customer who claims not to have read the disclosures,

10   or whose identity was stolen, a chargeback of two monthly payments would be double counted

11   when, in fact, it was a single purchase.  That is different from a company that sells a single

12   charge product and then faces one chargeback.

13         2.     When the percentage first exceeded the 1% ratio, IWorks developed

14   filters to reduce third-party fraud (and thereby chargebacks).  Among other things, these filters

15   a) blocked customers from recharging for multiple products just to improve sales for a particular

16   affiliate; and b) identified and blocked carding attacks (where individuals test a website with

17   consecutively numbered credit cards until they find a combination that works).  These measures

18   drove chargebacks back down below 1% in 2007 and into 2008.[132]

---

[130] Exh. 1832, CJ-IWORKS 00751-752; Exh. 1828, Kent Rept., p. 10.

[131] Exh. 1831, Payne Second Dec. ¶¶ 3-4, ex A and B; DE 1238-8, Exh. 1626, J. Johnson depo., pp. 41-49; DE 1240-6, Exh. 1653, Riddle depo., pp. 273:16 - 281:13.

[132] DE 1238-8, Exh. 1626, J. Johnson depo., pp. 41-49; Exh. 1831, Payne Second Dec., ¶¶ 9-12, and ex F (showing over 1,385,000 sales blocked using IWorks fraud filters, each of which was blocked because there had been a previous, unblocked purchase that included duplicate products (439,000), chargebacks (87,000), refunds (79,500), cancelled at trial (42,700), and other duplicate fraud filters)).  Most of these blocked charges would be accompanied by a previously fraudulent charge that was undetected.  *Id.*

3.      The FTC tries to lump a calculation of IWorks's chargeback ratio in with IWorks's refund ratios, as if the two concepts are the same.  But the evidence supports a contrary inference, that customers who called to request refunds understood the terms and conditions of the contract they entered and simply forgot to cancel.[133]

4.      The FTC also uses some product-specific chargeback figures that it knows are misleading.  (*E.g.*, FTC Mem., p. 41.)  When a product line is terminated or sales decline, that artificially inflates chargeback rates on those products, because chargebacks are calculated as chargebacks for this month/sales for this month – but chargebacks are always for purchases made earlier.  As an example, assume that 1,000 widgets are sold in October, but only 100 widgets the following January.  In January, 20 chargebacks come through on those October purchases.  As measured by credit card companies, that is a "20%" chargeback rate for January, when it was really 2% of the October purchases.[134]

B.      Processing companies.

The FTC cites the use of multiple processing accounts as suggesting fraud for the 2006-2010 period.  There are several problems with that:  First, IWorks operated with only one or two processing accounts from January 2006 through July 2008.[135]  Under the FTC's theory, this militates against an inference of fraud during that time.  Second, this argument by the FTC puts at issue the defendants' reason for utilizing such companies, and that is disputed:  There is ample evidence that the intent was not to deceive banks, customers, the FTC, or anyone else,

---

[133] DE 1237-5, Exh. 1608, Cox depo., pp. 55:9-56:2, 93-94; *also* Exh. 1626, J. Johnson depo., pp. 98:5-101:13.

[134] DE 1240-6, Exh. 1653, Riddle depo., pp. 59:25-60:3

[135] Exh. 1831, Payne Second Dec. ¶¶ 1-4 ex A and B (summary of Processing Accounts).

1   but instead to track and possibly isolate instances of fraudulent chargebacks.[136]

2       IWorks undertook this strategy at the suggestion of an Independent Sales Organization

3   with which it had been working.[137]  With this strategy, as IWorks brought in a new client, it

4   would create a new company to run the processing for that client's business so as to avoid the

5   possibility of the new client's processing being adversely affected by affiliate fraud chargeback

6   issues in other accounts.[138]

7       The creation of additional merchant accounts through these other companies—which the

8   FTC conclusorily labels "shell companies"—was perfectly legal, and there is no evidence that

9   any consumers were misled or otherwise harmed by this practice.  Nor was there any harm to

10  the processing companies that held the accounts or to the card companies. The processing

11  companies that held the accounts and were acting on behalf of banks were fully aware that they

12  were related to activity by IWorks and Jeremy Johnson.  In fact, the processing companies

13  asked Mr. Johnson to submit a personal guaranty for the various accounts, and he obliged.[139]

### C.    BadCustomer.com.

       The FTC has stated in this case that it does not claim the creation or reference to

BadCustomer.com to have violated the FTC Act.  DE 125, p. 9, ¶18.    Nonetheless, it cites the

website as another supposed "indici[um]" of fraud.  This argument by the FTC again puts at

issue the defendants' state of mind, which is disputed:

---

[136] DE 1240-6, Exh. 653, Riddle depo., pp. 273:16-281:13; DE 1238-8, Exh. 1626, J. Johnson depo., pp. 243:19-246:8.

[137] DE 1238-8, Exh. 1626, J. Johnson depo. pp. 245:1-246:8.

[138] DE 97, Payne dec., ¶ 34; DE 1240-1, Exh. 1626, J. Johnson depo., pp. 245:1-246:8.

[139] DE 1239-7, Exh. 1638, Kramm Depo. p. 232:5-9; DE 1240-1, Exh. 1642, Marker Depo., pp. 88:17-100:6 (discussions with banks and processing companies about additional accounts); 213:17-214:2 (Jeremy was personal guarantor).

As problems with multiple types of fraud escalated in the industry, IWorks correctly saw a need for both vendors and innocent consumers to protect themselves, and it created BadCustomer.com.  This website offered several types of services:  It provided vendor members with a means of screening potential customers to detect chargeback-fraud risk, it offered consumers a free dispute resolution service, and it encouraged customers to contact customer service representatives directly before initiating chargebacks through their banks.[140]  The idea arose from a discussion between Jeremy Johnson and Martin Elliot of Visa, who said it was a merchant's responsibility to motivate consumers to contact the company before initiating a chargeback.[141]

Businesses that used BadCustomer.com configured filters to determine the parameters according to which sales would be flagged. When the business received payment information for a potential sale, the BadCustomer database screened the information to determine whether the customer posed an unacceptable chargeback risk.  If so, the merchant was presented with the choice to accept or decline the sale.  If the sale was declined, the customer was directed to the GateKeeper system.  There, the consumer had the option of signing a "No Future Chargebacks" Agreement or cancelling the sale.  Restricted customers who signed the agreement were permitted to complete their transactions if they so chose.[142]  BadCustomer had a legitimate purpose and provided a useful service, and issues of fact exist on this issue.

**VIII.   AN ISSUE OF FACT EXISTS AS TO WHETHER THE DEFENDANTS RELIED ON THE ADVICE OF COUNSEL OR OTHERWISE LACKED AN INTENT TO**

---

[140] Exh. 1801, Jacobsen depo., pp. 79:13-83:20, citing Exh. 961 and 962.

[141] DE 90, Johnson Dec., ¶3.

[142] *Id.*, ¶ 4.

55

1    **VIOLATE THE ACT.**

2        Ordinarily, the FTC takes the position that a defendant's state of mind, and whether it

3    relied upon advice of counsel, are not available defenses to an FTC Act violation.  In this case,

4    however, the FTC has waived that position and acknowledged that the defendants may assert

5    this defense by using in the FTC's case in chief attorney-client communications that it admits

6

7    are relevant only to such a defense.

8        When IWorks's servers and records were seized, its communications with in-house

9

10   counsel Gubler and outside counsel were all secured by an FTC "taint team" to prevent FTC

11   litigation counsel from violating attorney-client privilege.  DE-1110.  Nevertheless, near the end

12   of discovery, the FTC filed an "emergency" motion to seek the defendants' privileged material

13   "to the extent it constituted legitimate advice of counsel on the FTC matters upon which the

14   inside and outside attorneys advised IWorks and the other defendants."  *Id.*

15       Objections to the production of this privileged material were filed, noting that the FTC

16   cannot both deny an advice-of-counsel defense while affirmatively using evidence relevant only

17

18   to an advice of counsel defense. (DE-1114).  Magistrate Judge Foley allowed the production of

19   advice-of-counsel communications to the extent the FTC's "taint lawyer" could identify them as

20   such.[143]  The taint lawyer then gave the FTC all such material.

21       Among the many documents were emails reviewing brokers and affiliate websites for

22

23   compliance[144], emails showing secret buys to check for thank you emails and customer service

24

25

26   _____

     [143] *See* DE-1116 ("The Court grants the [FTC's] motion on the basis stated on the record, in terms of the
     scope of the waiver of the attorney/client privilege *to the extent of the affirmative defenses* raised by
27   defendant I Works and/or by defendant Johnson.") (emphasis added).

28   [144] *See, e.g.,* Exhs. 1089, 1090, 1091, 1092 to Gubler Depo.

compliance,[145] pixel reports identifying to brokers and the compliance team changes to websites that IWorks was requiring to comply with IWorks standards[146], legal briefs to advise IWorks employees[147], research and advice from outside counsel to Mr. Gubler[148], etc.

Mr. Gubler was hired in May 2005 specifically to oversee compliance, first with a telemarketing campaign and then with issues associated with IWorks' internet offerings.[149] IWorks directed workers to him with legal questions and training regarding compliance[150].  He attended compliance meetings at IWorks, and most importantly reviewed hundreds of pages of landing and order pages submitted for approval by IWorks employees in charge of developing such pages.  Mr. Gubler had specific approval to determine what approach IWorks should take in trying to interpret the vague maze of disclosures, where they should be, and related issues.[151]

In addition to looking at pages developed by IWorks, Mr. Gubler also reviewed pages pulled in from brokers' and upsellers' web pages after their changes were made to review compliance with the guidelines that IWorks set up and tried to follow.  Later, when the pixel program and other compliance measures were set up to try and keep up with changing web pages developed by brokers, Mr. Gubler was at the heart of these programs and making

---

[145] *See, e.g.,* Exh. 1087, parts 1 and 2 to Gubler Depo.

[146] *See* Exhs. 1093, 1094, 1095 to Gubler Depo. (Pixel Reports).

[147] *See, e.g.,* Exh. 1085 to Gubler Depo. (April 2009 18-page summary of legal documents and emails and Jeremy Johnson's response); Exh. 1086 to Gubler Depo ("This is an excellent document and I think we should send this to all the people we work with that deal in negative options and upsell etc.").

[148] DE 1260-1, Exh. 1234 to Gubler Depo.

[149] DE 1238-1, Exh. 1617, Gubler Depo., pp. 9:9-10:9.

[150] DE 1240-1, Exh. 1642, Marker depo., p. 19:10-20, pp. 226:12-227:12; DE 1239-7, Exh. 1638, Kramm depo., p. 103:1-22.

[151] DE 1238-1, Exh. 1617, Gubler depo., pp. 10:10-15:20.

recommendations regarding the rejection of orders, the payments withheld for broker noncompliance, and termination of contracts with some brokers who refused to comply with the guidelines he enacted and enforced.[152]

Mr. Gubler himself relied on the advice of counsel[153] and advice provided in a Negative Option Workshop put on by the FTC in 2007.[154]   That seminar emphasized only that the disclosures were to be in "immediate proximity" to the "payment information" so consumers could see the disclosures on the same page prior in time to hitting the submit button.[155]

During the conference, Jeremy Johnson realized that he was sitting next to a Midwest Region director of the FTC.   Mr. Johnson asked the director about the meaning of "clear and conspicuous."   She asked if IWorks' disclosures were "anywhere in the vicinity of" the submit button and whether the price and terms of the core product and the upsells were contained in the disclosures, and directed him to the materials that had been handed out.[156]   Those materials included examples with disclosures below the submit button.[157]   This information was communicated to Mr. Gubler, along with the materials (some of which were later published on

---

[152] *E.g., id.*, pp. 15:21-17:19, 20:24-28:19; 195:9 - 196:3, and Exh. 1091, pp. 1-2 (disputes regarding IWorks refusal to pay).

[153] DE 1238-1, Exh. 1617, Gubler depo., p. 251.

[154] *Id.*, p. 10:10-24.

[155] *See* Exh 1835 (CJ-IWORKS 00724-46, Negative Options Workshop handout from 2007); *see also* Exh. 1817, Bloom depo., pp. 94:16 - 96:18, interpreting workshop materials as establishing a temporal, not geographical, guideline regarding the submit button.

[156] DE 1238-1, Exh.1626, J. Johnson depo., pp. 61:20-66:1.

[157] Exh. 1086 pp. 135-154, to Gubler depo.

58

1    the FTC website in 2009).[158]

2          On each of the challenged issues in this case (for example, placement of disclosures), a

3    factfinder could conclude that IWorks reasonably relied on counsel and the FTC workshop

4    examples, and lacked any intent to violate the Act.  The FTC cites a few emails that reflect

5    occasional differences of opinion or gray areas, but ignores all other communications reflecting

6    good faith efforts to follow counsel's advice.  The FTC will argue that IWorks did not follow

7    Mr. Gubler's advice on some issues, but when Mr. Gubler affirmatively opined that something

8    was a violation (rather than arguable) and that IWorks could not do it, IWorks followed that

9

10   advice.[159]  Moreover, the FTC ignores the fact that, as a risk-avoidance measure, IWorks was

11   seeking input that would exceed what the law required.  IWorks sought this same precautionary

12   counsel not only from Mr. Gubler, but from outside counsel Linda Goldstein.[160]

13

14         Ironically, the FTC believes that a July 2009 email from Ms. Goldstein is damning,

15   when the converse is true.  In that e-mail, Ms. Goldstein responded to requests for advice by

16   indicating that, at that time, "the FTC" would dispute the placement of some disclosures.[161]

17   Significantly, however, Ms. Goldstein did not state that she agreed with the FTC's position (nor

18   would she so testify at trial).  To the contrary, Ms. Goldstein has informed the FTC that she

19   believes IWorks was compliant with all FTC Act requirements, and produced many examples to

20

21

22   _____

     [158] DE 1238-1,  Exh. 1617, Gubler depo., pp. 10:14-24; 12:25-13:22 and Exh. 1086, pp. 85-157.

23

24   [159] DE 1238-8, Exh. 1626, J. Johnson, pp. 109:21-112:5, and Exh 1298, ("And I'm telling Phillip here—
     the part the FTC cut out was I told Phillip that if you—after he'd explained all these things, the changes
     they wanted to have made, I tell Phillip that, okay, if you get any resistance to changing the sites, let me
25   know and I will get it done."); DE 1238-1, Exh. 1617, Gubler Depo., pp. 81:3-14, 125:21-127:19, Exh.
     1089, pp. 3-4 (Gubler approving placement of terms and condition adjacent to submit button in February
26   2010); and Exh. 1090, pp. 2-5 (Jeremy concurring in Gubler's advice regarding upsells and compliance.)

27   [160] DE 1238-1, Exh. 1617, Gubler depo., p. 251.

28   [161] See DE 1260-1, Exh. 1234 to Gubler Depo.

                                          59

support that belief.[162]

The defendants' belief that the input it was receiving from Mr. Gubler, Ms. Goldstein, and others exceeded legal requirements was reaffirmed by complaints from brokers and sales agents that IWorks was imposing standards that were not legally required, including arguments from the brokers' own attorneys to that effect.[163]

The FTC not only obtained all of these privileged communications, but they were then able to question Mr. Gubler at length – again, based on an advice of counsel defense[164] - about the advice that was provided to IWorks on virtually every aspect of the business from the landing and order pages, location and content of disclosures, to the setting up of business entities for use in processing.

The FTC has cited privileged communications more than two dozen times in its two motions for summary judgment. Because it is relying so heavily on evidence that it obtained only by claiming it was legitimate advice of counsel to the defendants, the FTC cannot now deny defendants this defense. Put differently, the FTC cannot recognize the advice of counsel defense in order to intrude into the defendants' privilege, and then claim the defense does not exist. That is especially true where the FTC filed these privileged communications – including the *entire deposition* of Phillip Gubler and Ms. Goldstein's email – not under seal, open to public view in a high-profile case. That bell cannot be unrung.

In the alternative, if the FTC continues to claim that advice of counsel and lack of intent to violate the law are not a legitimate defense, then every single citation or privileged

---

[162] *See* Exh 1835, CJ-IWORKS 00724-46.

[163] *E.g.,* DE 1240-1, Exh. 1642, Marker depo., pp. 74:12-76:22.

communication should be disregarded, along with all arguments (Counts I, II, III, IV, V, VI, VII, VIII and IX) to the extent they rely on the ill-gotten communications.

At a minimum, issues of fact exist in this case as to whether IWorks (and, derivatively, all other defendants in the case) reasonably relied on the advice of counsel or otherwise lacked intent to violate the FTC Act.  While no compliance program is – or can be – 100 percent foolproof (or fraud-proof), IWorks asked for, and implemented, recommendations that exceeded applicable law based on the advice from their attorneys, and lacked any intent to violate the law.

## IX.   THE FTC MUST SHOW THAT A REPRESENTATIVE SAMPLE OF CONSUMERS RELIED ON EACH ALLEGED MISREPRESENTATION.

Proximate cause is a bedrock concept in the law.  The FTC seeks an exception, citing *FTC v. Figgie Int'l, Inc.,* 994 F.2d 595 (9th Cir.1993) for the proposition that it need not show reliance on an alleged misrepresentation by any consumer, if it can show that the misrepresentation was "widely disseminated".  There are two problems with that contention:

### A.   The "fraud on the market" theory upon which the claimed reliance presumption is based is unsupported and in jeopardy.

*Figgie*'s rebuttable presumption, which equates causation with reliance, was primarily derived from securities law's fraud-on-the-market ("FOTM") theory.   However, this presumption is based on a misunderstanding and misapplication of the case law; moreover, the FOTM concept has been largely discredited and the U.S. Supreme Court is poised to overturn it in the next few months, neutralizing *Figgie* and other cases that rely on it.

The reliance presumption was first articulated in *FTC v. International Diamond Corp.*, 1983-2 Trade Cases Par. 65,506 (N.D. Cal. 1983).[165]  In determining whether the FTC had to

---

[164] DE 1238-1, Exh. 1617, Gubler depo., pp. 144:22-145:7.

[165] 1983 WL 1911 (N.D. Cal. 1983) (holding "the FTC may meet its burden by proving that the alleged dishonest or fraudulent practices were the type of misrepresentation on which a reasonably prudent

show that each purchaser subjectively relied on the defendant's material misrepresentations, *International Diamond* drew heavily from *Blackie v. Barrack*,[166] the first case to apply FOTM. *Blackie* held that "plaintiffs could be relieved of the burden of proving subjective reliance in open market trading transactions where the purchasers relied on the prices set in the market and where defendants' misrepresentation constituted a fraud on the market."[167]  Based on *Blackie*, the *International Diamond* court incorrectly concluded that proof of materiality establishes causation because while "misrepresentations [are] a traditional prerequisite to recovery under common law fraud actions, . . . [s]ubjective  reliance is not a distinct element of proof in class actions."[168]

    After *International Diamond* was decided, the U.S. Supreme Court approved FOTM in *Basic v. Levinson*.[169]  However, the *Basic* Court rejected *Blackie*'s FOTM version, the exact version *International Diamond* used to justify its reliance presumption.   Justice White, in writing for the dissent said he agreed with the majority in rejecting a version of the theory

> which equates "causation" with "reliance" and permits recovery by a plaintiff who claims merely to have been *harmed* by a material misrepresentation . . . notwithstanding proof that the plaintiff did not in any way rely on [the misrepresentation].  .  .  .  A nonrebuttable presumption of reliance would effectively convert Rule 10b-5 into 'a scheme of investor's insurance.'"[170]

    The reliance presumption sought by the FTC does exactly what Justice White and the

---

person would rely, that they were widely disseminated, and that the injured consumers purchased . . . from [the defendant].").

[166] 524 F. 2d 891 (9th Cir. 1975), cert. denied, 429 U. S. 816 (1976).

[167] *Int'l Diamond* at *6.

[168] *Id.* at *5

[169] *Basic Inc. v. Levinson*, 485 US 224 (1988).

[170] *Id.* at 251–52 (emphasis in original).

*Basic* Court rejected:  It "equates causation with reliance," and allows the FTC to claim consumers have been harmed without proving that even one consumer relied on an alleged misrepresentation.  While it is true that requiring proof of subjective reliance by each consumer would "thwart effective prosecution" of redress actions and "frustrate the statutory goals,"[171] this does not justify allowing the FTC to claim reliance without  showing subjective reliance by at least a representative sample of consumers for each claimed misrepresentation.

Even if *Blackie* were considered good law, *International Diamond* misunderstood and misapplied the case.  According to *International Diamond*, "*Blackie* held that the requisite causation is established by proof of purchase and the materiality of the misrepresentation."[172] This is not entirely accurate, because the purchase must be made *on a well-developed market*. FOTM is based on the efficient-market hypothesis where the misrepresentation is factored into the price of the security.  *See Basic, supra*.  This same principle does not translate to FTC consumer redress actions.  If causation does not equal reliance in a 10b-5 context, with the backdrop of the efficient market to bolster the claim, then causation cannot possibly equal reliance in a consumer redress action.

Last but not least, *Figgie* and other cases that rely on the FOTM/reliance doctrine may soon have little precedential value, because the Supreme Court is expected to substantially modify or overturn the doctrine entirely during the present term.[173]

Because the reliance presumption is based on a case that is no longer good law, and the

---

[171] *FTC v. Kitco of Nevada, Inc.*, 612 F.Supp. 1282, 1293 (D.C.Minn.1985).

[172] *Int'l Diamond* at *6.

[173] See http://blogs.law.harvard.edu/corpgov/2013/12/04/supreme-court-to-consider-overruling-fraud-on-the-market-presumption/ (explaining likelihood of reversal or substantial modification this term).

entire underlying theory has been discredited and is of doubtful vitality, the FTC should be required to show at least a representative sample of consumers on each claimed material misrepresentation.  Absent such evidence, summary judgment is not appropriate.

**B.      The FTC has not shown that specific misrepresentations were "widely disseminated" in any event.**

Under the FTC's own theory, to seek summary judgment on a misrepresentation, it must establish as a matter of law that the misrepresentation was "widely disseminated."  (*See* FTC Mem., p. 49.)  The FTC's motion does not address this element.  In a single sentence, the FTC references the requirement, admits that it bears the burden of proof, and then – nothing.  *Id.* Because it would be unfair for the FTC to brief an element for the first time in a reply memorandum, the FTC's motion must be denied on this ground alone.

The lack of briefing requires the defendants to speculate as to what the FTC might have in mind on this element, but if the FTC believes that anything posted on the internet is widely disseminated, the Ninth Circuit has rejected that notion.[174]

---

[174] *See Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1145 (9th Cir. 2009) ("Although we recognize the power of the internet to reach a wide and diverse audience, the evidence here is not sufficient to demonstrate wide dissemination.").  Many experts agree that there are close to one billion websites on the internet.  See, e.g., 861,379,152 websites as of January 2014. Netcraft Ltd. (2014), http://news.netcraft.com/.    Many of those sites receive no internet traffic. The mere existence of information on a webpage is not sufficient evidence to rise to the level of wide dissemination. During the pre-internet days of  1993 *Figgie*, it was logical to presume that consumers would use a brochure or pamphlet when deciding to purchase the seller's product. The brochure or pamphlet created an inference of wide dissemination and reliance. The same inference cannot be applied to a webpage. Unlike printed materials that are fixed, the content of a webpage is constantly changing (and is supposed to change).

One consideration noted in the *Art Attacks* case was that the challenged web page was not generally available through internet searches.  In this case, FTC investigators Tyndall and Jacobsen have admitted that, with many of the FTC's exhibits, they had to "back in" to get to the pages, *i.e.*, type in specific URLs, or run specialized searches based on information they had previously received from third parties.  DE 1241-1, Exh. 1655, Tyndall depo., pp. 87:9-88:19; Exh. 1801, Jacobsen depo., pp. 41:6-42:5, 101:23-102:13, 139:3-17 and DE 1254-5, Exh. 974 (Jacobsen Corrected 1st dec., ¶ 50 (URL–https:/secure2.securesiteorders.net/grants/1231/100/index1104-1.html).)

Moreover, even if the FTC had shown accessibility, there were not enough sales on many of the disputed pages to show wide dissemination. The Ninth Circuit held in 2003 that a video was not considered widely disseminated after selling 17,000 copies.[175] Most of the sales pages for IWorks products did not approach even this number.[176]

Whether the alleged misrepresentations for which the FTC seeks redress were widely disseminated is a genuine issue of material dispute, and summary judgment is inappropriate.

## X.   THE FTC'S REQUESTED MONETARY RELIEF IS UNSUPPORTED AND UNREASONABLE.

The FTC seeks $280,911,870 million for consumer redress, demanding all revenues for all products from all websites, regardless of the evidence. This all-or-nothing approach has not served the FTC well in other cases that actually went to trial.[177] In this case, apart from the Court's lack of authority to enter a judgment exceeding the receivership estate (*see* Duane Fielding's opposition to the FTC's motion for summary judgment as to individual defendants), there are many potential outcomes of a trial. One outcome, of course, is a finding that the FTC has not proved its case at all. Another possibility is that the FTC will prove part of its case. And another possibility is that the FTC will prove all or part of its case on liability, but not on relief, or that certain amounts would have to be deducted. For example:

---

[175] *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003).

[176] DE 1265-3, Exh 1760, pp. 6-7.

[177] For example, in *FTC v. Publishers Business Solutions*, 2:08-cv-00620-PMP-GWF, the FTC demanded "$34,419,363.00 in gross revenues" as monetary relief. Judge Pro warned the FTC that he did not consider the FTC's all-or-nothing position to be a reasonable approximation of such relief, and advised the FTC to present evidence regarding alternative measures of relief at an evidentiary hearing. *See id.*, DE 261, Transcript of 12/21/10 Pretrial Hearing at pp. 8-10; 13-14. The FTC declined, and after a trial, Judge Pro awarded $191,219.00. *Id.*, DE 248. Although the Ninth Circuit later disagreed with one aspect of Judge Pro's determination, the court expressly agreed that on remand, the trial court was not constrained by the FTC's all-or-nothing proposition. *FTC v. Publishers Business Services*, 11-17270 (9th Cir. 2013) (unpub'd).

• The defendants' expert has testified, and the FTC has not controverted, that failing to monitor credit card statements and to notice charges beyond the second month is widely considered to be unreasonable consumer behavior.[178]  Because the FTC Act only applies to consumers who act reasonably, if the factfinder finds this undisputed expert testimony persuasive, then the total amount the FTC seeks should be reduced to $79,641,752.

• The FTC's memorandum does not cite a single consumer who purchased the AdWords product, nor does the FTC have any evidence to contradict the defendants' evidence regarding this product.  If the factfinder agrees with this undisputed testimony, then $85,873,283 must be subtracted from the FTC's request.

• All evidence in the case contradicts the FTC's claim that IWorks misrepresented the availability of (government) grants for personal needs, if "grant" is given the meaning ascribed by normal consumers.  If a factfinder believes this undisputed evidence at trial, then $118,992,726 must be subtracted from the FTC's request.[179]

• If the Court determines that the FTC's claim is derivative of unjust enrichment and that established economic principles and equity limit an award to net profits, then the pool of recovery is no more than $49,033,072.  Backing out Grant ($19,238,760) and AdWords products ($13,884,004), the maximum judgment would be $15,910,308.

• Consumers uniformly testified that they expected to pay shipping and handling

---

[178] DE 1262-1, Exh. 1426, Vigil Rept., pp. 12-16.

[179] *Id.*, p. 19.

66

for a "free" CD, and did not expect any refund of those amounts.[180]  At a conservative average of $2.29 per CD purchase, and with at least 2,258,725 purchasers of the core grant product, $5,172,480.25 must be subtracted.[181]

•    Regardless of other calculations, amounts will have to be subtracted that cannot be determined until trial.  For example, as discussed above, even under the FTC's own theories, sales from any websites that the FTC's own documents show did not produce sales of at least 17,000 (or more) must be excluded.  Sales from websites that advertised both government and private grants must be excluded.

## XI.    ISSUES OF FACT EXIST ON THE FTC'S "COMMON ENTERPRISE" CLAIMS

The FTC asserts a claim for common enterprise in an attempt to hold every company named in the complaint jointly and severally liable for all relief that it seeks against only a few entities actually involved in the operations of IWorks. (FTC Mem., pp. 36-46.)  However, the FTC's facts either lack citation, are unsupported by the citation, or contradicted by other evidence.  The FTC also fails to tie the relief sought to the dates in which the various companies came into existence or joined the enterprise.[182]

Examples of unsupported and disputed facts throughout the FTC's common enterprise assertion include:

---

[180]  *See, e.g.*, DE 1237-1, Exh. 1600, Bachman depo., pp. 66:15–68:13 (knew about $2.29 S/H); Exh. 1804, Blohm depo., pp. 33:25–34:14; Exh. 1620, Huffman depo., p. 39:1-12; 122:21–123:9; Exh. 1810, Kizzie depo., p. 41:18-24; p. 44:19-23; DE 1240-2, Exh. 1647, Miller depo., pp. 18:15–19:7.

[181] DE 1262-1, Exh. 1426, Vigil Rept., p. 5 (number of purchasers).

[182] The FTC's primary analysis regarding Anthon Holdings and Network Agenda is in its motion for summary judgment against the individual defendants (in connection to defendant Duane Fielding). Accordingly, these defendants' liability is addressed in the response to that memorandum.

• IWorks could not assume all responsibility for web sites as the FTC alleges because the websites were not hosted on IWorks servers[183];

• The one million refund and cancellation requests under the cited Disposition Report were not necessarily placed there because consumers were not informed about the monthly charges[184];

• IWorks did not use scores of Processing Companies[185];

• The IWorks Compliance Team was not routinely ignored as alleged by the FTC, and the testimony of the Kramm and Marker are limited to one short time period (December 2008-August 2009)[186].

---

[183] Exh. 1226 to Gubler Depo. (Feb. 2010 email to outside counsel. (Jeremy Johnson "we do not host any of the pages. They are always hosted by the different advertisers so we find ourselves in the position of policing them which has been increasingly difficult over past year." Upsells through someone elses offer were even more difficult to keep compliant.)

[184] FTC Investigator Tyndall admitted he did not know the criteria IWorks gave its representatives as to who was included in the various categories. He made his conclusions based on a review of only 100 Customer calls out of millions of calls and chose not to preserve the evidence of even those he did look at. DE 1241-1, Exh. 1655, *Tyndall* depo., pp.193-195; DE 1238-1, Exh. 1617, *Gubler* depo., p. 266:2-11 (for consumers who did not know about the charges it was because they did not read the disclosures not because they were not present or that they were hidden).

[185] Exh. 1831 ex. B is a graph that shows IWorks used only one and sometimes two processing accounts in 2006 and up through 2008. Even up to the middle of 2009, IWorks only used 3 processing accounts at any given time and only 6 in total. This is hardly "scores" of processing accounts. Six of the companies only performed check processing and 19 companies set up for processing, never processed at all. *Id.* Then for a little over 6 months in late 2009 IWorks, on the advice of their processing agents, began to utilize multiple processing accounts for each of the various entities to try and combat the fraud that had caused so many chargebacks that it resulted in the TMF of the account that had been used exclusively by IWorks up to that point. It is interesting that the FTC uses the fact that the many companies shared processing accounts as a reason to lump them into one common enterprise, but if IWorks tried to have multiple accounts for the different entities and products, the FTC labels that as somehow inappropriate and an indication of fraud. It should not be able to have an inference both ways for common enterprise.

[186] The FTC equates not giving an in-house attorney decision-making authority as ignoring the attorney. That is an odd assertion: Attorneys seldom are removed from their advisory (legal) role and put in decision-making (business) roles. Here, as discussed above, the advice of Gubler was followed in sending corrected websites to brokers, withholding payment, etc. That is one reason why brokers complained about IWorks' stringent requirements.

Apart from these factual disputes, the FTC's claimed facts do not support a finding of common enterprise.  Anthon Holdings is a good example.  As set forth in Duane Fielding's separate response, Anthon Holdings has always been wholly separate from IWorks.  It is logical that Anthon Holdings had IWorks handle the marketing and website service for Anthon because that was the agreement between the owners of the two companies.  If sharing marketing creates a common enterprise liability, many companies who enter into marketing agreements where clients are provided both the marketing and customer service functions and other full service agreements would then create unintended common enterprise liability.  Of course IWorks took care of marketing, websites and processing service – that is what IWorks contracted with companies to do, a useful service to new companies lacking the experience to market, and provide efficient and professional service to their customers.  This does not create a common enterprise between the companies.

Finally, the one piece of information lacking from all of detail provided by the FTC on their common enterprise allegations is the date that the cited companies were created.  The FTC seems unconcerned that at least five of these answering defendants[187] never even processed a single penny for any of the companies and are guilty of nothing but setting up a company and obtaining a processing account in late 2009.  Based on that alone, the FTC seeks to assert a common enterprise and thus joint and several liability for actions of IWorks – and, more important, for actions taken before these entities were even in existence.   So far, although the FTC has mentioned the dates these entities came into existence, it has ignored the fact that most were after June of 2009 – up to three and one half years after the alleged violations occurred.

---

[187] Revive Marketing, Inc., Success Marketing, Inc., Summit Processing, Inc., Tran Voyage, Inc., and TranFirst, Inc.  *See* fn. 135.

69

In addition, the FTC has included three of these answering defendants that never participated in credit card procession or debit card EFT charges.[188]   As such, the FTC's allegations of chargebacks, fraudulent processing accounts or the other "indicia of fraud" have no bearing on them.

## CONCLUSION

If the FTC truly believes it has overwhelming evidence against these defendants, it should not fear a trial.  For the reasons set forth above, the Defendants request the Court deny the FTC's motion for summary judgment, and set this case for trial at the Court's earliest convenience.

DATED this 19th day of January, 2014.

**CHRISTENSEN & JENSEN, P.C**.

/s/  Karra J. Porter
Karra J. Porter
Kelly H. Macfarlane
Phillip E. Lowry, Jr.
Sarah E. Spencer
15 West South Temple, Suite 800
Salt Lake City, UT 84101

**ROYAL & MILES, LLP**

/s/  Gregory A. Miles
Gregory A. Miles
1522 W. Warm Springs Road
Henderson, NV 89014
*Attorneys for Defendants:*
*Blue Streak Processing, Inc., Business First, Inc.*
*Cloud Nine Marketing, Inc., Cold Bay Media, Inc.*
*CPA Upsell, Inc., Diamond J Media, Inc.*
*EBusiness Success, Inc., Elite Debit, Inc.*
*Funding Success, Inc., Hooper Processing, Inc.*
*I Works, Inc., Internet Economy, Inc.*

---

[188] These processing only entities include Cold Bay Media, Inc., Elite Debit, Inc., Money Harvest, Inc.,

70

1

*Internet Fitness, Inc., Market Funding Solutions, Inc.*

2

*Money Harvest, Inc., Monroe Processing, Inc.*

*Net Commerce, Inc., Premier Performance, Inc.*

3

*Pro Internet Services, Inc., Revive Marketing, Inc.*

*Success Marketing, Inc., Summit Processing, Inc.*

4

*Tran Voyage, Inc., TranFirst, Inc.*

5

*Unlimited Processing, Inc., and eCom Success, Inc.*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2

3

I hereby certify that I have on the 19th day of January, 2014, caused the foregoing document to be served on the following via the ECF system:

4

5

6

7

8

Collot Guerard
J. Ronald Brooke, Jr.
Janice L. Kopec
Dotan Weinman
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW, Room 288
Washington, DC  20580

9

10

11

Blaine T. Welsh
Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV  89101
   *Attorneys for Plaintiff Federal Trade Commission*

12

13

14

Edward D Boyack
401 North Buffalo Drive, Suite 202
Las Vegas, NV 89145
   *Attorney for defendants Terrason Spinks and Jet Processing*

15

16

17

18

19

20

21

22

23

D. Neal Tomlinson
Karl O. Riley
Chad Fears
Brian Reeve
SNELL & WILMER, LLP
3883 Howard Hughes Pkwy., Suite 1100
Las Vegas, NV 89169
   *Attorneys for defendants Scott Muir, Big Bucks Pro, Inc., Blue Net Progress, Inc., Bolt Marketing, Inc., Business Loan Success, Inc., CS Processing, Inc., GGL Rewards, Inc., Highlight Marketing, Inc., Mist Marketing, Inc., Net Discounts, Inc., Optimum Assistance, Inc., Razor Processing, Inc., and Simcor Marketing, Inc.; Duane Fielding, Anthon Holdings Corp., and Network Agenda LLC; and Andy Johnson*

24

25

26

27

Gary Owen Caris
Lesley Anne Hawes
MCKENNA LONG & ALDRIDGE LLP
300 South Grand Avenue, 14th Floor
Los Angeles, CA 90071
   *Attorneys for the Receiver*

28

72

Jeanette Swent
Jared C. Bennett
OFFICE OF THE UNITED STATES ATTORNEY
185 South State Street, Suite 300
Salt Lake City, UT  84111
         *Attorneys for Intervener United States of America*

Jeremy Johnson
529 S. Woods View Circle
St. George, UT 84770
         *Defendant (Pro se)*

Jacob A. Reynolds, Esq.
HUTCHISON & STEFFEN, LLC
10080 West Alta Drive, Suite 200
Las Vegas, NV 89145
         *Attorneys for Todd Vowell Parties*

And via email or First Class mail postage prepaid to:

Loyd Johnston
2988 Kings Court Lane
Washington, Utah 84780
         *Defendant (Pro se)*

Scott Leavitt
2271 Southgate Hills Drive
St. George, UT 84770

Ryan Riddle
446 East 1410 South
Washington, UT  84780
         *Defendant (Pro se)*

Jason Vowell
# 19688081 Satellite Prison Camp Tucson
PO Box 24549
Tucson, AZ  85734

_____
Legal Secretary, CHRISTENSEN & JENSEN, P.C.