Karra J. Porter
Karra.Porter@chrisjen.com
Kelly H. Macfarlane
Kelly.Macfarlane@chrisjen.com
Phillip E. Lowry, Jr.
Phillip.Lowry@chrisjen.com
Sarah E. Spencer
Sarah.Spencer@chrisjen.com
**CHRISTENSEN & JENSEN, P.C.**
15 West South Temple, Suite 800
Salt Lake City, Utah  84101
Telephone:    801-323-5000
Facsimile:    801-355-3472

*Attorneys for Defendants Duane Fielding, Network Agenda, Anthon Holdings, and for **Relief Defendants** Sharla Johnson, Barbara Johnson, Kerry Johnson, KB Family Limited Partnership, KV Electric, Inc., Orange Cat Investments, LLC, Zibby, LLC, and Zibby Flight Service, LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                    Plaintiff(s),<br><br>v.<br><br>JEREMY JOHNSON, et al.<br><br>                    Defendant(s). | Case No.:    2:10-cv-2203-MMD-GWF |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FTC'S MOTION FOR SUMMARY JUDGMENT AGAINST INDIVIDUAL LIABILITY DEFENDANTS AND RELIEF DEFENDANTS (DE 1279)**

Defendants Duane Fielding, and Relief Defendants Sharla Johnson, Barbara Johnson, Kerry Johnson, KB Family Limited Partnership, KV Electric, Inc., Orange Cat Investments, LLC, Zibby, LLC, and Zibby Flight Service, LLC, hereby submit this memorandum of points and authorities in opposition to the FTC's "Motion for Summary Judgment Against Individual Liability Defendants and Relief Defendants (DE 1279)".

**TABLE OF CONTENTS**

STATEMENTS OF FACT ................................................................................1

I.     FACTS REGARDING DUANE FIELDING, ANTHON HOLDINGS AND
NETWORK AGENDA ....................................................................1

II.    FACTS RELATING TO RELIEF DEFENDANTS .............................6

      A.    *Relief Defendant Kerry Johnson* ...............................................6
      B.    *Relief Defendant Barbara Johnson* ........................................10
      C.    *Relief Defendant KV Electric, Inc.* ........................................11
      D.    *Relief Defendant KB Family Limited Partnership* ..................12
      E.    *Relief Defendant Sharla Johnson* ...........................................12

RELIEF DEFENDANTS' DISPUTATION OF FTC'S STATEMENT OF FACTS ..........13

SUMMARY OF FTC'S DISGORGEMENT CLAIMS....................................27

ARGUMENT ...............................................................................................30

I.     SUMMARY JUDGMENT CANNOT BE GRANTED AGAINST
INDIVIDUAL OR RELIEF DEFENDANTS IF THE COURT DENIES THE
FTC'S MOTION AGAINST THE CORPORATE DEFENDANTS .....................30

II.    THE FTC HAS NOT ESTABLISHED ENTITLEMENT TO JUDGMENT
AGAINST DUANE FIELDING .....................................................30

      A.    There Was No Common Enterprise Between IWorks and Anthon
Holdings Corporation and/or Network Agenda, LLC ..................34

           1.    Common control..............................................35
           2.    Sharing of office space and officers...................35
           3.    Business being transacted through a "maze of interrelated
companies"...........................................................36
           4.    Commingling of corporate funds and failure to maintain
separation of companies ......................................36
           5.    Unified advertising................................................37
           6.    Evidence that reveals that no real distinction exists between the
corporate defendants .........................................38

      B.    Fielding is Not Individually Liable for IWorks' Alleged Misconduct ..........38

           1.  Direct Participation................................................38
           2.  Authority to Control ...............................................39

ii

C.     This Court Lacks Jurisdiction to Award "Equitable Monetary Relief" Beyond Those Assets That Have Been Collected and Held by the Receiver Over the Last Three Years .................................................. 44

D.     In any Event, Any Award of Disgorgement or Equitable Restitution is Predicated on Unjust Enrichment, Which Is Measured by Defendants' Gain (Profit), Not Consumer Loss (Revenue) ................................... 51

III.    THE FTC HAS NOT DEMONSTRATED ENTITLEMENT TO SUMMARY JUDGMENT AGAINST THE RELIEF DEFENDANTS ........................................ 55

A.     Legal standard applicable to equitable disgorgement claims against nominal parties such as Relief Defendants ....................................... 55

B.     There is a genuine dispute of material fact regarding whether the transferred assets and funds are ill-gotten ......................................... 57

C.     The FTC has failed to adequately support its motion against Relief Defendants ....................................................................................... 57

D.     Relief Defendants have adduced affirmative evidence of "presumptive title" and therefore a legitimate claim of ownership to the transferred funds ...................................................................................................... 59

IV.    IN ANY EVENT, THE MAXIMUM LIABILITY OF THE RELIEF DEFENDANTS IS THE TOTAL SUM TO WHICH THE FTC CLAIMS IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ....................................... 61

CONCLUSION .............................................................................................................. 61

iii

1

## TABLE OF AUTHORITIES

2

3

**Cases**

*Amgen, Inc.  v. Connecticut Retirement Plans and Trust Funds*, 132 S. Ct. 2742 (2013) ..........51

*CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187 (4th Cir.2002).......................................56

*FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080 (C.D. Cal. 1994)...........................39

*FTC v. Amy Travel Serv.*, 875 F.2d at 564 (7th Cir. 1989)........................................................40

*FTC v. Bronson Partners*, *LLC*, 564 F. Supp. 2d 119 (D. Conn. 2008) ...................................57

*FTC v. Bronson Partners, LLC*, 674 F.Supp.2d 373 (D.Conn.2009) ...................................56, 57

*FTC v. Direct Marketing Concepts, Inc.*, 648 F. Supp. 2d 202 (D. Mass. 2009) .....................57

*FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997).............................................................................46

*FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) ...............................................................52, 53

*FTC v. Freecom Communications, Inc.*, 401 F.3d 1192 (10th Cir. 2005)..................................40

*FTC v. Garvey*, 383 F.3d 891 (9th Cir. 2004)......................................................................38, 40

*FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199 (D. Nev. 2011)..........................................34

*FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975 (N.D. Cal. 2010)...............................................56

*FTC v. Inc21.com Corp.*, aff'd 475 F. App'x 106 (9th Cir. 2012)..............................................56

*FTC v. International Diamond Corp.*, 1983-2 Trade Cases Par. 65,506, (N.D. Cal. 1983)........53

*FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176 (C.D. Cal. 2000) .......................................38, 40

*FTC v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004) .............................................................38, 40

*FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 U.S. Dist. LEXIS 104982, 2011
     WL 4348304 (D. Utah Sept. 16, 2011).............................................................................39

*FTC v. Nat'l Urological Group*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008)..................................35

*FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127 (9th Cir. 2010) ..........................................34

*FTC v. Publishers Business Services, Inc.*, 2013 WL 5273302 (U.S. App. 9th Cir. Sept. 19,
     2013) ................................................................................................................................40

*FTC v. QT Inc.*, 512 F.3d 858 (7th Cir. 2008)...........................................................................52

*FTC v. Sharp*, 782 F. Supp. 1445 (D. Nev. 1991) ....................................................................40

*FTC v. Think Achievement Corp.*, 144 F.Supp.2d 1013 (N.D. Ind. 2000) ................................56

*FTC v. Transnet Wireless Corp.*, 506 F.Supp.2d 1247 (S.D.Fla.2007)....................................56

*FTC v. Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 U.S. Dist. LEXIS 17114, 1997
     WL 33642380 (N.D. Ga. Sept. 30, 1997).........................................................................39

*Great-West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204 (2002)...............................
     ...........................................................................................48, 49, 50, 52, 53, 54

*Heater v. FTC*, 503 F.2d 321 (9th Cir. 1974) ...........................................................................53

*Janvey v. Adams*, 588 F.3d 831 (5th Cir.2009).........................................................................56

*Mertens v. Hewitt Assocs.,* 508 U.S. 248 (1993) ......................................................................48

*Pike v. Hester,* No. 3:12-cv-00283-RCJ-VPC (D. Nev. July 9, 2013) ......................................57

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir.1998)........................................................................57

*SEC v. Certain Unknown Purchasers,* 817 F.2d 1018 (2d Cir. 1987)........................................46

*SEC v. Certain Unknown Purchasers*, cert. denied, 484 U.S. 1060 (1988) ..............................47

*SEC v. Cherif*, 933 F.2d 403 (7th Cir.1991) .............................................................................55

*SEC v. Colello*, 139 F.3d 674 (9th Cir.1998)......................................................................55, 56

*SEC v. First City Fin. Corp.,* 890 F.2d 1215 (D.C. Cir. 1989).......................................46, 47, 48

*SEC v. First Pac. Bancorp*, 142 F.3d 1186 (9th Cir. 1998).......................................................47

iv

*SEC v. First Pac. Bancorp.*, cert. denied, 525 U.S. 1121 (1999) .................................47
*SEC v. George*, 426 F.3d 786 (6th Cir.2005)...............................................................56
*SEC v. Happ*, 392 F.3d 12 (1st Cir. 2004) ...................................................................47
*SEC v. Hughes Capital Corp.*, 124 F.3d 449 (3d Cir. 1997) .......................................47
*SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972) ..........................46
*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) .....................................................................47
*SEC v. Platforms Wireless Int'l, Inc.*, 617 F.3d 1072 (9th Cir. 2010) ........................47
*SEC v. Ross*, 504 F. 3d 1130 (9th Cir.2007)...................................................56, 59, 60
*SEC v. Texas Gulf Sulfur Co.*, 446 F.2d 1301 (2d Cir.).............................................46
*Smith v. SEC*, 653 F.3d 121 (2nd Cir.2011)..................................................................56
*Standard Educators, Inc. v. FTC*, 475 F.2d 401 (D.C. Cir. 1973)...............................39
*U.S. Commodity Futures Trading Com'n v. Schiera*, No. CV05 2660 CAS, 2006 WL
   4586786 (S.D.Cal. Dec. 11, 2006)..........................................................................57


**Other Authorities**
Laycock, THE SCOPE AND SIGNIFICANCE OF RESTITUTION, 67 Tex. L. Rev. 1277
   (1989)....................................................................................................................52, 53
RESTATEMENT OF RESTITUTION (1937) ..........................................................52


# TABLE OF EXHIBITS

**Exhibit 1**     Anthon Holdings Corporation's Response to FTC's
              First Set of Interrogatories 1-23

**Exhibit 2**     Declaration of Duane Fielding

**Exhibit 3**     Declaration of Kerry Johnson

**Exhibit 4**     Declaration of Sharla Johnson

**Exhibit 5**     Declaration of Scott Leavitt

**STATEMENTS OF FACT**

**I.  FACTS REGARDING DUANE FIELDING, ANTHON HOLDINGS AND NETWORK AGENDA**

Duane Fielding was the sole owner of Anthon Holdings Corporation, an entity he created 11 years ago to facilitate his business ventures.[1] Some of the businesses with which Anthon has been involved or conducted since 2003 include: landscaping (2002-2004), used car sales (2002-2004), used car flooring 2002-2004, mortgage lending and construction loans (2004-2006), real estate development (2004-2006), project management and calendaring software development (2005-2009), and construction software development (2004).[2]

In time Fielding developed an internet-based calendaring system, which ultimately became Network Agenda.[3]  IWorks sold products where scheduling of periodic reminders to study or to check websites could be very helpful and the reminder/calendaring features of Network Agenda intersected well with those products.[4]  The FTC has not alleged that any disclosures regarding the terms and benefits of Network Agenda were misleading or deceptive. The FTC merely claims that the existence of the upsells themselves was not adequately disclosed on the order pages, which is contrary to the evidence.  (*See* DE 1284, Defendants' Memorandum in Opposition to the FTC's Motion for Summary Judgment.)

Because of the inherent value of an internet program with calendaring features (which predated current programs such as Google Calendar), Jeremy Johnson and Hyrum Smith (one of

---

[1] DE 1237-7, Fielding, 15:25-18:21.

[2] Exh. 1, Anthon Holdings Corporation's Response to FTC's First Set Of Interrogatories 1-23, Response to Interrogatory 3.

[3] DE 1237-7, Fielding, 21:8-23:8.

[4] Exh. 2, Fielding Decl. 1/19/14, ¶ 1.

the pioneers of the Franklin Planner scheduling books) contracted in 2009 with Fielding to form a new company, Network Agenda, LLC, which had an exclusive third-party license to sell the Network Agenda product within the IWorks business model.[5] (Hereafter the third parties selling Network Agenda shall be referred to as Anthon/NA).  The license allowed IWorks to set the price for Network Agenda at several price points, and also the term for the free trial that came with the software.[6]  The LLC structure allowed the owners to create a sharing ratio among them that allowed for a division of revenues as they agreed.[7]  The license did not prevent Anthon/NA from continuing to sell Network Agenda on its own, just as it had before it began its relationship with IWorks.[8]  Only Fielding maintained managerial control of Network Agenda, LLC; Johnson and Smith were mere members for purposes of sharing distributions.[9]

Fielding understood that IWorks' customer base, both actual and potential, far exceeded any volume Anthon had previously encountered.  Thus, Anthon relied on IWorks to market the product.[10]  This marketing included use of the IWorks Customer Relations Management database, as the database already existed and was readily available.  However, Anthon/NA's access to that database was limited to only customers who had subscribed to Network Agenda.

---

[5] DE 1237-7, Fielding, 57:3-58:7.

[6] DE 1237-7, Fielding, 44:1-14 and 149:6-23.

[7] Exh. 2, Fielding Decl. 1/19/14, ¶ 4.

[8] The FTC contends that Network Agenda was a "forced upsell," but Fielding never agreed with that characterization, simply because the consumer was never compelled to buy Network Agenda, and Network Agenda had a free trial period that allowed for cancellation with no charge.  DE 1237-7, Fielding, 50:1-15.

[9] Exh. 2, Fielding Decl. 1/19/14, ¶ 4.

[10] *Id*., ¶ 5.

Anthon/NA could not access any other IWorks' customers' information that was unrelated to Network Agenda.[11]

IWorks represented to Fielding that it was experienced with payment card industry (PCI) compliance, that is, complying with credit card merchant account guidelines.   Anthon/NA maintained its own merchant account, but relied on IWorks to ensure PCI compliance for its accounts.[12]   Later, when CPA Upsell, LLC was formed, it was responsible for monitoring the marketing of IWorks and third party upsells of Network Agenda.[13]   Thus, IWorks hosted customer data to ensure PCI compliance, and Anthon/NA handled payments through its own merchant account[14] and administered its own customer service and support.   (For these reasons, the FTC's statement that "IWorks handled all aspects of the product" is not only vague but untrue.   The FTC's own witness, IWorks customer service representative Chris Cox, acknowledged that he rarely ever saw Network Agenda arise in consumer calls.[15])

Anthon/NA maintained its own customer service department in a separate city, which grew as large as a dozen personnel and which handled customer support and inquiries, both technical and billing.[16]   IWorks would generally refer customer service calls to Anthon/NA, unless the customer was upset and a transfer might unacceptably aggravate that upset.[17]

---

[11] Exh. 2, Fielding Decl. 1/19/14, ¶ 6.

[12] *Id.*, ¶ 7.

[13] *Id.*, ¶ 8.

[14] This fact directly contravenes Tracy Kramm's statement in its supporting memorandum that IWorks handled Anthon/NA's merchant account.  DE 1280 at p. 41.

[15] DE 1237-5, Cox Deposition at 133:17-20.

[16] DE 1237-7, Fielding 61:1-63:18, 69:9-17, 72:12-73:12.

[17] Exh. 2, Fielding Decl. 1/19/14, ¶ 11; DE 1237-7, Fielding 63:19-64:8.

Anthon/NA took its obligation to provide customer support so seriously that it would even augment customer support with offshore personnel when the need arose.[18]

Anthon/NA always maintained its own network, its own servers, and its own DSL.[19] It was required to logon to the IWorks customer relation management ("CRM") database with a logon and password and lacked access to any customers save those who had purchased Network Agenda.[20] Fielding received no quality control reports regarding sales of Network Agenda from IWorks or CPA Upsell.[21] Fielding sold other products that he either developed or licensed, and did not use IWorks to do so.[22] Network Agenda worked well with the IWorks products but it was developed independent of any IWorks product.[23] Moreover, Network Agenda was not the only product that Fielding was developing.

Anthon, in the course of its business dealings, was located in a variety of offices. Only briefly was it in the same location as IWorks, and this was as a short bridge while the subject space was vacant.[24] Once IWorks found a paying tenant, Anthon had to secure a new location. Anthon's locations included: 115 N Stone Mountain Drive, St. George, Utah 84770 (2002-

---

[18] DE 1237-7, Fielding 61:4-9.

[19] DE 1237-7, Fielding 145:23-146:5.

[20] Exh. 2, Fielding Decl. 1/19/14, ¶ 12.

[21] DE 1237-7, Fielding 125:6-12.

[22] DE 1237-7, Fielding 166:3-169:6. Each of the products had distinct merchant accounts that processed their sales.

[23] Exh. 2, Fielding Decl. 1/19/14, ¶ 2.

[24] *Id.*, ¶ 13.

2004); 152 N 200 E, St George, UT 84770 (2005-2006); 151 N Main Street, St. George, Utah 84770 (2007); 249 E Tabernacle #105, St. George, Utah 84780 (2008-2009).[25]

As noted, even though Anthon/NA had contracted with IWorks to conduct marketing, maintain a Customer Relations Management (CRM) database, and ensure PCI compliance, the actual charges for sales of Network Agenda were posted to Anthon/NA's merchant accounts.[26] As late as October 2008, IWorks was not involved in setting up merchant accounts for Anthon; rather, it simply assisted in creating a link between Anthon's merchant account and the CRM so the customer could be billed for the product.[27] Because Anthon/NA maintained its own merchant accounts, when chargeback rates began to climb it fell to Anthon/NA to submit chargeback reduction plans and take chargeback reduction steps.  This was Anthon/NA's responsibility, and it met that obligation[28] as an independent developer of a valuable product that was ultimately responsible for accounting for revenue, both positive and negative, and for its contractual obligations to merchant banks.[29]

---

[25] Exh. 1, Anthon Holdings Corporation's Response to FTC's First Set Of Interrogatories 1-23, Response to Interrogatory 2.

[26] Anthon/NA also maintained its own checking and bank accounts, an indicium of keeping corporate formalities but impugned, for reasons unknown, by the FTC.  Fielding Declaration II ¶ 3.

[27] DE 1237-7, Fielding 118:2-120:15.

[28] Exh. 2, Fielding Decl, ¶ 14.

[29] As noted, the entity CPA Upsell was responsible primarily to monitor and manage the relationship between the core sale company and the upsell company.  Both CPA Upsell and Anthon/NA worked to lower chargeback rates for accounts over which they were responsible.  Anthon was still responsible for managing its own processing and merchant accounts.  CPA Upsell was essentially a broker between various upsell products and core products.  Being the middle man between the upsell company and the core product company, CPA Upsell had a natural responsibility to protect the upsell company from the core product company and vice versa.  In order to keep the relationships healthy and long lasting, CPA Upsell had a vested interest in monitoring compliance disclosures and chargebacks both for the purposes of protection and longevity of the brokered relationship.  *Id*. II ¶ 9.

The ultimate plan was for Network Agenda, along with other third party products, to be sold using a third party customer relation management database, called Gold, that never went live, but was designed exclusively for vendors of third party products like Network Agenda.[30] If accomplished, this would have created a complete customer service separation.[31]

## II.    FACTS RELATING TO RELIEF DEFENDANTS

### A.    *Relief Defendant Kerry Johnson*

Relief Defendant Kerry Johnson is the father of Defendant Jeremy Johnson and the husband of Relief Defendant Barbara Johnson.  He is the president of Relief Defendant KV Electric, Inc. and a general partner of Relief Defendant KB Family Partnership.[32]

Since 1998, Kerry Johnson has provided personal services in connection with the operation and management of Jeremy Johnson's various business ventures.  For example, Kerry Johnson is a licensed airplane and helicopter pilot and has provided professional pilot services to Jeremy Johnson, IWorks, and IWorks' related entities for more than six years in total.[33]

Between the years 2002 and 2004, Kerry Johnson worked approximately 600 total hours as a pilot for IWorks.  In addition to those hours, he also was on-call 24 hours a day, 7 days a week.  During that time, Mr. Johnson flew an Aerostar N69MF airplane to various locations as requested by Jeremy Johnson and other IWorks representatives.  Later, between August of 2007

---

[30] DE 1237-7, Fielding 156:25-158:15

[31] DE 1237-7, Fielding 163:15-23.

[32] *See* DE 830, amended complaint at ¶¶ 362, 373, 376; DE 1099, Relief Defendants' Answer at ¶ 362; DE 1239-3, K. Johnson 7/14/2011 Depo., pp. 19:6-11; 21:22-22:1; 19:14-20:24; 32:22-35:24.  *See also*, DE 1239-1, K. Johnson Depo., pp. 7:21-8:1; DE 1239-3; DE 1239-8, KV Electric 30(b)(6) Depo. 9:12-15; 13:7-19; DE 1239-6, KB Family Ltd. Partnership Depo. 5:19-25.

[33] DE 1239-1, K. Johnson 8/1/13 Depo., 46:14-48:1; DE 1284-1, K. Johnson Decl., ¶ 5.

and mid-2009, Kerry Johnson provided at least 110 hours of 24/7 on-call pilot service for IWorks and Jeremy Johnson.  During such time, he piloted a Piper Cheyenne LS400.[34]

In addition to actual flight time, when he was not in the air Kerry Johnson spent a significant amount of time assisting IWorks and its employees.  For example, whenever Kerry Johnson piloted an aircraft to a given location for IWorks, he would accompany the IWorks representatives to the jobsite and would assist with whatever tasks might be needed.  (Kerry Johnson's willingness to help with whatever was needed at a given location was significantly more helpful than other professional pilots, who would stay with the aircraft or handle personal matters while on layover for IWorks trips).  In addition, when Kerry Johnson was at home in Utah, he also spent time managing and maintaining the aircraft, arranging for maintenance of the aircraft, and providing training for other pilots.[35]

Kerry Johnson individually provided other professional services to IWorks and Jeremy Johnson.  From approximately 2004 until the end of 2010, Kerry Johnson advised Jeremy Johnson about classic collector cars, including which cars were the best investments for Jeremy's purchase.  After Jeremy Johnson would purchase the vehicles, Kerry Johnson maintained and worked on them.  For example, Kerry Johnson overhauled the engines of a 1972 Chevelle SS 454 and a 1952 Ford Sedan flathead V8.  Kerry Johnson also conducted repairs on a 1961 Cadillac, a 1957 Chevy BelAir and a 1960 Lincoln Continental.  Kerry Johnson

---

[34] DE 1284-1, K. Johnson Decl., ¶¶ 6-8.

[35] *See id*. at ¶¶ 9, 11.  Additionally, Relief Defendant Zibby Flight and Defendant CPA Upsell (two of the IWorks-related entities who owned the planes that Kerry Johnson flew) ultimately hired three other pilots to replace the services of Kerry Johnson.  *See* DE1284-5, Declaration of Scott Leavitt at ¶ 4. Employee Plus, the payroll entity for IWorks, paid approximately $176,928.71 for pilot services between February of 2008 and December of 2010.  *See id*. at ¶ 5.  Additionally, between April of 2009 and July of 2010, CPA Upsell paid pilot Scott Rye a total of $125,538.34.  *See id*. at ¶ 6.

conducted most of the repairs in his shop located behind his home in Santa Clara, Utah. *See id.* at ¶ 13.[36]

At the time Kerry Johnson rendered services to IWorks, including the private pilot and classic car consultant services, he expected that he would receive payment in the future in the event that IWorks was financially successful. His understanding was based upon conversations with his son Jeremy Johnson, and his own experience as a small business owner in which he rendered services without pay in consideration for future payment from the business.[37]

Consistent with his expectation, in 2009 Employee Plus paid $697,500 in wages to Kerry Johnson to compensate Kerry Johnson for the more than six years of work Kerry Johnson had performed on IWorks and Jeremy Johnson's behalf as a pilot for airplanes flown on IWorks' behalf and as a classic car consultant.[38]

Kerry Johnson also rendered professional consulting services on Jeremy Johnson's behalf in connection with Jeremy Johnson's acquisition of an interest in an oil refinery located in Wyoming. For approximately one year, Kerry Johnson worked as an electrical consultant for Jeremy Johnson, including engineering a lightning protection system and a ground grid system, as well as investigating the purchase of an oil cracker. Jeremy Johnson asked Kerry Johnson to

---

[36] *See id.* at ¶¶ 12-14.

[37] *See id.* at ¶¶ 14-15.

[38] *See* DE 830, FTC amended complaint ¶ 364.b; Receiver Complaint at ¶ 19; DE 127, Receiver First Report at p. 17; DE 1284-1, Declaration of Kerry Johnson at ¶ 16; DE 1239-1, K. Johnson 8/1/13 Depo. 78:9-79-15; DE 1242-9, Employee Plus 2009 W-2 (Depo. Exh. 382).

perform the work to investigate whether the oil refinery was a good investment for Jeremy Johnson to purchase.[39]

One of the issues Kerry Johnson investigated was profitability relating to the refining process.  Kerry Johnson recommended that the refinery sell excess by-product called "bottoms" instead of hauling the material away as hazardous waste.  Kerry Johnson investigated possibilities to sell the material for manufacture as chewing gum or asphalt.  *Id.*  He also looked into purchasing an oil "cracker," which would allow the refinery to further refine the materials into diesel fuel.[40]

Another issue Kerry Johnson was investigating was regarding repeated shutdowns the refinery was experiencing.  Kerry determined that the oil refinery required mechanical systems to dissipate electricity coming into the system, either through a lightning strike or static electricity.  Kerry Johnson designed a ground grid and worked with a contractor to develop a lightning protection system for the refinery, which he believed would address the repeated shut downs the refinery was experiencing.[41]

To compensate Kerry Johnson for the extensive work he performed in evaluating the electrical functionality and viability of the refinery, Jeremy Johnson acquired a 10% ownership interest in the refinery on Kerry's behalf and in Kerry's name.  Kerry Johnson later received $750,000 when his interest in the oil refinery was bought out.  The $750,000 that Kerry Johnson

---

[39] *See* DE 1239-1, Kerry Johnson 8/1/13 Depo. 40:18-43:23; 83:1-88:24; *see,* DE1284-1, Declaration of Kerry Johnson at ¶¶ 17-21; DE 1238-8, Jeremy Johnson 9/5/13 Depo. 25:10-33:7.; *See* DE 1239-1, Kerry Johnson 8/1/13 Depo. 88:15-90:7.

[40] *See* DE 1239-1, Kerry Johnson 8/1/13 Depo. 83:21-85:4.

[41] *See* DE 1239-1, Kerry Johnson 8/1/13 Depo. 85:18-86:24.

received in exchange for one year of work was commensurate with the compensation Kerry has received for other work Kerry has performed through his electrical company KV Electric.[42]

**B.      Relief Defendant Barbara Johnson**

Relief Defendant Barbara Johnson is the mother of Defendant Jeremy Johnson and the wife of Relief Defendant Kerry Johnson.  She is the secretary of Relief Defendant KV Electric, Inc. and a general partner in Relief Defendant KB Family Partnership.[43]

Starting in 2002 and until 2003, Barbara Johnson worked at IWorks for approximately one year.  During that time, she did not receive compensation for her services.  The services she performed included preparing mailings and managing customer lists.  She worked approximately 35 to 40 hours per week at IWorks in the years 2002 to 2003.  When she worked at IWorks in 2002 and 2003, she understood that IWorks was a small business startup that was financially unable to pay her but which needed her help in order to succeed.  Barbara Johnson understood and expected that if IWorks became a success in the future, she would receive back-pay compensation to make up for the time and effort she contributed at the ground floor during the company's formative years.[44]

As she expected, once IWorks became profitable, Defendant Employee Plus paid $77,500 to Barbara Johnson in 2009 to compensate her for the work she performed at IWorks in 2002 and 2003.  Defendant Employee Plus was the payroll processing entity for IWorks.  The

---

[42] *See* DE 1239-1, 8/1/13 Kerry Johnson Depo. 87:2-88-:14; 91:19-92:3; DE 1238-8, Jeremy Johnson 9/5/2013 Depo. 29:23.

[43] DE-830, Am.Compl. ¶¶ 362, 373, 376; DE-1099, Relief Defts' Answer at ¶ 362. *see also*, DE 1238-6, B. Johnson 7/31/13 Depo., 10:11-15; 14:9-14; DE 1239-8, KV Electric 30(b)(6) Depo. 9:12-15; 13:7-19; DE 1239-6, KB Family Ltd. Partnership Depo. 5:19-25.

[44] *See* DE 1238-6, B. Johnson 7/31/13 Depo., 20:1-21:6; DE 1284-2,  B. Johnson decl. ¶¶ 4, 6-10.

payments Barbara Johnson received in 2009 were paid in exchange for services she rendered to IWorks in 2002 and 2003.[45]

### C.   Relief Defendant KV Electric, Inc.

KV Electric, Inc. ("KV Electric") is a Utah corporation owned and operated by Kerry and Barbara Johnson.  KV Electric has been in the business of electrical contracting for about 29 years.  It currently has about 15 employees and at its largest size in the mid-1990's, employed 120 people.[46]

Although the FTC originally alleged that between January 20, 2008 and June 21, 2010, KV Electric received at least $807,505.90 in "gratuitous transfers" from Relief Defendant Zibby, LLC, after multiple subpoenas, three depositions of Kerry Johnson and a 30(b)(6) deposition, the FTC now only seeks disgorgement of $305,000 from KV Electric.

The FTC seeks to disgorge from KV Electric, Inc. the proceeds of a loan that KV Electric took out from Zion's Bank in April of 2011.[47]  The loan was secured by a $250,000 certificate of deposit.  KV Electric made the certificate of deposit ("CD") with Zion's Bank in March of 2011 with funds that that Kerry Johnson transferred to KV Electric.  Kerry Johnson had obtained the funds used to obtain the CD from the sale of certain precious metals that were given to him by his son Jeremy Johnson.[48]

---

[45] DE 830, Am.Compl. ¶¶ 45, 366; DE 1 in Case 2:12-cv-01053-MMD-VCF, Receiver Compl., ¶ 20; DE 127, Receiver First Report at p. 17; DE 1238-6, B. Johnson 7/31/13 Depo. 23:17-24:16; DE 1242-10, B. Johnson 2009 Employee Plus W-2 (Depo. Exh. 383); DE 1284-2, B. Johnson decl. ¶¶ 9-10.

[46] DE 830, Am.Compl. ¶ 373; DE 1099, Relief Defendants' Answer ¶ 373; DE 1239-8, KV Electric 7/31/13 30(b)(6) Depo. at 9:6-15, 17:8-15; DE 1239-3, K. Johnson 7/14/11 Depo. 19:14-20:24.

[47] DE 1239-8, KV Electric Depo, 63:24-64:14; 65:15-67:4.

[48] Id.

11

Importantly, and contrary to the FTC's assertions, KV Electric repaid in its entirety all of the amounts that it borrowed against the certificate of deposit.[49]  Moreover, KV Electric did not borrow $305,000 as the FTC claims; rather, the April 2011 loan was for $250,000.[50]  In any event, KV Electric repaid to Zion's Bank all amounts that it borrowed.

### D.    Relief Defendant KB Family Limited Partnership

KB Family Limited Partnership was formed as a Utah partnership in August of 1996 in connection with Kerry and Barbara Johnson's estate planning.[51]

### E.    Relief Defendant Sharla Johnson

Starting in 2000 and until her first daughter was born in 2003, Sharla Johnson worked at IWorks helping with data entry, maintaining corporate books and accounting, and assisting with other office tasks on an as-needed basis.  When Sharla started working at IWorks, it only had approximately four employees.  Mrs. Johnson worked full-time at IWorks between 2000 and 2003 on an approximately 40-hour work week.  After she had her child and stopped working in 2003, IWorks hired Scott Leavitt on a full-time basis to serve as its bookkeeper.[52]

Sharla Johnson knew that IWorks had insufficient financial ability in those early stages to compensate her contemporaneously for her services.  She was nonetheless willing to work without being paid at that time in hopes of building a successful business for her husband and family.  She also knew there was risk that the company might not be financially successful.  She

---

[49] See Exh. 3, Kerry Johnson Decl. 1/19/14, ¶¶ 2-5.

[50] Id.; see also, DE 1239-2, Kerry Johnson 11/4/2013 Depo. 101:10-19.

[51] DE 1239-3, K. Johnson 7/14/11 Depo. 32:22-35:24; DE 1239-6, KB Family Partnership 30(b)(6) Depo. 6:7-16.

[52] See DE 1239-4, S. Johnson 7/30/13 Depo. 28:10-29:20; 146:8-10; 22:6-8; DE 1284-4, S. Johnson Decl. ¶¶ 4, 10; DE 1239-9, Leavitt 2/1/11 Depo. 11:2-7; 149:18-150:18; DE 1239-10, S. Leavitt 9/6/13 Depo. 8:22-9:12.

assumed that, in such event, she would not be compensated for her time and services. Even so, based on discussions with her husband Jeremy Johnson that occurred in 2000 to 2003, she knew and understood that if and when IWorks was successful in its business endeavors in the future, she would be compensated for her time, effort, energy, and assumption of risk inherent in working without pay for a startup company such as IWorks.[53]

As such compensation for her work at IWorks in 2000 through 2003, Defendant Employee Plus paid Sharla Johnson $149,704 in 2006, $151,575 in 2007, $211,551 in 2008, and $130,309 in 2009. All of the payments issued by IWorks through Employee Plus to Sharla Johnson were paid to compensate Sharla for the work she had performed at IWorks in 2002.[54]

**RELIEF DEFENDANTS' DISPUTATION OF FTC'S STATEMENT OF FACTS**

The FTC filed its motion for summary judgment against Relief Defendants on November 26, 2013. *See* DE 1279.

> **FTC FACT:** Zibby, a Utah limited liability company, is owned by the Johnsons with Sharla as its titular owner. (DE 1279 fn. 219).

**RESPONSE:** Although it is undisputed that Jeremy and Sharla Johnson own Zibby, LLC, the fact that Sharla Johnson is a "titular" (record) owner of Zibby does not mean that she lacked control of the company. To the contrary, Sharla Johnson participated in management decisions regarding the business operations of Zibby, LLC.[55]

> **FTC FACT:** Zibby's primary business purpose is to receive and hold funds and assets from Johnson's business activities, primarily IWorks. (DE 1279 fn. 220).

---

[53] DE 1284-4, S. Johnson Decl. ¶¶ 6-9.

[54] *See* DE 830, Am.Compl. ¶ 361.c; DE 1239-4, S. Johnson Depo. 143:14146:10; DE 1263-1, FTC Exh. 1725, Tyndall Declaration at ¶ 21; DE 1284-4, S. Johnson Decl. ¶ 13.

[55] *See* Exh. 4, Sharla Johnson Decl. 1/19/14, ¶¶ 1-9.

**RESPONSE:**  Disputed in part.  The record citation does not support the contention regarding the alleged "primary" business purpose of Zibby.

**FTC FACT:**  Between 2006 and 2011, Zibby held title to various real estate investments.  (DE 1279 fn. 221).

**RESPONSE:**  Disputed in part.  The record citation does not support its contention as to the time period "between 2006 and 2011."

**FTC FACT:**  Although Zibby had "no business relationship" with IWorks, IWorks funneled millions of dollars to Zibby.  (DE 1279 fn. 222).

**RESPONSE:**  The FTC mischaracterizes IWorks' CID Response.  Interrogatory 5 asked IWorks to "describe the business purpose of IWorks' business relationship with each Johnson Company and each Related Company."[56]  The response states that Zibby, LLC had "no business relationship" (which was not defined) with IWorks, but it is undisputed that Zibby was a holding company for Jeremy Johnson and that its purpose, as alleged by the FTC itself, was to hold funds and assets from Johnson's business activities, primarily IWorks.[57]

**FTC FACT:**  The exact amount funneled to Zibby varies according the records, but it ranges between $12,470,500 and $14 million.

**RESPONSE:**  The FTC has failed to support this assertion with any citation of record evidence.  The FTC's claim that assets were "funneled" is an attempt to impugn IWorks and Relief Defendants.  Finally, the FTC admits that it cannot prove either amount; therefore, it should be limited to claiming the smaller amount.

**FTC FACT:**  Between January 1, 2006, and March 25, 2010 IWorks distributed at least $13,671,000 in capital contributions to Zibby. (DE 1279 fn. 223).

---

[56] *See* DE 20-2, IWorks CID Response (Rog 5) at Ex 3, p 14.

[57] This is one of several paragraphs in which the FTC uses conclusory words such as "funneled" to connote wrongdoing.  Such words are not statements of fact but rather argument, and the Relief Defendants do not respond herein.

14

**RESPONSE:**  Undisputed that IWorks' general ledger produced to the FTC in response to Interrogatory 56 shows that Zibby received capital contributions from IWorks in the amount of $13,671,000.  Notably, however, the FTC concedes that this amount should be "reduced by the $102,526 Zibby transferred to Guardian Title for the benefit of Kerry and Barbara Johnson."[58]  By subtracting $102,526 from amount of disgorgement sought from Zibby, the FTC recognizes that it cannot seek double disgorgement from multiple Relief Defendants for the same monies originally transferred from IWorks or Vowells.

**FTC FACT:**  Indeed, Jeremy Johnson testified that IWorks transferred more than $14 million to Zibby to fund investments. (DE 1279 fn. 224.)

**RESPONSE:**  Disputed insomuch as the FTC's assertion is not supported by the noted citation.  Jeremy Johnson did not testify that IWorks in fact transferred that amount; rather he only testified that IWorks' answer to interrogatory 56 said that the amount was transferred to Zibby.

**FTC FACTS:**  Zibby's Quickbook files show that between January 1, 2006, and March 25, 2010, Zibby received at least $12,470,500 in capital contributions from IWorks and Jeremy Johnson (fn. 225) for which it provided no consideration.  (DE 1279 fn. 226).

Additionally, in May 2007, Zibby acquired the real property on which the Johnsons residence is located.  (DE 1279 fn. 227).

Zibby Flight is a Delaware limited liability company located in St. George, UT.  (DE 1279 fn. 228).

**RESPONSE:**  Undisputed

**FTC FACT:**  It is owned by the Johnsons, (fn 229) with Sharla a titular owner. (DE 1279 fn.  230).

---

[58] *See* DE 1279 p.41 at fn. 223.

1    **RESPONSE:**  Undisputed (although it is unclear whether the FTC connotes anything

2   other than an owner of record when it says "titular").  As stated, Sharla Johnson participated in

3   management decisions regarding the business operations of Zibby, LLC.[59]

4

5    **FTC FACT:**  The primary business purpose of Zibby Flight is to hold title to
     helicopters and planes.  (DE 1279 fn.  231).

6

7    **RESPONSE:**  Disputed in part.  The record citation does not support the contention

8   regarding the alleged "primary" business purpose of Zibby Flight.

9    **FTC FACT:**  The funds Jeremy Johnson invested in Zibby Flight came from
     IWorks.  (DE 1279 fn.  232).

10

11   **RESPONSE:**  Undisputed.  However, the FTC has failed to show evidence that all of

12  Zibby Flight's capital came from IWorks.

13   **FTC FACT:**  Between January 1, 2006, and March 29, 2010, IWorks distributed
     at least $2,495,000 to Zibby Flight for which Zibby Flight provided no
14    consideration.  (DE 1279 fn.  233).

15   **RESPONSE:**  Disputed in part.  It is undisputed that IWorks' general ledger produced

16  to the FTC in response to Interrogatory 56 shows that Zibby Flight received transfers from

17  IWorks in the amount of at least $2,495,000.  Importantly, however, the FTC's citations do not

18  support its contention that those services were rendered without consideration.  Jeremy Johnson

19  did not testify, as the FTC contends, that Zibby Flight "provided no consideration;" rather, he

20  testified that he was not sure (which is understandable, given that "consideration" is a legal term

21  of art with which most laypersons would be unfamiliar).[60]   Also, contrary to the FTC's

22

23

24

25

26

27  ---
    [59]  *See* Exh. 4, Sharla Johnson Decl. 1/19/14, ¶¶ 2-9

28  [60]  *See* FTC MSJ. Exh. 1627, J Johnson Asset Deposition at 221:1-10.

16

assertion, Zibby Flight did indeed provide consideration for transfers from IWorks because Zibby Flight operated aircraft on IWorks' behalf and charged IWorks for those services.[61]

> **FTC FACT:**  Orange Cat is a Utah limited liability company located in St. George, UT.  (DE 1279 fn. 234) The Johnsons own Orange Cat, 235 with Sharla being a titular owner.  (DE 1279 fn. 236).

**RESPONSE:**  Although it is undisputed that Jeremy and Sharla Johnson own Zibby, LLC, the admission that Sharla Johnson is the "titular" owner of Zibby does not concede that she lacks of control of the company. To the contrary, Sharla Johnson *See* participated in management decisions regarding the business operations of Zibby, LLC.[62]

> **FTC FACT:**  The primary business purpose of Orange Cat is to hold assets from Jeremy Johnson's business activities, including a commodity futures trading account and title to two houses and two houseboats.  (DE 1279 fn. 237).

**RESPONSE:**  Disputed in part.  The evidence cited by the FTC does not support the contention regarding the alleged "primary" business purpose of Orange Cat.

> **FTC FACT:**  Although Orange Cat had "no business relationship" with IWorks, (fn 238) IWorks distributed at least $5,105,348.65 to Orange Cat between January 1, 2006, and March 29, 2010 for which Orange Cat provided no consideration.  (DE 1279 fn. 239).

**RESPONSE:**  Disputed in part.  While IWorks' CID Response to Interrogatory 5 stated that Orange Cat had "no business relationship" with IWorks,[63] it is undisputed Orange Cat held assets from Jeremy Johnson's business activities.

It is also undisputed that IWorks' general ledger produced to the FTC in response to Interrogatory 56 shows that IWorks distributed at least $5,105,348.65 to Orange Cat between January 1, 2006, and March 29, 2010.

---

[61] *See* Exh. 5, Scott Leavitt Decl. 1/19/14, ¶¶ 2-7.

[62] *See* Exh. 4, Sharla Johnson Decl. 1/19/14, ¶¶ 2-9

Importantly, however, none of the FTC's citations support its contention that Orange Cat provided no consideration to IWorks in exchange for the transferred assets and funds.

**FTC FACT:**  KB Family Limited Partnership ("KB Family") is a Utah limited partnership owned by Kerry and Barbara Johnson.  (DE 1279 fn. 240).

**RESPONSE:**  Undisputed.

**FTC FACT:**  KB Family was set up by Kerry and Barbara to hold property and equipment.  (DE 1279 fn. 241).

**RESPONSE:**  Disputed.  The cited evidence does not state that KB Family was "set up" for the purpose of holding property and equipment; rather, it was formed as part of Kerry and Barbara's estate planning.[64]  Nonetheless, it is undisputed that "[w]hat it does mostly is holds property and equipment and leases it."  *Id.*

**FTC FACT:**  Starting from March 2009, Jeremy Johnson gratuitously transferred substantial proceeds of IWorks to KB Family.

**RESPONSE:**  Disputed as the FTC has failed to support this assertion with any citation of record evidence.

**FTC FACT:**  KB Family deposited $50,000 in the form of two checks from IWorks in March 2009.  (DE 1279 fn. 242).

**RESPONSE:**  Undisputed.

**FTC FACT:**  Between March 10, 2009, and June 10, 2009, a company owned by Todd and Jason Vowell, Market Mastery Trading, LLC, transferred at least $82,923.10 to KB Family.  (DE 1279 fn. 243).

**RESPONSE:**  Disputed in part.  Presumably, the FTC is referencing Barbara Johnson's July 15 (not 5), 2011 deposition.  In 2011, the Department of Justice was threatening to prosecute Jeremy Johnson's entire family.  Based upon the advice of her then-counsel, Mrs. Johnson pleaded the Fifth Amendment during the cited portions of that deposition, and therefore

---

[63]*See* DE 20-2, IWorks CID Response (Rog 5) at Ex 3, p 14

did not testify as to the inquired matters.  (She was later deposed in 2013, after the DOJ indicated it did not intend to prosecute her.)  The FTC does not analyze the claimed impact of her earlier invocation of the Fifth Amendment or her later deposition.  Excluding those matters to which Barbara Johnson pleaded the Fifth Amendment, the FTC has only shown evidence of $72,000.29 in transfers to KB Family Partnership from Market Mastery Trading, LLC.  Finally, to the extent the FTC is seeking to recoup from KB Family Partnership any monies that were transferred to it from the Vowells' entity Market Mastery Trading, LLC, the FTC is seeking double disgorgement.  The FTC is simultaneously claiming that the assets of Market Mastery Trading are part of the Receivership Estate, and therefore it should be precluded from seeking disgorgement of the same monies from KB Family.

> **FTC FACT:**  Between June 16, 2009 and March 8, 2010, Paydirt Capital, another company owned by the Vowells, transferred at least $188,372.50 to KB Family.  (DE 1279 fn. 244).

**RESPONSE:**  Disputed as unsupported.  As noted, Barbara Johnson did not testify during the July 15, 2011 deposition and therefore did not testify as to the inquired matters.  Excluding the matters to which Barbara Johnson did not testify, the FTC has only shown evidence of $57,569.25 in transfers to KB Family Partnership from Paydirt Capital, LLC.  Moreover, even if the Court considers the evidence inquired about in Barbara's 2011 deposition, the FTC has still only adduced evidence of payments totaling $98,495.03.  Finally, to the extent the FTC is seeking to recoup from KB Family any monies transferred to it from the Vowells' entity Paydirt Capital, the FTC is seeking double recovery.  *See* p. 23, *infra*.

> **FTC FACT:**  Barbara Johnson testified that the transfers by the Vowells were interest payments on a loan that Jeremy Johnson had made to the Vowells.  (DE 1279 fn. 245).

---

[64]*See* Deposition (30-b-6) of KB Family Limited Partnership, DE 1239-6, FTC Ex 1635 at 6:7-13.

**RESPONSE:** Disputed. In the record citation, Barbara Johnson testified that Jeremy Johnson told her that the transfers by the Vowells were interest payments on a loan that Mr. Johnson had made to the Vowells, which is materially distinct from direct evidence from Jeremy Johnson or the Vowells regarding the same. In any event, it is undisputed that Barbara Johnson so understood the payments.

**FTC FACT:** As such, the funds are traceable to Jeremy Johnson and IWorks.

**RESPONSE:** There is no record citation for this statement.

**FTC FACT:** On December 9, 2009, $1.7 million from a home equity line of credit secured by Sharla and Jeremy Johnson's residence was transferred to KB Family in order to purchase stock in SunFirst Bank's holding company. (DE 1279 fn. 246).

**RESPONSE:** Disputed. The evidence cited by the FTC does not mention anything about a claimed "holding company." Further, Kerry Johnson pleaded the Fifth in the cited deposition testimony. Moreover, the FTC is seeking double recovery on this. *See* p. 23, *infra*.

**FTC FACT:** Kerry Johnson testified that neither he nor his wife nor KB Family incurred any risk in this transaction. (DE 1279 fn. 247).

**RESPONSE:** Disputed in part. In the citation, Kerry Johnson did not testify that he and Barbara had no "risk" in the transaction; rather, he testified that 1) he would not have to repay if stock became worthless; 2) he would share in profits 50/50 with Jeremy if stock value went up; 3) he would not owe Jeremy for half of investment if value went down; and 4) if the stock sold for 50% of its original acquisition price, Jeremy would bear the loss. Kerry did not address "risk" in any other forms in the cited testimony. Furthermore, whether or not Kerry Johnson had any "risk" in the transaction is immaterial to whether the gains were ill-gotten or whether he provided consideration for the transfers.

**FTC FACT:** Moreover, Kerry Johnson admits that he was buying the stock with funds from, and at the suggestion of, his son Jeremy Johnson, and

conveniently "could not remember" why Jeremy did not buy the stock in his own name.  (DE 1279 fn. 248).

**RESPONSE:**  Disputed.  Kerry was not buying the stock with funds from Jeremy; he was buying the stock with funds from Sharla Johnson.  Moreover, in making this allegation, the FTC fails to draw inferences in Relief Defendants' favor as non-moving parties, asking the Court to find that Kerry was somehow lying for his son's benefit when he testified he could not recall why Jeremy did not buy the stock in his own name.  Drawing inferences in Kerry's favor, the FTC and Court must accept Kerry's testimony as true that he did not know why Jeremy did not purchase the stock in his own name.

>**FTC FACT:**  In addition to her interest in Zibby, Zibby Flight, and Orange Cat, (fn 252) Sharla has personally received large gratuitous transfers of cash and real property traceable to the IWorks scam.

**RESPONSE:**  Disputed.  As established in the corporate Defendants' memorandum, IWorks' business model was not a "scam."  Also, the FTC mischaracterizes the record: The FTC has failed to support this assertion with any evidence that transfers to Sharla Johnson were "gratuitous", and in the cited testimony Sharla did not say that QuiltedWorks was the "only" business she was involved in, as the FTC claims.

>**FTC FACT:**  On December 2, 2009, Zibby transferred to Sharla via quitclaim deed the title to the multi-million dollar, 20,000 square foot residence of the Johnsons, with a current value of at least $3,829,000.  (DE 1279 fn. 253).

**RESPONSE:**  Disputed and unsupported.  Foremost, none of the FTC's citations substantiates the alleged size of the house.  Further, the FTC's assertion regarding the present value of the house lacks foundation.  FTC Investigator Tyndall purports to authenticate and attach a property record from Washington County (DE 1263-1, Exh. 1725), but that record does not set forth any value of the property in 2013.  Nor does Tyndall set forth the basis for his alleged value amount.  Finally, the FTC is seeking double recovery.  *See* p. 23, *infra*.

1
2
3

**FTC FACT:**  Sharla provided no consideration to Zibby in exchange for the transfer.  (DE 1279, fn. 254).  Shortly after the transfer was recorded, Sharla used the residence to secure a $3.1 million line of credit from SunFirst Bank.  (DE 1279 fn. 255).

4
5
6
7
8
9
10
11
12
13
14
15

**RESPONSE:**  Disputed.  Again, the FTC's citations do not support its claimed "fact."  Sharla Johnson testified that she could not remember paying consideration, not that she did not pay consideration.  Further, even assuming she did not pay consideration, such is irrelevant insomuch as the FTC is already seeking disgorgement of the value of the house from Zibby and therefore cannot seek duplicative recovery of the value of the house from Sharla.  Further, there is no support for the FTC's allegation that Sharla obtained the home equity line of credit "after" the sale of residence.  Zibby transferred the house to Sharla on December 2, 2009, but the exhibit reflects that Sharla applied for the line of credit months earlier on September 19, 2009.  Exhibit 405 to the FTC's motion (DE 1243-1) does not say anything about the residence at 529 Woodsview Circle.

16
17
18

**FTC FACT:**  Additionally, between 2006 and 2010, Sharla received $619,139 in unearned cash transfers from IWorks.  Tax records show that IWorks paid Sharla Johnson at least $578,139 through Employee Plus as a purported employee of IWorks.  (DE 1279 fn. 256).

19
20
21

**RESPONSE:**  Disputed and unsupported.  The FTC asserts that the transfers were "unearned" but FTC Investigator does not have any personal knowledge of whether Sharla worked at IWorks; his affidavit merely authenticates tax returns.

22
23
24

**FTC FACTS:**  Bank records show that Sharla Johnson received checks from IWorks totaling $41,000 in 2010.  (DE 1279 fn. 257).

Sharla did not recall the reason she had received that money.  (DE 1279 fn. 258).

25
26

**RESPONSE:**  Undisputed

27
28

**FTC FACT:**  Sharla provided no services for these gratuitous transfers of ill-gotten funds because she had not worked at IWorks since 2003.  (DE 1279 fn. 259).

22

1

2      **RESPONSE:**  While it is undisputed that Sharla did not work at IWorks after 2003, she

3  worked at IWorks handling bookkeeping and human resources through that time.  *See* Statement

4  of Facts, *supra*, at pp. 12-13.  The FTC admits that Sharla Johnson rendered services for IWorks

5  in 2003, and cites no affirmative evidence that she did so without the intent of ultimately being

6  compensated, or that IWorks did not in fact intend to compensate her for those undisputed

7  services.  Finally, the FTC's "fact" actually sets forth a legal conclusion.

8

9      **FTC FACT:**  In total, Sharla received directly or indirectly $4,448,139 from I
       Works.

10

11     **RESPONSE:**  There is no record citation for this statement.

12     **FTC FACT:**  As previously shown, KB Family received $1.7 million, which it
       invested in SunFirst Bank, and $321,295.60 in cash transfers from IWorks and

13     the Vowells.  Barbara Johnson subsequently transferred the entire $321,295.60
       KB Family received from IWorks and the Vowells to a personal bank account

14     titled in her and her husband's name.  (DE 1279 fn. 260).

15     **RESPONSE:**  Disputed.  As shown above, pp. 18-20, the FTC has not adduced

16  evidence to show transfers to Kerry and Barbara Johnson in the amount of $321,295.60.

17  Rather, at best the FTC has shown evidence of $50,000 from IWorks (DE 1279 fn. 242),

18  $82,923.37 from Market Mastery Trading, LLC (id. at fn. 23), and $98,495.03 from Paydirt

19  Capital (id. at 244), for a total of $231,418.40.  Further, the FTC is precluded from seeking a

20  double recovery of these sums in any event.  *See* p. 23, *infra*.

21
       **FTC FACT:**  In 2009, at the suggestion of his father, (fn 261) Jeremy added
22     Barbara and Kerry Johnson to IWorks' list of employees.  (DE 1279 fn. 262).

23

24     **RESPONSE:**  Disputed in part and unsupported.  The fact that Kerry suggested to

25  Jeremy that he put Kerry on the payroll does not demonstrate that Jeremy Johnson and IWorks

26

27  acted in response to or based upon Kerry's suggestion, the reason why IWorks made the

28

23

decision, or that it was Jeremy Johnson who made the decision.  That being said, it is undisputed that Kerry and Barbara Johnson were paid wages by Employee Plus in 2009.

**FTC FACT:**  Subsequently, Barbara and Kerry received a total of $77,500 and $697,500 respectively from the IWorks scheme through Employee Plus as purported "IWorks employees."

**RESPONSE:**  Disputed.  Again, the FTC fails to adduce any evidence that Barbara and Kerry received wages "subsequent" to Kerry making statements to Jeremy. It is undisputed, however, that Kerry and Barbara Johnson were paid wages by Employee Plus in 2009.

**FTC FACT:**  However, neither Barbara nor Kerry Johnson had performed any services for IWorks as employees since at least March 2003.  (DE 1279 fn. 265).

**RESPONSE:**  Disputed.  First, Barbara's testimony was limited to herself, and did not include Kerry.  Additionally, as demonstrated *supra* in Defendants' statement of facts at p. 6-11, Barbara and Kerry performed numerous services for IWorks and understood that IWorks paid them wages in exchange for those services.

**FTC FACT:**  Moreover, as Kerry Johnson confessed, IWorks paid him "a lot more than you would normally get" for the purported work he performed on his son's aircraft in 2009.  (DE 1279 fn. 266).

**RESPONSE:**  Disputed.  The FTC has grossly mischaracterized Kerry Johnson's deposition testimony.  In the noted pages, Kerry explained why he believed Jeremy had paid him more wages than what an employee might receive on an annual basis for doing the same work.  Kerry said that Jeremy did so in order to compensate Kerry for the services Kerry had previously rendered to Jeremy and IWorks.[65]

**FTC FACT:**  Additionally, in September 2008, Jeremy Johnson purchased with IWorks funds 79 1000-ounce silver bars, (fn 267) which he transferred to his parents as a gift.  (DE 1279 fn. 268).

---

[65]*See* DE 1239-1, Kerry Johnson (8-1-13) 48:6-11.

24

**RESPONSE:** Disputed as unsupported. The FTC's citations do not substantiate that the purchase was made with "IWorks' funds," that Jeremy Johnson made the purchase, that the transfer was made as a gift or that the transfer went to Jeremy Johnson's "parents."

**FTC FACT:** In August 2010, Jeremy exchanged the 79 silver bars for silver and gold coins ("precious metals"). (DE 1279 fn. 269).

**RESPONSE:** Disputed as materially vague and ambiguous. In the citation, Kerry actually testified that the bars were swapped for "mostly silver coins and gold coins" and perhaps some small silver bars. He further noted that Jeremy never physically moved the bars; Jeremy simply informed Kerry that he was trading the bars for other precious metals stored in another location.

**FTC FACTS:** The precious metals were relatively the same value as the 79 silver bars. (DE 1279 fn. 270).

In late February 2011, Kerry Johnson sold some of the precious metals, for which he received $1,000,320. (DE 1279 fn. 271).

**RESPONSE:** Undisputed.

**FTC FACT:** In April and May 2012, Kerry Johnson liquidated most of the remaining precious metals in his possession receiving $475,544.67 and $1,035,765.05 respectively. (DE 1279 fn. 272-273).

**RESPONSE:** Disputed as unsupported and mischaracterizing the evidence. According to the FTC's citations, Kerry Johnson received $1,034,765.05, *not* "$1,035,765.05" as the FTC claims. Relief Defendants presume this may be a typographical error.

**FTC FACT:** In 2011, Kerry Johnson received $750,000 in return for relinquishing his ownership interest in a refinery. (DE 1279 fn. 274).

**RESPONSE:** Disputed as unsupported. The FTC's citations only substantiate a claimed amount for sale of a business interest; they do not provide any information regarding a "refinery."

25

**FTC FACT:**   Kerry Johnson's ownership interest stemmed from a 2009 Operating Costs Agreement between himself and the owners of the refinery. (DE 1279 fn. 275).

**RESPONSE:**  Disputed as unsupported.  Kerry Johnson never testified that his interest stemmed from such an agreement.  To the contrary, in the noted citations Mr. Johnson stated that he could not recall the written agreement or any prior agreements.

**FTC FACT:**   Kerry Johnson did not provide any funds pursuant to the Operating Agreement.  (DE 1279 fn. 276).

**RESPONSE:**  Disputed as unsupported and lacking in foundation.  Although Kerry Johnson testified that he did not provide any funds pursuant to a written Operating Agreement, he was posed questions about a document he was unfamiliar with, which he said he did not recall or recognize.

**FTC FACT:**   Instead, all the funds came from IWorks and Jeremy Johnson. (DE 1279 fn. 277).

**RESPONSE:**  Undisputed that Kerry Johnson did not contribute monies to the refinery purchase, but it is uncontroverted that Mr. Johnson spent a year working on the refinery.  His work included analyzing profitability relating to the refining process, evaluating possibilities to sell oil material for manufacture as chewing gum or asphalt, investigating the purchase of an oil "cracker," and designing a ground grid and working with a contractor to develop a lightning protection system for the refiner.  *See* pp. 8-10, *supra*.

**FTC FACT:**   Finally, in July 2008, Zibby paid $102,526 to Guardian Title apparently on behalf of Barbara and Kerry Johnson to help them reacquire title to their Santa Clara, Utah home.  (DE 1279 fn. 278).

**RESPONSE:**  Disputed as unsupported.  Sharla Johnson testified that she could not recall the circumstances of that transaction.[66]  The cited evidence does not mention anything about "help[ing] [Kerry and Barbara] reacquire title to their Santa Clara, Utah home."

> **FTC FACT:**  The amount Zibby transferred to Guardian Title, $102,526, is the exact amount as the shortfall between the settlement amount and the mortgage amount for which Barbara and Kerry Johnson had been approved to repurchase the property.  (DE 1279 fn. 279).

RESPONSE:  Disputed as unsupported.  Barbara Johnson testified that she could not recall any shortfall.[67]  Additionally, the FTC is precluded from seeking a double recovery, and the $102,526 amount it claims in relation to Zibby, LLC.  To the extent the FTC admits that such amount is not being sought from Zibby, the amount is still not subject to disgorgement because the FTC has failed to prove the absence of consideration or that the monies were the result of ill-gotten gains.

> **FTC FACT:**  In total, Barbara and Kerry Johnson received $4,460,451 that can be traced directly or indirectly to the IWorks scam.

**RESPONSE:**  The FTC has failed to support this pejorative assertion with any citation to record evidence.

### SUMMARY OF FTC'S DISGORGEMENT CLAIMS

As to Relief Defendants, the FTC seeks an order "requiring Zibby to disgorge $13,568,474; Zibby Flight to disgorge $2,495,000; Orange Cat to disgorge $5,105,348.65; KB Family to disgorge $1,700,000; KV Electric to disgorge $305,000; Sharla Johnson to disgorge $4,448,139; and Barbara and Kerry Johnson to disgorge $4,460,451."  *See* DE 1279 at p. 41.

---

[66]*See* DE 1241-4 (FTC Exh. 1659) Zibby (7-30-13) Sharla Johnson 57:13-15.

[67]*See* DE 1238-6, Barbara Johnson (7-30-13) 33:23-34:18.

The following table summarizes instances in which the FTC is seeking double recovery, *i.e.*, to disgorge the same monies from multiple Relief Defendants.  In other words, in instances where money was initially transferred from IWorks and then re-transferred amongst the Relief Defendants, the FTC is seeking the value of both transfers rather than only the original transfer.

| RELIEF DEFENDANT | AMOUNT | FTC ALLEGED BASIS FOR DISGORGEMENT | CITATION – FTC MSJ DOCKET ENTRY NO. 1279 | EXPLANATION OF DUPLICATION |
|---|---|---|---|---|
| KB Family | $1,700,000 | $1.7 million from home equity line of credit | PP. 34-35, 41 | Sharla Johnson transferred $1.7 million to KB Family from a home equity line of credit she obtained that was secured by the 529 Woodsview circle.  The FTC is already seeking disgorgement of value of the 529 Woodsview house from Zibby, LLC, the entity that paid for the house's construction and the real property it was built on. |
| Sharla Johnson | $4,448,139 | Zibby transferred title of 529 Woodsview Circle house valued at least $3,829,000 | PP. 36, 41 | Zibby transferred the 529 Woodsview Circle house to Sharla Johnson on December 2, 2009.  Zibby, LLC paid for the house's construction and real property.  The FTC is already seeking disgorgement |

28

| RELIEF DEFENDANT | AMOUNT | FTC ALLEGED BASIS FOR DISGORGEMENT | CITATION – FTC MSJ DOCKET ENTRY NO. 1279 | EXPLANATION OF DUPLICATION |
|---|---|---|---|---|
| | | | | of value of the 529 Woodsview house from Zibby, because the FTC is seeking disgorgement of all capital contributions Zibby used to construct the house and purchase the real property. |
| Kerry and Barbara Johnson | $4,460,451 | $321,295 in cash transfers from IWorks and Vowells | PP. 37-39, 41 | **$271,295.16 for Vowell payments (*see* DE 1279 fn. 243-244, p. 34) composing alleged payments from Vowell-related entities.**<br><br>The FTC is already seeking recovery from the Vowells of monies transferred to them and their entities by IWorks and Jeremy Johnson. |
| | | $102,526 payment from Zibby to Guardian Title to help Barbara and Kerry reacquire Santa Clara, Utah home | | **$102,526**<br><br>The FTC is already seeking disgorgement of all of Zibby's capital, including the $102,526 it issued to pay off the mortgage on the Johnson residence. |
| KV Electric | $305,000 | Kerry Johnson individually | PP. 35, 41 | **$305,000** |

| RELIEF DEFENDANT | AMOUNT | FTC ALLEGED BASIS FOR DISGORGEMENT | CITATION – FTC MSJ DOCKET ENTRY NO. 1279 | EXPLANATION OF DUPLICATION |
|---|---|---|---|---|
| | | transferred $305,000 that is traceable to sale of precious metals that Jeremy Johnson gifted to Kerry and Barbara Johnson | | The FTC is already seeking disgorgement of the liquidated value of the silver bars directly from Kerry Johnson. |

**ARGUMENT**

**I.     SUMMARY JUDGMENT CANNOT BE GRANTED AGAINST INDIVIDUAL OR RELIEF DEFENDANTS IF THE COURT DENIES THE FTC'S MOTION AGAINST THE CORPORATE DEFENDANTS.**

The FTC's claims for relief against these Defendants are all predicated upon the FTC successfully proving as a matter of law that IWorks violated the FTC Act.  For the same reasons the FTC's motion for summary judgment against the corporate defendants should be denied, the Court should likewise deny the FTC's motion for summary judgment against Fielding, Network Agenda, Anthon Holdings, and Relief Defendants.

**II.    THE FTC HAS NOT ESTABLISHED ENTITLEMENT TO JUDGMENT AGAINST DUANE FIELDING.**

**Introduction**

The FTC alleges that Duane Fielding and two enterprises in which he had interests, Anthon Holdings Corporation and Network Enterprise, LLC, should be held liable in this matter as, respectively, an individual participating in violations of the FTC Act and entities acting as part of a common enterprise.

30

The FTC devotes most of its argument to Fielding's alleged individual liability, which the parties agree requires a two-part showing:  First, the FTC must demonstrate that the two corporate entities with which it associates Mr. Fielding are liable for a violation of the FTC Act under a common enterprise theory.  Second, the FTC must prove individual liability of Mr. Fielding for those corporations' actions.

For injunctive relief, the FTC must prove direct participation in the acts crucial to the success of the enterprise or authority to control the corporate entities.  Then, the FTC must prove the individual: (1) had knowledge of a material misrepresentation, (2) was recklessly indifferent to the truth or falsity of a misrepresentation, or (3) had awareness of a high probability of fraud along with an intentional avoidance of the truth.

As noted, devotes most of the FTC's analysis of the entities' role in Duane Fielding's alleged liability is set forth in the FTC's memorandum discussing individual defendant liability. The same approach is followed here.

The FTC tries to attach Fielding to a "common enterprise" of IWorks and a variety of other entities with the thinnest thread.  Fielding attended one IWorks customer service meeting in person and another via telephone, and sent Anthon/NA personnel to several more of these meetings.  The purpose of this attendance was to confirm that IWorks was performing its marketing contractual obligations and to visualize how Network Agenda customers were being treated, not to participate in some nefarious fraud scheme, as the FTC speculates.  Once Fielding and other Anthon/NA personnel had touched that process, they were content to no longer participate.[68]

---

[68] Exh. 2, Fielding Decl. 1/19/14, ¶ 9.

The same is true for the much-touted reports generated by IWorks, on which Fielding was copied.  Fielding testified that while IWorks may have been impressed by the whiz-bang nature of the reports (and perhaps they were cutting edge and informative within IWorks), they had little to do with Fielding's product or contract.  They became for him little more than inbox clutter.[69]

Fielding was largely unaware of the core products IWorks was selling with Network Agenda.  He knew that Jeremy Johnson felt there was good synergy between the core products and the calendaring features offered by Network Agenda, but little else.[70]  He was also provided some glimpse of the FTC's elusive guidance on compliance, and offered to compare that with sites IWorks was using to market Network Agenda as an upsell.  It appeared to Fielding that IWorks' efforts were compliant based on what he could see.[71]

The FTC makes much of the fact that Anthon/NA experienced chargebacks, and occasionally needed to take steps to mitigate chargeback rates.  For most of the tenure of the relationship between Anthon/NA and IWorks, chargeback rates were well below the threshold to raise any concerns of the merchant banks.  ECHO originally did processing for Anthon, and then Anthon migrated to Litle in 2008.[72]  Anthon never had any chargeback fines from ECHO or Litle.[73]  Later, however, affiliate and friendly fraud became more of a concern, and drove up

---

[69] DE 1237-7, Fielding 122:3-123:24

[70] Exh. 2, Fielding Decl. 1/19/14, ¶ 1; DE 1237-7, Fielding 64:9-15.

[71] DE 1237-7, Fielding 185:1-187:3; 201:11-203:6.

[72] DE 1237-7, Fielding 172:21-173:5.

[73] DE 1237-7, Fielding 173:6-13.

32

chargeback rates.[74]    (These concepts are explained in DE_____, the Corporate Defendants

memo in opposition to the FTC's motion for summary judgment, at _____.)

        The chargeback reduction plans submitted by Anthon/NA address the factors driving up

chargeback rates.  In particular, compliance monitoring of affiliates and the highest customer

service possible, are addressed.  While the FTC states that high chargeback rates are an

"indicia" [*sic*] of fraud, its rhetoric assigns the chargebacks far more credit than they deserve.  It

is improper to view chargeback rates in isolation as probative evidence of fraud, especially

where chargebacks have become more commonplace with the relaxed standards that banks now

impose on customers requesting them.  *See id.*, p. _____.  As part of its chargeback reduction

efforts, Anthon/NA would take measures to ensure that cancelling customers were not

rebilled.[75]

        Most important, the fact that Anthon/NA experienced increasing chargebacks associated

with the upsell of its product in no way creates an inference or conclusion that Anthon/NA, and

Fielding by association, were acting in concert with IWorks as anything more than a contractual

partner to market Anthon/NA's pre-existing valuable calendaring product. That Anthon/NA's

product was sold in volume by IWorks is no more evidence of a relationship creating derivative

liability than Random House books being frequently sold by Amazon.com.  In essence, the FTC

suggests that a company that developed a quality and frequently-sold product should be

condemned merely because of its sales volume.  Significantly, the FTC does not argue or even

suggest that Network Agenda was an inferior or worthless product.  Thus, the FTC is left only

---

[74] Exh. 2, Fielding Decl. 1/19/14, ¶ 15.

[75] DE 1237-7, Fielding 115:7-116:22.

with the argument that an independent retailer of the product—IWorks—could act in such a way to discredit the product's originator.  There is no basis in the law for such an inference.

### A.   There Was No Common Enterprise Between IWorks and Anthon Holdings Corporation and/or Network Agenda, LLC.

The FTC cannot establish the first prong of its burden: Anthon/NA was not controlled by IWorks or any of its principals.  Anthon was wholly owned by Fielding.  Network Agenda, LLC, was originally owned by Fielding, Jeremy Johnson and independently successful and sophisticated businessman Hyrum Smith.  Fielding was the only member/manager of NA. Smith and Johnson were members only for purposes of splitting revenue, not control.  Thus, there is no evidence that IWorks or its principals exerted any control over Anthon or Network Agenda, LLC.

As noted above, in order to find Fielding personally responsible, entities with which he had a relationship must be found to be part of a common enterprise with IWorks.  The common enterprise doctrine is based on equitable principles and covers a wide range of circumstances where parties abuse the corporate form to circumvent enforcement of the law.

Corporations "'constitute a common enterprise when they exhibit either vertical or horizontal commonality – qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues.'"  *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) (quoting *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010)).  Factors that courts consider in determining whether corporations form a common enterprise.

> include common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants.

34

1

2   *FTC v. Nat'l Urological Group*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008). Nevertheless,

3   "the pattern and frame-work of the whole enterprise must be taken into consideration." *Id.*

4   (internal quote omitted).

5       Looking at the various relevant factors, it is clear that Anthon/NA was not part of any

6   common enterprise with the IWorks defendants.

7

8       **1.     Common control.**  Anthon Holdings Corporation was wholly owned by Duane

9   Fielding, and was established to conduct a variety of businesses in 2002.  At no time before

10  Duane Fielding encountered Jeremy Johnson or IWorks, did IWorks have any control, or even

11  influence, over Anthon. Anthon Holdings developed the Network Agenda product before

12  entering into any kind of transactional or other relationship with Jeremy Johnson or IWorks.

13      When Johnson and an independent businessman, Hyrum Smith, expressed interest in

14  marketing the network agenda product, they formed a new entity, Network Agenda, LLC, in

15  order to distribute earnings among themselves, but Fielding remained the manager of the LLC,

16  not Smith or Johnson.  Fielding's primary contribution to the LLC's capital was the intellectual

17  property represented by the product Network Agenda; Smith and Johnson contributed

18  marketing savvy. Fielding retained his right to sell the Network Agenda product directly, with

19

20  the LLC retaining the exclusive right to market it as a third-party product.

21

22      All of these factors taken together demonstrate that there was no common control

23  between the IWorks entities and Anthon/NA.  It certainly shows that there is a material dispute

24  of fact as to common control.

25      **2.     Sharing of office space and officers.**  As has been noted, Fielding was the sole

26  owner and officer of Anthon Holdings, and was the sole manager of Network Agenda, LLC.

27  There was no sharing of officers.  And while the FTC seizes upon a short period of time in

28

35

which Network Agenda, LLC, occupied some vacant space in the building on Tabernacle Street, this occupancy was of short duration.  Once IWorks found a paying tenant, Network Agenda was required to find its own space, which it did.  Significantly, Anthon/NA maintained its own network, its own customer service representatives, its own merchant accounts, and did not co-locate these assets with any of those of IWorks.  These facts reflect a genuine dispute of material fact as to whether there was any sharing of office space or officers to the degree to there could be an inference of common control.

**3.    Business being transacted through a "maze of interrelated companies."**  The history of the relationships in this case is relatively simple. There is no maze, nor are there interrelated companies. Anthon Holdings had a product. It was a good product.  Jeremy Johnson saw the product, and realized that the product's sales volume could increase if it were marketed with IWorks products. He and another businessman approached Fielding, the sole owner of Anthon, and a contract was struck. To implement the contract, a new entity was formed in order to share the proceeds (Network Agenda, LLC).  Anthon transferred its ownership of the product to the new entity.

Because of the volume and complexity of the credit card sales that generated most of the revenue, specialty company CPA Upsell became involved.  Its primary purpose was to ensure processing compliance and efficiency.  At all times Anthon/NA was an independent, arm's-length contractual party with IWorks.  There is simply no evidence to support an inference that the companies were interrelated through any kind of "maze."  Moreover, the facts presented here are genuine material disputes of fact regarding this factor.

**4.    Commingling of corporate funds and failure to maintain separation of companies.**  Anthon/NA maintained separate bank accounts, both checking/operation accounts

and merchant accounts.  Fielding and Phillip Gubler, an attorney who worked for IWorks, had a friendship independent of their business association that predated any relationship with IWorks. They went scouting for deer as friends once, and Gubler offered to personally help Fielding on an issue that Anthon was having with a car flooring business associate.  The assistance Gubler rendered and that is cited in the FTC's memo was predicated on that relationship, not any relationship with IWorks.[76]

The FTC also deems suspicious the fact that IWorks and CPA Upsell addressed chargebacks associated with the Network Agenda product.  That is innocuous.  IWorks was a core product provider.  CPA Upsell later acted as a broker between IWorks and Anthon/NA. Both entities thus had the responsibility to monitor and to answer and communicate to Anthon/NA (and any other vendor) on any issues that would have to do with the rate of chargebacks, quality of customer service, or compliance with disclosure of the upsell product.[77] The companies did have common objectives: to make money through a quality product and to provide quality customer service, all through an arms-length contractual marketing arrangement.  By no means does this evidence a common enterprise.

**5.    Unified advertising.**   If this were the sole factor that defined a common enterprise, every exclusive marketing and licensing agreement in the country would make the parties thereto a common enterprise.  That is simply not the case.  IWorks marketed and advertised the Network Agenda product but did so through a marketing contract. This is not unified advertising as contemplated by the cases articulating the common enterprise factors.

---

[76] Exh. 2, Fielding Decl,. ¶ 17.

[77] *Id.*, ¶ 18.

**6.** **Evidence that reveals that no real distinction exists between the corporate defendants.**  Like the other elements, this catchall factor is not satisfied.  In light of the totality of the evidence which has been presented herein, the FTC is merely taking uncontextualized and isolated facts to try to cobble together a common relationship between Anthon/NA and IWorks.  Moreover, the FTC is improperly asking this Court to draw inferences from isolated facts to construct a common relationship between the entities, when at summary judgment all inferences must be drawn in favor of Fielding, Anthon and Network Agenda, LLC.

**B.** **Fielding is Not Individually Liable for IWorks' Alleged Misconduct**

Fielding is not personally liable for any alleged misconduct asserted by the FTC.  Fielding did not participate personally in the marketing of Network Agenda.  He set up Anthon long before IWorks or the Network Agenda software ever became a part of his life.

"Each defendant is entitled to an individualized determination of his interests."  *See FTC v. Kuykendall*, 371 F.3d 745, 758 (10th Cir. 2004).  There are two ways to hold an individual individually liable: injunctive relief and equitable monetary relief.

*Injunctive Relief*

To prove injunctive relief against an individual, the FTC must establish corporate liability under Section 5 of the FTC Act, and then prove that an individual "(1) participated directly in the acts in question or (2) had authority to control them."  *FTC v. Garvey*, 383 F.3d 891, 900 (9th Cir. 2004).

**1.** **Direct Participation.**  Participation can include an individual working at and drawing a salary from the company, even if the individual is not involved in day-to-day operations. *See, e.g.*, *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000).  Furthermore, where an officer participates in "acts crucial to the success" of an enterprise, the

38

officer has directly participated for the purposes of individual liability. *Id.*  In *J.K. Publications*, for instance, the court held that a corporate officer who had both obtained merchant accounts and purchased a database of consumers had engaged in direct participation for the purposes of individual liability.

2.     **Authority to Control.**   The FTC can demonstrate authority to control by showing "'active involvement in business affairs and the making of corporate policy.'" *Id.* at 1203 (quoting *FTC v. Am. Standard Credit Sys., Inc.*, 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)). A defendant's "status as a corporate officer and authority to sign documents on behalf of the corporate defendant can be sufficient to demonstrate the requisite control." *Id.* at 1204. Indeed, courts have held that a "corporate officer is presumed to be in control of a small, closely held corporation, and assuming the duties of a corporate officer is probative of an individual's participation or authority."  *FTC v. LoanPointe, LLC*, No. 2:10-CV-225DAK, 2011 U.S. Dist. LEXIS 104982, *26, 2011 WL 4348304, *10 (D. Utah Sept. 16, 2011); *see also Standard Educators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C. Cir. 1973) ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception."); *FTC v. Windward Mktg.*, No. Civ. A. 1:96-CV-615F, 1997 U.S. Dist. LEXIS 17114, *38, 1997 WL 33642380, *13 (N.D. Ga. Sept. 30, 1997) ("An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation.").

*Equitable Monetary Relief*

In order to prove equitable monetary relief, "the FTC must also show that the individual had actual knowledge of a material misrepresentation, was recklessly indifferent to the truth or falsity of a misrepresentation, or had awareness of a high probability of fraud along with an

intentional avoidance of the truth." *FTC v. Garvey*, 383 F. 3d 891, 900 (9th Cir. 2004). Thus, he must have knowledge of the acts, omissions or practices that the FTC alleges violates the FTC Act. *See id.* The "degree of participation in business affairs is probative of knowledge." *FTC v. Amy Travel Serv.*, 875 F.2d at 564, 574 (7th Cir. 1989); *FTC v. Sharp*, 782 F. Supp. 1445, 1450 (D. Nev. 1991).

Merely being an officer or director of a company is insufficient to impose equitable monetary relief, as "the FTC must show a heightened standard of awareness beyond the authority to control." *See FTC v. Freecom Communications, Inc.*, 401 F.3d 1192, 1207 (10th Cir. 2005). Moreover, because the FTC's burden is based on the individual's "actual knowledge," the FTC must meet its burden as to each individual defendant and cannot simply lump defendants together. *See Kuykendall, supra*, 371 F.3d at 758 (rejecting an attempt to blur defendants and stating that "each individual is entitled to an individualized determination of his interests").

In *FTC v. Publishers Business Services, Inc.*, 2013 WL 5273302, at *2 (U.S. App. 9th Cir. Sept. 19, 2013), the court affirmed a ruling out of the District of Nevada in which a president and owner of the defendant's telemarketing company was not individually liable even though she participated in administrative functions of the company, had authority to sign contracts and checks, and had power to bind the company. Likewise, in *FTC v. J.K. Publishing, Inc.*, 99 F.Supp.2d 1176, 1208 (C.D. Cal. 2000), the court held that an officer and director (though those positions theoretically provided authority to control the corporations actions), had insufficient knowledge to be held liable.

The FTC fails to meet the threshold for either of injunctive relief or equitable monetary relief. Fielding is not subject to injunctive relief because, as demonstrated, Anthon Holdings

Corporation and Network Agenda, LLC, were independent third-party companies that contracted with IWorks to market its primary product, the software network agenda.

The FTC has also failed to show any evidence that Fielding is subject to equitable monetary relief.  There was no relationship between Fielding and IWorks other than an arms-length commercial relationship to develop and sell a valuable product.  Fielding developed Network Agenda and transferred ownership rights to his entities, which then contracted to sell those rights to others in the consuming public.  IWorks was retained to conduct marketing and ensure PCI compliance and other marketing compliance.

None of the facts that the FTC has cited demonstrate any deviation from a garden-variety marketing relationship based on an arms-length contract.  Every fact that the FTC cites is either incomplete, out of context, or rebutted with specific, surgical testimony.  Fielding did not review reports from IWorks.  He did not regularly, or even sporadically, attend IWorks customer service meetings.   His read-in of IWorks compliance activities was, to him, satisfactory, as it included reviewing applicable FTC standards, and was something he was paying IWorks (handsomely) to handle.

The FTC incorrectly attempts to use Fielding's explanation as to why chargebacks were occurring as evidence that Fielding knew that IWorks was deceiving customers.  As noted, Fielding was in no position to know IWorks' alleged intentions as to deception, or anything else, for that matter, and he knew that IWorks had its own in-house counsel. IWorks represented to him its compliance with FTC Act requirements.  With all this in mind, there is no way to fairly draw an inference that Fielding knew that websites were allegedly deceptive from the quotations made by the FTC.[78]

---

[78] DE 1279 at 28-30.

The FTC also cynically cites Fielding's attempts at candor and correction to implicate him in something allegedly crooked.  Describing how consumers are confused or are not properly engaging with a website does not suggest, remotely, that Fielding knew about, much less condoned, any attempt at deception.  On its face the second letter cited by the FTC is not evidence of knowledge of deception.  What is stated in the letter is no different than any garden-variety continuity program, such as offered by a gymnasium or a magazine.  Consumers may or may not terminate these programs, but both federal law and principles of economics recognize that continuity programs extending beyond a certain time are deemed legitimately accepted. The FTC fails to articulate the material factor that converts this continuity program into deception, or how Fielding's knowledge of it converts him into some sort of accomplice.

The same is true about Fielding's knowledge of complaints to the Better Business Bureau or state attorneys general.  Fielding unequivocally qualified that to his knowledge the complaints were sporadic at best.[79]  (Which is true – the FTC points to only a tiny ratio of complaints for the Network Agenda product.)  Knowledge of sporadic complaints does not show knowledge of deception; with the volume of sales experienced with the Network Agenda software, it would be surprising if there were *no* complaints.

As has been shown, the FTC's attempt to demonstrate a link between Fielding and IWorks is a series of uncontextualized statements and isolated instances of words and conduct the FTC would characterize as embedded and rampant rather than isolated and sporadic.  It is beyond the pale for example, that the FTC would take one quote by Fielding so completely out of context:  In August 2010, computer glitches at IWorks were causing problems with deposits

---

[79] DE 1237-7, Fielding 205:10-206:11.

42

being made into Anthon/NA's operating accounts.  Fielding was attempting to deal with repeated overdraws on certain accounts, and having to reassure the bank (SunFirst) that the problem would be corrected.  In desperation, he sent an email to Jeremy Johnson telling him his efforts to appease the bank on this were running dry.[80]  The FTC used this email as follows: "Fielding knew that IWorks' sale sites were misleading consumers and generating high chargebacks. At one point, he warned Johnson 'We are running out of smoke and mirrors to keep [Elite Debit accounts at Sun First] alive.'"[81]

This is a gross misrepresentation.  The quoted email had nothing to do with chargebacks or consumer deception.  It had to do with garden variety IT issues that were causing a sync failure between deposits and withdrawals, which in turn were causing bank balances to go into the red and racking up overdraft fees, and ultimately threatening Anthon/NA's ability to retain its checking account with Sun First Bank (which was not even a merchant or card processing bank).  It was serious business, to be sure, but not the nefarious failure to advise consumers the FTC alleges.  It is unfortunate that the FTC would stoop to this level of mischaracterization to advance a point that is, in reality, a fabrication.

---

[80] Exh. 2, Fielding Decl. 1/19/14, ¶ 19.

[81] DE 1279 at 28.  The Sun First accounts were opened by Elite Debit with the Elite Debit address (which was the same as that of IWorks' accounting) as an attempt to use their software to allow customers the option to pay via electronic check.  This option never launched for Network Agenda.  In the meantime, because of the software, fees were being withdrawn from Network Agenda's low balance sweep accounts, which threatened their closure.  *See* Exh. 2, Fielding Decl. 1/19/14, ¶ 20.

1

2

**C.      This Court Lacks Jurisdiction to Award "Equitable Monetary Relief"
        Beyond Those Assets That Have Been Collected and Held by the Receiver
        Over the Last Three Years.**

3

4

The FTC's memorandum asks the Court for "monetary relief in the amount of

5

$280,911,870 to redress the numerous victims" of IWorks' conduct.  But the law is clear – and

6

the FTC itself has acknowledged – that it is not entitled to any such award.

7

At the inception of this case, the FTC defined its requested remedies and acknowledged

8

the limits to them.  In its motion for temporary restraining order,[82]  the FTC specifically stated,

9

in preparing the proposed order (which the Court ultimately signed), that the assets to be frozen

10

included the assets of Jeremy Johnson and the corporate defendants, and also including "assets

11

obtained after the time this Order was entered *if the assets are derived from the conduct alleged*

12

*in the Commission's Complaint.*"[83] (*Emphasis added.*)

13

Later, the FTC submitted its first amended complaint.[84]  The FTC specifically prayed for

14

the following:

15

16

> 3. Award such relief as the Court finds necessary to redress injury to consumers
> resulting from the Defendants' violations of the FTC Act, EFTA, and Regulation
> E, including, but not limited to, rescission or reformation of contracts, restitution,
> the refund of monies paid, and the disgorgement of ill-gotten monies;
> 4. Enter an order requiring Relief Defendants to disgorge all funds and assets, or
> the value of the benefit they have received from the funds and assets, *which are
> traceable to Defendants' unlawful acts or practices* . . . .[85]  (*Emphasis added.*)

17

18

19

20

21

In both its prayer and its argument, the FTC acknowledges that it is limited to seeking

22

only those monies traceable to any alleged misconduct.  And, as discussed herein, the case law

23

24

25

[82] DE 17.

26

[83] DE 17-4 at 9:9-12 (emphasis supplied).

27

[84] DE 830.

28

[85] DE 830 at 87:8-16.

is similarly clear:  The Court lacks authority to enter an award that exceeds the assets remaining in existence that are specifically traceable to the alleged violations.  That figure is ascertainable here, because the Court appointed a receiver to investigate and determine that very thing:  all assets (allegedly) traceable to the defendants' claimed FTC Act violations.  And the receiver has done so, devoting three and one-half years and approximately $6 million to the effort.[86]

The FTC's motion includes a request that the receivership estate be liquidated and the receivership terminated.[87]  At that point, a final determination will have been made as to the assets attributable to the alleged unlawful activities.  Those assets constitute the final definable pool of traced monies and things that can be used to satisfy an equitable award.  The FTC may not seek what amounts to a damages award exceeding that definable pool.[88]

As the FTC acknowledges, this Court is sitting in equity, and only equity.  It may not award damages, or make a punitive award.  The FTC Act empowers the FTC to seek a wide range of equitable remedies in federal court. Under Section 13(b) of the Act, those remedies and sanctions include injunctive relief, and, as interpreted by subsequent federal court decisions, other "equitable relief" for the benefit of consumers. As exemplified by this case, the FTC routinely demands "disgorgement" of ill-gotten gains, and district courts routinely grant it, based on the essential premise that this monetary sanction in fact constitutes "equitable relief"

---

[86] DE 236, 517, 688, 836, 1169.

[87] DE 1280 at 70:1-7.

[88] The exact amount of the estate (and thus, the maximum monetary award) cannot be determined until the receivership is terminated.  Some of the physical assets claimed by the Receiver have not yet been sold, and the Receiver's last invoice for his and his attorney's expenses was only through July 31, 2013. DE 1169.

45

rather than punitive or legal relief.[89]   But in many cases - this one being a quintessential example with the FTC seeking far more money than is available in the receiver's hands - the requested "disgorgement" order improperly seeks to impose a personal liability on IWorks and the individual defendants to pay a sum of money approximating gains that are no longer available for the defendant to "disgorge."

Congress has never explicitly included disgorgement among the remedies and sanctions the FTC may seek from a federal court.  Despite the absence of such explicit authority, the FTC has sought the remedy in federal courts for decades and courts have granted it for nearly as long (often without meaningful challenge).  Courts initially held that disgorgement (or "restitution," as some courts labeled it early on), while not explicitly authorized by Congress, was an ancillary remedy within a court's general equitable powers and specific statutory authority to grant injunctive relief. *See, e.g., SEC v. Texas Gulf Sulfur Co.,* 446 F.2d 1301, 1307-08 (2d Cir.), *cert. denied,* 404 U.S. 1005 (1971); *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1103-04 (2d Cir. 1972); *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1230 (D.C. Cir. 1989) (disgorgement is available "simply because the relevant provisions … vest jurisdiction in the federal courts").

Indeed, over time some courts came to regard the equitable nature of disgorgement as essentially a truistic premise. *See, e.g., SEC v. Certain Unknown Purchasers,* 817 F.2d 1018, 1020 (2d Cir. 1987) ("[t]he disgorgement remedy … is, *by its nature*, an equitable remedy"

---

[89] And often only because the defendants, with frozen assets, can mount no meaningful defense.  "The court's opinion in *FTC v. Febre,* 128 F.3d 530 (7th Cir. 1997) seems to offer very weak precedential value because of the circumstances of the case.  The defendants defaulted in their obligations to contest the factual claims of the plaintiff, resulting in the Court's per se acceptance of the FTC's remedy calculations."  George P. Roach, A Default Rule of Omnipotence: Implied Jurisdiction and Exaggerated Remedies in Equity for Federal Agencies, 12 Fordham J. Corp. & Fin. L., 97 (2007).

46

(emphasis added)), *cert. denied*, 484 U.S. 1060 (1988); *SEC v. First City Fin. Corp.,* 890 F.2d at 1230 ("[d]isgorgement is an equitable remedy"); *SEC v. Wang,* 944 F.2d 80, 85 (2d Cir. 1991) (same); *SEC v. Huffman,* 996 F.2d 800, 802 (disgorgement is an equitable remedy akin to an injunction), *reh'g denied*, 4 F.3d 992 (5th Cir. 1993); *cf. SEC v. Clark,* 915 F.2d 439, 453 (9th Cir. 1990)(disgorgement is "included" within the power to grant injunctive relief).

Courts have generally described disgorgement as "an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others" from violating the law. *First City Financial,* 890 F.2d at 1230 (citing cases from other circuits); *see also SEC v. First Pac. Bancorp,* 142 F.3d 1186, 1191 (9th Cir. 1998), *cert. denied*, 525 U.S. 1121 (1999); *SEC v. Hughes Capital Corp.,* 124 F.3d 449, 455 (3d Cir. 1997) (quoting *First City Financial*). Courts also generally hold that disgorgement cannot be used punitively and thus must be limited to an amount causally connected to the wrongdoing. *See, e.g., First City Financial,* 890 F.2d at 1231 (citing cases from other circuits).

In calculating the disgorgement amount, courts generally hold that disgorgement must represent a "reasonable approximation" of the alleged ill-gotten gains. Once the FTC offers such an approximation, the burden shifts to the defendant to rebut it. *See, e.g., First City Financial,* 890 F.2d at 1231 (citing cases from other circuits); *SEC v. Platforms Wireless Int'l, Inc.,* 617 F.3d 1072, 1096 (9th Cir. 2010) (citing *First City Financial); SEC v. Patel,* 61 F.3d 137, 139-40 (2d Cir. 1995) (same); *SEC v. Happ,* 392 F.3d 12, 31 (1st Cir. 2004) (same).

Most of the Supreme Court cases predate 2002 Supreme Court case law, or simply pre-dates 2002 cases without analysis. In short, it is undisputed that federal courts lack power to order disgorgement in FTC cases unless the sanction is a form of "equitable relief" that issues out of the section 13(b) power to secure an injunction. For decades, the FTC and the lower

courts have effectively treated disgorgement orders as inherently equitable, while uniformly acknowledging that "disgorgement may not be used punitively." *SEC v. First City Fin. Corp.,* 890 F.2d 1215, 1231 (D.C. Cir. 1989).  But in a case like this one, where the defendant no longer possesses the relevant ill-gotten gains because those gains long ago passed on to a receiver, an order requiring payment of the nonexistent funds many years later cannot plausibly be called either "disgorgement" or a remedy in equity.

In *Great-West Life & Annuity Insurance Co. v. Knudson,* 534 U.S. 204 (2002), the Court addressed whether the monetary relief sought in that case - reimbursement of insurance funds previously paid to a beneficiary, who had later recovered other funds in a settlement reached with a third-party tortfeasor - fell within the broad scope of "equitable relief" authorized by Section 502(a)(3) of the Employee Retirement Income Security Act of 1974. The analysis in *Great-West* was not ERISA-specific.  The court was required to assess equity generally, as a threshold, non-statutory matter.  This required the court to analyze the broad question of what is legitimate "equitable relief" under federal law.

The court acknowledged that *some* forms of restitution are equitable in nature, but emphasized that others were not, and instead are available only at law. The court quoted from earlier precedent to emphasize that "equitable relief," as used without qualification in the statute at issue in *Great-West*, "must refer to 'those categories of relief that were *typically* available in equity.' " 534 U.S. at 210 (quoting *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 256 (1993) (emphasis in original)).

The Court distinguished between "restitution at law" and "restitution in equity," holding that only the latter falls within a court's equitable powers. The Court described "restitution at law" – which a court on equity cannot order -- in a manner that fairly captures the essence of the

disgorgement sought by the FTC in this case: "In cases in which the plaintiff 'could *not* assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him,' the plaintiff had a right to restitution *at law* through an action derived from the common law writ of assumpsit." *Id.* at 213 (citations omitted; emphasis in original). "In such cases," the Court continued, "the plaintiff's claim was considered legal because he sought 'to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money.' " *Id.* (citations omitted).

The Court then contrasted the separate concept of restitution in equity:

> In contrast, a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, *where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession.* A court of equity could then order a defendant to transfer title (in the case of the constructive trust) or to give a security interest (in the case of the equitable lien) to a plaintiff who was, in the eyes of equity, the true owner. *But where "the property [sought to be recovered] or its proceeds have been dissipated so that no product remains, [the plaintiff's] claim is only that of a general creditor," and the plaintiff "cannot enforce a constructive trust of or an equitable lien upon other property of the [defendant]." Thus, for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession.*

*Id.* at 213-14 (internal citations omitted; emphasis added).  Because the plaintiffs in *Great-West* were seeking to impose the type of personal monetary liability described by the Court as *legal* restitution, the Court held that the remedy was not within the district court's equitable power.

The issue here, then, is whether the disgorgement the FTC seeks here is equitable or legal in nature.   To answer that question, *Great-West* requires some historical research. Disgorgement is a relatively modern concept, particularly in the context of law enforcement. It was not known as such to historical courts of chancery, much less "typically" granted by them.

Similarly, it was neither known, contemplated, nor "typically" awarded even when Congress enacted the FTC Act in the 1930s. And as best we can tell, neither "disgorge" nor "disgorgement" appeared in Black's Law Dictionary until publication of the Seventh Edition in 1999.

One commentator found "only 11 cases in federal and state case law that were published between 1800 and 1960 that use the term 'disgorgement' in any context".   Roach at 47 & n. 175.   The Government Accounting Office has likewise reported that "[t]he use of the disgorgement sanction in securities law violation cases is a relatively recent phenomenon. Disgorgement was first ordered in a securities law violation case in 1970." Government Accounting Office, Report No. 94-188, *Securities Enforcement Improvements Needed in SEC Control Over Disgorgement Cases*, at p. 2 & n.3 (August 1994) (available at www.gao.gov/assets/230/220095.pdf).   The closest historical antecedent to modern disgorgement is probably restitution, which as previously noted is the label some of the earliest disgorgement cases put on the remedy, and which happens to be the remedy the court specifically dissected at length in *Great-West.*

Here, the FTC has specifically acknowledged that its enforcement authority to be limited to assets accrued as a result of the allegedly violative acts. This court is jurisdictionally required to hold the FTC to that assertion, as Congress has given this court jurisdiction to act only in equity, not at law. The FTC, through its receiver, has had an opportunity over three years to gather and trace a pool of assets upon which it can exercise recoupment. Thus, the power at the FTC seeks may be wielded against definable assets--but nothing more.

With a traceable pool of funds over which to impose equitable relief, this Court lacks jurisdiction to issue an order that imposes a mere personal liability on IWorks and the individual

defendants to pay a sum of money calculated as a "reasonable approximation" of ill-gotten gain. Yet, by citing a dollar figure in the same paragraph as its own self-limiting language, this is precisely what the FTC is attempting to do. The FTC seeks, in asserting a claim to over $280 million, an inherently legal and punitive award.  This the Court cannot do.

> **D.      In any Event, Any Award of Disgorgement or Equitable Restitution is Predicated on Unjust Enrichment, Which Is Measured by Defendants' Gain (Profit), Not Consumer Loss (Revenue)**

The concept of "equitable restitution" is at base an economic one, rooted as it is in equity.  Equity's aim is fairness, and the discipline of economics devotes much of its energy to achieving efficiency and fairness.   Recent scholarship and jurisprudence demonstrate that macroeconomic principles, albeit at times counterintuitive, should still govern.  A remarkable example is courts' recent revisiting of the concept of instantaneous dissemination of information that underscores the "fraud on the market" concept.  That concept is now under increasing scrutiny and potential repudiation because, simply stated, it does not reflect economic reality. *See Amgen, Inc.  v. Connecticut Retirement Plans and Trust Funds*, 132 S. Ct. 2742 (2013); *see also*,                 Fraud-on-the-Market                 Theory                 Questioned, http://apps.americanbar.org/litigation/litigationnews/top_stories/061213-fraud-on-the-market.html

As explained by Dr. Robert Vigil, an economist who offered unrebutted economic testimony, economic principles suggest that only profit be disgorged, with no requirement that funds expended in costs be disgorged.  Vigil Report. P. 19-20.  "In this case, Defendants did not gain by the amount of the net revenues received. This is because the Defendants incurred certain costs in order to develop, market, and administer the products at issue. Subtracting amounts satisfies basic principles of economic efficiency. It ties the amount of restitution paid to

51

consumers to the amount of "ill-gotten" gains of the Defendants, while accounting for contributions made by the Defendants to the accused products and the role of these contributions in generating the accused revenues." Vigil Report at 19-20. In other words, he opines that profits, not gross revenues, are the proper measure of an unjust enrichment equitable recovery.

Forcing disgorgement of only profit—not total revenue (which the FTC insists on here) -- is the historical norm, as explained by the Restatement of Restitution and eminent scholarship. RESTATEMENT OF RESTITUTION (1937); Laycock, THE SCOPE AND SIGNIFICANCE OF RESTITUTION, 67 Tex. L. Rev. 1277, 1287-90 (1989). Equity has never required restitution of all revenue. Under the traditional and accepted definition of equitable restitution, such a remedy is always net—never gross. Laycock at 1282-83; *see, e.g. FTC v. QT Inc*., 512 F.3d 858, 863 (7th Cir. 2008). Some case law may have strayed from this definition, and it is on this case law that the FTC relies. *See, e.g., FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993). However, *Great-West* subsequently clarified the importance of parsing the historical application of equitable remedies and ensuring that they were not expanded beyond their traditional definition.

History demonstrates that virtually all monetary equitable theories are based on the concept of unjust enrichment. Laycock at 1279-83. Enrichment is, by definition, measured by gain. Dr. Vigil explains that there are good economic reasons why "gain" is truly measured by profit. But there are common sense reasons for similarly concluding. It is difficult to conceive of how one might disgorge that which one no longer has. Disgorgement is, at base, a remedy where one literally vomits forth what one has—not what is missing. In this respect the notion that gain is measured by profit synergizes perfectly with the point made above, that equity limits

52

recovery to those amounts traceable to the allegedly offending conduct.  If revenue has been dissipated, it makes little sense to demand recovery for monies spent on suppliers, shippers, or salaries of customer support personnel – that crosses the line into damages, which the Court may not award.

The FTC cites *Figgie* to support its desire for revenue disgorgement.  But *Figgie*, as clarified by *Great-West*, is inapplicable here.  *Figgie* was a section 19 case, and thus was not bound by equitable restraints. Section 19 allows legal remedies; Section 13(b), the authority in the present case, does not). This distinction is especially clear in light of *Great-West*'s intervening clarification that equitable remedies are to be strictly applied within a historical context,[90] and there is no historical precedent for disgorging revenues as opposed to profits. Professor Laycock makes this eminently clear in his discussion of how unjust enrichment, which is the underpinning of disgorgement, always assesses the remedy in terms of the defendant's gain, not the consumer's loss.  And defendant's gain is, definitionally, profit, not revenue.  Laycock 1278-81.  *See also* John Villafranco and Daniel Blynn, Consumer Redress

---

[90] *Figgie*'s ancestry is suspect in any event.  As noted, *Figgie* concerned an FTC claim under Section 19, whose remedies "may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages." To justify revenue disgorgement and refusal to offset the value of Figgie's product against Figgie's payment obligation, *Figgie* stated that restitution could be available even when the goods in question are not worthless.  *Figgie* at 15.

      *Figgie* cites *FTC v. International Diamond Corp.*, 1983-2 Trade Cases Par. 65,506, (N.D. Cal. 1983) for this proposition.  However, International Diamond was based on traditional remedies in equity under section 13(b).  The rejected proposition--that worthlessness was required to invoke restitution— was actually rooted in historical equity principles, as reflected by FTC administrative practice.  That practice was overturned by *Heater v. FTC*, 503 F.2d 321 (9th Cir. 1974).  But in eviscerating FTC practice, *Heater* threw the baby out with the bath water.  The correct self-imposed restraint the FTC employed of only awarding restitution in the face of a worthless product was discarded along with the administrative practice.  Subsequent opinions used this as an excuse to ignore the restraint's heritage in equity doctrine, improperly unmooring FTC restitution from its equity roots. Roach 14-17.  *Great-West* repudiates this disconnect with history.

Under Section 13(b) of the FTC Act: Correcting the Record, November 2010 *Regulatory Focus* 8.

Professor Laycock provides an erudite discussion of equitable disgorgement being measured by unjust enrichment, which is always moored to defendant's gain and not consumer loss. Others have addressed how there could be any confusion in this area at all if the old courts of chancery were so clear on the matter. Again, history instructs. The FTC's pursuit of revenue (gross) disgorgement is borne of an equivocation, since both the concepts of "restitution" and "disgorgement" can be legal or equitable remedies. It is possible for a court bounded only by equity to cite to a "restitution" case that was based on a legal theory, and thus misstep and allow the often greater restitution allowed in a court at law (rather than a court of equity). Roach 67-68.[91] This is why *Great-West* saw the need to label restitution as either legal or equitable.

"[I]t is clear that none of [the cases supporting the FTC's position] comply with the process envisioned in . . . *Great-West*. No attempt is made to determine if the proposed remedies are traditional remedies in equity and no attempt is made to determine whether the proposed restitution is at law or in equity. Whether the remedy is labeled as restitution, disgorgement, consumer redress, refund, or reimbursement, the remedies remain either restitution of revenues, compensating damages, or both. At most, the cases in this area recite that disgorgement or restitution is an equitable remedy and fail to look beneath the label." Roach at 95-96.

The FTC use of inapt labels not only is unmoored from history (a mooring required by *Great-West*), but it would allow remedies in the name of equity that are, in reality, abhorrent to

---

[91] The essential contradiction in most of the case law relating to implied jurisdiction is that the agencies opt for the advantages of jurisdiction in equity, but resist the concomitant obligation to conform their remedies to traditional remedies in equity. *See generally* Roach *passim*.

equity because of their negative impact on substantive rights.  Labeling a punitive or legal label as an equitable one not only disregards jurisdictional bars (such as that allowing the FTC to bring an action in federal district court instead of commencing with an administrative action (section 19 v. section 13(b)), but also erodes, or eliminates, the fundamental guarantees or rights normally afforded defendants to actions at law, concerning such issues as the right to a jury trial, the applicability of statutes of limitations, the ability to execute on a judgment, characterization of debt under the Fair Debt Collections Act, and contempt potential for failure to pay.  Roach *passim*.  In short, the FTC used equity to get into the courthouse; it cannot now seek non-equitable remedies.

## III.   THE FTC HAS NOT DEMONSTRATED ENTITLEMENT TO SUMMARY JUDGMENT AGAINST THE RELIEF DEFENDANTS.

The FTC asserts a single claim for relief against Relief Defendants entitled "Disgorgement of the Assets Held by Relief Defendants in Constructive Trust for the Benefit of Consumers."[92]  The Court should deny summary judgment because there is a genuine dispute of material fact regarding whether the funds are "ill-gotten" gains and regarding whether Relief Defendants completely lack a legitimate claim of entitlement to the assets.[93]

### A.   Legal standard applicable to equitable disgorgement claims against nominal parties such as Relief Defendants.

"A nominal defendant is a person who 'holds the subject matter of the litigation in a subordinate or possessory capacity *as to which there is no dispute*.'"  *SEC v. Colello*, 139 F.3d 674, 677 (9th Cir.1998) (*quoting SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir.1991) (emphasis

---

[92] *See generally*, Amended Complaint DE 830 at ¶¶ 480-484.
[93] The Relief Defendants previously filed a motion for summary judgment (DE 1284); to avoid unnecessary duplication, the arguments set forth in that motion, which are similar but more expansive than the arguments stated herein, are not repeated.

added)).  "The paradigmatic nominal defendant is 'a trustee, agent, or depositary ... [who is] joined purely as a means of facilitating collection.'"  *Id.*  Such a person may be joined in an enforcement action "to aid the recovery of relief," provided that he "has no ownership interest in the property which is the subject of litigation."  *SEC v. George*, 426 F.3d 786, 798 (6th Cir.2005) (internal quotation marks omitted).

As noted above, to seek disgorgement of funds from a nominal "relief" defendant, the FTC's burden is to prove that 1) the named defendants actually violated the Act, 2) the assets the FTC seeks to disgorge are specifically traceable to the violations, and 3) the relief defendants have no legitimate claim to the funds at issue.  *See e.g. Colello*, *supra* at 677; *SEC v. Ross*, 504 F. 3d 1130, 1142 (9th Cir.2007) (same); *see also*, *Smith v. SEC*, 653 F.3d 121, 128 (2nd Cir.2011) (*quoting FTC v. Bronson Partners, LLC*, 674 F.Supp.2d 373, 392 (D.Conn.2009)); *FTC v. Think Achievement Corp.*, 144 F.Supp.2d 1013, 1020 (N.D. Ind. 2000); *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1009 (N.D. Cal. 2010) *aff'd* 475 F. App'x 106 (9th Cir. 2012); *FTC v. Transnet Wireless Corp.*, 506 F.Supp.2d 1247, 1273 (S.D.Fla.2007).

Because the FTC bears the burden of proof on this element, it must establish as a matter of law (among other things) the absence of any consideration, or provision of services, or other means by which the recipient can legitimately claim to have earned or to have an interest in the asset.  The FTC's burden includes the elimination of any claim of consideration, because relief defendants who have provided some form of consideration in return for the proceeds of alleged fraud are beyond the reach of the district court's disgorgement remedy.  *See Ross, supra* at 1141-1142; *Janvey v. Adams*, 588 F.3d 831, 834-835 (5th Cir.2009); *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir.2002); *Transnet Wireless Corp.*, *supra*, 506 F.Supp.2d at 1273; *U.S. Commodity Futures Trading Com'n v. Schiera*, No. CV05 2660 CAS,

56

2006 WL 4586786, *6 (S.D.Cal. Dec. 11, 2006); *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir.1998) (same); *see also FTC v. Direct Marketing Concepts, Inc*., 648 F. Supp. 2d 202, 222-223 (D. Mass. 2009); *FTC v. Bronson Partners*, *LLC*, 564 F. Supp. 2d 119 (D. Conn. 2008); *FTC v. Bronson Partners, LLC*, 674 F. Supp. 2d 373, 392 (D. Conn. 2009).

**B.      There is a genuine dispute of material fact regarding whether the transferred assets and funds are ill-gotten.**

As noted in Section I, *infra*, because the FTC must prove that the transferred funds are "ill-gotten," the Court cannot grant summary judgment against the Relief Defendants if the Court concludes that there is a genuine dispute of material fact on the issue of IWorks' liability for the claimed violations of the FTC Act.

**C.      The FTC has failed to adequately support its motion against Relief Defendants and mischaracterizes the record evidence.**

The disputation of the FTC's evidence set forth on pages 13-17, *supra*, identifies in detail deficiencies in the FTC's claimed evidence against Relief Defendants.  Where the FTC has failed to adduce evidence in support of its burden of proof, summary judgment may not be granted.  *Pike v. Hester,* No. 3:12-cv-00283-RCJ-VPC (D. Nev. July 9, 2013) (Jones, J.) ("If the moving party fails to meet its initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.").

While the FTC has substantiated many of its claimed transfers, it has failed to adduce evidence to back up all of the alleged transfers from the Vowells' entities, and wholly mischaracterizes the evidence in other instances.  For example, the FTC claims that Barbara and Kerry Johnson received from Paydirt Capital, a company owned by the Vowells, at least $188,372.50 that was transferred to KB Family between June 16, 2009 and March 8, 2010.  *See* DE 1279 fn. 244.  The problem with that assertion is that a close examination of the cited

57

documents shows that the payments from PayDirt only amount to $98,495.03, not $188,372.50 as the FTC contends.

Moreover, much of that claimed amount the FTC has not substantiated because it has not introduced admissible evidence to show it undisputed that PayDirt made such payments. The FTC may argue that it is not required to adduce any such proof because Barbara and Kerry Johnson initially asserted their Fifth Amendment rights due to the (then) threat of criminal prosecution, but that would be incorrect: Barbara Johnson and Kerry Johnson later revoked their assertions of the Fifth Amendment and testified freely at deposition. The FTC was free to ask them any questions about any transactions; no adverse inference is available if the FTC simply chose not to inquire into some transactions. Thus, the total amount of transfers from PayDirt that the FTC has actually substantiated (if instances in which she pleaded the Fifth are not included) is $57,569.25.

The same holds true for the claimed payments from Vowell entity Market Mastery Trading, LLC, which the FTC claims transferred at least $82,923.10 to KB Family. DE 1279 fn. 243. While the FTC has the total right, it has not introduced any admissible evidence to substantiate the claimed payments in April. As such, it has only shown evidence of payments from Market Mastery Trading, LLC to KB Family Partnership in the amount of $72,000.29.

As other examples of the FTC's failure to substantiate its allegations, the FTC has failed to provide evidentiary foundation for numerous of its other assertions, including the claimed value of the 529 Woodsview Circle House, (DE 1279 fn. 253), and that the claimed transfers to Sharla were gratuitous (DE 1279 fn. 259).

Finally, it is undisputed that Relief Defendant KV Electric repaid the line of credit from which it originally borrowed the $305,000 that the FTC now seeks to disgorge from it.  The FTC omits this fact from its motion.

**D.    Relief Defendants have adduced affirmative evidence of "presumptive title" and therefore a legitimate claim of ownership to the transferred funds.**

The FTC's motion must be denied for the additional reason that Relief Defendants adduced affirmative evidence in support of a claim of consideration for the assets.  *See Ross, supra* at 1142.  Kerry, Barbara, and Sharla Johnson all provided extensive employment services to IWorks.  As is common in the early stages of a business, they knew that compensation would be deferred.  All of the payments issued to Kerry, Barbara and Sharla by Employee Plus were paid to compensate them for these services, which were undisputedly provided.

Kerry acted as a private pilot, an aircraft manager, investment car consultant, and a personal assistant while on pilot jobs.  Accordingly, Kerry has shown presumptive title to and a legitimate claim of ownership of the $697,500 transferred to him by Employee Plus.  Kerry also provided highly specialized consultation regarding the lighting protection grid and other electrical components of the Wyoming oil refinery that Jeremy Johnson was considering purchasing.  As such, Kerry has shown presumptive title to and a legitimate claim of ownership of the $750,000 that was generated from the sale of his interest in the refinery, which Jeremy Johnson had purchased for Kerry Johnson in exchange for Kerry's services on evaluating productivity and profitability, investigating the purchase of the oil cracker, and designing electrical grounding and a lightning protection system.

Similarly, Barbara and Sharla Johnson also provided services in exchange for the payments issued them.  Barbara Johnson handled secretarial and office responsibilities when IWorks was a mere startup.  Sharla Johnson likewise handled IWorks' bookkeeping, human

59

resources, and data entry during the business's critical early stages.  Both Sharla and Barbara contributed their effort, time, and energy to a brand new company with the expectation and anticipation that should the company become successful, they would ultimately be compensated for their services.   Based upon such, Barbara Johnson and Sharla Johnson have shown presumptive title to and a legitimate claim of ownership of the $75,500 and $643,099, respectively, transferred to them by Employee Plus.

The Relief Defendants have shown evidence of a legitimate claim of entitlement to the transferred funds, including: $75,500 to Barbara Johnson, $1,447,500 to Kerry Johnson, and $643,099 to Sharla Johnson.   The FTC might attempt to raise a dispute of fact regarding whether the Relief Defendants have shown a legitimate claim of interest, but that would defeat the FTC's own motion for summary judgment.

In this case, the Relief Defendants "received compensation in return for services rendered," and therefore they "have presumptive title to those [payments] [.]"  *Id.*   For that reason, they are not mere "custodian[s] or trustee[s]." *Id.*   Rather, they are owners of property that is legitimately their own.  Consequently, they are not properly named as relief defendants or nominal parties with respect to those assets.  Simply put, the Constitution does not permit the use of "the nominal defendant designation to deprive one whose only plausible basis for liability is a violation of the securities [or FTC] laws of either his right to full and formal service of process or his right to fully litigate the question of his own liability under the securities [or FTC] laws." *Id*. at 1142.

**IV.    IN ANY EVENT, THE MAXIMUM LIABILITY OF THE RELIEF DEFENDANTS IS THE TOTAL SUM TO WHICH THE FTC CLAIMS IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW.**

The FTC's motion for summary judgment against Relief Defendants seeks an order "requiring Zibby to disgorge $13,568,474; Zibby Flight to disgorge $2,495,000; Orange Cat to disgorge $5,105,348.65; KB Family to disgorge $1,700,000; KV Electric to disgorge $305,000; Sharla Johnson to disgorge $4,448,139; and Barbara and Kerry Johnson to disgorge $4,460,451." *See* DE 1279 at pp. 41.

Because disgorgement may be ordered only when a party has no legitimate *claim* to the property or money, the maximum liability of the Relief Defendants, if any, is the amount to which the FTC claims that it can obtain judgment as a matter of law, and which the FTC has outlined in its motion for summary judgment.

## CONCLUSION

Based upon the foregoing, Defendants Fielding and Relief Defendants, respectfully request that the FTC's motion for summary judgment be denied.

DATED this 19th day of January, 2014.

**CHRISTENSEN & JENSEN, P.C.**

/s/  Karra J. Porter
Karra J. Porter
Kelly H. Macfarlane
Phillip E. Lowry, Jr.
Sarah E. Spencer
15 West South Temple, Suite 800
Salt Lake City, Utah 84101

*Attorneys for Defendants Fielding, Network Agenda and Anthon Holdings and Relief Defendants*

61

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

I hereby certify that I have on the 19th day of January, 2014, caused the foregoing document to be served on the following via the ECF system:

4

5

6

7

8

Collot Guerard
J. Ronald Brooke, Jr.
Janice L. Kopec
Dotan Weinman
FEDERAL TRADE COMMISSION
600 Pennsylvania Avenue, NW, Room 288
Washington, DC  20580

9

10

11

Blaine T. Welsh
Assistant United States Attorney
333 Las Vegas Blvd. South, Suite 5000
Las Vegas, NV  89101
     *Attorneys for Plaintiff Federal Trade Commission*

12

13

14

Edward D Boyack
401 North Buffalo Drive, Suite 202
Las Vegas, NV 89145
     *Attorney for defendants Terrason Spinks and Jet Processing*

15

16

17

18

19

20

21

22

23

D. Neal Tomlinson
Karl O. Riley
Chad Fears
Brian Reeve
SNELL & WILMER, LLP
3883 Howard Hughes Pkwy., Suite 1100
Las Vegas, NV 89169
     *Attorneys for defendants Scott Muir, Big Bucks Pro, Inc., Blue Net Progress, Inc., Bolt Marketing, Inc., Business Loan Success, Inc., CS Processing, Inc., GGL Rewards, Inc., Highlight Marketing, Inc., Mist Marketing, Inc., Net Discounts, Inc., Optimum Assistance, Inc., Razor Processing, Inc., and Simcor Marketing, Inc.; Duane Fielding, Anthon Holdings Corp., and Network Agenda LLC; and Andy Johnson*

24

25

26

27

Gary Owen Caris
Lesley Anne Hawes
MCKENNA LONG & ALDRIDGE LLP
300 South Grand Avenue, 14th Floor
Los Angeles, CA 90071
     *Attorneys for the Receiver*

28

1
2       Jeanette Swent
        Jared C. Bennett
3       OFFICE OF THE UNITED STATES ATTORNEY
        185 South State Street, Suite 300
        Salt Lake City, UT  84111
4               *Attorneys for Intervener United States of America*

5
6       Jeremy Johnson
        529 S. Woods View Circle
7       St. George, UT 84770
                *Defendant (Pro se)*

8
9       Jacob A. Reynolds, Esq.
        HUTCHISON & STEFFEN, LLC
        10080 West Alta Drive, Suite 200
10      Las Vegas, NV 89145
                *Attorneys for Todd Vowell Parties*
11
12      And via email or First Class mail postage prepaid to:

13      Loyd Johnston
        2988 Kings Court Lane
14      Washington, Utah 84780
                *Defendant (Pro se)*
15
16      Scott Leavitt
        2271 Southgate Hills Drive
17      St. George, UT 84770

18
        Ryan Riddle
19      446 East 1410 South
        Washington, UT  84780
20              *Defendant (Pro se)*

21
        Jason Vowell
22      # 19688081 Satellite Prison Camp Tucson
        PO Box 24549
23      Tucson, AZ  85734

24

25      _____
        Anne L. MacLeod
26      Legal Secretary, CHRISTENSEN & JENSEN, P.C.

27

28

                                63