UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

JEREMY JOHNSON, et al.,

Defendants.

Case No. 2:10-cv-02203-MMD-GWF

ORDER

(Plf's Motion for Summary Judgment – dkt. nos. 1235 & 1278)

## I.   SUMMARY

Before the Court are Plaintiff Federal Trade Commission's ("FTC") Motion for Summary Judgment Against All Corporate Liability Defendants ("Motion") (dkt. nos. 1235, 1280) and Motion For Summary Judgment Against All Individual and Relief Defendants ("Individual Liability Motion") (dkt. nos. 1278, 1279). Also before the Court is Relief Defendants' Motion for Partial Summary Judgment ("MPSJ") (dkt. no. 1284). For the reasons set out below, the Motion is granted in part and denied in part. The Individual Liability Motion and the MPSJ are denied without prejudice to renew. The Court will set a status conference to address the effect of this Order on the remaining issues raised in the parties' motions and the process for the Court's consideration of these issues.

## II.   BACKGROUND

### A.   Relevant Facts

Plaintiff FTC brought this suit on December 21, 2010, against Defendants Jeremy Johnson, Loyd Johnston, Ryan Riddle, numerous other individuals, and numerous

corporate entities, including I Works, Inc. ("IWorks"), alleging that Defendants engaged in deceptive and unfair business activities on the Internet. The Amended Complaint alleges that Defendants, in essence, made misrepresentations and deceptively enrolled consumers into memberships for their products, and then charged consumers' credit cards or debit accounts for said memberships without authorization. (*See* dkt. no. 830.)

The Amended Complaint alleges the following facts. Defendants used websites to offer "free or risk-free" information about Defendants' products or programs, including government grants to pay personal expenses and Internet-based money-making opportunities with Google "Adwords." The government grant sites contained testimonials that gave the false impression that consumers would likely get the same results from the products or programs as the people in the testimonials. The websites asked consumers to fill out a form and provide their credit card or bank account information to pay for the shipping and handling of a CD with information on Defendants' products or programs. The websites' disclosures often stated that consumers were actually being enrolled in negative option membership plans and upsells bundled with the core product. The negative option plans would charge an initiation fee and recurring monthly fees for a membership. The upsells would also contain separate and recurring monthly fees.

The following counts are asserted in the Amended Complaint pursuant to Section 5(a) of the FTC Act, 15 U.S.C. § 45(a): (Count I) misrepresenting the availability of government grants to pay personal expenses; (Count II) misrepresenting that consumers using Defendants' grant product are likely to find government grants to pay personal expenses; (Count III) misrepresenting the amount of income the consumers are likely to earn using Defendants' products; (Count IV) misrepresenting the free or risk-free nature of Defendants' offers; (Count V) failing to disclose that consumers will be entered into negative option continuity plans; (Count VI) misrepresenting that consumers using Defendants' grant product are likely to obtain grants such as those obtained by consumers in the testimonials; (Count VII) misrepresenting that positive articles are from unbiased consumers who used the products offered by Defendants; (Count VIII) failing

to disclose that Defendants created the positive articles and other web pages about the products they market; and (Count IX) engaging in unfair billing practices.

The Amended Complaint also asserts a count pursuant to Section 907(a) of Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693e(a), and Section 205.10(b) of Regulation E, 12 C.F.R. § 205.10(b): (Count X) Defendants debited consumers' bank accounts on a recurring basis without obtaining written authorization.

Finally, the FTC asks for disgorgement of funds or value of benefits received in Count XI.

**B. Dispositive Motions**

The FTC moves for summary judgment as to the corporate defendants in the Motion (dkt. nos. 1235, 1280) and the individual defendants in the Individual Liability Motion (dkt. nos. 1278, 1279).

An opposition to the Motion was filed collectively by the majority of corporate defendants (dkt. no. 1343). Oppositions to the Motion were also filed separately by Loyd Johnston (dkt. no. 1346), Andy Johnson (dkt. no. 1347), Ryan Riddle (dkt. no. 1352), and Jeremy Johnson (dkt. no. 1351). The FTC filed a reply. (Dkt. no. 1387.) As to the Individual Liability Motion, oppositions were filed by the relief defendants (dkt. no. 1344), Loyd Johnston (dkt. no. 1346), Andy Johnson (dkt. no. 1347),and Scott Leavitt and Employee Plus, Inc. (dkt. no. 1358). The FTC filed a reply. (Dkt. no. 1386.)

The filings by Loyd Johnston and Andy Johnson consist of two paragraphs each and are merely brief statements of opposition. (Dkt. nos. 1346, 1347.) There are also non-substantive joinders to the various oppositions filed by other defendants. (Dkt. nos. 1348, 1349, 1350.)

The Relief Defendants also filed a Motion for Partial Summary Judgment as to the disgorgement claim in Count XI. (Dkt. no. 1284.) In their motion, the Relief Defendants argue that the FTC has failed to demonstrate that they did not have legitimate claims to the challenged assets. (*Id.*) The FTC filed an opposition (dkt. no. 1335) and the Relief Defendants filed a reply (dkt. no. 1384). The FTC presents its affirmative argument as to

Relief Defendants' disgorgement of assets in its Individual Liability Motion. (Dkt. no. 1279.) The Relief Defendants thus challenge disgorgement in both their opposition to the Individual Liability Motion and their MPSJ. (Dkt. no. 1284 at 3.)

In order to reach the issues of individual liability and disgorgement raised in the Individual Liability Motion and the MPSJ, the Court must first determine whether any violation of the FTC Act and EFTA actually occurred. The FTC's Motion (dkt. no. 1280) presents the FTC's arguments as to why there are no genuine issues of material fact as to the Amended Complaint's alleged violations of the FTC Act and EFTA. Therefore, in determining whether the websites at issue violated the FTC Act and EFTA, the relevant filings are the Motion (dkt. no. 1280), the Corporate Defendants' opposition (dkt. no. 1343), Ryan Riddle's opposition (dkt. no. 1352), Jeremy Johnson's opposition (dkt. no. 1351), and the FTC's reply (dkt. no. 1386.)

The Court held a hearing on the Motion, the Individual Liability Motion, and the MPSJ on October 16, 2014. (Dkt. no. 1536.)

## III. SCOPE OF THIS ORDER

The FTC has provided over one-hundred exhibits of grant websites. For the most part, each exhibit consists of several pages of images. The images are captured through various methods, including images received from the Better Business Bureau, from Defendants' brokers, from Defendants themselves and the FTC's own undercover investigations. The FTC also provides an expert report from Dr. Nathaniel Good, who analyzed 125 websites provided to him by the FTC and gave his opinion as to the consumer experience. (Dkt. no. 1261-9, Good Report, Exh. 1418.) It is not clear from the record, however, which sites were reviewed by Dr. Good and the source of those sites. The FTC states that it filed the sites that Dr. Good relied upon as "GR" exhibits, but the "GR" designation was only for exhibits that had not already been presented to the Court. (Dkt. no. 1280 at 4 n.8.) It is therefore not apparent which of the many exhibits already presented to the Court were reviewed by Dr. Good before making his report.

///

Defendants' counsel stated at the October 16, 2014, hearing that the sites presented by the FTC are a drop in the bucket compared to the full extent of website variations employed. Defendants provide a report from their expert Dr. Robert Vigil, which states that the sample provided by the FTC is not statistically significant because IWorks, its affiliates, and its brokers "used hundreds (or possibly thousands)" of different pages to sell their products. (Dkt. no. 1262-1, Vigil Report, Exh. 1426.) Dr. Vigil states that his understanding of the reason for the large amount of different pages is that Defendants' individual affiliates engaged in "multivariate testing," in which live websites were repeatedly changed to determine which changes increased purchases. (*Id.*) Defendants argue that they are not liable for the websites of these affiliates. (Dkt. no. 1343 at 47.)

The FTC argues that the sites presented to the Court are all that are available and asks the Court to draw conclusions as to all of Defendants' sites, presented to the Court or not, based on the exhibits presented and Dr. Good's report.

Given the breadth of this case, its complexity, the unique way in which Defendants' affiliates marketed and tested their websites, and various other reasons further explored below, the Court determines that it is appropriate to address summary judgment in a series of stages. This Order will examine a group of website examples presented to the Court and determine whether they are deceptive or unfair under the FTC Act and the EFTA. The Court will then determine the effect of this Order on the remaining claims.

**IV.   LEGAL STANDARD**

The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court. *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). Summary judgment is appropriate pursuant to Fed. R. Civ. P. 56 when the pleadings, the discovery and disclosure materials on file, and any affidavits "show there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 330 (1986) (citation omitted). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for the nonmoving party and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (citations omitted). In evaluating a summary judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fishbach and Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986) (citations omitted).

The moving party bears the burden of showing that there are no genuine issues of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982) (citation omitted). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted). Once the moving party satisfies Rule 56's requirements, the burden shifts to the party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party "may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252.

*///*

## V. FTC ACT DECEPTION CLAIMS

### A. Deceptive Acts or Practices

Counts I through VIII of the Amended Complaint allege deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

An act or practice is deceptive if: (1) there is a representation, omission, or practice; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) the representation, omission, or practice is material. *FTC. v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009) (citation omitted). Deception may be found based on the "net impression" created by a representation. *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006). The FTC is not required to show that all consumers were deceived, and the existence of satisfied consumers does not constitute a defense. *See Stefanchik*, 559 F.3d at 929 (citing *FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 572 (7th Cir. 1989)).

An advertisement can make both express claims and implied claims. Express claims "are ones that directly state the representation at issue." *In re Thompson Med. Co., Inc.*, 104 F.T.C. 648 (1984), *aff'd*, *Thompson Med. Co. v. FTC*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, *Thompson Med. Co. v. FTC*, 479 U.S. 1086 (1987). Implied claims "are any claims that are not express. They range from claims that would be virtually synonymous with an express claim through language that literally says one thing but strongly suggests another, to language which relatively few consumers would interpret as making a particular representation." *Id.* The law does not recognize any distinction between express and implied misleading claims. *Figgie Int'l*, 994 F.2d at 604.

A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures. *Cyberspace.com*, 453 F.3d at 1200; *see also Donaldson v. Read Magazine, Inc.*, 333 U.S. 178, 188 (1948) ("Advertisements as a whole may be completely misleading although every sentence separately considered is literally true.") In *Cyberspace.com*, defendants "mailed

approximately 4.4 million solicitations offering internet access to individuals and small businesses." 453 F.3d at 1198. These solicitations "included a check, usually for $3.50, attached to a form resembling an invoice designed to be detached from the check by tearing at the perforated line" and the check "was addressed to the recipient and the recipient's phone number appeared on the 're' line." *Id.* The portion of the mailing resembling an invoice included columns labeled "invoice number," "account number," and "discount taken." *Id.* "The back of the check and invoice contained small-print disclosures revealing that cashing or depositing the check would constitute agreement to pay a monthly fee for internet access, but the front of the check and the invoice contained no such disclosures." *Id.* The Ninth Circuit affirmed the district court's granting of summary judgment for the FTC, finding that the "mailing created the deceptive impression that the $3.50 check was simply a refund or rebate rather than an offer for services." *Id.* at 1200. The Ninth Circuit agreed with the district court that "no reasonable factfinder could conclude that the solicitation was not likely to deceive consumers acting reasonably under the circumstances." *Id.* at 1201.[1]

The FTC can prove that a representation is likely to mislead consumers by establishing either: 1) actual falsity of express or implied claims ("falsity" theory); or 2) that the advertiser lacked a reasonable basis for asserting that the message was true ("reasonable basis" theory). *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994) (citing *Thompson Med.*, 104 F.T.C. 648); *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012). "For an advertiser to have had a 'reasonable basis' for a representation, it must have had some recognizable substantiation for the representation prior to making it in an advertisement." *John Beck Amazing Profits*, 865 F.

[1]As a further example of a solicitation likely to mislead consumers acting reasonably, the court in *Cyberspace.com* referred to *Floersheim v. FTC*, 411 F.2d 874, 876-78 (9th Cir.1969), in which "the Ninth Circuit found that substantial evidence supported the FTC's determination that the appearance and prominent repetition of the words 'Washington D.C.' on debt-collecting forms from a private collections company created the deceptive impression that the forms were a demand from the government even though the forms contained a small print disclaimer informing recipients that such was not the case." *Cyberspace.com*, 453 F.3d at 1200.

Supp. 2d at 1067 (citing *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 298 (D. Mass. 2008)). "Defendants have the burden of establishing what substantiation they relied on for their product claims" and the FTC has the burden of establishing that the purported substantiation is inadequate. *John Beck Amazing Profits*, 865 F. Supp. 2d at 1067 (citing *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 959 (N.D. Ill. 2006)). "Where the advertisers lack adequate substantiation evidence, they necessarily lack any reasonable basis for their claims" and those claims are deceptive as a matter of law. *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010) (internal citation omitted).

As to the final factor, "[a] misleading impression created by a solicitation is material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product.'" *Cyberspace.com*, 453 F.3d at 1201 (citation omitted). For instance, the Ninth Circuit in *Cyberspace.com* found that "the misleading impression the solicitation created — that the check was merely a refund or rebate — clearly made it more likely that consumers would deposit the check and thereby obligate themselves to pay a monthly charge for internet service." *Cyberspace.com*, 453 F.3d at 1201. Express representations about a product are presumed to be material. *Pantron I*, 33 F.3d at 1096-96 (9th Cir. 1994) (citation omitted). Implied representations are material "when they pertain to the central characteristics of the products or services being marketed." *John Beck Amazing Profits*, 865 F. Supp. 2d at 1076 (internal quotation marks and citation omitted); *see also In re Cliffdale Associates*, 103 F.T.C. 110 (1984) (reprinting *FTC Policy Statement on Deception,* Oct. 14, 1983). Generally speaking, information is material where it "concerns the purpose, safety, efficacy, or cost, of the product or service." *Direct Mktg.*, 569 F. Supp. 2d at 299 (citing *Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000) (quoting *FTC Policy Statement on Deception*); *In re J.B. Williams Co.*, 68 F.T.C. 481, 546 (1965), *aff'd*, 381 F.2d 884 (6th Cir. 1967)).

///

///

**B. The Grant Websites**

To determine whether Defendants made certain representations or omissions, this Court must first review the websites. This is the first step in the Court's inquiry. Once the Court determines that the representations alleged in Counts I through VIII are present on IWorks' grant websites, the Court will then consider whether they were likely to mislead consumers acting reasonably under the circumstances, and whether the representations are material. *See Stefanchik*, 559 F.3d at 928.

Immediately the Court is confronted with a problem. As previously mentioned, the FTC has provided over one-hundred exhibits of grant websites and the expert report from Dr. Good. However, for the purposes of summary judgment, the Court cannot rely solely on the representations of the FTC and their expert as to what the websites represent. The Court must review the websites, in a light most favorable to Defendants and draw all inferences in Defendants' favor, in order to understand the representations made and whether the sites create a net impression that is deceptive. The summary judgment standard thus compels the Court to limit the body of website captures that it can review. In its briefing, the FTC picks examples of claims from across its grant website exhibits to suit their arguments. It is not clear to the Court, however, whether the FTC's examples are representative of the grant website experience as a whole. In their exhibit list, the FTC organizes the website images only by source. The Court cannot adopt the FTC's approach of using selected examples of claims picked from across the entire universe of the FTC's exhibits, seemingly without a clear methodology, and draw conclusions as to every one of Defendants' sites. Indeed, the exhibits presented to the Court indicate that the websites were not identical, perhaps due to the "multivariate testing" explained by Dr. Vigil. The parties have not stipulated to a collection of representative sites for the Court to analyze.

Therefore, in analyzing the claims and disclosures made on Defendants' websites in a light most favorable to Defendants, the Court focuses its inquiry on those website images that Defendants provided to the FTC and those that they ask the Court to review.

This body of website images includes the undercover purchases made by FTC investigators Samuel Jacobson[2] and Roberto Menjivar.[3] It also includes website images provided by IWorks in response to FTC's civil investigative demand ("CID"),[4] and in opposition to FTC's motion for preliminary injunction.[5] The Court will examine this body of sites first, then proceed to analyze whether the necessary elements of a deceptive act or practice are satisfied pursuant to Section 5(a) of the FTC Act. The Court finds that this body of sites is fair to both parties as the FTC's position is that *all* of IWorks' grant websites were deceptive, and Defendants have either produced these exhibits or directed the Court's attention to them. The Court's decision is therefore limited to this collection of websites, not the larger universe of websites offered by the FTC.

In attempting to describe these sites, the Court's task is difficult. The websites contain significant amounts of text in large and small fonts in different varieties of boldness and capitalization. They also contain a large amount of images, testimonials, and interactive boxes that prompt the user to enter personal information. The sites' claims appear in images of notepads or post-it notes, or are tucked into boxes of text with different headings. However, in order to fairly present the "net impression" of the IWorks' sites, and to understand their effect on a consumer, the Court must endeavor to describe the information delivered to the consumer, and how it is delivered, as they

[2]These images appear as FTC Exhs. 116-120 (collectively "Jacobson Sites"). (*See* dkt. no. 1254-5, Jacobson Decl.; dkt. no. 31-3, Exh. 116; dkt. no. 31-4, Exh. 117; dkt. no. 31-5, Exh. 118; dkt. no. 31-6, Exh. 119; dkt. no. 31-7, Exh. 120.) Defendants ask the Court to examine these exhibits in their opposition. (Dkt. no. 1343 at 22 n.65.) The opposition directs the Court to Exhs. 964-968 in Jacobson's deposition, which are the same as FTC Exhs. 116-119. (Dkt. no. 1339-2, Exh. 1801 at 4-5.) Defendants also directed the Court's attention to these exhibits at the hearing. (Dkt. no. 1553 at 73-75.)

[3]These images appear as FTC Exhs. 124-126 (collectively "Menjivar Sites"). (*See* dkt. no. 26, Menjivar Decl.; dkt. no. 32-6, Exh. 124; dkt. no. 32-7, Exh. 125; dkt. no. 32-8, Exh. 126.) Defendants indicate that Menjivar's investigation was more favorable to Defendants and less "outcome-oriented." (Dkt. no. 1343 at 9.)

[4]These images appear as FTC Exhs. 121A-121D ("CID Sites"). (*See* dkt. no. 1263-1, Reeve Tyndall Decl. ¶¶ 11-15; dkt. no. 31-8, Exh. 121A; dkt. no. 31-9, Exh. 121B; dkt. no. 32, Exh. 121C; dkt. no. 32-1, Exh. 121D.)

[5]These images appear as Defendants' Exhs. 1-8 ("PI Opposition Sites"). (*See* dkt. no. 97, Bryce Payne Decl.; dkt. no. 99, Exhs. 1 and 2; dkt. no. 100, Exhs. 3 and 4; dkt. no. 101, Exhs. 5, 6, 7 and 8.)

make their way from the landing page to the order page and place their order. Selected images from these sites are also attached to the Order to better illustrate the Court's description. (*See* attached App. 1-5.)

**1. Jacobson Sites**

On April 6, 2009, FTC investigator Jacobson visited a website called "Government Money Secrets" and purchased the Government Money Secrets program. (Dkt. no. 1254-5 ¶ 28.) The "Government Money Secrets" page has questions at the top of the page that ask, "ARE YOU WORRIED about making ends meet? Disappointed with your last pay check? Did you even get a paycheck?" (Dkt. no. 31-3, Exh. 116 at 1.) Beneath those questions it states that "Hope can be had in a Government or Private Grant. Millions are available to those who qualify and claim their portion." Moving down the page, it states that the "Grant Program will show you the grants that are available and HOW AND WHERE TO APPLY." Under "You can use grants to" it lists uses such as "stop foreclosures," "pay down debt," and "gain peace of mind." Further down the page it asks, "Have you heard about the success others are having with the grant program?" Under that question, the site offers two testimonials with photos. One is titled "Money To Fix Up Your Car!" by "Sharon E" and states, "I would like to thank you for accepting my grant for funding through the grant program. I am enclosing two different pictures of my 1997 Ford Ranger truck, which I spent most of the funding for breaks and to have the motors repaired." Another testimonial is titled "Money To Pay Your Business Expenses!" by "Tamara S," which states, "Thank you so much for awarding me a $500 Grant from the Grant Program. I never thought I would get awarded and then there it came in the mail. I will be putting the grant money to good use to pay some debt I have incurred in start up of my Home-Based Business." Under the testimonials, the site directs users to "Enter your details below to see if you qualify." The details requested include name, marital status, household income, employment status, time at current residence, and year of birth. There is a button that says "CLICK HERE to see if you qualify!" (Dkt. no. 31-3, Exh. 116 at 2.)

The next page captured by Jacobson then boldly proclaims "CONGRATULATIONS! You're on your way to becoming one of the countless people who have already claimed their share of Government Grant Money!" in large letters at the top of the page. (Dkt. no. 31-3, Exh. 116 at 3.) Further down it states in smaller text that "Each day we send out a certain number of our Private and Federal Grant CDs, and You qualify for one! Not only that, but when you learn how to claim Government Grant Money now and . . ." "Instantly access the #1 Rated Grant Member Site," "Follow the advice in the Express Business Funding Guide," and "Demand your fair share of the Millions of Dollars in Government Grant Money" ". . . you can be well on your way to receiving literally thousands of dollars in unclaimed Government Grant Money[.]" Underneath that is another testimonial titled "Money to Pay Your Business Expenses!" by "Jennifer B" that says "[t]he money went to pay overdue bills. Mainly electric, gas and telephone. I used the left over money for groceries and much needed household supplies. I can't thank you enough for what you did in sending that check. It really came just in the nick of time. I was sitting in my apartment thinking I was going to have to break my lease and further ruin my credit. I received your check in the mail today!" The testimonial is next to a photo of a woman holding a child. Under the testimonial, the site directs users to "Please tell us where to ship your grant program and information." The details requested include name, email, phone, address, city, state, and zip. There is a button that says "CLICK HERE TO GET YOUR CD NOW!!"

The next page captured by Jacobson is the order page itself, which says "Sit back and relax! You can stop worrying about the recession, our Grant Program Software is waiting for you!" (Dkt. no. 31-3, Exh. 116 at 4.) Beneath that heading it says "You can literally breathe a sigh of relief." In smaller text it states, "Your Grant Program will help you seek out funding that can get you the money you need to do the things you want. Upon covering the shipping costs, your Grant Program CD will be processed and sent to you directly. In as little as two weeks from today, you could have a check in your hand." Moving down the page, it says "It's as easy as 1, 2, 3!" and has three steps: "1 Receive

your Grant Program 2 Choose from thousands of available grants 3 Get your check!" Beneath that is another testimonial and photo, this time from "Delroy S" who says "With your generous grant I was able to bring my payment up to date, and stop the foreclosure." In small print the site then says "We GUARANTEE you will get money within the next six months" and "Our FREE SOFTWARE contains everything you need to know about how and where to access your free money and can be shipped directly to your home or office within a matter of days." Along the right side of the page it says "We're holding a Grant Program Kit that has been reserved for you. Please complete the information below within the allotted time" and has a timer counting down. This section says "Priority Shipping – Only $2.99" and has areas to put in details such as the name on the credit card, the credit card type, the card number, expiration, and CVV number. Beneath that is a button that says "Ship my KIT!" Beneath the button is small, narrowly-spaced print that informs the consumer they are ordering "the Private and Federal Grant CD" and trial membership for $2.99 S&H" but that after a seven day trial, the consumer is charged $39.95 a month if they don't cancel as well as $7.95 a month and $9.95 a month for "Search Market" and "Network Agenda" respectively. At the bottom of the page it says "Special Bonus!" and mentions two products, "Search Market" and "Network Agenda" and under the titles of those products it says "14 day unlimited TRIAL!" and "21 day unlimited TRIAL!" respectively.

The other website images captured by Jacobson include the "Grant Doctor" site visited on June 8, 2009 (dkt. no. 1254-5 ¶ 32; dkt. no. 31-4, Exh. 117), the "Fast Grants" site visited on October 7, 2009 (dkt. no. 1254-5 ¶ 36; dkt. no. 31-5, Exh. 118), the "Federal Grant Connection" site visited on October 28, 2009 (dkt. no. 1254-5 ¶ 43; dkt. no. 31-6, Exh. 119), and the "Grant Seeker Secrets" site visited on November 18, 2009 (dkt. no. 1254-5 ¶ 50; dkt. no. 31-7, Exh. 120). These sites all follow a three-stage structure similar to the "Government Money Secrets" site in that the consumer proceeds through three stages to place an order.

///

The first stage is the landing page and, as in the first page of the "Government Money Secrets" site, consumers are informed that they may be entitled to grant money if they qualify. These initial pages tell the consumer "You May Qualify for FREE Government Funding" (dkt. no. 31-4, Exh. 117 at 1), "Hope may be had in a Government or Private Grant. Money may already be available for you!" (dkt. no. 31-5, Exh. 118 at 1), "Claim *Your* Share of the Millions of Dollars in Grant Money Given Away Every Year! *You May Have Money Waiting To Be Claimed!*" (dkt. no. 31-6, Exh. 119 at 1), "Claim Your Grant Money Today" (*id.*), "Are You Entitled? Find out today!" (*id.*), and "Congratulations, You May Qualify for FREE Government Funding (dkt. no. 31-7, Exh. 120 at 1). These pages also inform the consumer that this grant money can be spent on personal expenses, stating "Up to 75% of your rent paid by Uncle Sam" (dkt. no. 31-4, Exh. 117 at 2) "$4,000 cash to pay your mortgage" (*id.*), "$5,000 free money to fix up your home" (*id.*) "Money to fix up your car!" (dkt. no. 31-5, Exh. 118 at 1), "$9,500 to pay medical bills" (dkt. no. 31-6, Exh. 119 at 1), and "Purchase Real Estate" (dkt. no. 31-7, Exh. 120). These pages all contain various testimonials, like the ones from "Sharon E" and "Tamara S" from the "Government Money Secrets" site, which indicate that consumers can receive checks in the mail to pay personal expenses. For example, the Grant Doctor site has an image of a check and says "Act fast and you could be holding a check like this one in the palm of your hand within just 7 days!" next to testimonials and photos from "D Stewart" who says he avoided foreclosure thanks to "your generous grant," and "N. Lee", a "single mother," who used the money to buy clothes and a bed for her children. (Dkt. no. 31-4, Exh. 117 at 1-2.) The "Grant Doctor" site contains a statement from Dr. John Porter, "Professional Grant Writer," that says "Dear Taxpayer, If you're tired of the government taking thousands of dollars off you every year . . . if you're tired of working so hard for your money and then each year giving Uncle Sam a bigger and bigger share of it . . . I'd like to send you a FREE CD which shows you at least 147 perfectly legal ways to get a check out of Uncle Sam." (Dkt. no. 31-4, Exh. 117 at 1.) The "Federal Grant Connection" site's initial page contains a list of people and the money

they received under the title “These People Already Got Theirs!” including “$40,500” for “A. Bailey,” “$5,637” for “A. Bakian,” and “$101,020” for “A. Betts.” (Dkt. no. 31-6, Exh. 119 at 1.) The “Grant Seeker Secrets” site has a testimonial from “Lisa W” that says, “I couldn’t believe it!!! I filled out the paper work and two weeks later I received a check in the mail” and a list of other testimonials under the heading, “Read About REAL PEOPLE Who Have Received REAL MONEY!” (Dkt. no. 31-7, Exh. 120 at 1-2.) As with the “Government Money Secrets” site, these sites contain boxes that ask for information such as name, marital status, income, employment status, time at current residence, and year of birth. The “Government Money Secrets” site prompts the consumer to enter this information to “see if you qualify.” (Dkt. no. 31-3, Exh. 116.) Similarly, the “Grant Doctor” site prompts the consumer to “CLICK HERE to see if you qualify for one of our remaining FREE Grant Doctor CDs!” (Dkt. no. 31-4, Exh. 117.) The “Fast Grant” site merely states “CLICK HERE to continue.” (Dkt. no. 31-5, Exh. 118), “Federal Grant Connection” asks, “Do You Qualify?” (Dkt. no. 31-6, Exh. 119), and “Grant Seeker Secrets” says, “Click Here To See If You Qualify for the Grant Member Site” (dkt. no. 31-7, Exh. 120).

In the second stage or the intermediary page, as in the second page of the “Government Money Secrets” site, consumers are congratulated, reminded that they may be entitled to grant money, and provided more testimonials. These pages start with “Congratulations! You Are Well On Your Way To Becoming One Of The Countless People Who Have Already Claimed Their Rightful Government Grant Money!” (dkt. no. 31-4, Exh. 117 at 4), “CONGRATULATIONS! You may be on your way to becoming one of the countless people who have already had success with our proven system” (dkt. no. 31-5, Exh. 118 at 3), “Congratulations! You Qualify for a FREE CD!” (dkt. no. 31-6, Exh. 119 at 5) and “Congratulations! You Could Be Well On Your Way To Becoming One Of The Countless People Who Have Already Claimed Their Rightful Government Grant Money” (dkt. no. 31-7, Exh. 120 at 5). The “Grant Doctor,” “Fast Grants,” and “Grant Seeker Secrets” sites also inform the consumer that they will be able to “Instantly access the #1 Rated [or “Independently Rated”] Grant Resource Center” in order to receive their

grant money. (Dkt. no. 31-4, Exh. 117 at 4; dkt. no. 31-5, Exh. 118 at 3; dkt. no. 31-7, Exh. 120 at 5.) The "Federal Grant Connection" site encourages consumers to use the CD to "Get *YOUR* Cash" including "$192.3 Billion for Personal Grants!" (Dkt. no. 31-6, Exh. 119 at 5.) Under a box titled "Easy. Free Software" the "Federal Grant Connection" site lists seven items that are presumably benefits of the software, including "Updated downloadable federal grant listings," "Updated searchable database, "Application wizard," and "Unlimited email access to the Specialists at the Grant Help Center for only $39.95/month." (*Id.*) The intermediary pages contain more testimonials, such as from "J. Barsness" aka "Jennifer B" who states that "the money went to pay overdue [utilities] bills" as well as groceries and household supplies. (Dkt. no. 31-4, Exh. 117 at 4; dkt. no. 31-5, Exh. 118; dkt. no. 31-6, Exh. 119 at 5; dkt. no. 31-7, Exh. 120 at 5.) She says, "I can't thank you enough for what you did in sending me that check." (*Id.*) These pages also contain boxes for the consumer to enter their name and address in order to receive a CD. These boxes prompt consumers to "Please Tell Us Where You'd Like Your Free Copy Of The Grant Doctor Program Rushed!" (dkt. no. 31-4, Exh. 117 at 4), "Please Tell Us Where You'd Like Your Private and Federal Grant CD Shipped" (dkt. no. 31-5, Exh. 118 at 3; dkt. no. 31-7, Exh. 120 at 5), and "Get Your FREE Software!" (dkt. no. 31-6, Exh. 119). Beneath the shipping information, consumers are asked to "CLICK HERE TO GET YOUR FREE TRIAL NOW" (dkt. no. 31-4, Exh. 117 at 4; dkt. no. 31-7, Exh. 120 at 5), "CLICK HERE to continue" (dkt. no. 31-5, Exh. 118 at 3), "Yes, rush me my FREE copy. Get It Now!" (dkt. no. 31-6, Exh. 119 at 5).

The third and final stage is the order page. As in the order page of the "Government Money Secrets" site, consumers are again told that they may qualify for grant money, provided with more testimonials, and asked for their credit card information. These pages tell consumers "You qualify for one of our remaining FREE Grant Doctor Software CDs!" "1 Get our FREE Grant Network Software Kit," "2 Choose from thousands of available grants," and "3 Apply for your FREE MONEY!!" (dkt. no. 31-4, Exh. 117 at 5), "Only One More Step!" (dkt. no. 31-5, Exh. 118 at 5), "There are over

90,000 Private & Federal Grants Listed! There Was Over 80 Billion Dollars Given Out Last Year!" (*id.*), "You're Almost Done! Enter your info to get your FREE CD Rushed" (dkt. no. 31-6, Exh. 119 at 7), and "You qualify for one of our remaining Private and Federal Grant CDs!" "1 Get our Free Grant Network Software Kit 2 Choose from and apply for thousands of available grants 3 Upon funding approval, Receive your MONEY!!" (dkt. no. 31-7, Exh. 120 at 7). These pages indicate, in the box to enter credit card information, that consumers will be charged for shipping and handling, stating "Priority Shipping – Only $2.99" (dkt. no. 31-4, Exh. 117 at 5; dkt. no. 31-7, Exh. 120 at 7), listing the cost of all of the programs and products as "$0.00" save for the shipping and handling at "$2.29" (dkt. no. 31-5, Exh. 118 at 5), and prompting "Get Your FREE Software! Shipping $2.29" (dkt. no. 31-6, Exh. 119 at 7). The "Grant Seeker Secrets" order page has a big arrow pointing to the order box that says "START HERE" and other testimonial from "Carol K" that says, "…In about 2 weeks I received a check in my hand." (Dkt. no. 31-7, Exh. 120 at 7.) These pages all contain disclosures, either beneath the buttons to submit credit card information or at the top of the page, which state that the consumer is paying for the shipping and handling and also agreeing to enroll in three trial memberships with costs and fees that will be automatically charged if the trial memberships are not cancelled. The order pages contain information about the trial memberships (or "upsells"), referring to them as "FREE BONUS GIFTS!" (dkt. no. 31-4, Exh. 117 at 6), "Free [14-day or 21-day] trial!" (dkt. no. 31-5, Exh. 118 at 4), and "Special Bonus!" (dkt. no. 31-6, Exh. 119 at 7) always at the bottom of the page, but do not refer to the associated monthly fees. These pages further contain testimonials from people claiming they received money in the mail to pay personal expenses.

**2. Menjivar Sites**

FTC Investigator Roberto Menjivar visited and printed pages from IWorks websites in October 2008, approximately one year before Jacobson captured the images described above. (Dkt. no. 26 ¶¶ 4-7.) These images include the initial landing pages

///

that ask for basic personal information, such as income and marital status, and order pages that prompt the user to provide their shipping information.

One website Menjivar visited called "Grant Funding Solutions" asks "Will A New President Change The Federal Grant System? Get A Grant Now Before Any Changes Take Place" and beneath CNN ad CNBC logos it says "Congratulations, You May Qualify for FREE Government Funding. CNN and other sources report that the U.S. Government must find recipients in order to distribute financial aid money to organizations and private individuals who qualify and need it!" (Dkt. no. 32-6, Exh. 124.) The site further states that "Millions of Dollars are available now!" and contains testimonials identical to those in the Jacobson sites in which recipients claim that they received money and were able to pay for personal expenses. There are also brief testimonials including statements such as "I received a check in my hand for $100,000" by "Carol K.," "I got the check in my hand for $150,000" by "William Rivas," and "I just had $300,000 dollars deposited into my bank account" from "Edwin Hurd." (*Id.*) Further down the page, it says "Our FREE SOFTWARE contains everything you need to know about how and where to access your grant money and can be shipped directly to your home or office within a matter of days" and "Information worth thousands of dollars! It's yours now for FREE!" (*Id.*) Beneath those statements the site prompts users to "Please Enter Your Details Below To See If You Qualify For One of Our Free Trials" indicating that the shipping and handling for the CD is $2.29 and asking for personal information followed by a button that says "Click Here To See If You Qualify For One Of Our Remaining FREE Grant Master CDs!" (*Id.*)

The next page in the "Grant Funding Solutions" site opens with "Congratulations! You Are Well On Your Way To Becoming One Of The Countless People Who Have Already Claimed Their Rightful Government Grant Money!" (*Id.* at 11.) Following the testimonial by "Jennifer Barsness" also seen in the Jacobson sites, the page says "You qualify for one of our remaining FREE Grant Master Software CD's!" and further mentions that the consumer can "instantly access the #1 Rated Grant Resource Center"

and "follow the advice in the Express Business Funding Guide" in order to "demand your fair share of the $1.5 Trillion in FREE Government Grant Money." (*Id.*) The site then prompts users to "Please Tell Us Where You'd Like Your Free Copy Of The Grant Master Program Rushed!" and asks for the user's shipping information, followed by "CLICK HERE TO GET YOUR FREE TRIAL NOW" (*Id.* at 11-12.)

The image of the "Grant Master CD" site captured by Menjivar is formatted in a strange way, perhaps as a result of the way it was captured, but it clearly contains similar elements to the sites already described, including prompts for personal information to "see if you qualify," testimonials about receiving money to pay personal expenses from "D. Stewart" and "N. Lee," the letter to the taxpayers from Dr. Porter, an image of a check that consumers are told they can hold "within just 7 days!" and examples of personal expenses paid with money from "Federal and Private sources." (Dkt. no. 32-7, Exh. 125 at 1-2.)

The third site captured by Menjivar in October 2008 is the "Grant Funding Success" site. This one begins with "WARNING . . . The Grant Master Software Was Not Created For Those People Who Just Want To Know Which Grants Are Available to Claim. The Grant Master Software Was Created to Help YOU Claim The Grants That You May Qualify For. Have Uncle Sam Lend You a Financial 'Leg-Up' Where You Need It Most. USE WITH CAUTION!" (Dkt. no. 32-8, Exh. 126 at 1.) As with the "Grant Funding Solution" site, the "Grant Funding Success" site features CNN and CNBC logos, congratulates the user because they "may qualify" for government funding, and states that "CNN and other sources report" that the "U.S. Government" must distribute money to "private individuals who qualify and need it!" (*Id.*) The site also contains Dr. Porter's letter to the taxpayers, a Dr. Porter bio, an image of a check that consumers are told they can hold "within just 7 days!" and a box asking for name and address. (*Id.*) The box says "Get Your Risk-Free Grant CD! If you don't take advantage of these benefits, you are only cheating yourself. You could have a check in your hands within 7 days if you start looking for grants today! It's easy, fast and guaranteed. So why wait? Secure your

copy before they're all snapped up!" followed by a button that says "Get Your RISK-FREE CD!" (*Id.*)

**3. CID Sites**

In response to an FTC CID Interrogatory seeking details regarding IWorks' sales sites, IWorks provided screenshots of certain websites, including four images from "Grant Writer Pro" websites. (*See* dkt. no. 1263-1 ¶¶ 11-15.) The images from the "Grant Writer Pro" websites appear to be identical. (*See* dkt. no. 31-8, Exh. 121A; dkt. no. 31-9, Exh. 121B; dkt. no. 32, Exh. 121C; dkt. no. 32-1, Exh. 121D.) The "Grant Writer Pro" sites appear to proceed in two stages.

First, their initial pages state that "The Government gives away BILLIONS each year! The SECRET Behind Government Cash! Our FREE software reveals how you can get your share of Federal money!" Beneath that is an image of an envelope that prompts the user to put in their address and click "Ship My Kit." An image of a check pokes out from behind the envelope that is from "The Grants For Better Living." There is a testimonial from "Diane O'Leary" that says "I received a check within a week. Literally all I did was use the software to complete an application." In big letters in the middle of the page it says "FREE!" and under a CBSNews.com logo it states "'CBS News and other sources report that the U.S. Government must find recipients, and then distribute over $360 billion dollars to groups, organizations and private individuals just like you!" There are testimonials from people who claim to have received checks and were able to pay for personal expenses. These testimonials appear bellow boasts such as "Thousands of CDs ordered! Millions of dollars awarded! OVER HALF A MILLION MEMBERS HAVE FOUNDS GRANTS." Testimonials include "I couldn't believe it when I opened the letter with a $5,000 check inside! It took less than two weeks! I never thought it could be so easy to get a Grant!" from "Alexis Pierce" and "I replaced my kitchen and bathroom faucets, bought a new vanity, fixed the pipes under my house, and paid my power bill" by "Shauna Donaldson."

///

Second, the "Grant Writer Pro" site tells users "Just One More Step!" and asks for credit card information to "Get your software." Users have the option of a download for $0.99 or a CD for "$1.97 S&H." Under the "CONTINUE" button there are disclosures regarding the three trial memberships and charges that will be applied if they are not cancelled. Beneath that, the site describes "Special Bonus #1 14 Days Unlimited Access to the Express Business Funding membership site!" and "Special Bonus #2! 21 days of unlimited access to the Network Agenda membership site!" but these descriptions do not mention price.

**4. PI Opposition Sites**

Defendants provided eight exhibits in support of their opposition to the FTC's motion for preliminary injunction. (*See* dkt. no. 97, Bryce Payne Decl.; dkt. no. 99, Exhs. 1 and 2; dkt. no. 100, Exhs. 3 and 4; dkt. no. 101, Exhs. 5, 6, 7 and 8.) According to Bryce Payne, Operations Manager for IWorks, Exhs. 1, 2, 4, and 8 in particular "were among the most popular landing and order pages for the Grant Program." (Dkt. no. 97 ¶ 7.)

Exhibit 1 begins with "NOTICE! There are literally thousands of Private and Federal Grants out there, providing BILLIONS OF DOLLARS in Grant money. Finding your way through them can be difficult and time consuming! We can help you find your way through the maze of red tape!" (Dkt. no. 99, Exh. 1.) The page proceeds with the claim that "There are over 1,000 Federal and 50,000 Private Grants, providing BILLIONS OF DOLLARS in Grants! Congratulations! You can be one of thousands of people who have applied for Grant Money ONLINE!" Moving down the page there is a testimonial from "Tiffany S" who is thankful for funding through the Grant-A-Day program. The site claims "There are literally THOUSANDS of Federal and Private Grants Available!" and "The annual amount of Grants given every year amounts to BILLIONS OF DOLLARS world-wide!" As to the types of grant money available, the site states "Everyone knows about Scholarship and various types of small business assistance that is available, but there [are] people getting Grants that they've used for everything from mortgage

assistance to medical bills. Let us introduce you to a few of them! Continue reading below to see the real stories behind real people who've had real results with Grants!" The site then lists five (5) testimonials under the heading "Read About REAL PEOPLE Who Have Received REAL MONEY!" These testimonials include many that are also featured on other sites described above, including "Delroy S" who used the money to stop foreclosure, "Tamara S" who got a check in the mail and used it to pay off debt associated with her home business, and "Sharon E" who used the money to fix up her truck. Although these are the same testimonials that appeared in the Jacobson and Menjivar sites, here they explicitly state that money was provided through the "Grant-A-Day" program, as opposed to the more generic "grant program" or "grant doctor program" that these same people credit as the source of their funding in the otherwise identical testimonials printed on the Jacobson and Menjivar sites. There is also a testimonial from "Joyce S" — under the title "Money To Buy Christmas Presents!" — who received a check in the mail and used the money to pay off bills so that she could buy Christmas presents for her kids. The site then asks for the typical landing page information such as marital status and income "To See If Our Unique One Of A Kind CD Is Right For You."

The next page says "Congratulations! You Could Be Well On Your Way To Locating And Applying For A Grant!" The page features a testimonial from "Jennifer B" who says in big lettering "I just can't thank you enough!" and explains that she received a check in the mail and paid her utility bills. Moving down the page it says "Great News! We'd like to send you one of our Private and Federal Grant CD's! Not only that, but we'd like to give you access to our FULL RANGE of services, including our Live Chat Representatives and our cutting-edge Grant Search technology." Before asking for the user's shipping address the page states, "This could be the day that you take charge of your life, and start making a difference! We want you to be one of the many people whose lives we've improved through Grants. Sign up now, and see for yourself if you can benefit from the BILLIONS of dollars in Grant money that are out there."

Exhibit 2 (dkt. no. 99, Exh. 2) is an order page substantially similar to the "Fast Grants" order page captured by Jacobson (dkt. no. 31-5, Exh. 118 at 5). Like that page, it boldly states, "Only One More Step!" and features a big arrow directing users to a box where they can enter their credit card information. (Dkt. no. 99, Exh. 2.) This box contains a tally with items such as the "Fast Grants CD" and the "Trial" and "Trial Memberships" all listed with a price of "$0.00" and "Shipping & Handling" listed at "$2.29" with a sum total of "$2.29" as "TODAY'S TOTAL." This order page also features the familiar testimonials, disclosures in small print at the top of the page, and the large print claim that "There Are Over 90,000 Private & Federal Grants Listed! There Was Over 80 Billion Dollars Given Out Last Year!"

Exhibit 4 is a landing page for "Grant Search Assistant." (Dkt. no. 100, Exh. 4.) Next to an image of a smiling woman, it states in large print "How a Desperate Housewife Got a Check In Her Hand To Help Her Family!" and has a testimonial from "Samantha Hall" who says that she received a check and used the money to pay for her utility and cell phone bills. (*Id.*) The page states, "If You've Ever Paid The Government Taxes . . . you might qualify for federal or private grant money!" (*Id.*) Huge letters say "NOW!" and point the user towards a box to enter their shipping information, which says "Hurry! Claim Your CD By Filling Out This Form! [only ${SH.PRICE} S&H]." (*Id.*) This page also features an image of a check for $1500 from the "Grant Trust Foundation" and states, "You could have a check like this one within a week!" (*Id.*) The page also has a statement from Dr. Porter similar to those featured on other sites described above.

Lastly, Exhibit 8 appears to be a landing page for a "Grant Master" site. (Dkt. no. 101, Exh. 8.) It says, "Let Us Help You Locate Grants!" and has "Now!" in big letters with an arrow directing users to fill in their shipping information to "Claim Your FREE CD TODAY (only $2.99 S&H)." (*Id.*) It touts "The Grant Master Software!" and says "There are literally thousands of Private and Federal Grants providing billions of dollars in Grant money. Finding your way through them can be difficult and time-consuming! We can help you through the maze of red tape!" (*Id.*)

The remaining PI Opposition Sites appear to be duplicative of past exhibits or illegible. Exhibit 3 appears to be identical to Exhibit 1. (Dkt. no. 100, Exh. 3.) Exhibits 6 and 7 (*id.*) are identical to the "Fast Grants" landing page captured by Jacobson (dkt. no. 31-5, Exh. 118 at 1). Exhibit 5 is illegible and therefore cannot be analyzed in this Order. (Dkt. no. 101.)[6]

Because many of these sites, including Exhibit 8, refer to the "FREE CD" that appears to contain software related to the advertised grant products and programs or a database of available grants, it is important to discuss what is not contained in the CD. Jeremy Johnson stated at the hearing that consumers could only find relevant grant programs on IWorks' website. (Dkt. no. 1553 at 117.) Indeed, he stated that the grant database could not be made available on the CD because it was always changing, so the goal was to get consumers online. (*Id.*) He further stated that the entire product could have been online, but that "people like to get something tangible in the mail" and that IWorks wanted to be able to say they were giving something away for free. (*Id.*)

### C. Count I – Misrepresenting the availability of government grants to pay personal expenses; Count II – Misrepresenting that consumers using Defendants' grant product are likely to find government grants to pay personal expenses; and Count VI – Misrepresenting that consumers using Defendants' grant product are likely to obtain grants such as those obtained by consumers in the testimonials

The parties group Counts I, II and VI together. With regard to these counts, the FTC asserts that "IWorks' claims misrepresented the purpose and efficacy of its grant product, promising consumers that they were likely to obtain grants for personal expenses, while such grants were generally unavailable, and deceptively using 'testimonials' that were fake, unsubstantiated, and were not from people who actually received a government grant." (Dkt. no. 1280 at 50.)

///

///

[6] Consequently, any determination of liability in this Order cannot apply to the site presented in Exhibit 5 (dkt. no. 101).

**1. Claims**

A particular advertising claim will be deemed to have been made if consumers, acting reasonably under the circumstances, would interpret the statements to contain that message. *In re Kraft, Inc.*, 114 F.T.C. 40 (1991), *aff'd*, 970 F.2d 311 (7th Cir. 1992) (citing *Thompson Med.*, 104 F.T.C. 648). Advertisements that are "capable of being interpreted in a misleading way should be construed against the advertiser." *FTC v. Gill*, 71 F. Supp. 2d, 1030, 1045-46 (C.D. Cal. 1999) (quoting *Resort Car Rental Sys., Inc. v. FTC*, 518 F.2d 962, 964 (9th Cir. 1975)).

A consumer using the grant sites described above and acting reasonably under the circumstances is likely to believe there are government grants[7] available for personal expenses, that they are likely to receive money from said grants, and that the result of using Defendants' programs and products will be similar to those indicated in the testimonials. The sites create this impression by repeatedly emphasizing the huge amount of government grant money available and providing numerous testimonials from people who claim to have paid for a wide variety of personal expenses after receiving checks through grant programs. Over and over, the sites claim that there are millions or billions of dollars given away each year in the form of grants and that there are thousands of grants available. The sites present testimonial after testimonial where people claim they received money, sometimes checks in the mail in a matter of weeks, to do everything from buy household goods to pay overdue bills or stop foreclosure. The sites and testimonials claim grants were given out in amounts ranging up to six figures.

**2. Misleading**

The FTC argues that the representations were actually false because government grants were not available for personal expenses. In support of their argument that grants for personal expenses are unavailable, the FTC offers up the fact that the "Grants.gov" website, which is the federal government's official grant site, says that few grants are

///

[7]The sites sometimes refer to government grants as "federal" grants.

available for individuals and "none of them are available for personal assistance." (*Id.* at 11; *see also* dkt. no. 26-3, David Bauer decl., Exh. D ¶ 26.) The "Grants.gov" site states that "[a] federal grant is an award of financial assistance from a federal agency to a recipient to carry out a public purpose of support or stimulation authorized by a law of the United States. Federal grants are not federal assistance or loans to individuals." (Dkt. no. 26-3 ¶ 26.) The FTC also provides a declaration from Donna Davis, Program Manager of the Catalog of Federal Domestic Assistance ("CFDA"),[8] who states that "only a very limited number of federal assistance programs offer grants directly to individuals" and they are typically for a public purpose. (*Id.* at 12; dkt. no. 27-5.) The FTC also presents the declaration of Dr. Porter, IWorks' grant consultant, who states that government grants to individuals were almost non-existent.[9] A declaration from FTC's expert David Bauer, who has worked in the grant-seeking business for 30 years, echoes Dr. Porter's declaration. (Dkt. no. 26-3 ¶ 27 ("[Government grants] are rarely, if ever, available to provide personal financial assistance, such as preventing foreclosure or paying a mortgage or other household expenses, and I have never come across any such grants during my 30 years in this field."))

As to the testimonials, the FTC issued a CID request for Defendants to identify every individual in its grant site testimonials and provide substantiation. (Dkt. no. 20-10 at 4-5.) In response, Defendants provided a list of 15 names. (*Id.*) This list does not include some of the people who gave testimonials that repeatedly appear in the sites described above, including "C. Robb Ross," who gave a testimonial about using the

[8]Davis' declaration describes the CDFA as "the authoritative, federal government-wide comprehensive listing of all Federal Domestic Assistance Programs available . . . ." (Dkt. no. 27-5.)

[9]Dr. Porter's declaration states: "In the 25 years that I have been searching and applying for government grants, I have found very few government grants that are available for individuals, with the exception of scholarships, fellowships and research grants. I have never found a government grant for an individual to pay the individual's personal expenses. I have never seen a government grant to pay credit card debt, to pay direct personal medical expenses, to buy Christmas presents, to pay for direct personal emergency expenses, or to fix up a car and it is unlikely they exist because government grants are to serve a public purpose rather than pay the personal expenses of an individual." (Dkt. no. 30-3 ¶ 17.)

money to pay for her son's textbooks, and "Jennifer B," who used the money to pay utility bills and buy household supplies. Nor does the list include any of the nine individuals listed on the landing page of the "Federal Grant Connections" site who received grant money in the range of approximately $5,000 to over $140,000 (dkt. no. 31-6, Exh. 119 at 1), or "Carol K," "William Rivas," and "Edwin Hurd" who received $100,000, $150,000 and $300,000, respectively, according to the "Grant Funding Solutions" site (dkt. no. 32-6, Exh. 124 at 1-2). Defendants also provided a list of their "Grant-A-Day" recipients and amounts received. (Dkt. no. 1263-1, Reeve Tyndall Decl., Exh. 1725 ¶ 17.) FTC investigator Tyndall compared the list of "Grant-A-Day" recipients to the list of people who gave testimonials, and discovered that 14 of the 15 people who gave testimonials also received money from the "Grant-A-Day" program. (*Id.* ¶ 18.) The "Grant-A-Day" program was not a government grant program but was developed by IWorks in partnership with a non-profit organization called Frontiers For Families.[10] (Dkt. no. 20-4 at 3.) The program provided users with an online application and a new winner was selected each day. (*Id.*) A check was sent directly to the winner. (*Id.*) In his review of the winners, Tyndall identified that the largest award was $5,000 and most were $500 or $1000. (Dkt. no. 1263-1, Reeve Tyndall Decl., Exh. 1725 ¶ 18.)

**3. Material**

The FTC argues that in addition to being misleading, the asserted misrepresentations are material because they were "used to induce the purchase of a particular product" pursuant to *Pantron I* and they "pertain to the central characteristics of the product" pursuant to *FTC Policy Statement on Deception*. (Dkt. no. 1280 at 50.)

**4. Rebuttal**

Defendants argue in opposition that: (1) the FTC does not challenge sites promoting both government and private grants; (2) consumers did not care about the source of a grant — whether it was government or private; (3) government grants are in

[10] IWorks transferred over $500,000 to Frontiers for Families between August 2007 and December 2008. (Dkt. no. 25-2, Crowley Decl., Exh. 32 ¶ 13.)

fact available for personal expenses; (4) IWorks' websites never represented the likelihood of a consumer qualifying for a grant; and (5) website testimonials are substantiated as to IWorks' "Grant-A-Day" program. (*See* dkt. no. 1343 at 7-18.)

Defendants' assertion that the FTC does not challenge sites promoting both government *and* private grants is a mischaracterization of the Amended Complaint and Motion. There is no indication in the Amended Complaint or the Motion that the FTC limits its arguments to those sites solely claiming government grants are available. In its examples of IWorks' misrepresentations with regard to government grant money, the FTC cites to websites that mention both government and private grants. (*See, e.g.*, dkt. no. 1280 at 4-5 n.9, n. 15, n. 17 (citing dkt. no. 31-5, Exh. 118 ("Hope may be had in a Government or Private Grant").) Further, the mere fact that Counts I and II allege misrepresentations with regard to government grants does not mean that any sites making representations about both private and government grants are categorically exempt. Indeed, a representation that there are thousands of government and/or private grants available is a representation as to the availability of government grants. To the extent that Defendants are arguing that "government and/or private grants" should be construed to mean "primarily private," then claims about the availability of thousands of government and/or private grants were fundamentally misleading in the first place. A consumer is likely to believe that such a representation means there are thousands of each, or at least a reasonable mix.

Defendants' argument that consumers did not care about the source of the grant — whether government or private — misses the point. In determining materiality, the question is whether the information is important and thus likely to influence a consumer's choice. *See Cyberspace.com*, 453 F.3d at 1201 (citing *Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984)) A consumer purchasing a product in the hopes of accessing grant money is certainly not likely to turn down money offered through a private source. That does not mean that consumers were less likely to be influenced by the sites' repeated representations as to the availability of government grant money. For instance, in

consumer Edgardo Hong's deposition, to which Defendants cite, he states that he would not have "ruled out" a grant from a private source. (Dkt. no. 1238-3, Exh. 1619 at 109.) Hong also states, however, that he "wasn't in the market for a grant" but when he "came across [the site], and it was mentioning [a] federal grant, there was a lot more legitimacy about the grant in general, so that's — that's what I was focusing on, a federal grant." (*Id.*)[11] While it's true that the sites' claims about the availability of private grants may have *also* been material to consumers' decisions, that possibility alone does not create a genuine issue of material fact as to the materiality of the websites' representations about the availability of government grants.

Defendants next argue that government grants are in fact available for personal expenses. (Dkt. no. 1343 at 10-11.) Defendants present a declaration from their expert, Beverly Browning, who has been in the grant business for 40 years and authored the book *Grant Writing For Dummies*. (Dkt. no. 1339-9, Beverly Browning Decl., Exh. 1808 at 1.) Browning states that from 2006 to 2010, the relevant time period in this case, there were "thousands of 'grants' (as used by laypersons)" available for "what might be considered 'personal needs'" including "programs for persons residing or operating businesses in smaller-population areas, veterans, students/prospective students, minorities, refugees, senior citizens and lower-income persons." (*Id.* at 7-8.) Browning then goes on to list some of these programs, such as rent and monthly allowance from "Section 8" for low-income residents, grants of up to $7,500 for lower-income residents 62 or older in rural areas to repair or modernize their home, up to $50,000 for injured veterans to make their homes accessible, and Pell grants and scholarships for students.

///

[11]Other consumer depositions cited by Defendants indicate that consumers were interested in finding government grants, even though they were not averse to receiving money from private sources. (*See* dkt. no. 1237-1, Pamela Bachman Depo., Exh. 1600 at 62 (stating that she "was mainly looking along the federal track" and didn't recall "private sources" coming to her attention); dkt. no. 1238-4, Nona Huffman Depo., Exh. 1620 at 42 ("I thought it was free money from the government."); dkt. no. 1241-3, Thomas Waite Depo., Exh. 1658 at 27-28 (stating that he went to Defendants' website because he saw a pop-up ad that stated "federal grants are available to start a business" and that grabbed his attention).)

(*Id.* at 8-16.) Browning states that laypersons adopt an extremely broad definition of grant that includes "any programs by which . . . money or savings can be obtained, such as benefit programs, scholarships, fellowships, research grants, training grants, traineeships, service grants, experimental and demonstrations grants, evaluation grants, planning grants, technical assistance grants, survey grants, construction grants, and unsolicited contractual agreements." (*Id.* at 3.) FTC expert Bauer filed a rebuttal report in which he claims that grants do not include any and all programs through which individuals can obtain money or savings, and that such a definition of "grants" for laypersons is without any authority. (Dkt. no. 1389-4, Dadiv Bauer Suppl., Exh. 1769 at 3-4.) Bauer also states that the programs identified in Browning's report are: "(1) not grants to individuals; and/or (2) highly restrictive and limited." (*Id.* at 7.)

The evidence before the Court shows that in the context of the sites addressed in this Order, consumers may have understood the word "grant" to be much broader than the definition adopted by the "Grants.gov" site. Dr. Porter explained in his deposition testimony that grant professionals do not consider all gifts of money, including Pell grants and scholarships, to be grants but that "the public uses the word 'grant' very loosely." (Dkt. no. 1339-4, Dr. Porter Depo., Exh. 1803 at 72-74.) Tyndall also stated in his deposition that the consumers he spoke to did not "seem to understand the distinction" between grants and entitlements or benefits generally. (Dkt. no. 1241-1, Exh. 1655 at 128-29.) In their deposition testimony, consumers revealed they had diverse views on what a "grant" is and whether it includes general assistance or loans.[12] Given the conflicting evidence, the Court cannot find that consumers who viewed the sites at

///

[12](Dkt. no. 1231-1, Bachman Depo., Exh. 1600 at 55 (understanding a grant to be "monies given to you with no repayment terms" and "not a loan" or subsidy); dkt. no. 1238-3, Hong Depo., Exh. 1619 at 67-68 (understanding a grant to be "pretty much like a loan" although "there are some grants that you do not have to pay back"); dkt. no. 1240-2, Miller Depo., Exh. 1647 at 14-15 (in searching for grants, she was looking for any assistance for her goals, whether she had to pay the money back or not); dkt. no. 1339-11, Kizzie Depo., Exh. 1801 at 40 (stating she had previously received a grant in the form of a Pell grant).

issue here would have understood the word "grant" to have the "Grants.gov" definition put forth by the FTC.

Defendants argue that their sites never gave the impression that consumers were *likely* to receive grant money because they emphasized that consumers "may" qualify. (*Id.* at 15-16.) The Court disagrees. For the reasons previously stated, the sites give the impression that there are thousands of grants and millions or billions of dollars waiting to be claimed by those who use Defendants' products and programs. The sites also stress that millions or billions have already been given away and encourage consumers to claim their share. Some sites even cite to news sources and state that the government has money that it must give away. Many sites ask for personal information and congratulate the user in large letters, giving the impression that users are already in the process of qualifying. Some of the sites tell the consumer that they "qualify" for software or a CD. This process of "qualification" and congratulation even occurs in the example provided by Defendants in their opposition to the FTC's motion for preliminary injunction. (Dkt. no. 99, Exh. 1.) Some of the sites say that government money is available to the consumer if they have paid taxes. Though the approach is not always the same in every site, all of the examples reviewed by the Court give the impression that the consumer is likely to receive government grant money. The occasional presence of words like "may" does nothing to dull the impact of these claims because the sites present little to no barriers between the consumer and government grant money. The impression is clear: if the consumer purchases the product, they will receive this money.

Lastly, Defendants argue that they have provided substantiation for their Grant-A-Day recipients. (Dkt. no. 1343 at 16-17.) Even accepting that as true, Defendants have not provided substantiation for all of the testimonials used in the sites. More problematic, however, is that the testimonials were used in a misleading way. Only in four of the sites considered by the Court (dkt. no. 32-6, Exh. 124; dkt. no. 32-7, Exh. 125; dkt. no. 99, Exhs. 1 and 2) do any of the testimonial excerpts clearly state that money was provided through the Grant-A-Day program. This language was apparently changed to match the

name of the IWorks program or product being promoted such as "grant program" or "grant doctor" (the Jacobson Sites; dkt. no. 101, Exh. 6), or removed entirely from the testimonials printed on other sites, giving the misleading impression that their results were from any one of the thousands of grant programs that IWorks' websites boasted about. Even in the pages that do feature testimonial excerpts mentioning Grant-A-Day, that program is not otherwise described or explained. (Dkt. no. 32-6, Exh. 124; dkt. no. 99, Exhs. 1 and 2.) The lone exception is one of the Menjivar Sites, "Grant Master CD," but even there the description is vague at best and states that, "The revolutionary Grant-A-Day Program has achieved the highest success rate in our history for our software users!" (Dkt. no. 32-7, Exh. 12.)[13] That description only lends to the impression that consumers are frequently getting grant money through the thousands of government or private programs touted on the sites.

**5. Conclusion**

**a. Count I**

Count I alleges that Defendants misrepresented the availability of government grants to pay personal expenses. The FTC's position is that the sites represent that government grants are available to pay for personal expenses and that such a representation is false. The "Grants.gov" site says that "[a] federal grant is an award of financial assistance from a federal agency to a recipient to carry out a public purpose of support or stimulation authorized by a law of the United States." (Dkt. no. 26-3 ¶ 26.) Viewing the sites in a light most favorable to Defendants, the sites do not represent to consumers that they can receive "an award of financial assistance from a federal agency" in order to pay for personal expenses. The sites represent that government money is available in the form of grants and grant programs without necessarily giving the impression that consumers will receive grants from federal agencies directly. The

///

[13]Defendants argue that Grant-A-Day is clearly described in one of the PI Sites. (Dkt. no. 1343 at 17.) The relevant exhibit is Dkt. no. 101, Exh. 5. As previously mentioned, that exhibit is illegible.

sites' representations may therefore be understood to be consistent with the broader definition of "grant" advanced by Defendants, which includes assistance and loans. A consumer could have reasonably understood that the purpose of the IWorks programs and products was to point the consumer towards relevant grant programs and give them guidance on how to apply. These grant programs could have been any number of the ones pointed out in Browning's report. The Court therefore cannot determine that Defendants' representation as alleged in Count I is likely to mislead a consumer acting reasonably. Simply put, a consumer acting reasonably could expect that the sites' references to government grants included loans and assistance. The Court does not, and need not, determine what the word "grant" means to the average consumer. The Court does find, however, that the FTC has not demonstrated that there is no genuine issue of material fact as to Count I and summary judgment is denied as to that count.

**b. Count II**

Count II alleges Defendants misrepresented that consumers using Defendants' grant product are likely to find government grants to pay personal expenses. Even accepting Defendants' broader definition of "grant," such government grant programs are still only available to limited groups. Consumers would not be able to tell that by looking at the sites, however, which repeatedly reinforce that the government is giving away money but do not identify any specific programs for limited groups like those highlighted in Browning's report. For the reasons set out above, the sites give the impression that consumers will be able to access government grant money through the use of IWorks' programs and products. Nearly every page is filled with multiple testimonials from people who received money, usually in the form of checks in the mail, with apparently no strings attached. Consumers are bombarded with huge numbers about grant money available and given away. To the extent that the sites mention any qualifying groups of persons, they are as basic as "taxpayers" or "U.S. Citizens" and not persons "in smaller-population areas, veterans, students/prospective students, minorities, refugees, senior citizens and lower-income persons," which are the categories identified in Browning's

report. Further, Donna Davis' declaration, discussed above, indicates that federal assistance programs, even if considered as part of grants, are themselves very limited. (*See* dkt. no. 27-5.) Dr. Porter's deposition testimony further supports this point. Dr. Porter was IWorks' grant consultant and a selling point on IWorks' sites. He maintained IWorks' grant database and kept it up to date. As Defendant points out, Dr. Porter also acknowledged that the public has a looser definition of grant. However, he stressed in his deposition that while there are grant programs out there that may pay for personal expenses, such as housing credits and assistance for veterans, "it's the smallest slice of the population that qualifies for it."[14] (Dkt. no. 1339-4, Porter Depo., Exh. 1803 at 251-255.)

Despite strong challenges by the FTC as to the availability of grants, Defendants have not produced any evidence that any of their consumers actually received grant money outside of those that received money through Grant-A-Day. Only 0.04% of consumers enrolled in Defendants' grant membership program between August 2007 and January 2010 actually received money from the Grant-A-Day program.[15] (Dkt. no.

---

[14]The limited applicability of grants for personal expenses is further demonstrated by FTC investigator Tyndall's search of IWorks' database. Tyndall went to the website database on IWorks' "Your Federal and Private Grant CD" and searched "grant" in the category "Personal Needs" and got 172 programs, 84 of which were scholarship programs. Of the remaining programs, only one federal program and one state program accepted applications from individuals, and those were for war veterans in exceptional circumstances. The rest included one program for subsidized loans, nine tax deduction/credit programs, 20 private programs for non-profit or social services organization, and 7 programs for terminally ill children. (Dkt. no. 26-1, Tyndall Decl., Exh. 37 at ¶¶ 31-33.) Defendants argue that Bryce Payne ran a search in an updated database (grantdirector.com) and produced results for "medical," "healthcare," "housing," "utilities," and "bills" (dkt. no. 1343 at 14) but it is not clear whether these results where grants for individuals.

[15]Defendants point out that the 0.04% figure includes all purchasers, including those that cancelled their trial membership or never applied for Grant-A-Day. (Dkt. no. 1343 at 17.) Even so, the figure is informative. The question for the Court is whether consumers were misled in making their purchase decision. The evidence shows that only 0.04% of purchasers actually received money through Grant-A-Day, which is, the evidence shows, the only program through which consumers received money. The Court finds that consumers did not make their purchases believing that they can only receive money like the people in the testimonials if they maintain a monthly membership and apply for the Grant-A-Day program. One of the precise problems in this case is that the sites never gave that impression.

1254-1, Tyndall Decl., Exh. 899 ¶¶ 39-41.) Further, Defendants have not produced any evidence that there were grants available on IWorks' database for individuals to pay personal expenses.

The Court concludes that the sites are likely to mislead consumers acting reasonably under the circumstances into believing that they are likely to receive government grants. This representation was false because the grant money promoted on these sites was either only available to limited groups or not available at all, depending on which definition of "grant" is being used. The mere fact that the sites also mention "private" grants does not alter the deceptive net impression as to the availability of "government" or "federal" grants. The deceptive impression created by this representation is material because it goes to the central characteristics of the product and induces purchase. That is, as a consumer using these sites would order IWorks' CD under the belief that government grants for personal expenses are available and that they are likely to receive money in the mail to pay for personal expenses. Indeed, the ease with which consumers were led to believe they could access this millions or billions of dollars in grant money by using IWorks' products was Defendants' main selling point and relates directly to the products' efficacy. The Court therefore finds that there is no genuine issue of material fact as to the alleged FTC Act violation asserted in Count II.

**c. Count VI**

Count VI alleges that Defendants misrepresented that consumers using Defendants' grant product are likely to obtain grants such as those obtained by consumers in the testimonials. The testimonials appear again and again on every one of the sites' pages. Defendants provided substantiation for some of the testimonials, but the listed recipients almost exclusively received money through the Grant-A-Day program. Yet this information is omitted in all but four of the sites before the Court, and many of the sites do not mention the Grant-A-Day program at all. As previously discussed, the sites give the clear impression that the people in the testimonials received money through any one of the thousands of government and private grant programs

touted on these sites that have millions or billions of dollars to give away. These people appeared to have received money in the mail that they appeared to be able to spend on any personal expense. Some of the testimonials indicate that people received grants in a week or two.[16] Even in the sites featuring testimonial excerpts that do mention the Grant-A-Day program, a description of that program is absent or otherwise vague and leaves consumers with the impression that the Grant-A-Day results are from any one of the thousands of programs contained in IWorks' database.

The Court concludes that the sites are likely to mislead consumers acting reasonably under the circumstances into believing, incorrectly, that they are likely to receive money like the people in the testimonials. This was false because the evidence before the Court is that the people in the testimonials almost exclusively received money through the Grant-A-Day program operated in part by IWorks, and not the thousands of private or federal programs mentioned on the sites. As previously mentioned, only 0.04% of consumers enrolled in Defendants' grant membership program between August 2007 and January 2010 actually received money from the Grant-A-Day program. The recipients of Grant-A-Day awards did not need to use IWorks' databases full of grant programs. They were eligible to apply purely by virtue of having purchased IWorks' program or product. The deceptive impression created by this representation is material because it goes to the central characteristics of the product — earnings and efficacy — and induces purchase.

With regard to substantiation for the testimonials, there is no evidence before the Court that the testimonials proclaiming grants of higher than $5,000 have any reasonable basis to support them. As previously mentioned, the evidence shows that the Grant-A-Day program only gave awards as high as $5,000. There is no evidence in this case that anybody made any money off of the grant memberships outside of the Grant-

///

---

[16]Browning testified in her deposition that there is typically longer than a three-week waiting period for receiving grant money, and federal government grants take at least a couple months. (Dkt. no. 1339-39, Browning Depo., Exh. 1840 at 103-04.)

A-Day recipients. Even drawing all inferences in favor of Defendants, the Court cannot determine what the other testimonials could have been based on apart from pure speculation. Indeed, Defendants do not argue that testimonials regarding money received outside of the Grant-A-Day program have any substantiation.

The Court therefore finds that there is no genuine issue of material fact as to the alleged FTC Act violation asserted in Count VI.[17]

**D. Count IV – Misrepresenting the "free" or "risk-free" nature of Defendants' offers; Count V – Failing to disclose that consumers will be entered into negative option continuity plans**

As Counts IV and V both deal with the negative option memberships and their disclosure on the sites, the Court will consider these counts together. The parties group these counts together as well. The FTC alleges, as to Count IV, that "IWorks falsely represented in numerous marketing sites that its products were 'Free' or 'Risk-Free' while, in fact, once consumers provided their billing information, IWorks deceptively enrolled them in pricy negative option continuity programs." (Dkt. no. 1280 at 51-52.) The Amended Complaint asserts, as to Count V, that Defendants represented that consumers would only be charged a small fee for a CD or software while failing to adequately disclose that consumers will be enrolled in negative option memberships and upsells. (Dkt. no. 830 ¶¶ 457-459.)

While Counts I, II, and VI were only asserted as to the grant membership sites, Counts IV and V are asserted as to *all* of Defendants' sites marketing and selling "various products or services." (Dkt. no. 83 at 80-81.) For the reasons explained above, the Court can only limit its inquiry to the grant sites it reviewed.

**1. Claim**

The sites described above represent, explicitly and repeatedly, that consumers will be paying a small shipping and handling or download fee for a free, or risk-free, CD

///

[17]The Court's determination as to Counts II and VI only applies to the grant sites described and analyzed in this Order.

or software.[18] The sites otherwise contain the words "FREE" or "RISK-FREE" in large letters all over the described pages, referring to the money that can be received, the grant programs, the CD, or nothing specific.

**2. Misleading**

The FTC asserts that Defendants' representations about the free or risk-free nature of the product and the cost of the CD/software were misleading because consumers were also enrolled in negative option memberships and upsells without adequate disclosures. (Dkt. no. 1280 at 53-57.) They assert that IWorks placed its "fine-print disclosures" after consumers had already begun the ordering process. (*Id.*) According to the FTC, a consumer proceeding through the website pages would have the net impression that they were getting a free CD for a minimal shipping and handling or download fee. (*Id.*) They state that the sites collected preliminary information without informing the consumer that they would be enrolled in a core membership with a negative option and additional upsell memberships with negative options. (*Id.*) They also claim that in the final step, consumers were confronted with a prominently placed order box, which asked for credit or debit card information for the small fee. (*Id.*) They assert that IWorks placed disclosures about the negative option and upsells either at the top of the page or under the button to submit the order in small print. (*Id.*)

In sum, the FTC argues that the disclosures were presented in a way that made consumers unlikely to expect them (because the claims "free" and "risk free" were so prominent) and were unlikely to see them (because the disclosures were inadequate or non-existent). (Dkt. no. 1387 at 26.)

Looking at the sites described above, the Court generally agrees with FTC's characterization of IWorks' sites. As noted in the Court's description above, PI Opposition Sites Exhibits 4 and 8 are landing pages only. Aside from those examples, the remaining sites appear to proceed in two to three stages with the initial landing page

///

[18] The Court's use of "CD" refers both to the CD itself and the software.

highlighting the grants available, the money that can be made, and people who have achieved positive results. After being prompted to provide personal information, consumers are told they qualify for a free CD. In those sites that have three stages, such as the Jacobson Sites, consumers are asked in the intermediary pages to provide shipping information for the CD and are then directed to the order page in the final stage. All of the order pages ask for credit card information and indicate that the user will be charged a fee, typically two dollars and change, for the shipping and handling, or sometimes approximately one dollar for a download. The words "FREE" or "RISK-FREE" are repeated in large print throughout all of the sites' pages. Disclosures in small print relative to the rest of the page appear at the very top of the page or under the submit button.[19] They inform the user that they will be enrolled in three trial memberships, including one core membership with an initiation fee and recurring monthly charges, and two other trial memberships with separate and distinct cancellation periods and recurring monthly fees. Some of the order pages contain information about the upsell memberships at the bottom of the order page. The entire cost of membership is only revealed in the disclosures.[20] None of the sites allow consumers to opt out of the negative option memberships or upsells before paying the fee for the CD.

---

[19]Defendants argue that the process by which the FTC investigators captured and presented the sites to the Court did not maintain their proper resolution. However, the Defendants do not argue that a given piece of text is scaled improperly as to the rest of the text on the page. When the Court describes text as "small," it is describing the text as small relative to the rest of the page. The Court need not view the sites in their original resolution to make that determination. As is clear from the Court's description of the sites, the order pages contain a large array of text and images. The text is different sizes, in different fonts, with claims often in bold and capitalized. Though occasionally there was other text on the page as small as the disclosure text, it was always among the smallest text on the page and smaller than the large text directing consumers to order the CD. In many of the sites, the disclosure text was also the most narrowly-spaced text on the page.

[20]Only one of the sites reviewed by the Court lists any costs associated with the negative option memberships outside of the order page disclosures. The "Federal Grant Connection" site mentions at the bottom of its landing and intermediary pages a cost of "$39.95" and "$39.95/month" respectively. (Dkt. no. 31-6, Exh. 119 at 4, 5.) Even these prices appear to be misleading, however, as the disclosures on the order page indicate that the core membership is "$24.95" a month with an initiation fee of "$129.95" after a trial period of three days. (*Id,* at 7.)

Most problematically, the sites do not prominently advertise memberships. Setting aside the order page disclosures for a moment, a consumer looking at these sites is not likely to understand that they are signing up for one membership program, let alone three. The program or product being advertised is generically referred to as a "grant program," "grant doctor program," or "grant resource center." The sites' claims are primarily focused on promoting the grant money available and the free CD. The only odd references to memberships the Court can find in reviewing the sites are: (1) the words "the #1 Rated Grant Member Site" that appear on the intermediary page of the 'Government Money Secrets" site (dkt. no. 31-4, Exh. 116 at 3); (2) the "Grant Member Site" referred to in the "Grant Seeker Secrets" site (dkt. no. 31-7, Exh. 120); (3) the CID Sites that refer to testimonials as "members" who have found grants; and (3) the words "TRIAL," "FREE access" or "membership site" that are listed in the upsells section at the bottom of some of the order pages (*see* dkt. no. 31-4, Exh. 116 at 4; dkt. no. 31-5, Exh. 117 at 6; dkt. no. 31-6, Exh. 119 at 7; CID Sites). Claims about grant money and free CDs always overwhelm these brief mentions of members or memberships, which are only passing mentions to begin with. The important exceptions are the two sites that list all of the trial memberships in the order box directly above the space to enter credit card details. (Dkt. no. 31-5, Exh. 118 at 5; dkt. no. 66, Exh. 2.) These references to memberships are not accompanied by any explanation as to what the terms of the membership are.

As further evidence of the deception, the FTC points to an email from Ryan Riddle, IWorks' General Manager, in which he states that "we make our money off the clients that forget to cancel, or simply don't take the time to read the disclosures and thank-you emails." (Dkt. no. 1253-2, Exh. 857.) According to the Tyndall's review of IWorks' records, of the three million consumers who requested refunds, more than one

///

///

///

million were "not aware of the monthly charges." (Dkt. no. 1254-1, Exh. 899 ¶ 36) This was the most used event code between January 1, 2006 and October 31, 2010. (*Id.*)[21]

**3. Rebuttal**

Defendants argue in response that: (1) negative options are a convenience and practiced by many businesses; (2) the FTC's requirements for effective disclosures were not clear; (3) it is standard e-commerce practice to place a negative option disclosures on the order page as opposed to the landing page; (4) the disclosures were in clear, plain language and gave the necessary information; and (5) the rate of cancellations in the trial periods indicate that consumers understood they were enrolling in membership programs and were aware of the upsell products. (Dkt. no. 1343 at 22-35.)

Defendants argue that negative options are a convenience for purchasers, and profiting off of consumers who forget to cancel or do not read disclosure terms is a legal business model. (*Id.* at 34-35.) Defendants point to other major businesses that profit from this model, including major sites such as Audible.com, Lifelock.com, and Netflix.com to name a few. (*Id.*) The Court will not weigh in on the legality of this business model in all cases. The Court notes, however, that there is a significant distinction between sites that clearly offer subscription-based or membership-based services to a consumer with a trial period and negative option on one hand, and sites that offer to ship a product for a one-time payment with a bundled membership trial period and negative option on the other. In the first situation, the consumer is made aware of an ongoing obligation for use of the seller's service. Generally speaking, Defendants are correct that a consumer's failure to cancel their membership in that situation would be the fault of the consumer. In the second situation, however, a consumer may be misled into believing they are purchasing a product with no continuing obligation. The Court's concern in this case is that the sites do not clearly offer a

///

[21]Tyndall states that he was told there was a possibility that some of the complaints may have been miscoded. (Dkt. no. 1241-1, Tyndall Depo., Exh. 1655 at 40-41.)

membership program. Though some language in the sites may allude to an ongoing service, the sites very clearly offer a free CD for a small shipping and handling or download fee. A consumer could understand their relationship with IWorks to be complete after paying the fee and receiving the CD. Consequently, they would have no awareness of an ongoing payment obligation. That is a significantly different situation from one in which a consumer willingly receives the benefit of a subscription or membership program and forgets to cancel.

Defendants also argue that, as a matter of due process, they should have been provided with fair notice that the form of their disclosures was prohibited. (Dkt. no. 1343 at 23-24; dkt. no. 1352.) Defendants cite to cases in which federal agencies imposed civil penalties for violating regulations for mine safety, *Stillwater Min. Co. v. Federal Mine Safety and Health Review Commission*, 142 F.3d 1179 (9th Cir. 1998), and toxic substances, *General Electric Co. v. U.S. E.P.A.*, 53 F.3d 1324 (D.C. Cir. 2011). Defendants also cite to a case in which the United States brought a civil forfeiture action on the basis of an alleged violation of the Shark Finning Prohibition Act. *United States v. Approximately 64, 695 Pounds of Shark Fins*, 520 F.3d 976 (9th Cir. 2008). In all of these cases, the penalized parties argued that the particular statute or regulation did not clearly cover their conduct. Defendants' contention here is unclear. The FTC has not assessed a penalty against Defendants in this case. Counts IV and V are brought pursuant to Section 5(a) of the FTC Act, which prohibits deceptive conduct in advertising. Defendants do not argue that Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), is vague or inapplicable to their sites. There is extensive case law and guidance on what constitutes a deceptive act or practice under Section 5(a) going back to before the relevant time period in this case, including FTC guidance on internet advertising. *See FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1083 (C.D. Cal. 2012) ("[T]he test under section 5(a) draws on well-established principles of advertising law and common sense.")

///

Defendants may not mislead consumers about the costs associated with their programs or products and claim that they did not have clear notice as to the particular method of their deception. "Such a rule . . . calls for a rigid formula that undermines the very usefulness and flexibility of the law permitting it to be applied to a multitude of factual circumstances under sustained principles." *Id.* The FTC seeks to impose liability on grounds that Defendants misled consumers into believing they had no obligation beyond a small fee when in fact they were enrolled in negative option memberships and upsells with initiation fees and recurring payments. Focusing on the form of the disclosures misses the forest for the trees. *See Cyberspace.com*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation contains truthful disclosures.")

Defendants state that presenting the negative option disclosure on the order page, as opposed to the landing page, was not problematic in and of itself. They base this assertion on the report of their expert Jeffrey Bloom, who says that placing the negative option disclosure on the landing page would be against standard e-commerce practices, in which sellers put a value proposition on the landing page and not an abundance of information. (Dkt. no. 1343 at 24; dkt. no. 1339-17, Bloom Rept., Exh. 1816 at 9-12.) The Court agrees that it is not necessarily the case that a negative option disclosure must be placed on the landing page to avoid being deceptive.

Defendants argue that the disclosures were in clear, plain language that provided all of the information required by the FTC. (Dkt. no. 1343 at 26-27.) Defendants state that the disclosures included "(i) the fact of the trial program enrollment; (ii) the length of trial period; (iii) the fact that the consumer would be charged "thereafter" if not cancelled; (iv) the amount of the charges; (v) the fact that the charges were monthly; and (vi) the fact that the charges would be billed to the same credit/debit card." (*Id.*) They argue that these disclosures were satisfactory like the disclosures in *In re Vistaprint Corp Marketing & Sales Practices Litigation*, 4:08-md-1994, 2009 WL 2884727 (S.D. Tex. Aug. 31, 2009).

In *Vistaprint*, the plaintiffs alleged that an online business card retailer deceived consumers into believing they had to complete a survey in order to complete their online purchase, and that completion of the survey enrolled consumers in negative option membership with recurring payments. *Id.* at *4. After consumers completed the checkout process for their business card, they were presented with a "VistaPrint Rewards" page that offered "A special thank you with your purchase from VistaPrint" in the form of $10.00 cash back. *Id.* The court found that it was clear that by the time consumers reached this page their order was already complete, and the new page was offering, at the top of the box containing the survey, "$10.00 Cash Back just for trying VistaPrint Rewards FREE for 30 days." *Id.* at *5. Beneath the survey questions, consumers were directed to enter their email address and below that instruction but before the space that allows the consumer to enter and confirm their email address, was the following:

> By typing your email address below, it will constitute your electronic signature and is your written authorization to charge/debit your account according to the Offer Details. By clicking "Yes" I have read and agree to the Offer Details and authorize VistaPrint to securely transfer my name, address and credit/debit card information to VistaPrint Rewards, a service provider of VistaPrint.

*Id.* "This clear language advises the consumer before the place for entering and confirming the email address that typing in the email address and clicking 'Yes' authorizes VistaPrint to charge/debit the consumer's account according to the Offer Details, signifies that the consumer has read and agrees to the Offer Details, and authorizes VistaPrint to transfer the consumer's credit/debit card information to VistaPrint Rewards." *Id.* There is a choice to then click "Yes" or "No, Thanks." *Id.* The "Offer Details" appear immediately beside the survey box and "are in the same size and color as most of the print on the webpage except that the title 'Offer Details' is in bold print." *Id.* The court found that the VistaPrint Rewards page was not deceptive because it "contains adequate disclosures which, if read by the consumer, prevent the webpage — as a matter of law — from being deceptive." *Id.* at 6.

///

The Court finds that *VistaPrint* is not persuasive. The facts are distinct. Unlike the situation in *VistaPrint*, the negative option memberships in this case are not part of a separate offer following purchase in which consumers are given a choice to receive an additional benefit. The memberships in this case come packaged with the "free" CD and consumers do not have the ability to decline the negative option memberships short of deciding to abort the ordering process altogether. As the court in *VistaPrint* notes, consumers in that case would not reasonably believe that they had to complete the survey in order to receive their business cards. In this case, on the other hand, the sites make it clear that consumers must provide their credit card information in order to receive their CD. Once that process is complete, the consumer is enrolled in the negative memberships and must take affirmative steps to cancel before automatic payments kick in.

The *VistaPrint* page also informs the consumers, above the "Yes" button in text that is only smaller than the title of the page, that by entering an email address and clicking "Yes," they are consenting to have their credit card or debit card charged. Consumers are also explicitly directed to the "Offer Details" that are titled in bold next to the survey box. In this case, on the other hand, disclosures appear either at the top of the page or under the submit button in text smaller and more narrowly-spaced than the majority of other text on the page. The site does not direct consumers to examine the disclosures and they are not titled in bold. The box that asks for credit card or debit card information prominently states that there is a shipping and handling fee of two dollars and change, or a download fee of approximately one dollar, without mentioning the ongoing payment obligations that appear in the disclosures.

Further, the court in *VistaPrint* appeared to conclude that clear and easily understandable disclosures in close proximity to the area where a consumer submits their agreement prevents a page from being deceptive "as a matter of law." *Id.* at 5-6. There is no such bright-line rule. Nor can there be such a rule as consumers may be misled into believing close review of the disclosures is not warranted in the first place. In

fact, the Ninth Circuit found that the solicitations in *Cyberspace.com* created the deceptive impression that consumers were receiving a refund or rebate check and not an offer for services, even though the mailing contained truthful disclosures. *Cyberspace.com*, 453 F.3d at 1200-01; *see also Gill*, 71 F. Supp. 2d at 1044 (disclaimers do not automatically exonerate deceptive activities).

Defendants also assert that the rate of cancellations demonstrates that consumers were familiar with the disclosure terms. (Dkt. no. 1343 at 27-28.) Dr. Robert L. Vigil, economics expert for Defendants, states in a report that of the customers that purchased the products from January 2006 to December 2009, 19.9% of the core memberships and 28.1% of the upsell memberships were cancelled in the trial period, which indicates that “many consumers understood they were enrolling in membership programs” and were aware of the upsells. (Dkt. no. 1262-1, Vigil Rept., at 10-11.) The FTC argues in response that this does not account for the majority that did not cancel and there is no evidence as to how these consumers knew to cancel, whether it be from a confirmation email, the product itself or some other source. (Dkt. no. 1386 at 30 (citing *Commerce Planet*, 878 F. Supp. 2d at 1071-72).

**4. Conclusion**

Moving through the pages of the various sites, the Court is struck by the fact that it is never clear what precisely IWorks is providing. The sites initially hook consumers through claims about the large amount of money available in grants. It is made repeatedly clear to the consumer that huge amounts of money are being given away in the form of grants, and people are receiving this much-needed money to pay personal expenses. Apart from that, consumers are told in a barrage of bullet points, text, and graphics, that Defendants have a resource center, software, live chat representatives, and a grant expert, amongst other things. Consumers are also told, through express claims and testimonials, that they can receive money in the mail. Consumers proceed through dubious qualification steps in which they are asked to provide personal information. Consumers who proceed to the final stage see an order page that prompts

them to enter credit card or debit card information, sometimes with a timer ticking away, in order to pay the shipping and handling or download fee for the CD. Sometimes the CD is referred to as "free" or "risk-free" but in all cases the only price listed is the small fee. It is not clear from the sites what of value is on the CD, if anything,[22] but it is clear to the consumer that they are entitled to a CD and it is ready to be mailed or downloaded. By the time consumers reach the stage where they can pay the fee and get their CD, it has been reinforced again and again that there is money out there, people are receiving it, and Defendants have the resources and expertise to help consumers get it. Exactly how they are helping consumers, and how the CD factors in, is murky at best.

What is clear, however, is that the sites do not advertise a membership program. Aside from the couple of odd instances described above, the sites don't even mention memberships outside of the disclosures. The sites do not clearly state what services will be provided for the monthly fee and how much it will cost. The only cost prominently described on the order page is the fee for the CD. A consumer that did happen to review the disclosures would not necessarily understand what they are receiving for the monthly fees, particularly when they are already receiving the CD for free. That speaks to the reality of these websites: they are selling the availability of grant money and they are selling the CD, but they are not selling memberships or the benefits of said memberships.[23] Yet before submitting payment information, Defendants expect consumers to find and study the disclosure language to determine whether there may be recurring payments for negative option memberships. The Court concludes that

---

[22]As previously mentioned, Jeremy Johnson stated at the hearing that the grant database itself was on a website, not on the CD, and the goal was to get consumers online using the database. (Dkt. no. 1553 at 117.)

[23]Dr. Good, the FTC's expert, reached a similar conclusion in his analysis. He mentions that "[t]he pages preceding the order page, (the landing page and the mid page) mention a free CD and nominal shipping and handling charges, but do not mention the core terms, or upsells." He adds that, consequently, "if the consumer gets to the order page with the intent to get the CD, the only cost they would likely be expecting would be the nominal shipping and handling charge." (Dkt. no. 1261-9, Good Report, Exh. 1418 at 27.) The Court does not adopt Dr. Good's conclusions as to the sites currently before the Court but merely notes a similar result.

consumers are likely to believe that they are ordering a CD for a one-time fee and would not have reason to believe they were enrolling in membership programs with monthly charges.[24]

Defendants' sites actively encourage this deception. Unlike the *VistaPrint* pages, the sites do not direct users to review the disclosure or give consumers the option to accept or decline the terms of an offer. Consumers are informed about the fee, they are asked to provide their credit card or debit card information, and they are directed to click a button that says "submit" or "continue" or "ship my kit" or "ship my software." This language does not give the impression that consumers are agreeing to the terms of a membership. It was Defendants' responsibility to ensure that a consumer acting reasonably would understand, before purchasing the product, that they were getting a CD and three trial memberships. Instead, Defendants' sites mislead consumers into thinking that they are only ordering a CD. Information about the trial memberships, and their associated costs, are hidden in disclosures that consumers would be justified in believing they did not have to examine closely.

Count IV alleges that Defendants misrepresented the free or risk-free nature of their offers. The Court concludes that the sites are likely to mislead consumers acting reasonably under the circumstances into believing that they are receiving a "free" or "risk-free" product. This representation was actually false because upon ordering the CD, consumers were enrolled in negative option memberships and upsells that automatically charged consumers' credit cards or debit cards after the trial periods. The mere fact that the sites contained disclosures in smaller print and described the upsells as "bonuses" and trials at the bottom of the order pages, does not alter the deceptive net impression as to the cost and nature of the product because consumers would not be inclined to

---

[24]The Court's conclusion is bolstered by consumers who stated in their depositions that they ordered the free "Your Federal and Private Grant CD" and paid for shipping and handling but were surprised by the memberships, which they did not want. (*See* dkt. no. 1280 at 25 n.113; dkt. no. 1237-1, Bachman Depo., Exh. 1600 at 118; dkt. no. 1240-2, Miller Depo., Exh. 1647 at 36; dkt. no. 1238-4, Huffman Depo., Exh. 1620 at 48.)

seek out this information.[25] The deceptive impression created by this representation is material because it goes to the central characteristics of the product and induces purchase. That is, a consumer using these sites would order IWorks' CD/software under the belief that they were making a one-time payment of a small shipping and handling or download fee for an otherwise free product.

Count V alleges that Defendants failed to disclose that consumers will be entered into negative option continuity plans. The Court concludes that the sites are likely to mislead consumers acting reasonably under the circumstances into believing that they would only be charged a small fee for a CD or software. For the reasons described as to Count IV, this representation was actually false and material.

However, the Court finds that there is a genuine issue of material fact as to whether judgment on Counts IV and V is appropriate as to the two sites that list all of the trial memberships next to a price of "$0.00" in the order box directly above the space to enter credit card details. (Dkt. no. 31-5, Exh. 118 at 5; dkt. no. 66, Exh. 2.) These sites make it clear, right before the consumer enters their payment information, that consumers are receiving the CD and trial memberships. While it may be that they are still deceptive given that the price is listed as $0.00, the issue is a close call and one for a factfinder at trial to decide.

The Court therefore finds that there is no genuine issue of material fact as to the alleged FTC Act violation asserted in Count IV and Count V.[26]

**E. The Google "Adwords" Websites**

The FTC provides images of IWorks' Google product sites that the FTC received in response to a CID request. (Dkt. no. 1280 at 19 n.87.) They appear as FTC Exhs.

---

[25]Dr. Good, the FTC's expert, states that research shows that consumers ignore "legal text." That is, "text that has the appearance of 'terms and conditions' and 'end user license agreements' has been shown to be widely ignored by consumers" and are infrequently read. (Dkt. no. 1261-9, Good Report, Exh. 1418 at 11.)

[26]The Court's decision regarding Counts IV and V only applies to the grant sites reviewed and analyzed by this Order that were presented with an order page. The Court makes no determination as to those exhibits that did not contain the relevant order pages.

131, 132, 133, and 136. (Dkt. nos. 33-2, 33-3, 33-4, and 33-7.) The Court will focus on these exhibits in its analysis of the FTC's claim regarding the Google product because Defendants provided these images.

Exhibit 131 is an image of a page from a "Google Biz Kit" site. (Dkt. no. 33-2.) The top of the site says "Google has 'made it viable for people to make a couple dollars, or thousands of dollars" next to an image of The New York Times' logo. Beneath that is an image of a laptop with cash coming out of the screen and logos from USA Today and CNN, among others. Next to the image of the laptop, in the largest letters on the page, it says, "You could make $199 or more a day on Google." There is a box that says "COMPLETE THE FORM TO SEE IF YOU QUALIFY" and asks for name, email, and phone number and prompts the user, "FOR INSTANT ACCESS CLICK HERE." The site says, "CONGRATULATIONS – YOU QUALIFY FOR A FREE TRIAL" in large letters and tells the user, "This is THE OPPORTUNITY YOU'VE BEEN LOOKING FOR!" At the bottom of the page, beneath images of people expressing desires for their careers, is a USA Today logo next to a quote that says, "Riches range from a few hundred dollars a month to $50,000 or more a year!" Under that it says, "Your Cost = $0. In just a few minutes per day, Google Biz Kit will show you how you could earn $199 per day working from home!" Beneath that it says, "Google makes it possible to bring in money with little effort and major return."

Exhibit 132 is an image of a page from a "Google Profit Software Kit" site. (Dkt. no. 33-3.) In large letters up top it says, "Easily make $188-$923 a day from home, online. Thousands are doing it and YOU CAN TOO!" It states "Risk FREE Trial" in front of an arrow that says "COMPLETE THE FORM TO START IMMEDIATELY" and points to a box that asks the user for name, email, and phone number. Beneath the arrow is an image of an equation that has an image of a laptop multiplied by the Google logo plus "YOU" equals an image of money. It also presents three steps that are, in order, "FAST," "EASY," and "CASH."

///

Exhibit 133 is an image from a "Google Pay Day" site. (Dkt. no. 33-4.) The top of the page has the same quote next to The New York Times' logo, same image of money emerging from a laptop, and same claim about making "$199 or more a day" as the "Google Biz Kit" site. Like that site, there is also a box that says "COMPLETE THE FORM TO SEE IF YOU QUALIFY" but the "Google Pay Day" site asks for the user's desired income, desired hours, and zip code. The page also lists three steps including, "1 Tell us how much $$ you're looking to earn per week. 2 See if you qualify for one of your limited trial kits 3 Begin filling out offers and see the cash fly in!" Like the "Google Biz Kit" site, under the "qualification" box is a USA Today logo next to a quote that says, "Riches range from a few hundred dollars a month to $50,000 or more a year!" and under that it says, "Your Cost = $0. In just a few minutes per day, Google Biz Kit will show you how you could earn $199 per day working from home!" Under that is three testimonials, such as "Julie H" who says "I implemented your system . . . my first sale made $37" and "Sherrie D" who says ". . . by the time I got finished, . . . my humble little test run made $50 in the first two hours!" At the bottom of the page it says, "In a few hours THIS COULD BE YOU!" and has an arrow pointing to an image of a woman holding several hundred-dollar bills.

Exhibit 136 is an image from another "Google Pay Day" site. (Dkt. no. 33-7.) It asks, "WOULD YOU LIKE TO MAKE $200 A DAY FROM HOME? WITH Google, YOU COULD MAKE IT HAPPEN!" The page features logos of television news channels and the USA Today logo next to a quote that says, "Riches range from a few hundred dollars a month to $50,000 or more a year!" Beneath that quote it says, "Google pays millions of dollars every month to people just like you, not just big businesses." The page has a "qualification" box that asks for name, address, phone number, and email. Under the requested information it says, "SEE IF YOU QUALIFY CLICK HERE." Next to the box it says, "Everything you'll need to make guaranteed fast money on Google: Your Cost = $0. In just a few minutes per day, Google Money Profits will show you how to earn $150, $500 — even $1,000 per day or More!" There is an arrow pointing to the "qualification"

box with a picture of stacks of cash that says, "UPON QUALIFYING, YOU'LL HAVE INSTANT ACCESS. YOU COULD START MAKING MONEY TODAY!"

**F. Count III – Misrepresenting the amount of income the consumers are likely to earn using Defendants' products**

The FTC asserts that "IWorks materially misrepresented the income potential of its make-money products on numerous websites, and . . . its earnings claims lacked adequate substantiation." (Dkt. no. 1280 at 50.) Count III focuses on IWorks' Google "Adwords" program,[27] which IWorks' Operations Managed Bryce Payne describes as a program that "taught customers to create ads using AdWords and AdSense, provided guidance on ad placement, gave tips on driving online traffic through their websites to other sites, and offered similar advice." (Dkt. no. 1343 at 18; dkt. no. 97, Payne Decl. ¶ 20.)

**1. Claims**

A consumer using the Google "Adwords" sites described above and acting reasonably under the circumstances is likely to believe that they are likely to earn hundreds of dollars in one day and tens of thousands of dollars in one year using the product. The potential earnings are made explicit and the likelihood of profitable results is reinforced by the testimonials, apparent news excerpts, language about how money can be made with "little effort" or "easily" or "in a few hours," and language about how Google has "millions" to give away.

**2. Misleading**

The FTC's sole argument in summary judgment is that the Google "Adwords" sites' earning claims are not substantiated. (Dkt. no. 1387 at 15.) In response to a CID request asking Defendants to identify every individual featured in the sites' testimonials and the substantiation that supports their testimonials, Defendants provided a list of four

///

[27]The Motion suggests that the category of "make-money" products sold by Defendants is broader than just the Google product, but the Google product is the only one specified and addressed in the Motion. (Dkt. no. 1280 at 18-21.)

names and their original testimonials, which are in the form of emails initially sent to Stephen Holdaway, who licensed the Google products to IWorks. (Dkt. no. 20-10 at 4-5.) There are four emails from three individuals. (Dkt. no. 22-3 at 34-37.) The only earnings information in the emails comes from Ryan Diedrich who states that he is making a net profit of $52.00 per day and John Steel who says that he had his first sale after five hours, making a $37 sale and a $26 commission. (*Id.*)

The FTC argues this substantiation is insufficient because: (1) they came from emails to Holdaway and were thus not purchasers of the product through IWorks; and (2) their earnings were nowhere near the amounts claimed on the sites. (Dkt. no. 1280 at 20.)

**3. Material**

The FTC argues that express claims regarding expected earnings are material to a consumer's decision whether to purchase a product. (Dkt. no. 1280 at 50-51.)

**4. Rebuttal**

Defendants argue that the earnings claims are substantiated and true as demonstrated by Stephen Holdaway. (Dkt. no. 1343 at 18-21.) Payne describes Holdaway as a search engine marketing expert and Google advertising professional. (Dkt. no. 1343 at 18; dkt. no. 97, Payne Decl. ¶ 20.) Holdaway says that he made in excess of $120,000 per day in college using the methods outlined in his product and $200-943 per day is an achievable goal. (Dkt. no. 1339-14, Holdaway Rept., Exh. 1813 at 1-8.) He says that a consumer capable of browsing the Internet and making purchases could achieve the results described in the sites. (*Id.*) He further states that claims stating "millions of people are making money from home" was accurate because Google Adwords was Google's sole income at the time. (*Id.* at 7-8.) He also states that customers have reported making a profit on the very first day. (*Id.*)

**5. Conclusion**

Count III alleges that Defendants misrepresented the amount of income the consumers are likely to earn using Defendants' products. The FTC argues the Google

"Adwords" sites' earnings claims are misleading because there was no reasonable basis to make those claims. Viewing the evidence in the light most favorable to Defendants, the evidence shows that Holdaway licensed his product to IWorks and believes, based on his interactions with clients and experience, that the earnings claims are accurate as to his product. As Defendants have produced substantiation, it is the FTC's burden to show that it is insufficient. *John Beck Amazing Profits*, 865 F. Supp. 2d at 1067.

The FTC argues that Holdaway did not purchase the product through IWorks and that he "bears no resemblance to the ordinary inexperienced consumers IWorks targeted." (Dkt. no. 1387 at 19-20.) Although Holdaway may be sophisticated, he also claims to have based his conclusions on interactions with clients (dkt. no. 1339-14, Holdaway Rept., Exh. 1813 at 4) as well as emails from consumers who purchased the product from IWorks (dkt. no. 1238-2, Ex 1618 at 56-58).

The FTC further argues that Holdaway could not have provided the substantiation for Defendants' earnings claims because he only testified to providing IWorks with testimonials. (Dkt. no. 1387 at 20.) As Defendants' response to the CID request for substantiation for its testimonials did not provide a reasonable basis for the earnings claims, the FTC asks the Court to conclude that Holdaway could not have provided the necessary substantiation. The Court cannot conclude that the *only* substantiation Holdaway provided to IWorks was in the form of testimonials merely because he did not mention providing any other form of substantiating evidence in his deposition.

The emails provided in response to the FTC's CID request appear to be insufficient to substantiate the sites' earnings claims as they simply do not support the earnings of hundreds of dollars a day advertised on the sites. Defendants argue that testimonials are not required to "vouch [for] the truthfulness of marketing" (dkt. no. 1343 at 21) and the Court agrees. However, IWorks has failed to explain what their earnings claims were actually based on apart from the four emails provided in response to the CID. Even accepting Holdaway's conclusions as accurate, the mere fact that the earnings claims happen to be true does not address the question of whether IWorks had

a reasonable basis to make such earnings claims at the time they were made. *John Beck Amazing Profits*, 865 F. Supp. 2d at 1067 ("For an advertiser to have had a 'reasonable basis' for a representation, it must have had some recognizable substantiation for the representation prior to making it in an advertisement" and "[d]efendants have the burden of establishing what substantiation they relied on for their product claims") (citations omitted). Defendants do not argue that they made the earnings claims based on information provided by Holdaway. They only argue that Holdaway's testimony establishes that "the challenged representations were in fact true." (Dkt. no. 1343 at 19.)

However, the FTC bears the burden of proving that Defendants lacked a reasonable basis for their earnings claims. See *Pantron I*, 33 F.3d at 1096. The Court finds that the FTC has not carried their burden of showing that there was no reasonable basis for the claims. There is a genuine issue of material fact as to the accuracy of the earnings claims. Given that Holdaway has stated the earnings claims are accurate and Defendants licensed the product from Holdaway, it may be inferred that Defendants relied on Holdaway for substantiation. A reasonable jury thus may find that Defendants did have a reasonable basis to make these claims.

For the foregoing reasons, the Court finds that there is a genuine issue of material fact as to Count III and summary judgment is denied as to that count.

### G. Count VII — Misrepresenting that positive articles are from unbiased consumers who used the products offered by Defendants; Count VIII — Failing to disclose that defendants created the positive articles and other web pages about the products they market

The parties address Counts VII and VIII together. The FTC alleges that IWorks "misrepresented that the positive articles and blogs about its products, which IWorks widely disseminated on the Internet, were independent reviews by unbiased consumers who used its products. Instead, IWorks' employees and agents authored these web postings." (Dkt. no. 1280 at 51.)

///

The FTC submits a declaration from Tracey Kramm, IWorks' Merchant Accounts Specialist, who states that IWorks hired Reputation Hawk and Josh Stanley to "generate fake blogs and news articles praising IWorks products and to manipulate search engine results so that favorable reviews of IWorks products appeared above any negative reviews. These fake reviews were posted online in order to counter bad reviews and consumer complaint and did not identify that they were IWorks postings." (Dkt. no. 1254-2, Kramm Decl., Exh. 30 ¶ 21.) The FTC also submits the deposition testimony of Sara Marker-Demille, former IWorks employee, who states that some of the positive web postings came from other IWorks employees. (Dkt. no. 1240-1, Clements Depo., Exh. 1642 at 190-92.)

In response, Defendants submit a declaration from Charles Martin, founder of Reputation Hawk, who states that he "was briefly hired by IWorks to improve their online reputation for certain sites" but was "not asked or instructed to post false information." (Dkt. no. 1339-24, Martin Decl., Exh. 1823 ¶ 3.) He states that Reputation Hawk was "asked to write about grants and include the names of certain sites they own within the content." (*Id.*) Defendants also submit a declaration from Josh Stanley who states that he was never hired to produce false statements of IWorks customers. (Dkt. no. 1339-25, Stanley Decl., Exh. 1824 ¶¶ 3-4.) He states it is common practice to write and publish articles and press releases to counter "negative, misleading and false information on the Internet." (*Id.*) Defendants argue that identifiable client contact information isn't always provided when a complaint is posted online, so IWorks had no way of responding to negative posts and comments. (Dkt. no. 1343 at 37.) They thus used reputation management to decrease visibility of negative content. (*Id.*)

The Court finds there are genuine issues of material fact as to Counts VII and VIII such that summary judgment is not appropriate. The form and content of these articles and web pages is not apparent to the Court and the Court is thus unable to determine what representations were actually made and how they were presented. Further, as to the articles and web pages being deceptive, there is evidence before the Court in the

form of declarations with respect to Reputation Hawk and Josh Stanley to suggest that their postings did not contain false information.

The Court therefore denies summary judgment as to Count VII and Count VIII.

## VI. FTC ACT UNFAIRNESS CLAIM

### A. Unfair Acts or Practices

An act or practice is unfair if: (1) it causes substantial injury; (2) it is not outweighed by countervailing benefits to consumers or competition; and (3) consumers themselves could not reasonably have avoided it. 15 U.S.C. § 45(n); *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010). The substantial injury prong is satisfied if the FTC offers sufficient evidence that consumers “were injured by a practice for which they did not bargain.” *Neovi*, 604 F.3d at 1157 (citation and quotes omitted). “Both the Commission and the courts have recognized that consumer injury is substantial when it is the aggregate of many small individual injuries.” *Pantron I*, 33 F.3d at 1102 (citation omitted). “The second prong of the test is easily satisfied when a practice produces clear adverse consequences for consumers that are not accompanied by an increase in services or benefits to consumers or by benefits to competition.” *FTC v. J.K. Publ’ns*, 99 F. Supp. 2d 1176, 1201 (C.D. Cal. 2000). Lastly, “[i]n determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice.” *Neovi*, 604 F.3d at 1158.

### B. Count IX – Defendants engaged in unfair billing practices

The FTC alleges that “IWorks’ billing of its force upsells was unfair.” (Dkt. no. 1280 at 57.) The FTC’s allegations with regard to Count IX are the same as in Counts IV and V, discussed above, and the FTC addresses all three counts together in their reply.

Regarding the first prong, the FTC submits a declaration from investigator Tyndall who examined IWorks’ customer service database and discovered that IWorks billed customers 11.6 million times for a “Recurring Upsell” charge. (Dkt. no. 1254-1, Tyndall Decl., Exh. 899 ¶ 46.) It appears, however, that the database examined by Tyndall included all of IWorks’ various upsell products such as “Rebate Millionaire,” which is not

a product advertised or sold in any of the sites the Court has reviewed. Further, the Court has determined that there is a genuine issue of material fact as to the deceptiveness of certain sites with regard to Counts IV and V. If consumers using those sites understood they were receiving the trial memberships, then any charges associated with those sites could not be fairly considered as part of the substantial injury.

The FTC has therefore not sufficiently demonstrated that this claimed injury is due to the deceptive practices the Court has identified in this Order. Without concrete and quantifiable evidence as to the extent of injury related to the deceptive sites, the Court cannot conclude there was substantial injury. *See Neovi*, 604 F.3d at 1157 (citation omitted).

The Court therefore denies summary judgment as to Count IX.

## VII.   EFTA CLAIM

The EFTA was enacted "to provide a basic framework establishing the rights, liabilities, and responsibilities of participants in electronic fund transfer systems." 15 U.S.C. § 1693(b). It provides that a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a);  *see also* Regulation E, 12 C.F.R. § 205.10(b). The terms "preauthorized electronic fund transfer means an electronic fund transfer authorized in advance to recur at substantially regular intervals." 15 U.S.C. § 1693a(10). To qualify as a preauthorized transfer and trigger the requirements of the EFTA, the transfer must be one that is authorized to "recur." *See In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1091 (C.D. Cal. 2010). Pursuant to Section 917 of EFTA, every violation of EFTA and Regulation E constitutes a violation of the FTC Act. 15 U.S.C. § 1693o(c).

The FTC argues, as to Count X, that "IWorks' recurring debits from consumers' accounts could not have been preauthorized as IWorks failed to disclose, or adequately disclose, these charges to consumers." (Dkt. no. 1280 at 60.) The Court has not made a determination as to the adequacy of Defendants' disclosures in all of their sites nor has

the FTC presented sufficient evidence that, as a blanket matter, every single one of IWorks' sites had insufficient disclosures.

The FTC does offer three depositions from consumers who claim to have had their accounts debited. (Dkt. no. 1280 at 33 n. 145.) These three consumers offered declarations that say they ordered grant CDs and paid for the shipping and handling but did not recall seeing disclosures about the memberships. (*See* Huffman Decl., Exh. 78; Miller Decl., Exh. 82; Hong Decl., Exh. 77.) This evidence is not rebutted by Defendants.

The Court therefore grants summary judgment as to Count X for the electronic fund transfers made from consumer Huffman, Miller, and Hong's accounts.

## VIII. UNRESOLVED ISSUES

There are still a number of issues related to the dispositive motions that may need to be resolved. These issues include: resolution of the remaining sites not addressed by the Court and whether the remaining sites are similar to the sites examined in this Order; Defendants' liability for affiliates' actions; Defendants' common enterprise liability; Defendants' individual liability; and disgorgement. However, the Court determines it would not be an efficient use of the Court's resources to resolve these issues at this time. Given that this Order grants summary judgment with respect to the selected sites addressed herein, and not the full universe of sites relied upon by the FTC, it is not clear to the Court whether any of the unresolved issues relate to the specific sites analyzed in this Order. It is further unclear what issues remain viable. For example, it is not clear whether IWorks' brokers or affiliates marketed any of the sites addressed in this Order such that determination of agency liability would even be necessary or proper at this time. The same logic applies to the other remaining issues. Therefore, the Court will reserve judgment as to these issues without prejudice to the parties.

The Court will set a status conference to address the effect of this Order on the remaining issues and the process for the Court's consideration of these issues. The parties are ordered to confer on resolution of these issues and submit a joint status report within fifteen (15) days.

## IX. CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above. The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the parties' motions.

It is therefore ordered that the FTC's Motion for Summary Judgment Against All Corporate Liability Defendants (dkt. nos. 1235, 1280) is granted in part and denied in part consistent with this Order.

It is further ordered that the FTC's Motion For Summary Judgment Against All Individual and Relief Defendants (dkt. nos. 1278, 1279) is denied without prejudice.

It is further ordered that Relief Defendants' Motion for Partial Summary Judgment (dkt. no. 1284) is denied without prejudice.

The parties are ordered to confer on resolution of the remaining issues and submit a joint status report within fifteen (15) days. A status hearing will be scheduled.

DATED THIS 31st day of March 2015.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE

# APPENDIX 1

APPENDIX 1

2:40:21 PM 4/6/2009
Government Money Secrets - Mozilla Firefox
File Edit View Bookmarks Help
https://secure.securesiteorders.com/gms2/0123/index.php?subid=221064&subid2=,g|32|2560|RAG_skip_p2&h
Request A Grant
Government Money Secrets
Government Money Secrets
ARE YOU WORRIED about making ends meet?
Disappointed with your last pay check? Did you even get a paycheck?
Hope can be had in a Government or Private Grant.
Millions are available to those who qualify and claim their portion.
Our Grant Program will show you the grants that are available and HOW AND WHERE TO APPLY. You can use grants to:
Stop Foreclosures
Cover Business Expenses
Get Your Degree
Pay Down Debt
Gain Peace of Mind
And much much MORE!
Did you know that even during a recession, grant money IS AVAILABLE!?
"Grants to help in fight against foreclosures."
"...there are at least 6,000 households out there that avoided foreclosure over the last 18 months,"
- Read More
"(The grant) will definitely have some benefits to the people it will serve..."
- Read More
Have you heard about the success others are having with the grant program?
Money To Fix Up Your Car!*
I would like to thank you for accepting my grant for funding through the grant program. I am enclosing two different pictures of my 1997 Ford Ranger truck, which I spent most of the funding for brakes and to have the rotors repaired. I cannot thank you enough for your kindness, it is greatly appreciated. I am also sending a package to you with an enclosed letter to show my appreciation! Thank you!
Sharon E.
Money To Pay Your Business Expenses!*
Thank you so much for awarding me a $500 Grant from the Grant program. I never thought I would be awarded and then there it came in the mail. I will be putting the grant money to good use to pay some debt I have incurred in start up of my Home-Based Business. This will enable me to be home for my family instead of working away from my home. This grant was truly an answer to my prayers. Thanks again, not just from me, but from my family!
Tamara S.
Enter your details below to see if you qualify.
First Name

Annual Household Income
Time At Current Residence
Employment Status
Year Born
Choose a Birth Year
CLICK HERE to see if you qualify!
*Results May Vary Submitting this form shows acceptance of the Privacy Policy / Terms and Conditions of this Web Site. Copyright © Grant Seeker Secrets™ 2007-2008 - All Rights Reserved. You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify. CNN, CNBC, and the Federal Government do not sponsor, endorse, and are in no way affiliated with Grant Seeker Secrets™ or this promotion.
PLAY VIDEO
http://wp2.medina-gazette.com/2009/01/14/news/grant-money-to-address-foreclosures/
secure.securesiteorders.com

2:56:06 PM 4/6/2009

Government Money Secrets
Ex. 116, p. 4

6:13:40 PM 6/8/2009

Mozilla Firefox

File Edit View History Bookmarks Tools Help

https://grantdoctor.securepagehost.com/GDOC_v5_01/default.aspx

Most Visited Getting Started Latest Headlines

Thank you | https://grantdoc...01/default.aspx

Warning, this site is intended only for people who seriously wish to know if they are eligible for Free Government Grant Money.

# You May Qualify For FREE Government Funding

To see if you qualify, answer the following questions in the next 29:24 minutes.

THIS OFFER IS VALID ONLY FOR LEGAL CITIZENS OF THE U.S.A.

Read More To See How How A Desperate Housewife Got A Check Within 7 Days!

"We had no idea how the lights were going to stay on, then we received our check!*"
- S. Hall

First Name:
Year Born: 1991
Marital Status: Single
Annual Income: $0-$35,000
Employment Status: Self-Employed
Grant Amount Desired: $1 - $500

CLICK HERE to see if you qualify for one of our remaining FREE Grant Doctor CDs!

Satisfaction Guaranteed

Dear Taxpayer,
If you're tired of the government taking thousands of dollars off you every year... if you're tired of working so hard for your money and then each year giving Uncle Sam a bigger and bigger share of it... I'd like to send you a FREE CD which shows you at least 147 perfectly legal ways to get a check out of Uncle Sam.

Dr. John Porter, Professional Grant Writer

My name is Dr. John Porter and I've invested over two decades developing the amazing techniques, methods and secrets that have helped literally thousands of people find free grant money quickly and easily, with the minimum possible effort. In fact, I could fill 100 pages with the little known government benefits that are available to every US citizen. And with the help of a few friends, I've done just that and put it on a CD. However it doesn't just list them, it walks you step-by-step through how to qualify, who to contact (including address details) and examples of exactly what to say.

If you are interested, please let me know right away, by filling out the form at the top of the page, as I only have a small number of CD's remaining at this time.

50 million people in America are eligible to get Free Money but don't apply.

Act fast and you could be holding a check like this one in the palm of your hand within just 7 days!

Johnathan R. Smith $ 1,500
One Thousand, Five Hundred
Grant Award

Billions of dollars are given away by Federal and Private sources each year.

We were able to avoid foreclosure on our home!

Thanks to Grant Doctor my Wife and I were able to get a reprieve from foreclosure on our home. Like the Angels bringing the good news at Christmas-time you have given us a blessing, and a way to secure our home. We were about to lose our home to foreclosure. With your generous grant I was able to bring my payment up to date, and stop the foreclosure. It is great to know that there are organizations like yours that will give help to people like me and my wife who need it!
-- D. Stewart

This has enabled me to work from my home!



Here are some examples:
- $2,877 to pay your medical bills.
- Full scholarships for education.
- $2,000 / month to live on in order to get your own business off the ground.
- Up to 75% of your rent paid by Uncle Sam if you qualify and know how to apply.
- $4,000 cash to pay your mortgage.
- $5,000 free money to fix up your home.

Thank you so much for awarding me a Grant from the Grant Doctor program. I never thought I would be awarded and then there it came in the mail. I will be putting the grant money to good use to pay some of the debt I had incurred in start up of my own Home-Based Business. This will enable me to be home for my family instead of working away from my home. This grant was truly an answer to my prayers. Thanks again, not just from me, but from my family!
-- *T. Schaufler*

Our FREE software can help you find...

The Amazing Lost Money Secrets
OF THE U.S. GOVERNMENT

*Yours for the asking, but only for a limited time!*

**Grant money to help a struggling single mother!**

You have no idea how much that money helped out my family. Each one of my children now have a bed to sleep in. My Children have clothes that we all picked out together. My little girl is in a program with children that went through the same things.

Every time I think about what you have done I cry. I have 4 children currently and two on the way. Its so hard doing it alone. This has helped us so much. You made me feel like a wonderful Mom.
--*N. Lee*

We've all heard of the vast amounts of money that's available in the form of Government and Private Grants. You've seen the commercials, read the newspaper articles, and watched it on Television: BILLIONS of dollars are being given away each year! Still, obtaining that money has always seemed just beyond your reach. You've probably thought to yourself: "If only someone could show me how!" Well, now someone can... and will!

***Give us five minutes, and we can tell you if you qualify!***

If you've ever been SERIOUS about wanting to find Government Grant money, then you owe it to yourself to see if you qualify, and if our FREE software can help. That's not all though: qualified individuals can also take advantage of a FREE trial to the Grant Resource Center! That's right: if you qualify, you'll be part of the the HOTTEST grant site in America, just for qualifying as a potential Grant recipient!

**Grant money to help with educational expenses!**

Thank you so much for the funding. I really appreciate it! With this $500 I can pay for my son's textbooks for the entire year at military school! I am a single parent paying my son's school tuition without any help from his father. My son is a very patriotic 8th grader that wants to be a part of the war against terrorism. He wants to be a helicopter pilot in the Marines or Air Force. Again, thank you for this funding. The Grant Doctor program is a Godsend for us!
-- *C. Robb Ross*

**We're sorry, but our inventory is extremely limited, and only qualifying individuals will be eligible to receive this software.**

First Name:
Year Born: 1991
Marital Status: Single
Annual Income: $0-$35,000
Employment Status: Self-Employed
Grant Amount Desired: $1 - $500

Click Here to see if you qualify for one of our remaining FREE Grant Doctor CDs!


FGC
FEDERAL GRANT CONNECTION

**Claim *Your* Share of the Millions of Dollars in Grant Money Given Away Every Year! *You May Have Money Waiting To Be Claimed!***

# Claim Your Grant Money Today

All Taxpaying U.S. Citizens May Apply!

"I really didn't believe that applying for a grant would be so quick and easy!"

-Michael & Pat McG.

**ARE YOU ENTITLED? FIND OUT TODAY!**

**These People Already Got Theirs!**

| | |
|---|---|
| A. Bailey | $40,500 |
| A. Bakian | $5,637 |
| A. Betts | $101,020 |
| A. Boyer | $123,000 |
| A. Cease | $5,637 |
| A. Divakaruni | $40,500 |
| A. Eveland | $123,000 |
| A. Fuentes-Figueroa | $5,637 |
| A. Golubski | $147,324 |

# Do You Qualify?

Hurry! Claim your CD!
Your Countdown has begun!

| | |
|---|---|
| First Name: | |
| Year Born | Choose a Birth Year |
| Grant Type | Please select one |
| Current Marital Status | Please select one |
| Annual Household Income | Please select one |
| Time At Current Residence | Please select one |
| Employment Status | Please select one |

**Check Now!**

### "What a relief..."

"I first want to say thank you. I don't even think a thank you is sufficient for what you have done for my family. You have helped my family in such a tremendous way. Because of the financial funding we received from you, we were able to pay our rent, utilities and to buy groceries. What a relief that was lifted at a time when my family was enduring a hardship." -Sarah & Ray V.

### "...answer to my prayers."

"I never thought I would be awarded and then there it came in the mail. I will be putting the grant money to good use to pay some debt I have incurred in start up of my Home-Based Business. This grant was truly an answer to my prayers. Thanks again, not just from me, but from my family!!" - Tamara S.

### Can I Only Get One Grant?

Apply to as many sources as you can find. Having a list of funding sources that's complete and up to date is critical. Funding sources change frequently. You can apply to many. And you can apply every year. You are not limited.

### Is Funding Hard To Find?

Funding is hard to find because usually people look in a few places, but rarely look through everything. Funders are located all over the country and this FREE CD will help you to start looking in the right places for what you are trying to apply for.

### Are There Grants Just For Business?

This is one of the biggest mis-conceptions out there. One of the CFDA's (Catalog of Federal Domestic Assistance) categories is "Business and Commerce". There are so many programs located here, that's why there is a complete catagory dedicated to this.

### Is Applying Really Complicated?

Grants are not very complicated, you just need to know how to apply correctly. There is a certain format and these funders are looking for key things within your application. There are many wrong ways and only a few right ways to apply. Know the formula, and you're set.

### Who to contact, How to qualify, What to say & How to say it.

Unlimited Email Access to Grant Writing Specialists

### Make Your Dreams Come True

**$9,500** to pay medical bills

Federal Grant Connection
Ex. 119, p. 1



Special Bonus: Order your FREE CD today and receive a free 3 day trial enrollment in the Online Help Center which includes 24 Hour Email Access to Grant Specialists, Funding Instruction Courses, and Grant Sources Updated Daily. It also gives you access to our Grant Writing Specialists who are there to Quickly Answer Your Questions about the Grant Process. This membership continues at the low monthly rate of only $39.95 for as long as you need the help in your Grant Search and Application Process. You can stop your monthly subscription to the help center site anytime in the 3 days and you will not be billed anything. The free trial begins on the day the CD is ordered.

**$5,000** to start a home-based business
**$50,000** for college
**$10,000** for free healthcare

These are just some of the Government Grants that have been funded! Millions of dollars are available. You must act now!

*Results May Vary. Submitting this form shows acceptance of the Privacy Policy / Terms and Conditions of this Web Site. Copyright © Grant Seeker Secrets™ 2007-2009 - All Rights Reserved. You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify. CNN, CNBC and the State and Federal Government do not sponsor, endorse, and are in no way affiliated with Grant Seeker Secrets™ or this promotion.

**Federal Grant Connection**
**Ex. 119, p. 2**

6:18:00 PM 6/8/2009

Mozilla Firefox

File Edit View History Bookmarks Tools Help

https://grantdoctor.securepagehost.com/GDOC_v5_01/orderForm.aspx

Most Visited Getting Started Latest Headlines

Thank you | https://grantdo.../orderForm.aspx

## Congratulations! You Are Well On Your Way To Becoming One Of The Countless People Who Have Already Claimed Their Rightful Government Grant Money!

**This Final Opportunity To Learn *Exactly* How To Claim YOUR Grant Money Like So Many Of Our Customers Have With The Premium Grant Doctor Program Won't Be Available Forever - Act Within The Next 01:23 Minutes Or The Free CD We're Holding Will Be Released For Others Behind You To Claim.**

**"I just can't thank you enough!"**

The money went to pay overdue bills. Mainly electric, gas and telephone. I used the left over money for groceries and much needed household supplies. I can't thank you enough for what you did for me in sending that check. It really came just in the nick of time. I was sitting in my apartment thinking I was going to have to break my lease and further ruin my credit. I received your check in the mail that day!*

*-J. Barsness*

**Great news, T[redacted]**

**You qualify for one of our remaining FREE Grant Doctor Software CD's!**
**Not only that, but when you learn how to claim Government Grant Money now and...**

- Instantly access the #1 Rated Grant Resource Center
- Demand your fair share of the billions of dollars in Government Grant Money

...you could be well on your way to receiving literally thousands of dollars in unclaimed Government Grant Money by 6/22/2009.

**Please Tell Us Where You'd Like Your Free Copy Of The Grant Doctor Program Rushed!**

| | |
|---|---|
| First Name: | T[redacted] |
| Last Name: | [redacted] |
| Address: | [redacted] |
| Suite/Box #: | [redacted] |
| City: | [redacted] |
| State: | [redacted] |
| Zip: | [redacted] |
| Phone Number: | [redacted] |
| Email Address: | [redacted] |

CLICK HERE TO GET YOUR FREE TRIAL NOW

*Results May Vary.
Submitting this form shows acceptance of the PRIVACY POLICY (updated 02/12/2008) | Terms and Conditions of this Web Site.

Copyright © Grant Doctor™ 2007-2008 - All Rights Reserved.

You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify.
CNN, CNBC, and the Federal Government do not sponsor, endorse, and are in no way affiliated with Grant Doctor™ or this promotion.

Done grantdoctor.securepagehost.com

6:20:46 PM 6/8/2009

Mozilla Firefox
File Edit View History Bookmarks Tools Help
https://grantdoctor.securepagehost.com/GDOC_v5_01/orderFormA.aspx
Most Visited Getting Started Latest Headlines
Thank you
https://grantdo...rderFormA.aspx
Great news, T!
You qualify for one of our remaining FREE Grant Doctor Software CDs!
START HERE
1 Get our FREE Grant Network Software Kit.
2 Choose from thousands of available grants.
3 Apply for your FREE MONEY!!
T, we GUARANTEE you will get money within the next six months or we'll give you 6 additional months of FREE help.
No questions asked! Don't wait... Get started today!
• Money to pay medical bills!
• Money to start a home business!
• Money for college!
• Money for healthcare!
These are just some of the Government Grants that you'll find through your free membership to the Grant Resource Center, included as a free trial with your Grant Doctor CD! There are over 70,000 Private and Federal Grants, right at your fingertips!
We're holding this free CD just for you. Please complete this page within 2:15 minutes. After 00:17 minutes, this free CD we're holding will be released for others to claim.
Priority Shipping - Only $2.99
Cardholder's Name:
Card Type:
Visa
Credit Card Number:
(Please do not use spaces or hyphens)
Expiration Date:
CVV/Security Code:
submit >>
Trustwave Trusted Commerce
Click to Validate
(Please click SUBMIT! only once)
Terms and Disclosures. By clicking "Submit", I am ordering the Your Federal and Private Grant CD™ and trial membership for $2.99 S&H, after the seven day trial I will be charged $39.95 a month thereafter if I do not cancel. I also agree to the fourteen day and twenty-one day bonus trials to the Search Market Members Site™ Site™ and Network Agenda™ for $7.95 a month and $9.95 a month thereafter, should I choose not to cancel. I have read and agree to the PRIVACY POLICY (updated 02/12/09) | Terms and Conditions. Charges will appear on credit/debit statements as "www.mygrantsite.net". For questions, call 1-877-495-1145 M-F, 9am-9pm, EST.
100% SATISFACTION Guaranteed
Guaranteed SECURE TRANSACTION
Federal Grants usually never have to be repaid!
The US Government and Private Foundations are required to give away millions of dollars in FREE GRANT MONEY each and every month to help people just like you jump start their success.
What does that mean for you?
You can use this money to:
Thanks to Grant Doctor my Wife and I were able to get a reprieve from foreclosure on our home. Like the Angels bringing the good news at Christmas-time you have given us a blessing, and a way to secure our home. With your generous grant I was able to stop the foreclosure.*
D. Stewart
Thank you so much for the funding. I really appreciate it! I am a single parent paying my son's

Grant Doctor
Ex. 117, p. 5

- Start a Business
- Get An Education
- Buy Equipment
- Expand A Current Venture
- Purchase Real Estate
- And Much, Much MORE!

Unfortunately the general public isn't aware of the various programs and **billions of dollars go unclaimed each year as a result.**

## You Just Need To Know How And Where To Access All The Funds Available... And We Can Help!

Our FREE SOFTWARE contains **everything you need** to know about how and where to access your free money and can be shipped directly to your home or office within a matter of a few short days.

Not only will you learn how to find the grant that's right for you, but you'll also have **all the tools and resources you need to apply for this money quickly and easily, with the fastest results.**

**Information worth thousands of dollars! It's yours now for FREE!**

- Learn step-by-step instructions for apply your first Federal or Private grant.
- Access our Directory with over 1,500 Federal Grants as a special bonus.
- Learn how to tap into billions of Federal dollars to start or expand a business.
- We'll show you how to get cash fast!
- What to do after you secure your funds
- ....and much, MUCH more!



My son is a very patriotic 8th grader that wants to be a part of the war against terrorism. The Grant Doctor program is a Godsend!!*
*C. Robb Ross*



You have no idea how much that money helped out my family. Each one of my children now have a bed to sleep in. My Children have clothes that we all picked out together. Every time I think about all you have done for us, I cry. This has helped us so much.*
*N. Lee*



I never thought I would be awarded and then there it came in the mail. I will be putting the grant money to good use to pay some debt I have incurred in start up of my Home-Based Business. This will enable me to be home for my family. This grant answered to my prayers.*
*T. Schaufler*




When applying for the grant I wasn't sure what to expect but to my delight and surprise a check came in the mail in a few weeks! I was able to bless a divorced mother of three with funds to pay her monthly bills in order to free up some of her cash to purchase a few Christmas presents.*
*J. Joseph*



I would like to thank you for accepting my grant for funding through THE GRANT DOCTOR PROGRAM. I am enclosing two different pictures of my 1997 Ford Ranger truck, which I spent most of the funding for brakes and to have the rotors repaired. I cannot thank you enough.*
*S. Ebert*

## Start Today and GET 2 FREE BONUS GIFTS!

**1. Get 14 days of FREE access to the Search Market Members Site™!**
Open the door to even more funding for your future!

**2. Get 21 days of FREE access to the Network Agenda™!**
Organize all your contacts, emails and important dates in one location you can access from anywhere, even by phone!

*Results May Vary.
Submitting this form shows acceptance of the PRIVACY POLICY (updated 02/12/2009) | Terms and Conditions of this Web Site.
Copyright © Grant Doctor™ 2007-2008 - All Rights Reserved.
You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify.
CNN, CNBC, and the Federal Government do not sponsor, endorse, and are in no way affiliated with Grant Doctor™ or this promotion.

Done


grantdoctor.securepagehost.com



*Results May Vary. Submitting this form shows acceptance of the Privacy Policy / Terms and Conditions of this Web Site. Copyright © Grant Seeker Secrets™ 2007-2009 - All Rights Reserved. You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify. CNN, CNBC and the State and Federal Government do not sponsor, endorse, and are in no way affiliated with Grant Seeker Secrets™ or this promotion.

# APPENDIX 2

APPENDIX 2

**WARNING... The Grant Master Software Was Not Created For Those People Who Just Want To Know Which Grants Are Available To Claim. The Grant Master Softw Was Created To Help YOU Claim The Grants That You May Qualify For. Have Uncl Sam Lend You A Financial "Leg-Up" Where You Need It Most... USE WITH CAUTI**

WILL A NEW PRESIDENT CHANGE THE FEDERAL GRANT SYSTEM?

GET A GRANT NOW BEFORE ANY CHANGES TAKE PLACE!

CNN
CNBC

GFS
Grant Funding Solutions

Congratulations,
You May Qualify for **FREE** Government Funding

CNN and other sources report that the U.S. Government must find recipients in order to distribute financial aid money to organizations and private individuals who qualify and need it!

"I received a check in my hand for $100,000..."

I found the grant I needed and filled out the forms and sent them in and in about two weeks I received a check in my hand for $100,000. I'm telling everyone I know about you all and what you have done for me!*

-- Carol K.

**Get our FREE Grant Funding Solutions Kit**

**Find the Grant that's right for you**

**Receive your Grant Money!!!**

## Millions of Dollars are available now!

The US Government and private foundations award MILLIONS IN GRANTS to people just like you who are in need of financial help. The best part is, most grants



come with absolutely NO INTEREST! Do you know of ANY financial institution that can match that? Imagine qualifying for a grant to get your business going... and once you've got it up and running, paying back the investment pound-for-pound, without worrying about the pesky "interest" gouging away at your pockets! The government can actually be quite a good pal, you just need to know who to turn to, and what to say. We'll teach you all that and more in our free CD.

What does that mean for you? You can use this money to:

- Start a Business
- Expand Your Current Venture
- Get Your Education
- Purchase Real Estate
- Buy Equipment
- And Much, Much MORE!

Unfortunately the general public isn't aware of the various programs and billions of dollars go unclaimed each year as a result.

I got the check in my hand for **$150,000.*** Thank you again, William Rivas

---

I just had **$300,000** dollars deposited into my bank account. Thanks so much!* Edwin Hurd

**Read About REAL PEOPLE Who Have Received REAL MONEY!**

**Money To Pay Your Mortgage!***

Thanks to Grant-A-Day my Wife and I were able to get a reprieve from foreclosure on our home. Like the Angels bringing the good news at Christmas-time you have given us a blessing, and a way to secure our home. We were about to lose our home to foreclosure. With your generous grant I was able to bring my payment up to date, and stop the foreclosure. It is great to know that there are organizations like yours that will give help to people like me and my wife who need it!

*Delroy Stewart*

**Money To Pay Your Business Expenses!***

Thank you so much for awarding me a $500 Grant from the Grant-A-Day program. I never thought I would be awarded and then there it came in the mail. I will be putting the grant money to good use to pay some debt I have incurred in start up of my Home-Based Business. This will enable me to be home for my family instead of working away from my home. This grant was truly an answer to my prayers. Thanks again, not just from me, but from my family!

*Tamara Schaufler*

Grant Funding Solutions
Ex. 124, p. 2

Menjivar Attachment B, p. 2

**Money To Buy Christmas Presents!***

When applying for the grant I wasn't sure what to expect but to my delight and surprise a check came in the mail in a few weeks! I was able to bless a divorced mother of three with funds to pay her monthly bills in order to free up some of her cash to purchase a few Christmas presents for her children. These are truly great kids who's dad is on death row. It's very sad that the children of inmates, are more often than not, left with the many hardships.

*Joyce Joseph*

**We Show You How And Where To Access All The Funds Available... It's That Easy!**

Our **FREE SOFTWARE** contains everything you need to know about how and where to access your grant money and can be shipped directly to your home or office within a matter of days. Not only will you learn how to find the grant that's right for you if you do in fact qualify, but you'll also have all the tools and resources you need to apply for this money with all the clutter cut out.

Information worth thousands of dollars!
It's yours now for FREE!

- Learn step-by-step instructions for securing your first check.
- Access our Directory with over 1500 Federal & Private Grants as a special bonus.
- Learn how to tap into the grants that you may qualify for to start of expand a business.
- We'll show you exactly who to contact, with all the necessary addresses!
- What to do after you secure your funds.
- ...and much, MUCH more!

## Please Enter Your Details Below To See If You Qualify For One Of Our Free Trials

**Check To See If You Qualify!**

**HURRY! Claim your CD in the next 09:24 Minutes!**

$2.29 S&H

**First Name**

**Current Marital Status**

**Annual Household Income**

Grant Funding Solutions
Ex. 124, p. 3

Menjivar Attachment B, p. 3

Time At Current Residence

Employment Status

Year Born

Click Here To See If You Qualify For One Of Our Remaining FREE Grant Master CDs!

We value your privacy.
All information is 100% secure.

*Results May Vary Submitting this form shows acceptance of the Privacy Policy / Terms and Conditions of this Web Site. Copyright © Grant Funding Solutions™ 2007-2008 - All Rights Reserved. You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify. CNN, CNBC, and the Federal Government do not sponsor, endorse, and are in no way affiliated with Grant Funding Solutions™ or this promotion.

**WARNING... The Grant Master Software Was Not Created For Those People Who Just Want To Know Which Grants Are Available To Claim. The Grant Master Software Was Created To Help YOU Claim The Grants That You May Qualify For. Have Uncle Sam Lend You A Financial "Leg-Up" Where You Need It Most. USE WITH CAUTION!**

CNN

CNBC

GRANT FUNDING SUCCESS

# CONGRATULATIONS,

## You May Qualify for FREE Government Funding

CNN and other sources report that the U.S. Government must find recipients in order to distribute financial aid money to organizations and private individuals who qualify and need it!

## WE DELIVER GRANTS. GUARANTEED!

*We are the **ONLY** Grant company in the world that can **GUARANTEE** daily grants!*

*What's our secret? Our expert researchers know all the "insider" tricks that allow us to fund grants on a daily basis!*

**Order Now**

**Get Your Risk-Free Grant CD!**

If you don't take advantage of these benefits, you are only cheating yourself. You could have a check in your hands within 7 days if you start looking for grants today! It's easy, fast and guaranteed. So why wait? Secure your copy before they're all snapped up!

First Name

Last Name

Address

Suite/Apt#

City

State AK

Zip

Email

Phone

☐ Yes, I want to create multiple streams of income.

Get Your RISK-FREE CD!

**We Value Your Privacy. All Information is 100% Secure**

Privacy Policy | Terms & Conditions

This is not charity or welfare. The government owes you this money. This is what you rightfully are entitled to for dutifully paying thousands of dollars in taxes over the years.

## Dear Taxpayer,

**If you're tired of the government taking thousands of dollars off you every year... if you're tired of working so hard for your money and then each year giving Uncle Sam a bigger and bigger share of it... I'd like to send you a FREE CD which shows you at least 147 perfectly legal ways to get a check out of Uncle Sam and...**

## It's MONEY that MATTERS!

**BILLIONS of dollars are given away each year!**
**What are you waiting for? Get yours now!**

**50 million people in America are eligible to get Free Money but don't apply... yet the government gives out an average of $11,450 a year per taxpayer absolutely free.**





Here are some examples:

- $2,877 to pay your medical bills.
- Full scholarships for education.
- $2,000 / month to live on in order to get your own business off the ground.
- Up to 75% of your rent paid by Uncle Sam if you qualify and know how to apply.
- $4,000 cash to pay your mortgage.
- $5,000 free money to fix up your home.

**MEET DR. JOHN PORTER**

Dr. John Porter has concentrated his entire lifetime in one field: Discovering the best methods of helping ordinary Americans get the tax free cash from the government they're entitled to – and making everyone aware of how easy it is to get their hands on these little known unclaimed funds. Funds that can be used to pay off your bills, fix up your house, give your kids a better education, go back to school... or even fire your boss and start a business so you can better provide for your family.

It is estimated that Dr. Porter has raised millions of dollars in grants for individuals and corporations over the last 20 years. But why not take all of the incredible powerful breakthroughs and pack them into one CD – that can be used by any man or woman to claim the money they are entitled to – using strategies so quick and easy to use they may literally take your breath away!

This is the goal of this Free CD. "The job was too important to leave to someone else," Dr. Porter says, "I couldn't rest until I did it myself!"

**My name is Dr. John Porter and I've invested over two decades developing the amazing techniques, methods and secrets that have helped literally thousands of people find free grant money quickly and easily, with the minimum possible effort. In fact, I could fill 100 pages with the little known government benefits that are available to every US citizen. And with the help of a few friends, I've done just that and put it on a CD called "HOW TO CLAIM THE MONEY UNCLE SAM OWES YOU". However it doesn't just list them, it walks you step-by-step through how to qualify, who to contact (including address details) and examples of what to say.**

**If you are interested, please let me know by filling out the form on your right, as I only have a small number of CD's remaining at this time.**

Act fast and
you could be
holding a check
like this one
in the palm of
your hand within
just 7 days!

101
Johnathan R. Smith
1,500







# APPENDIX 3

APPENDIX 3

The Government gives away BILLIONS each year!

# The SECRET Behind Government Cash!

Our **FREE software** reveals how you can get your share of Federal money!

**HURRY!** Offer ends in 10:00 minutes!

First Name | Last Name
Address | Suite/Apt#
City | State
Zip Code | eMail
Home Ph | Cell Ph

Ship My Kit

*"I received a check within a week. Literally all I did was use the software to complete an application."*
*Diane O'Leary*

**FREE!**

- Find Government Money!
- Apply Quickly & Easily!
- Free Software & Support!

Guaranteed #1 Grant Source Results

cbsnews.com

"CBS News and other sources report that the U.S.Government must find recipients, and then distribute over $360 billion dollars to groups, organizations and private individuals just like you!"

Thousands of CDs ordered!
Millions of dollars awarded!
**OVER HALF A MILLION MEMBERS HAVE FOUND GRANTS!**

**"One month after I mailed my application I received a check. I was very thankful! It helped me pay for my training course."**
*-Marina Henthorn*

**"I replaced my kitchen and bathroom faucets, bought a new vanity, fixed the pipes under my house, and paid my power bill."**
*-Shauna Donaldson*

**"I couldn't believe it when I opened the letter with a $5,000 check inside! It took less than two weeks! I never thought it could be so easy to get a Grant!"**
*-Alexis Pierce*

**Locate & apply for cash using our FREE software! Finding Government grant money has never been easier or quicker!**

Submitting this form shows acceptance of the Privacy Policy | Terms and Conditions of this Web Site. All Rights Reserved.
Copyright © Grant Writer Pro™ 2007-2008 You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify.
*The Federal Government and CBS News do not sponsor, endorse, and are in no way affiliated with Grant Master™ or this promotion.

# Just One More Step!

Grant Writer Pro™

## Get your software, {CLIENT.FirstName}!

Complete this form to receive your SOFTWARE!

***Select your delivery method:***

◉ **Download ($0.99 - Get It Now!)**

○ **CD ($1.97 S&H)**

Card Number

Card Type: Visa

Exp Date: 11 / 2007

Security Code

SECURE server

SSL Secure

**CONTINUE**

Terms and Disclosures. You have ordered the Grant Writer Pro™ software and trial membership for $[amount]. After the 14-day trial you will be charged $49.95 cents a month thereafter if you do not cancel. You also agree to the 14-day and 21-day bonus trials to EBF™ and Network Agenda™ for $7.95 a month and $9.95 a month thereafter, should you choose not to cancel. You represent that you have read and agree to the Privacy Policy & Terms & Conditions. Charges will appear on credit/debit statements as "Grant Writer Pro". Cancel anytime at 1-866-396-5694 M-F, 9am-9pm, EST.

### Special Bonus #1!

14 days Unlimited Access to the Express Business Funding™ membership site!

Get online and discover tips for maximizing the cash you can receive to start or expand a business!
Learn industry secrets and creative ways to raise cash now!
Download exciting new financial software!
Chat about raising money with one of our our Live Chat Representatives!

### Special Bonus #2!

21 days of unlimited access to the Network Agenda™ membership site!

Track and schedule all of your tasks online from computer or phone!
Store and access applications and documents online!
Never lose track of important contacts!
Receive automatic text messages on your phone when tasks are due!
Receive e-mails and access your e-mail account from anywhere!

Submitting this form shows acceptance of the Privacy Policy & Terms & Conditions of this Web Site.

Copyright © Grant Writer Pro™ 2006-2007 - All Rights Reserved.

You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify.

# APPENDIX 4

APPENDIX 4

**NOTICE!** There are literally thousands of Private and Federal Grants out there, providing **BILLIONS OF DOLLARS** in Grant money. Finding your way through them can be difficult and time-consuming! We can help you find your way through the maze of red tape!

*There are over 1,000 Federal and 50,000 Private Grants, providing BILLIONS OF DOLLARS in Grants!*

# Congratulations!

**You can be one of the thousands of people who have applied for Grant Money ONLINE!**

It's easy to get bogged down in all the hype and red tape surrounding Government and Private Grants, but help is finally here! We've assisted people with grants for years, and we can help you too!

**"Thank you so much for your funding through the Grant-A-Day program!"**
The money you have so graciously provided is going to help me achieve my goal of getting my degree. It has been a lifelong goal to be able to graduate. And with the hard economic times that are in our world today you and other foundations like you are making it possible for me to reach my dreams and become my best!"
– Tiffany S.

*Search our HUGE Grant Database!*

*Talk to Live Chat Representatives!*

*Find the Grant that may be right for you!*

**Putting the POWER of Grants to work for YOU!**

Did you know that there are literally THOUSANDS of Grants available? How about this: The annual amount of Grants given every year amounts to BILLIONS OF DOLLARS world-wide! And yet, for the average person, a Grant still remains one of those things that "other people get." Why is it that so much money is available, and yet most people never bother to even try?

Let's be honest: finding a Grant can be confusing, difficult, and time-consuming. If it wasn't, everyone would do it. It's a lot like doing your taxes: sure, you can do it yourself, but odds are you'll have better results and a lot fewer headaches if you go with professionals. When it comes to Grants, we're the professionals! We have years of experience helping people with Grants.

There are literally THOUSANDS of Federal and Private Grants Available!

We'll help you find them, and even help you learn how to apply!

**What kind of Grants are out there?**

There are many different kinds of Grants available. Everyone knows about Scholarships and various types of small business

EXHIBIT 1

There are many different kinds of Grants available. Everyone knows about Scholarships and various types of small business assistance that is available, but there people getting Grants that they've used for everything from Mortgage assistance to medical bills. Let us introduce you to a few of them! Continue reading below to see the real stories behind real people who've had real results with Grants!

**Read About REAL PEOPLE Who Have Received REAL MONEY!**

### Money To Pay Your Mortgage!*

Thanks to Grant-A-Day my Wife and I were able to get a reprieve from foreclosure on our home. Like the Angels bringing the good news at Christmas-time you have given us a blessing, and a way to secure our home. We were about to lose our home to foreclosure. With your generous grant I was able to bring my payment up to date, and stop the foreclosure. It is great to know that there are organizations like yours that will give help to people like me and my wife who need it!

*Delroy S.*

### Money To Pay Your Business Expenses!*

Thank you so much for awarding me a $500 Grant from the Grant-A-Day program. I never thought I would be awarded and then there it came in the mail. I will be putting the grant money to good use to pay some debt I have incurred in start up of my Home-Based Business. This will enable me to be home for my family instead of working away from my home. This grant was truly an answer to my prayers. Thanks again, not just from me, but from my family!

*Tamara S.*

### Money To Buy Christmas Presents!*

When applying for the grant I wasn't sure what to expect but to my delight and surprise a check came in the mail in a few weeks! I was able to bless a divorced mother of three with funds to pay her monthly bills in order to free up some of her cash to purchase a few Christmas presents for her children. These are truly great kids who's dad is on death row. It's very sad that the children of inmates, are more often than not, left with the many hardships.

*Joyce J.*

### Money For A Mom To Pay For Emergency Expenses!*

You have no idea how much that money helped out my family. Each one of my children now have a bed to sleep in. My Children have clothes that we all picked out together. My little girl is in a program with children that went through the same things. Every time I think about what you have done I cry. I have 4 children currently and two on the way. Its so hard doing it alone. This has helped us so much. You made me feel like a wonderful Mom.

*Na-tasha L.*

### Money To Fix Up Your Car!*

I would like to thank you for accepting my grant for funding through THE GRANT-A-DAY PROGRAM. I am enclosing two different pictures of my 1997 Ford Ranger truck, which I spent most of the funding for brakes and to have the rotors repaired. I cannot thank you enough for your kindness, it is greatly appreciated. I am also sending a package to you at Grant-A-Day with an enclosed letter to show my appreciation! Thank you!

*Sharon E.*

**Get Information about Private & Federal Funds that are available and waiting to be claimed.**

Our **SOFTWARE** contains valuable information about how and where to access grant

Our **SOFTWARE** contains valuable information about how and where to access grant money that may be available. Not only could you learn how to find the grant that may be right for you, but you'll also have the tools and resources necessary to find and apply for this money.

## Our Grant Search Software Is The Best Of It's Kind! It's now Available!

- Learn step-by-step instructions for finding Federal & Private Grants.
- Access our Directory with thousands of Federal & Private Grants as a special bonus.
- Learn how to tap into the Grants that you may qualify for to start or expand a business.
- Live Chat Representatives to help you on your way.
- ...and much, MUCH more!

## Please Enter Your Information Below To See If Our Unique One Of A Kind CD Is Right For You.

Don't Waste Another Minute!
First Name
Current Marital Status
Single
Annual Household Income
$0-$35,000
Time At Current Residence
0-3 Years
Email Address
Year Born
1990
I agree with the Terms & Conditions and Privacy Policy.
CONTINUE
We value your privacy.
All information is 100% secure.

*Results May Vary. Submitting this form shows acceptance of the Privacy Policy | Terms & Conditions of this Web Site.
Copyright © Grant Advisor™ 2007-2009 - All Rights Reserved. You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify. CNN, CNBC and the State and Federal Government do not sponsor, endorse, and are in no way affiliated with Grant Advisor™ or this promotion.

EXHIBIT





## Congratulations! You Could Be Well On Your Way To Locating And Applying For A Grant!

**This is it! This is your opportunity to become involved in the ever-growing world of Federal and Private Grants! We hope you're as excited about teaming up with us as we are about working with you! We've invested thousands of man-hours into making Grant Seeker Secrets THE BEST Grant Assistance program available!**

### "I just can't thank you enough!"

**The money went to pay overdue bills. Mainly electric, gas and telephone. I used the left over money for groceries and much needed household supplies. I can't thank you enough for what you did for me in sending that check. It really came just in the nick of time. I was sitting in my apartment thinking I was going to have to break my lease and further ruin my credit. I received your check in the mail that day!**

***-Jennifer B.***

**Great news, !**

**We'd like to send you one of our Private and Federal Grant CD's! Not only that, but we'd like to give you access to our FULL RANGE of services, including our Live Chat Representatives and our cutting-edge Grant Search technology.**

This could be the day that you take charge of your life, and start making a difference! We want you to be one of the many people whose lives we've improved through Grants. Sign up now, and see for yourself if you can benefit from the BILLIONS of dollars in Grant money that are out there.

### Please Tell Us Where To Ship Your Private and Federal Grant CD.

| | |
|---|---|
| First Name | |
| Last Name | |
| Address | |
| City | |
| State | Click to Select |
| Zip | |
| Phone Number | ( ) - |
| Email Address | |
| | ☐ Yes, I'm interested in generating multiple streams of income. |

*Results May Vary. Submitting this form shows acceptance of the Privacy Policy | Terms & Conditions of this Web Site.
Copyright © Grant Advisor™ 2007-2009 - All Rights Reserved. You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify. CNN, CNBC and the State and Federal Government do not sponsor, endorse, and are in no way affiliated with Grant Advisor™ or this promotion.

EXHIBIT 1

Terms, Disclosures, and Electronic Signature Information. Raven Media's authorization to provide and bill its services is obtained by way of your electronic signature. Once submitted, this electronic order constitutes an electronic letter of agency. NetPro Marketing's reliance on your electronic signature, as obtained above, is done pursuant to the Uniform Electronic Transactions Act and the electronic Signatures in Global and National Transactions Act. Both laws specifically preempt State laws that recognize only paper records or handwritten signatures. By submitting this form, I am ordering the Fast Grants CD™ and trial membership for $2.99 S&H. After the 14 day trial I will be charged $29.95 a month thereafter if I do not cancel. I also agree to the 14 day and 21 day bonus trials for Network Agenda™ and Trackitdaily™ for $7.95 a month and $9.95 a month thereafter, should I choose not to cancel. I have read and agree to the Privacy Policy | Terms & Conditions. For questions, call 1-800-454-4891 9am-12am EST Monday-Friday and 9am-7:30pm EST Saturday and Sunday.

Act now and you'll not only get the Fast Grants CD, but other incredible bonus gifts as well!

**Only One More Step!**

## Last Step! Order Now!

| PRODUCT | QTY | PRICE |
|---|---|---|
| Fast Grants Software Download | 1 | $0.00 |
| FastGovGrants.com Trial Membership | 1 | $0.00 |
| Track It Daily Trial Membership | 1 | $0.00 |
| Network Agenda Trial | 1 | $0.00 |
| Shipping & Handling | | $2.99 |
| **Today's Total** | | **$2.99** |

**Cardholder's Name**

**Card Type**

<Select card>

**Credit Card Number**

(Please do not use spaces or hyphens)

**Expiration Date**

/

**CVV/Security Code**

What is this?

SHIP MY SOFTWARE

**Real Grant Recipient!***

"Thanks to Grant-A-Day my Wife and I were able to get a reprieve from foreclosure on our home!"
*-Delroy S*

**Real Grant Recipient!***

"You have no idea how much that money helped out my family. Each one of my children now have a bed to sleep in."
*-Na-Tasha L*

**Real Grant Recipient!***

"I will be putting the grant money to good use to pay some debt I have incurred in start up of my Home-Based Business."
*-Tamara S*

**networkagenda**

Get the power of a virtual office at your fingertips! Network Agenda is a revolutionary website that gives you powerful office tools to help interact with your business.

- Share contacts and calendar items!
- Track projects!
- Create a virtual conference room!
- Document sharing!
- Free 14-day trial! **

Trackitdaily

**21-day Bonus Membership!**

**Take control of your financial future!** This system has helped over 20,000 people go from rags to riches. We'll give you the tools to control and grow your money!

Once you know how to master spending and saving, you will be able to live a rich lifestyle, **regardless of how much money you make!**

There Are Over
90,000
Private & Federal
Grants Listed!
There Was Over
80 Billion Dollars
Given Out Last Year!

My story is this simple but true, my husband was laid off and the money was starting to run out.

The check came to us the day we ate our last ramen noodle. After lunch I went to the mail box and there it was your check! At first I couldn't believe it and thought "this isn't real". We went down to the bank and cashed it, we cried all the way to the grocery store.
*-Amber Harrison*

**Real Grant Recipient!***

"The money you sent me is going towards my sons medical bills from when he was born this year."
*-Victoria G*

**Real Grant Recipient!***

"This check came right on time and really helped me and my family. Thank you so much for helping us."
*-Geana O*

** See Terms & Conditions for details. * Results not typical. Submitting this form shows acceptance of the Privacy Policy | Terms & Conditions of this Web Site. Copyright © Grant Advisor™ 2007-2009 - All Rights Reserved. You must be 18 years old or older and a legal resident of the United States or the District of Columbia to qualify. CNN, CNBC and the State and Federal Government do not sponsor, endorse, and are in no way affiliated with Grant Advisor™ or this promotion.

EXHIBIT 2

# APPENDIX 5

APPENDIX 5

Google

NEWS AGENCIES ARE REPORTING:

*Google has "made it viable for people to make a couple dollars, or **thousands of dollars.**"*

You could make $199 or more a day on Google

Satisfaction 100% Trusted! Guaranteed

As reported by:     CNN

This kit can only be held for a brief time.

CONGRATULATIONS–

YOU QUALIFY FOR A FREE TRIAL!

We have reserved a copy of our **FREE SOFTWARE KIT** for you, but you must act quickly.

COMPLETE THE FORM TO SEE IF YOU QUALIFY

First Name

Last Name

Email

Phone

FOR INSTANT ACCESS CLICK HERE

This is **THE OPPORTUNITY YOU'VE BEEN LOOKING FOR!**

Don't let this chance to change your future pass you by.

Google

# HAVE YOU FELT THIS WAY?

"I need something that works with my school schedule."

"I want to be able to be home with my little girl."

"I'm tired of working for other people."

"I've got to bring in some money while I look for another job."

*"Riches range from a few hundred dollars a month to $50,000 or more a year!"*

**Your Cost = $0.** In just a few minutes per day, Google Biz Kit will show you how you could earn $199 per day working from home!

Google makes it possible to bring in money with little effort and major return.

## DON'T WAIT ANY LONGER

Submitting this form shows acceptance of the Privacy Policy / Terms and Conditions of this Web Site.

Copyright © 2006-2007 Google Pay Day!™ - All Rights Reserved.You must be 18 years old or older to order. Google does not sponsor, endorse, and is no way affiliated with Google Pay Day!™ or this promotion.

**NEWS AGENCIES ARE REPORTING:**

*Google has "made it viable for people to make a couple dollars, or thousands of dollars."*

The New York Times

**You could make $199 or more a day on Google**

Satisfaction 100% Trusted! Guaranteed

As reported by:

**COMPLETE THE FORM TO SEE IF YOU QUALIFY**

**How much money** per week are you looking to earn? --select--

**How much time** are you looking to spend working per week? --select--

**Please enter** your Zip Code to find out if you qualify

FOR INSTANT ACCESS **CLICK HERE**

## SEE IF YOU QUALIFY IN 3 EASY STEPS!

Tell us how much $$ you're Looking to earn per week.

See if you qualify for one of our limited trial kits

begin filling out offers and see the cash fly in!

*"Riches range from a few hundred dollars a month to $50,000 or more a year!"*

**Your Cost = $0.** In just a few minutes per day, Google Biz Kit will show you how you could earn $199 per day working from home!

Google Pay Day
Ex. 133, p. 1