1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | Case No. 2:10-cv-02203-MMD-GWF |
| Plaintiff, | ORDER |
| v. | |
| JEREMY JOHNSON, et al., | |
| Defendants. | |

## I.    INTRODUCTION

The Court granted summary judgment in favor of the FTC in part with respect to certain grant websites and deferred resolution of several issues, including review of additional sites ("SJ Order").[1] (Dkt. no. 1586). The Court addressed the remaining sites in an earlier Order. (Dkt. no 1794.) This Order addresses the remaining unresolved issues: affiliate liability, common enterprise liability, individual liability and disgorgement. (Dkt. no. 1586 at 60.) The Court grants summary judgment in favor of the FTC on the issue of affiliate liability, common enterprise liability, and individual liability with respect to Jeremy Johnson and Ryan Riddle. The Court denies summary judgment on the issue of disgorgement.

---

[1] The SJ Order covered the FTC's Motion for Summary Judgement Against All Corporate Liability Defendants (dkt. nos. 1235, 1280), the FTC's Motion For Summary Judgement Against All Individual and Relief Defendants (dkt. nos. 1278, 1279), as well as the Relief Defendants' Motion for Partial Summary Judgement (dkt. no. 1284). The terms used herein are the same as those used in the SJ Order.

## II.   BACKGROUND

The relevant factual background is recited in the SJ Order. (Dkt. no. 1586.) The Court permitted supplemental briefings on the issue of consumer redress and relevant new case law. (Dkt. no. 1599.) The parties submitted supplemental briefs on the issues addressed in this Order. (Dkt. nos. 1619, 1636, 1638.)

## III.   DISCUSSION

### A.   Affiliate Liability

The Court has found that, as a matter of law, a number of iWorks' websites violated Section 5(a) of the FTC Act. (Dkt. nos. 1586, 1794.) Defendants argue that even if the sites are deceptive, they should not be held vicariously liable if the sites were hosted by third party advertisers or marketers.[2] (Dkt. no. 1343 at 42.) As a secondary argument, Defendants contend that because they maintained a commercially reasonable monitoring program, they should not be liable for deceptive sites hosted by affiliates. (*Id.* at 43.) As part of the monitoring program, iWorks sought voluntary compliance from affiliates who violated the terms of their agreements, followed by written warnings, withheld payments, rejected sales, and termination of the relationship. (*Id.* at 49.)

The FTC contends that iWorks was contractually responsible for the sites hosted by brokers and marketing partners. In support of its position, the FTC points to networking agreements iWorks entered into with these third parties. (Dkt. no. 1280 at 30; dkt. no. 1387 at 48-49.) The agreements gave iWorks final say over the content and display of information about its offers on its partners' websites. (*See, e.g.*, dkt. nos. 1338-3; 22-1 at 25, 33; 22-2 at 17; 22-3 at 1.) The FTC argues that the same monitoring program that iWorks believes absolves it of liability should be considered further evidence of its control over its marketing partners' sites. According to the FTC, iWorks' ability to monitor sites through its pixel tracking system and its ability to communicate with and discipline brokers

---

[2] The parties agree that a majority of the sites were hosted by third party affiliates; and three third party affiliates—Paradigm Visions, Inc. ("PVI"), Cathexis, Inc. and Virgin—hosted a substantial number of sites. (Dkt. no. 1601 at 5-7.)

and marketing partners simply show that iWorks understood that it was ultimately responsible for the content on those sites. The Court agrees with the FTC.

Defendants are liable for violations of Section 5(a) of the FTC Act committed by third parties if those parties are acting within the scope of their actual or apparent authority. *See Southwest Sunsites, Inc. v. FTC*, 785 F.2d 1431, 1438-39 (9th Cir. 1986). The agreements between iWorks and its partners clearly indicate that iWorks was responsible for approving representations and disclosures regarding its products. For example, iWorks' agreement with Virgin indicates that iWorks requires proofs and tracking information for each website and "shall be responsible and liable" for all of the content it approves. (Dkt. no. 1389-9 ¶¶ 4.2, 4.4, 4.5.) Similarly, iWorks' agreement with Skunk Werks Media[3] gives iWorks authority to "approve any and all of [Skunk Werks Media's] marketing material related to [its product], including, but not limited to graphic and text creatives," and requires Skunk Werks to provide iWorks with "snap shots of its marketing material for iWorks' written approval." (Dkt. no. 1338-3 at 3, 8.) iWorks' agreements with other third party affiliates, such as PVI and Cathexis, contain identical or similar language. (*See, e.g.*, dkt. nos. 22 at 24; dkt. no. 1339-30.) These agreements clearly indicate that iWorks retained final editorial control over the advertisements for its products.

Defendants' secondary argument is without merit. Defendants have not identified any authority holding that establishing a commercially reasonable monitoring program is some sort of safe haven or affirmative defense to a violation of the FTC Act. In fact, courts have clearly held otherwise. *See Goodman v. FTC*, 244 F.2d 584, 592 (9th Cir.1957) ("[T]he courts take the view that the principal is bound by the acts of the salesperson he chooses to employ, if within the actual or apparent scope of his authority, even when unauthorized."); *see also FTC v. Stefanchik*, No. C04-1852RSM, 2007 WL 1058579, at *6 (W.D. Wash. Apr. 3, 2007) ("Under the FTC Act, a principal is liable for misrepresentations made by its agents regardless of any efforts of the principal to prevent

---

[3] In its agreement with iWorks, Skunk Werks Media is also referred to as Skunk Works Media.

3

such misrepresentations.") *aff'd*, 559 F.3d 924 (9th Cir. 2009). A monitoring program would help iWorks ensure compliance by third party brokers, but iWorks would still be bound by its brokers' conduct so long as they acted within the scope of their authority.

The FTC has offered undisputed evidence that iWorks' marketing partners—namely PVI, Virgin, Cathexis and Skunk Werks Media—were acting with actual authority pursuant to their agreements with iWorks. Therefore, Defendants are liable for violations of the FTC Act even if the representations were made on websites hosted by these third parties.

### B. Common Enterprise

The FTC asks this court to recognize all of the Corporate Defendants in this case as part of a common enterprise. Under the theory of common enterprise, each entity in a group of interrelated companies can be held jointly and severally liable for the actions of other entities in that group. *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010). "Entities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *Id.* "To determine whether a common enterprise exists, the Court considers factors such as: common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate defendants." *FTC v. Grant Connect, LLC*, 827 F. Supp. 2d 1199, 1216 (D. Nev. 2011) *aff'd in part, vacated in part*, 763 F.3d 1094 (9th Cir. 2014).

The FTC argues that all 61 Corporate Defendants fulfill this definition because they shared common ownership, operated in the same office, and utilized the same resources, accounts and employees. (Dkt. no. 1280 at 61-62.) Only three of the Corporate Defendants argue that they should not be considered part of a common enterprise: Anthon Holdings ("Anthon"), Network Agenda LLC ("Network"), and Employee Plus.

4

1       Anthon and Network argue that there was a lack of common control between
2   themselves and iWorks, that the companies only briefly shared office space, that the free
3   use of iWorks counsel was the result of a personal relationship, that shared advertising
4   should not be considered in this instance (for what reason, they do not elaborate), and
5   the companies had at most "an arm's-length contractual" relationship with iWorks. (Dkt.
6   no. 1344 at 35-38.)

7       These arguments are unconvincing. As an initial matter, Jeremy Johnson
8   ("Jeremy"), iWorks' owner and CEO, was a co-owner of Network. Jeremy shared joint
9   signatory authority with Duane Fielding over a business checking account in Network's
10  name. (Dkt. no. 35-3.) This demonstrates common control of the companies. Defendants
11  do not dispute that that they shared office space, advertising, and counsel. Nor do
12  Defendants dispute that iWorks handled customer service calls and monitored third party
13  sales and chargebacks for Network's product. Even resolving the factual disputes that
14  Anthon and Network allege in their favor, the undisputed facts demonstrate that the two
15  companies operated as part of a common enterprise with the other Corporate
16  Defendants.

17      Employee Plus argues that it was wholly separate from iWorks and offered other
18  companies the same services it offered iWorks. Employee Plus further argues that its
19  relationship with Raven Internet Media should not loop it into a common enterprise
20  because Raven Internet Media is not a named defendant and was set up to "keep matters
21  separate" from iWorks. (Dkt. no. 1358 at 60-62.)

22      Employee Plus does not dispute that it was owned and operated by Scott Leavitt,
23  who was iWorks' financial manager[4], or that it shared employees with iWorks. Employee
24  Plus also does not dispute that it provided merchant services to Raven Internet Media. Its
25  attempt to characterize its interactions with Raven Internet Media as distinct from work in
26  furtherance of a common enterprise is unavailing. While it is true that Raven Internet

27  _____
    [4] Leavitt disputes the FTC's characterization of his role as iWorks' Chief Financial
28  Officer. (Dkt. no. 1358 at 2.)

5

1    Media is not a named defendant, the FTC has provided undisputed evidence that the
2    company was simply a shell corporation through which iWorks conducted business. (Dkt.
3    no. 1387 at 50.) Resolving the alleged factual disputes in Employee Plus' favor, the Court
4    nevertheless finds that it acted as part of a common enterprise with the other Corporate
5    Defendants.

6         In sum, the Court finds that the FTC has demonstrated that the Corporate
7    Defendants operated as a common enterprise.

8         **C.    Individual Liability**

9         The FTC asks this Court to grant summary judgment and impose individual liability
10   against seven Individual Defendants: Jeremy Johnson, Ryan Riddle, Scott Leavitt, Andy
11   Johnson ("Andy"), Duane Fielding, Lloyd Jonson, and Terrason Spinks.[5] (Dkt. no. 1278.)

12        Under the FTC Act, individuals may be liable for both injunctive and equitable
13   monetary relief. To obtain injunctive relief, the FTC must show that a defendant
14   participated directly in the violations at issue or had authority to control them. *FTC v. Pub'l*
15   *Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th cir.1997). An individual may be liable for
16   equitable monetary restitution if, in addition to fulfilling the injunctive requirement, he or
17   she also "had knowledge that the corporation or one of its agents engaged in dishonest
18   or fraudulent conduct, that the misrepresentations were the type upon which a reasonable
19   and prudent person would rely, and that consumer injury resulted." *Network Servs. Depot,*
20   617 F.3d at 1138 (quoting *Pub'l Clearing House*, 104 F.3d at 1170.) The FTC can
21   establish the knowledge requirement by showing a defendant had actual knowledge of
22   the violation, was recklessly indifferent, or was aware of a high probability of fraud and
23   intentionally avoided the truth. *Network Servs. Depot,* 617 F.3d at 1138-39.

24        The FTC argues that every Individual Defendant meets the standards for injunctive
25   and monetary liability. The Court will address the FTC's arguments with respect to each
26   Defendant.

27

28        [5] The FTC also sought summary judgment against Defendant Scott Muir, but the
     FTC subsequently reached a resolution with Muir. (Dkt. no. 1386 at 6 n. 1.)

1          *1.    Jeremy Johnson*

2          It is undisputed that Jeremy Johnson was the CEO of iWorks. He hired and

3   supervised employees, signed legal documents, and had signatory authority over

4   financial accounts. The FTC also argues that he was involved in all levels of iWorks'

5   business, including decisions about compliance, marketing, and structuring. (Dkt. no 1279

6   at 3-4.) With respect to the element of knowledge, the FTC provides emails from both

7   iWorks' in house counsel and outside counsel indicating problems with iWorks' sales

8   sites. (*Id.* at 14-15.) Jeremy was also included on emails regarding iWorks' compliance

9   program, which documented failures to adequately disclose the terms of iWorks'

10  products. (*Id.* at 15.)

11         In his opposition, Jeremy does not seriously contest that he participated heavily in

12  iWorks' operations or that he had authority to control iWorks. Instead, his opposition

13  focuses on the merits of the claimed violations and alleges unethical behavior on the

14  FTC's part. (Dkt. no. 1351.) For the purposes of summary judgment, Jeremy has not

15  disputed any material facts.

16         The Court finds that the FTC has provided undisputed evidence to support a

17  finding that Jeremy had control of iWorks, participated in violations of the FTC Act, and

18  had knowledge of iWorks' deceptive practices as evidenced through the grant sites.

19  Therefore, the Court finds that Jeremy is subjected to individual liability for injunctive and

20  equitable monetary relief.

21         *2.    Ryan Riddle*

22         Ryan Riddle does not dispute the following characterizations by the FTC -- Riddle

23  was General Manager of iWorks for several years, oversaw managers, hired and fired

24  employees, executed legal documents and responded to complaints from the state

25  Attorneys General. Riddle was also the sole owner and officer of Diamond J Media, which

26  he used to obtain merchant accounts to process iWorks' sales. (Dkt. no. 1279 at 15-16.)

27  To show that Riddle had the knowledge required for monetary relief, the FTC argues that

28  he received emails from in house counsel, his own customer service department, and the

state Attorneys General informing him of inadequate disclosures and customer complaints. (*Id.* at 17-18.) The FTC also argues that Riddle was extensively involved in dealing with chargeback problems created by customers contacting their credit card companies. According to the FTC, the high chargeback rates alone provided him with actual notice that iWorks' sales sites were misleading customers. (*Id.* at 19.)

Riddle's opposition, like Jeremy Johnson's, focuses in large part on the merits of the underlying violations. (Dkt. no. 1352.) He does not seriously dispute the FTC's characterization of his role in iWorks or his knowledge of the sales tactics that the Court has already found to violate the FTC Act. Therefore, the Court finds that the FTC has presented undisputed facts which support a finding that Riddle participated in and had knowledge of the violations at issue, and grants the FTC's request to impose individual liability as to injunctive and equitable monetary liability against Riddle.

### 3.   Scott Leavitt

The FTC argues that Scott Leavitt was part of iWorks' upper management, and managed the company's finances, the finances of its affiliated companies, and Jeremy Johnson's personal finances. (Dkt. no. 1279 at 23.) The FTC suggests Leavitt's deep involvement in iWorks' financial workings is probative of his participation in iWorks' wrongdoing, and that Leavitt had enough control over iWorks' finances to satisfy the control element of injunctive liability. (*Id.* at 23-24.) Finally, the FTC argues that Leavitt displayed willful ignorance of iWorks' illegal practices, and that one can infer knowledge based on his widespread involvement in iWorks' financial matters.

Leavitt disputes both the FTC's characterization of his role with iWorks and the FTC's argument that he had the knowledge of alleged wrongdoing. Leavitt argues that the FTC has inflated his role within iWorks. He asserts that he is more akin to a bookkeeper than a CFO. (Dkt. no. 1358 at 5-6.) Leavitt claims that he took direction from and reported to iWorks' upper management. (*Id.* at 58.) He also disputes the FTC's characterization of portions of his deposition testimony offered to support the FTC's argument that he had knowledge of iWorks' deceptive practices. (*Id.* at 39.)

8

1    Leavitt disputes almost all of the FTC's claims about his work for iWorks, and
2    offered evidence to support his contention. Viewing the evidence in the light most
3    favorable to Leavitt, a genuine material issue of fact exists to preclude summary judgment
4    as to Leavitt's individual liability.

5                    **4.    Andy Johnson**

6    Andy Johnson managed iWorks' research and development department, which
7    developed products like Rebate Millionaire. (Dkt. no. 1279 at 30.) The FTC argues that
8    Andy also brought in potential clients and contractors, and was the sole owner and officer
9    of at least 10 shell companies. (*Id.* at 30-31.)

10   Andy counters that while he was involved in developing products for iWorks, he
11   was "isolated and removed" from any unlawful marketing practices. (Dkt. no. 1347 at 6-
12   7.) Andy further argues that he had no control over any shell corporations or any
13   involvement in any of their business affairs. (*Id.*) With regards to the knowledge element,
14   Andy argues that the FTC has mischaracterized his testimony, and that he believed that
15   chargeback problems were strictly financial and not indicative of fraud. (*Id.*) In support of
16   his opposition, Andy offers his and Riddle's declarations.

17   Andy disputes the FTC's characterization of his role within iWorks and his
18   knowledge of fraud. However, even absent these disputes, the Court finds that the FTC
19   has not satisfied its burden in presenting evidence to support its contention that Andy
20   directly participated in fraudulent activity, had control over it, or knowledge of it.[6] The
21   FTC's motion with respect to Andy Johnson's individual liability is denied.

22                   **5.    Duane Fielding**

23   Duane Fielding is the sole owner of Anthon and a co-owner of Network, companies
24   which have been found to be part of the iWorks common enterprise. (*See* discussion
25   *supra* at Sec. III(B).) To support its claim that Fielding participated in iWorks' unlawful

26

27       [6] Throughout its briefs, the FTC suggests that any work within iWorks qualifies as
     direct participation in the violations at issue. However, for purposes of this Order, the
28   Court is evaluating whether the Individual Defendants directly participated in the
     deceptive practices found in the SJ Order.

9

1  acts, the FTC points to records that indicate Fielding attended customer service meetings,

2  had access to iWorks databases, and was copied on reports and emails. (Dkt. no. 1279

3  at 27.) The FTC also argues that Fielding's role within Anthon and Network demonstrates

4  that he had sufficient control over iWorks, and that Fielding had personal knowledge of

5  sales sites, chargeback rates, and customer complaints. (*Id.* at 28 - 30.)

6       Fielding disputes that he attended any of iWorks' meetings or reviewed any of

7  iWorks' reports. He also denies that he had any knowledge of iWorks' fraudulent practices

8  and argues that he was not positioned close enough to iWorks' inner workings to be aware

9  of iWorks' intentions. (Dkt. no. 1344 at 46.)

10      The FTC has not offered sufficient evidence to show that Fielding directly

11  participated in or had control over any of iWorks' deceptive practices for which the Court

12  has granted summary judgment. Viewing the evidence in the light most favorable to

13  Fielding, the Court finds that a genuine material issue of fact exists to preclude summary

14  judgment as to Fielding's individual liability.

15              *6.    Loyd Johnston*

16      According to the FTC, Loyd Johnston was a part of iWorks management, and was

17  specifically responsible for overseeing the merchant accounts department. (Dkt. no. 1279

18  at 21.) The FTC argues that Johnston had authority to control 15 shell companies related

19  to iWorks and was general manager of Elite Debit, which debited customer's bank

20  accounts. (*Id.*) Finally, the FTC argues that the Court can infer knowledge because

21  Johnston's department reviewed sales sites and he was aware of high chargeback rates.

22  (*Id.*)

23      Johnston opposes the FTC's motion but fails to offer any evidence to dispute any

24  of the FTC's contentions. (Dkt. no. 1346.) Nevertheless, the Court finds that the FTC has

25  not provided sufficient evidence for the Court to conclude that, as a matter of law,

26  Johnston was directly involved in, or had control over, iWorks' deceptive practices, or had

27  the requisite level of knowledge to hold him responsible for equitable monetary relief.

28  Therefore, the FTC's motion with respect to Loyd Johnston is denied.

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 7.   *Terrason Spinks*

The FTC argues that Terrason Spinks was in charge of iWorks Google make-money products and was involved in marketing grant products and arranging merchant accounts to process sales. (Dkt. no. 1279 at 32.) Spinks co-owned Jet Processing with Jeremy Johnson and had a number of responsibilities, including working with processors on issues relating to high levels of chargebacks. (*Id.* at 33.) The FTC contends that Spinks knew or should have known about fraud through his work related to chargebacks. (*Id.* at 34.)

Spinks does not address any of the FTC's arguments regarding his individual liability directly, but joins in the oppositions of Lloyd Johnston and Andy Johnson. (Dkt. no. 1348.) While Spinks has not disputed the FTC's account of his role and knowledge, the Court finds that the FTC has not presented sufficient evidence to support a finding of individual liability as a matter of law. Spinks' role in any Google make-money products cannot be considered at this stage because the Court denied summary judgment with respect to the claims involving those products. Therefore, the FTC's motion as it relates to Spinks' individual liability is denied.

### D.   Disgorgement

Because the Court has not resolved all of the FTC's claims and determined the extent of Defendants' liability, it is premature for the Court to grant summary judgement on the FTC's disgorgement claim. It is unclear at this stage, for example, whether the entirety of iWorks' proceeds is attributable to fraudulent practices. Therefore, it is not possible to determine whether funds are traceable to any violations. The FTC's motion with respect to its disgorgement claim is denied.

For the same reasons, the Court denies the Relief Defendants' motion for partial summary judgement on the FTC's disgorgement claim as alleged in Count XI. (Dkt. no. 1284.) The Court has not determined the extent to which the funds at issue were "ill-gotten" and cannot therefore resolve issues relating to the total proper amount at stake for each defendant and whether those amounts are attributable to some legitimate claim.

11

1    In light of the Court's ruling, the FTC's motion to strike new evidence (dkt. no. 1649)

2  is denied as moot.

3  **IV.    CONCLUSION**

4    The Court notes that the parties made several arguments and cited to several

5  cases not discussed above. The Court has reviewed these arguments and cases and

6  determines that they do not warrant discussion as they do not affect the outcome of their

7  motions.

8    For the reasons stated above, the Court grants summary judgment in favor of the

9  FTC on the issue of affiliate liability, common enterprise liability, and individual liability

10  with respect to Defendants Jeremy Johnson and Ryan Riddle. The Court finds that a

11  genuine material issue of fact exists as to the individual liability of the other five Individual

12  Defendants (Scott Leavitt, Andy Johnson, Duane Fielding, Lloyd Jonson, and Terrason

13  Spinks). The Court denies summary judgment on the issue of disgorgement.

14    The FTC's Motion to Strike New Improperly-Filed Evidence (dkt. no. 1649) is

15  denied as moot.

16    DATED THIS 31st day of December 2015.

17

18                                            MIRANDA M. DU
                                            UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

27

28