UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>                            Plaintiff,<br><br>    v.<br><br>JEREMY JOHNSON, *et al.*,<br><br>                        Defendants. | Case No. 2:10-cv-02203-MMD-GWF<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

## I.    INTRODUCTION

The Federal Trade Commission ("FTC") brought this action against Defendants Jeremy Johnson, I Works, Inc. ("IWorks"), Terrason Spinks ("Spinks"), Jet Processing, Inc. ("Jet Processing"), and numerous other individuals and corporate entities. The FTC alleges that Defendants participated in a fraudulent scheme on the Internet that involved deceptive enrollment of consumers into memberships for various products, charging consumers' credit cards or debit accounts for said memberships without authorization, and then setting up merchant accounts in the names of numerous corporate entities to process IWorks credit cards sales to circumvent credit card companies' monitoring programs and tracking. The Court granted summary judgment on several claims and the FTC settled with all but two Defendants, Spinks and Jet Processing.

This Order thus addresses the remaining claims against these two Defendants, as well as the consumer injury for which these Defendants are jointly and severally liable. The Court also addresses the FTC's request for a final order permanently enjoining Spinks

and Jet Processing from engaging in deceptive practices, and holding Spinks and Jet Processing jointly and severally liable for $280,911,870 in consumer redress.

## II. PROCEDURAL BACKGROUND

### A. Complaint and Amended Complaint

In 2010 the FTC brought suit against Jeremy Johnson, IWorks, Spinks and Jet Processing, among a number of other individual and corporate defendants, for violations of the FTC Act, 15 U.S.C. § 45(a). (ECF No. 1.) In February 2013, the FTC filed an amended complaint adding several more defendants and asserting a number of claims under Section 5(a) of the FTC Act as well as the Electronic Funds Transfer Act, 15 U.S.C. § 1693e(a) ("EFTA"), and Regulation E, 12 C.F.R. § 205.10(b). (ECF No. 830.)

#### 1. Spinks

The FTC alleged in its Amended Complaint that Terrason Spinks was a business associate of Jeremy Johnson who worked in the IWorks headquarters and received regular reports of consumer complaints and high levels of chargebacks. (ECF No. 830 ¶¶ 347, 352.) It further alleged that Spinks participated in the IWorks scheme by obtaining merchants accounts on behalf of IWorks, owning and acting as an officer of Jet Processing (which the FTC alleges was a front for obtaining new accounts), submitting a Chargeback Reduction Plan to a bank on behalf of Jet Processing, and maintaining signatory authority over six bank accounts which received funds from IWorks or its sales. (*Id.* ¶¶ 348-51.)

#### 2. Jet Processing

In the Amended Complaint the FTC alleged that Jet Processing is a company incorporated in Nevada in 2009. (ECF No. 830 ¶ 172.) The FTC further alleged that Jet Processing was established as a front in order to obtain new merchant accounts so that IWorks and other defendants could continue to process credit and debit card charges even after old merchant accounts were terminated. (*Id.* at ¶¶ 4, 173-175.)

### B. Summary Judgment Orders

Over several years of litigation, the Court issued four partial summary judgment orders. The first order, issued on March 31, 2015 ("SJ Order I"), concluded that at least

some of the websites upon which the FTC relied violated the FTC Act. SJ Order I also granted summary judgment in favor of the FTC on the EFTA claim for fund transfers from three consumers. (ECF No. 1586.)

After the parties met and identified additional websites that they stipulated were similar to the ones the Court had already found deceptive, the Court issued a second summary judgment order ("SJ Order II") finding several additional sites deceptive. (ECF No. 1794.)

On December 31, 2015, the Court granted summary judgment ("SJ Order III") in favor of the FTC on the issues of affiliate liability (finding that IWorks was responsible for deceptive sites hosted by marketing partners), common enterprise liability (finding that the tangle of corporate defendants, including Jet Processing, operated as a single enterprise), and individual liability for Defendants Jeremy Johnson and Ryan Riddle. (ECF No. 1818.) The Court denied the FTC's summary judgment request as it related to individual liability for Spinks, even though Spinks did not directly address any of the FTC's arguments. The Court found that the FTC has not met its prima facie burden of establishing facts showing the Spinks had the requisite levels of knowledge and participation. (*Id.* at 11.)

Finally, the Court granted partial summary judgment against a number of unrepresented corporate defendants on June 9, 2016. (ECF No. 1924.)

**C.    Bench Trial**

Every defendant, except for Spinks and Jet Processing, eventually reached a settlement agreement with the FTC. (*See* ECF Nos. 1203, 1204, 1407, 1860, 1913, 1931, 1939-41, 1981, 1991.)

The Court held a three-day bench trial to determine whether, and to what extent, Spinks and Jet Processing were liable for violations of the FTC Act and the EFTA. Specifically, the parties identified the following issues of fact to be resolved by the Court: 1) the extent of Spinks participation in, and ability to control, the unlawful acts; 2) whether Spinks had actual knowledge or showed reckless indifference to the misrepresentations; 3) whether the deceptive sites were widely disseminated; 4) whether the so-called Google

3

sites made claims that were misleading and whether Defendants knew or should have known about those claims; 5) whether the remaining sites, on which the Court previously denied summary judgment, are deceptive; and 6) the amount of unreimbursed consumer injury associated with the deceptive acts at issue. (*See* ECF No. 1961.)

The FTC presented the testimony of seven witnesses. The witnesses included two former IWorks employees, Tracey Kramm and Sara Marker. Representatives from Visa and Mastercard also testified, as well as two FTC employees involved in the FTC's investigation. Finally, Spinks himself testified.

At the conclusion of the trial, the Court noted that it would rely on evidence offered in support of the several summary judgment motions in addition to the testimony and exhibits offered at trial. Based on this information, the Court makes the following findings of fact and conclusions of law.

## III.     FINDINGS OF FACT

### A.     Liability

#### 1.     Terrason Spinks

1.     Spinks met Jeremy Johnson in High School in St. George, Utah, sometime around 1993. (ECF No. 2001 at 99-100; ECF No. 1240-7 at 21.)

2.     Approximately seven years later, while working as a mortgage broker, Spinks ran into Johnson at an airport. The two struck up a conversation and had lunch. Afterwards, Spinks helped Johnson obtain several mortgages. (ECF No. 2001 at 103.).

3.     Spinks eventually began working from an office on the first floor of 249 East Tabernacle St. in St. George, UT, which was also home to IWorks. (ECF No. 2000 at 23; ECF No. 2001 at 125.)

4.     Spinks began working with IWorks at least as early as 2006. (ECF No. 1240-7 at 82-83.)

*Google Product*

5.     In late 2005 or early 2006, Spinks developed an idea to market a Google AdWords product that taught customers how to use Google's AdWords and Pay-Per-Click

to drive traffic to websites ("Google Product"). Spinks was familiar with these techniques because he used them to advertise his mortgage business. (ECF No. 2001 at 106.)

6. Spinks knew that Johnson was involved in telemarketing and internet marketing, so he approached Johnson with his Google Product idea. (*Id.* at 103-04) The final product Spinks developed was called "Growing Rich with Google." (*Id.* At 108.)

7. Spinks and Johnson entered into an oral agreement under which Spinks would create the product and the two would split any profits. (ECF No. 2001 at 107-08.)

8. iWorks created a landing page and an order page for the Google Product, and Spinks worked with Johnson to create a marketing plan. (*Id.* at 107, 173.)

9. Spinks reviewed the content of the sites created by IWorks. (ECF No. 1240-7 at 163-64; ECF No. 2001 at 695.)

10. Spinks helped set up customer service for the Google Product and attempted to drive web traffic to the Google Product sites for around two or three months. (ECF No. 2001 at 114-15; Ex. 724 (ECF No. 1969).)

11. While attempting to drive web traffic to the Google Product, Spinks also attempted to drive traffic to IWorks Grant Products. (ECF No. 2001 at 161.)

*Merchanting*

12. Spinks transitioned from marketing to merchanting in January 2007. (ECF No. 2001 at 116, 215.) He turned control of the Google Product over to Jeremy Johnson and no longer received any revenue from it. (*Id.* at 115.)

13. Spinks described merchanting as acquiring merchant accounts for companies, including IWorks. (*Id.*)

14. Independent Sales Organizations ("ISOs") are intermediaries between merchants and banks. They perform a function similar to a mortgage broker, except they connect merchants and acquiring banks rather than lenders and borrowers. (ECF N0. 2000 at 9-10.)

15. ISOs help merchants, like IWorks, acquire merchant accounts with banks. Banks that open merchant accounts in this context are referred to as acquiring banks.

1   Merchant accounts allow e-commerce companies like IWorks to receive payment for
2   goods and services via debit and credit cards. (ECF No. 2001 at 135; ECF No. 2000 at
3   61.)

4       16.     When a customer purchases a good or service from an e-commerce
5   merchant like IWorks, the ISO or sub-ISO who facilitated the account, the acquiring bank,
6   and the credit card company all receive revenue. (ECF No. 2000 at 77.)

7       17.     Acquiring banks often have their own underwriting departments and
8   generally establish criteria for ISOs to follow. For example, an acquiring bank may dictate
9   what type of business they are interested in and what level of risk they are willing to
10  tolerate. (*Id.* at 63.)

11      18.     ISOs sometimes contract with third parties which the parties in this case
12  have referred to as "sub-ISOs." Sub-ISOs are essentially independent sales agents for
13  ISOs. (*Id.* at 28.)

14      19.     Spinks began merchanting in late 2007 or early 2008, when he founded
15  Empower Processing with a relative. (ECF No. 2001 at 116.)

16      20.     Spinks conducted Empower Processing business from his home. (*Id.* at
17  124.)

18      21.     Empower Processing had a handful of clients, one of which was IWorks.
19  Spinks set up merchant accounts for IWorks on behalf of Empower Processing. (*Id.* at
20  120.)

21      22.     Spinks ended Empower Processing and parted ways with his relative in
22  either 2007 or 2008, around the same time he formed a Utah corporation called Jet
23  Processing, Inc. ("Jet Processing Utah"). (*Id.*)

24      23.     Jet Processing Utah was formed in 2008. Its offices were located at 249 East
25  Tabernacle, in the same building as IWorks. (Id. at 124.)

26      24.     Jet Processing Utah was a sub-ISO for two ISOs called Swipe and Cynergy.
27  (ECF No. 1999 at 184.)

28  ///

25. Spinks set up a Nevada corporation also called Jet Processing about a year later. (ECF No. 2001 at 124.)

26. Spinks helped IWorks set up merchant accounts through Jet Processing. (*Id.* at 134.)

27. Spinks also co-owned a company called Merchant Works, which was set up to process sales for IWorks. (*Id.* at 186-87.)

28. It is not clear from the evidence produced at trial when Merchant Works, Inc. was created, but the company applied for merchant accounts in December of 2007. (Tr. Exs. 700, 701, 702.)

29. Spinks applied for at least three merchant accounts on behalf of Merchant Works (d/b/a Growing Rich With Google, Rebates Millionaire, and Grant A Day) to process sales of IWorks products. In each of the applications, he identified himself as an owner/officer of Merchant Works. (Tr. Exs. 700, 701, 702.)

30. Spinks assisted in testing websites as part of his role in helping set up merchant accounts for Easy Google Profit, and IWorks product. (ECF No. 2001 at 177; Tr. Ex. 321 (ECF No. 1243-10).)

31. Tr. Ex. 2405 contains a list of 15 merchant accounts Spinks helped set up for IWorks through Swipe and Cynergy Data (page 1) and Jet Processing (page 2). (ECF No. 2001 at 224; Tr. Ex. 2405.)

32. Spinks was familiar with the IWorks products for which he set up merchant account, and knew about IWorks' practice of including upsells with core products. (ECF No. 2001 at 133, 141.)

33. Spinks also knew that IWorks' grant program included a membership. (ECF No. 1240-7 at 46.)

*Dealing with Chargeback Problems*

34. A chargeback is a reversal of a sale; it typically occurs when a cardholder wants a sale reversed for various reasons including fraud. The cardholder files a dispute with the bank that issued the credit or debit card to the consumer. (ECF No. 2000 at 25.)

35.     Visa has established at least 20 reasons codes for chargebacks. The card-issuing bank enters the reason code into the Visa system based on the conversation the bank had with its cardholder. (*Id.* at 26-27.) Reason code 83 is for fraud. The predominant code associated with the IWorks chargebacks was 83, fraud chargebacks. (*Id.* at 26.)

36.     During the period 2008-2010, Jeremy Johnson and IWorks were in the Visa chargeback monitoring program because "they had an excessive number of fraud chargebacks." (*Id.* at 16.)

37.     IWorks entered the MasterCard ECM program in 2008. (*Id.* at 92.)

38.     The average chargeback rate for IWorks, when it was in the MasterCard monitoring program, ranged from 1.7% to 5% across several acquiring banks. (*Id.* at 95.)

39.     IWorks was placed on the MATCH list by IWorks' acquiring banks 19 times. (*Id.* at 97.)

40.     Spinks knew that Visa and Mastercard both placed IWorks into monitoring programs due to high levels of chargebacks. (ECF No. 2001 at 145-46.)

41.     Spinks received, but testified that he did not review, a number of different reports discussing IWorks' chargeback problems.[1] (*Id.* at 135; Tr. Exs 338, 342-44, 352, 355–57, 720.) Spinks participated in numerous meetings where IWorks' chargeback problems were discussed. (ECF No. 1999 at 185-87, 194-95; ECF No. 2001 at 147-49.)

42.     Spinks also received emails detailing problems with various IWorks websites. (ECF No. 152 ¶ 351; ECF Nos. 1243-10, 1243-11; Tr. Exs. 321, 322.)

43.     MasterCard developed a system for tracking and cataloging merchants whose accounts have been terminated. At the times relevant to this case, that system was known as the Terminated Merchant File (TMF"). (ECF No. 2000 at 90, 110-11.)

///

///

---

[1]The Court finds that Spinks' testimony on his involvement is suspect. Spinks clearly tried to minimize his involvement. However, trial exhibits and his own testimony show that he continued to be copied on emails discussing marketing well into 2008, and that he continued to review IWorks marketing techniques, and be apprised of problems, as part of his merchanting responsibilities. (*See* Tr. Ex. 321; ECF No. 1992-23 at 164-65.)

44.     Online merchants experience an average chargeback rate of about 0.2%. IWorks experienced chargeback rates between 1.7 and 5%. (*Id.* at 94-95.)

45.     Jeremy Johnson and IWorks were placed on the TMF in April 2009. (ECF No. 1999 at 189.)

46.     Spinks knew that IWorks had problems with chargebacks when he first started working with IWorks. (ECF No. 2001 at 142.) Spinks knew that IWorks and Jeremy Johnson had been placed on the TMF around the time it occurred. (ECF No. 1240-7 at 95.)

47.     After Johnson and IWorks were placed on the Terminated Merchant File, Tracy Kramm worked with Spinks to set up new merchant accounts for new corporate entities through Jet Processing. (ECF No. 1999 at 188.) The purpose of the new accounts was to process IWorks sales. (*Id.* at 191-92.)

48.     Spinks participated in calls and meetings with IWorks employees and representatives from Swipe, Visa, regarding the large number of chargebacks. (ECF No. 1999 at 185-87; ECF No. 1240-7 at 66.)

49.     Spinks also prepared a Chargeback Mitigation Plan for Jet Processing. (ECF No. 152 ¶ 348; ECF No. 2001 at 167-68; Tr. Ex. 501-A.)

**2.     Jet Processing**

50.     Jet Processing was incorporated in Nevada on February 24, 2009. (Tr. Ex. 501A.) When it was incorporated, Jet Processing was co-owned by Spinks and Jeremy Johnson. (*Id.*)

51.     In Spinks and Jet Processing's Answer to the FTC's Complaint, they admitted that Jet Processing set up merchant accounts for IWorks products and opened bank accounts for both Jet Processing business and IWorks.[2] (ECF No. 152 ¶¶ 347, 350.)

///

///

///

_____

[2]Spinks and Jet Processing did not file an answer to the Amended Complaint.

52. Spinks and Jeremy Johnson were officers and directors of Jet Processing. (Tr. Ex. 285.) Spinks served as President and Treasurer of the company. (ECF No. 2001 at 194.)

53. Spinks had signatory authority over Jet Processing's bank accounts. (*Id.*)

54. Spinks eventually purchased Jeremy Johnson's share of Jet Processing and became sole owner. (ECF No. 2001 at 171.)

**B.    Consumer Harm**

55. Before trial, the Court found that 87 grant sale sites violate the FTC Act. (ECF No. 1586, 1794, 1908-1.)[3]

**1.    The Grant Sale Sites Reserved for Trial Also Violate the FTC Act as Alleged in Counts II, IV and VI**

56. At trial, Defendants argued that the Court should not admit certain sites produced by third-party broker Paradigm Visions, Inc. ("PVI") because, according to Defendants, the FTC had failed to disclose a certificate of custodian of records from PVI during discovery. The FTC, however, has demonstrated that it timely disclosed the PVI records as issue to Defendants during discovery and that Defendants failed to object to the admission of these records by the applicable deadline. (*See* ECF 1998 at 1-2.)

**a.    Twelve Sale Sites (Tr. Exs. 82-93) Produced by the PVI Violate the FTC Act as Alleged in Counts II, IV, and.**

57. The Court denied summary judgment as to Counts II, V and VI for 12 PVI-produced grant sites that the Court labelled as incomplete sites: Tr. Exs. 82-93; SJ Order II (ECF 1794) at 3-4.

58. The grant sites that are Tr. Exs. 82-93 were produced to the FTC by PVI pursuant to a CID and these sites were hosted by PVI. (ECF No, 1635-3at ¶ 2-4.)

///

///

_____

[3]The Court admitted on October 28 printouts of the following IWorks sale sites: Tr. Exs. 1-4, 6-69, 73-81, 94-105, 112, 114-115, 160, and 164. The Court admitted Tr. Ex. 75 when the Court granted on October 17 [ECF 1969] the FTC's motion to admit certain exhibits [ECF 1967], one of which is Tr. Ex. 75.

1    59.    The landing page introduced as Tr. Ex. 82 (ECF No. 1272-4) directed

2    consumers to one of 11 order pages, Tr. Exs. 82-93. (ECF No.1635-3 at ¶ 7.)

3        a.    The graphics, typeface, statements, appearance, and content for the 11

4            PVI-produced order pages are identical, except that the price of the grant

5            product varies as does the cost of the shipping and handling. (ECF No.

6            1635-3 at ¶ 7(a).)

7        b.    The PVI sites that the Court identified as "Incomplete Sites" in SJ Order

8            II, Tr. Exs. 82-93, are complete in that they consist of a landing and an

9            order page for each site.

10    60.    Tr. Exs. 82-93 violate the FTC Act as alleged in Count II for the following

11    reasons:

12        a.    The landing page, Tr. Ex. 82, states: "If you've always wanted to get your

13            share of the BILLIONS of Grant dollars that are given away by the

14            Federal Government and private Grantors EVERY YEAR, this is your

15            chance!" This statement is virtually identical to the representations on the

16            grant sites the Court ruled deceptive under Count II. Tr. Ex. 10 promise

17            "Billions of dollars are given away each year."; Tr. Exs. 17-20 explain

18            "The Government gives away BILLIONS each year!"; Tr. Ex. 14 asserts

19            "The US Government and private foundations award MILLIONS IN

20            GRANTS to people just like you who are in need of financial help.".

21        b.    The landing page of Tr. Ex. 82 lists three steps; step 3 tells the consumer

22            to "use our software to apply for even MORE Federal and Private Grant

23            Money."

24        c.    Toward the bottom of the landing page, the consumer is told "Get your

25            INSTANT trial, and you can start applying TODAY for Federal and private

26            grants!"

27        d.    The landing page further represents that consumers using the grant

28            product are likely to receive these grants. The text in the largest font asks

"Want a GUARANTEED Grant? . . . The First Grant Program that can guarantee you will get a Grant!"

 e. The landing page claims "We've made finding a Grant as easy as clicking a button! . . . Our proprietary Grant software removes the hassle usually associated with finding and applying for a Grant!"

 f. The landing page further states that the professional Grant researchers and proprietary software "insure that we are able to find the best match possible for your Grant needs!" and "No matter what your needs, we can probably find a Grant to fill them!"

 g. The landing page makes the same representations that the Court found deceptive on the grant sites upon which it granted summary judgment under Count II and the order pages that follow do nothing to refute these representations.

 h. Based on the above findings, Tr. Exs. 82-93 violate the FTC Act as alleged in Count II.

61. The 12 PVI-produced grant sites that are Tr. Exs. 82-93 also violate the FTC Act as alleged in Counts IV and V for the following reasons:

 a. The landing page, Tr. Ex. 82, makes no mention of memberships or recurring costs.

 b. The 11 associated order pages are identical, except that the inadequately-disclosed cost of the grant product and forced Upsells, and the download fee, differ to varying degrees that are of no consequence.

 c. The order pages, Tr. Exs. 83-93, tout "free unlimited access" for 25 and 60 days to Express Business Funding and Network Agenda, but provide no information about the negative option memberships, their monthly costs, and how and when to cancel to avoid the monthly charges, except in the inconspicuous disclosure. The disclosure is in the smallest, most

///

narrowly-spaced print on the order page, and is located below the fields where the consumer provides her billing information.

d. The Court previously held "The mere fact that the sites contained disclosures in smaller print and described the Upsells as 'bonuses' and trials at the bottom of order pages does not alter the deceptive net impression as to the cost and nature of the product because consumers would not be inclined to seek out this information . . . The consumer using these sites would order IWorks' CD/software under the belief that they were making a one-time payment of a small shipping and handling or download fee for an otherwise free product." (ECF No. 1586 at 49-50.)

e. Based on the above findings, the Court finds that Tr. Exs. 82-93 violate the FTC Act as alleged in Counts IV and V.

**b.  Two Other PVI-produced Sale Sites Violate the FTC Act as Alleged in Counts II, VI, IV and V.**

62.  The Court denied summary judgment as to Counts II, VI, IV and V for two other PVI-produced grant sites that the Court labelled as incomplete sites. (ECF No. 1794 at 4.)

a. Tr. Exs. 70, 71, and 72 were produced to the FTC by PVI pursuant to a CID and these sites were hosted by PVI. (ECF 1635-3 at ¶ 2-4.)

b. Tr. Ex. 70 and Tr. Ex. 72 are landing pages with almost identical representations, statements, layout, and graphics. Tr. Ex. 71 is an order page.

c. The two Grant Master landing pages, Tr. Ex. 70 and Tr. Ex. 72 directed consumers to the same order page, Tr. Ex. 71. (ECF 1635-3 at ¶ 6.)

d. The Court finds that there are two grant sale sites in this group: Tr. Ex. 70 (landing page "I got my first check within seven days) with an order page that is Tr. Ex. 71, and Tr. Ex. 72 (landing page "We had a check in hand in 7 days!") with an order page that is Tr. Ex. 71.

63. Defendants stipulated that if it could be shown that Tr. Ex. 71 was the order page for Tr. Ex. 70 and for Tr. Ex. 72, then they would stipulate that the two sites violate Counts II, VI, IV and V. (ECF 1615 at n. 5.)

64. Based on the above findings, the Court finds that Tr. Exs. 70-71 and Tr. Exs. 72-71 violate the FTC Act as alleged in Counts II, VI, IV and V.

### c. The Eight Remaining Grant Sites Where the Court Found Genuine Issues of Material Fact Violate the FTC Act. [4]

65. Site No. 1. Tr. Ex. 75 was produced by Jeremy Johnson as "an example of one of iworks highest producing sites." (ECF No. 233-3 at 1.)[5] The FTC contends Tr. Ex. 75 violates the FTC Act as alleged in Counts II, IV and V.

    a. The landing page for Tr. Ex. 75 is an exact duplicate of Tr. Ex. 8, which is defendants' preliminary injunction Exhibit 8 (ECF No. 101 at 4). The Court found Defendants' preliminary injunction Exhibit 8 deceptive under Count II. (ECF No. 1586 at 24-25, 36 (describing the landing page and finding no genuine issue of material fact that there is a violation of the FTC Act as alleged in Count II)).

    b. The landing page for Tr. Ex. 75 states, "It's easy to get bogged down in all the hype and red tape surrounding Government and Private Grants, but help is finally here. We've assisted people with grants for years, and we can help you too!" Virtually identical language appears on Tr. Ex. 1, defendants' preliminary injunction Exhibit 1, which the Court ruled deceptive under Count II.[6]

///

///

---

[4]The Court denied summary judgment on the following eight sites: Tr. Ex. 75 (ECF No. 233-3); Tr. Ex. 104 (ECF No.1268-4); Tr. Ex. 105 (ECF No. 1268-6); Tr. Ex. 106 (ECF No. 1268-3); Tr. Ex. 107 (ECF No. 1268-5); Tr. Ex. 108 (ECF No. 32-9); Tr. Ex. 109 (ECF No. 33); and Tr. Ex. 110 (ECF No. 32-3). (ECF No. 1794 at 4.)

[5]The Court admitted Tr. Ex. 75 when the Court granted on October 17 [ECF 1969] the FTC's motion to admit certain exhibits, one of which is Tr 75.

[6]ECF No. 1586 at 22-24, 34-36.

c. Tr. Ex. 75 also violates the FTC Act as alleged in Count IV. Tr. Ex. 75 encourages consumers to "Claim Your FREE CD TODAY!" on the landing page and to "Complete the form to receive your FREE CD!" with payment of a small fee. The order page states the small fee includes both the CD and "free trials." The express representation of a free CD and free trials is likely to mislead consumers into believing that they are receiving a free product. The Court has previously ruled that "this representation is false because upon ordering the CD, consumers were enrolled in negative option memberships and forced Upsells that automatically charged consumers' credit or debit cards after the trial periods." (ECF No. 1586 at 49.)

d. Tr. Ex. 75 also violates the FTC Act as alleged in Count V. Tr. Ex. 75 fails to disclose adequately that consumers would be entered into negative option continuity programs involving memberships. The disclosure is in small print relative to the rest of the order page and appears under the Submit button. The free trials described in the call-out boxes make no reference to the cost of the memberships, the need to cancel to avoid charges, or that memberships are involved. As the Court ruled in connection with other grant sites, "consumers are likely to believe that they are ordering a CD for a one-time fee and would not have reason to believe they were enrolling in membership programs with monthly charges." (*Id.*) As with the other grant sites, "Information about the trial memberships, and their associated costs, are hidden in disclosures that consumers would be justified into believing they did not have to examine closely." (*Id.*)

66.    Tr. Exs. 104, 105, 106, and 107 were produced by PVI as indicated by the bates label and explained by FTC investigator Reeve Tyndall. (ECF No. 2001 at 76-78, 82 (explaining Mr. Tyndall's naming convention in the context of an IWorks-produced sale

site, Tr. Ex. 114).) These sites include repeated references to "free" on the landing pages and all four sites have the same order page. The FTC contends that these four sites violate the FTC Act as alleged in Counts IV and V.

    a. Tr. Exs. 104 and 105 landing pages refer to "FREE Government Money" and tell consumers that "Government grants are distributed in the form of FREE MONEY that never have [sic] to be paid back." The landing pages for Tr. Ex. 104 - 107 refer to "a FREE CASH GRANT!" All four landing pages tell the consumer to "join" or "get" the "free trial." Tr. Exs. 105 and 107 include a check from the US Department of the Treasury with "FREE MONEY!" in the memo section.

    b. Tr. Exs. 104-107 order pages are identical and they continue the theme that what the consumer is getting is free with the payment of a small fee of \$.99. The Special Bonus boxes promise 25 and 60 days of "FREE Unlimited Access" to the forced Upsells.

    c. Nowhere on Tr. Exs. 104-107 are the material terms of the underlying offer and of the forced Upsells, such as the monthly charges and how and when to cancel to avoid such charges, mentioned other than in the disclosure below the check-out box in tiny, cramped font that is the smallest on the page. The forced Upsells are first listed below the check-out box and are presented as "Special Bonuses" that provide "Free Unlimited Access" to certain supposed benefits. These references fail to disclose the terms of the "bonuses." Thus, as with the grant sites the Court found deceptive under Counts IV and V (ECF No. 1586 at 47-50), the indisputable net impression from all four sites is that, for a nominal processing fee, the consumer gets "Free" "software that allows [her] to apply for [Guaranteed Daily] Grants online." The four sites fail to adequately disclose to the consumer that she is signing up for negative option plans with substantial recurring fees.

d. The order pages for the four sites are distinguishable from the order page in Tr. Ex. 2, which the Court found a "close call" for summary judgment under Count V. (*Id.* at 50.) Unlike in Tr. Ex. 2, the "bonus" information on the four sites is not in the order box and is not directly above the Submit button. Instead, it is below the order box and even there it lacks the material terms for the "bonuses." Moreover, the order box says nothing about memberships, recurring charges or the need to cancel to avoid charges. And as with all other grant sites the Court ruled deceptive under Count V, the four sites do not allow the consumers "to opt out of the negative option memberships or Upsells before paying the ["processing fee"] fee for the ["software"]." (*Id.* at 40.)

e. Based on the above findings, the Court finds that Tr. Exs. 104-107 violate the FTC Act as alleged in Counts IV and V.

67. Tr. Exs. 108 and 109 are landing pages only. The landing pages were captured and produced by the Better Business Bureau ("BBB"). The FTC contends these two exhibits violate the FTC Act as alleged in Counts II, VI and V.

a. Tr. Ex. 108 refers to "Free Government Grant Money" "free federal money" and information that is "yours for FREE!" Tr. Ex. 109 touts the "Free Grant Network software" that "we're giving it away free", "FREE MONEY", and only serious people should request the "FREE SOFTWARE" and "claim your share of this FREE MONEY."

b. Both Tr. Exs. 108 and 109 feature testimonials from consumers who received money to pay various personal expenses (fix up a car, avoid foreclosure, buy Christmas presents). The testimonials are "proof our system works!" (Tr. Ex. 109.) and consumers are told "Don't Take Our Word For It. Listen To What Others Are Saying." (Tr. Ex. 108.)

c. The net impression from the BBB-captured landing pages is that the government has billions of dollars in free grant money for ordinary

1   consumers to pay a variety of expenses and that consumers signing up

2   for the software "will be able to access government grant money through

3   the use of IWorks' programs and products." (ECF No. 1586 at 34.)

4       d. Based on the above findings, the Court finds that Tr. Exs. 108 and 109

5           violate the FTC Act as alleged in Counts II, IV and VI.

6       68.    Tr. Ex. 110 was not admitted at trial. However, other than an Exhibit stamp,

7   Tr. Ex. 110 is identical to Tab 15 of the White Paper, Tr. Ex. 177. Both Tr. Ex. 110 and

8   Tab 15 bear the same date and print-time (4/21/2010 at 1:54 PM). The Court admitted Tr.

9   Ex. 177 and its attachments. The Court also stated at the trial it would compare sites that

10  are Trial Exhibits, such as Tr. Ex. 110, and sites in the White Paper, to determine whether

11  they are essentially the same document. (ECF No. 2002 at 49.) The Court finds that Tr.

12  Ex. 110 and Tr. Ex. 177, Tab 15 are substantively the same. As the site at Tab 15 is the

13  same as Tr. Ex. 110, the Court admits Tr. Ex. 110 and also finds that it violated the FTC

14  Act as alleged in the Amended Complaint.

15      a. The top of the first page of Tr. Ex. 110 proclaims: "CNN and other sources

16          report that the U.S. Government will distribute over $360 Billion Dollars

17          to organizations and private individuals just like you!"

18      b. Tr. Ex. 110 touts the availability of government grants for personal

19          expenses: "Gain access to over 80,000 Federal and Private Grants,

20          awarding Billions a year!"; "Isn't it time that the Government helped YOU

21          for a change?"; "Ready to stop living paycheck-to-paycheck?"; "Grants

22          for almost every conceivable need!"; "Get Government GRANT

23          MONEY!"; "Federal Grants usually don't need to be repaid!" "You might

24          be able to use the money to: pay medical bills, get your diploma, obtain

25          real estate, start your business, pay business expenses and MORE!"

26  ///

27  ///

28  ///

These representations are virtually identical to those on sites the Court found deceptive under Count II.[7]

    c. Tr. Ex. 110 includes the same purported testimonial from "J. Barsness" (thanking IWorks for the grant check that allowed her to pay her lease and save her credit) that appears in grant sites the Court found deceptive under Count VI.[8]

    d. Both the landing and the order pages on Tr. Ex. 110 state that the Grant CD is free to keep even if the consumer decides to cancel.

    e. The order page includes an order box that indicates that the only cost to the consumer is $2.99. The descriptions of the forced Upsells, at the bottom, provide no information about the need to cancel within the trial period to avoid charges or even what the charges are. Nothing draws the consumer's attention to the terms in the disclosure. The consumer is likely to disregard the information about the costs and the need to cancel because it is printed in the smallest font on the page and is outside the order box.

    f. Based on the above findings, the Court finds that Tr. Ex. 110 violates the FTC Act as alleged in Counts II, IV, V and VI.

    **d.    The Order Page on Two Grant Sites Does Not Adequately Disclose That Consumers Are Signing Up for Memberships.[9]**

69.    The Court denied summary judgment on Counts IV and V for two grant sites, Tr. Ex. 1-2 and Tr. Ex. 11. These two sites include an order page that lists the trial

///

///

---

[7]The Court engaged in a detailed analysis of the grant sites, quoting extensively from those the Court analyzed. (ECF No. 1586 at 12 - 25.)

[8]Tr. Ex. 10 at 4 (ECF No. 31-4); Tr. Ex. 12 at 5 (ECF No. 31-6); Tr. Ex. 13 at 5 (ECF No. 31-7); Tr. Ex. 3 at 4 (ECF No. 100). The Court quoted from the J. Barsness testimonial in *SJ Order I.* (ECF No. 1586 at 13, 17.)

[9]There are seven sites before the Court that include this order page: Tr. Exs. 2, 11, 21, 22, 24, 25, and 26.

memberships next to a price of $0.00 in the order box. (ECF No. 1586 at 50.)[10] The Court also denied the Summary Judgment on Count IX because of the order page on these two sites. (*Id.* at 59.)

70.     The order page for these sites should be viewed in conjunction with the preceding landing page. The consumer arrives first at the landing page and then, if interested based on the landing page, makes the decision to continue to the order page. The consumer cannot avoid the landing page.

   a.  The landing page for these sites makes no reference to memberships, trials, or the forced Upsells. The landing page for the site that is Tr. Ex. 1-2 refers to "our Grant Search Software," "Our Unique One Of A Kind CD" and asks the consumer "Where To Ship Your Private and Federal Grant CD." The landing page for Tr. Ex. 11 refers to "Our Fast Grant Program," "We have one of our Private and Government Grant CD's ready to ship to you," and asks where the grant CD should be shipped.

   b.  The representation on the landing page is that the offer involves software or a CD. Nothing on the landing page alerts the consumer that the offer involves three memberships with monthly costs, the need to cancel to avoid charges, and how to cancel. As the Court held "Setting aside the order page disclosures for a moment, a consumer looking at these sites is not likely to understand that they are signing up for one membership program, let alone three." (ECF No. 1586 at 41.)

   c.  The order page for these sites does not adequately alert consumers that the offer involves memberships that consumers will have to cancel to avoid the charges. Nowhere is there an explanation of what the membership means. The terms are at the top of the page, far from the Ship My Software button. Nothing indicates to the consumer that the

[10]The Court granted summary judgment on Counts II and VI for these two sites. (ECF No. 1908-1 at 1.)

disclosure has important information. By contrast, a large red arrow points to the order box, specifically to the section where the consumer inputs billing information. The order box itself represents that the trial memberships cost nothing, reinforcing the free nature of the offer, one with no strings attached. In fact, the forced Upsells are described in bright red font as bonus "gifts" for which consumers pay nothing. Tr. Ex. 11 references free trials to the "incredible bonus gifts" and Tr. Ex. 2 mentions the free trial to Network Agenda.

d. Nathan Good, the FTC's disclosure expert, analyzed in his report the order page associated with the two sites, Tr. Ex. 1-2 and 11. In commenting on the order page, Dr. Good opined: "Although the order form box is the most visually distinct and attention grabbing portion of the order page, the list of purchases does not mention the recurring monthly cost of the core continuity program or the upsells continuity programs if they are not cancelled during the trial periods. Based on these factors, a consumer would not be [sic] expect that they would be incurring any costs other than the $2.99 shipping amounts by hitting "Ship My Software." The sole source of information about additional costs and terms exists in the Terms and Disclosures at the top of the page." (Tr. Ex. 178 at 28.)

71. Based on the above findings, the Court finds that the sales sites with the order pages described above (Tr. Ex. 1-2, Tr. Ex. 11) violate the FTC Act as alleged in Counts IV and V.

e. **Witness Testimony Support a Finding That the Sales Sites Failed to Disclose, or Disclose Adequately, Negative Option Memberships and Forced Upsells, and That the Grant and Google Sites Included Misrepresentations**

72. Tracey Kramm, a merchant account specialist who worked at IWorks from mid-December 2008 to August 2009, began reviewing sales sites when she first started with IWorks. (ECF No. 1999 at 29.)

///

73. During her time at IWorks, Ms. Kramm saw "very little change. Very little of what we were purporting to be wrong was corrected." (*Id.* at 71.)

74. Sara Marker started helping review sale sites near the end of May 2009. (*Id.* at 228.) When she became a member of the compliance team, she focused on the sites of the third-party brokers that were carrying IWorks' Upsells. (*Id.* at 230.)

75. Ms. Marker identified various issues when she was reviewing the sites of the third-party marketing partners including "they would have their disclosures below the fold. They didn't disclose price points. They weren't disclosing the Upsells. The I-Works Upsells would not be disclosed sometimes on some of the pages." (*Id.*)

76. Ms. Marker reviewed grant sales sites. The sites she reviewed included claims that one could use government money to "go Christmas shopping, buy that truck . . . It would also make it sound like it's easy as 1, 2, 3 type of thing. And those were the types of things that we were kind of telling people. You know, you can't – it's misleading to people." (*Id.* at 256.). She also testified that there were numerous sites "where the disclosures were not done, as far as the recurring charges for the Upsells on those Grant sites." (*Id.*)

77. Ms. Marker testified that it was her impression that the reasons consumers were charging back was because "a lot of them were unaware . . . they weren't aware of the other charges that were happening on their card. . . . they didn't know it was a recurring charge." (*Id.* at 245.)

78. Paul Paolucci, of MasterCard, also reviewed the IWorks sales sites. He testified that "we saw that the manner in which they were disclosing the products and the shipping fees weren't very clear to the cardholders and could cause cardholder confusion." (ECF No. 2000 at 107.)

### f. Consumer Complaints Support a Finding That the Negative Option Memberships and Forced Upsells Were Not Adequately Disclosed

79. Ms. Kramm, whose responsibilities included reviewing customer service reports from the IWorks call centers, testified that the main complaint in the reports "was

being charged for products they never ordered. . . . Not knowing about the products, not even—you know, in some cases, they never even heard of these products because they weren't on the sales site." (ECF No. 1999 at 147.)

80.     Ms. Kramm reviewed notes in the customer service database when she was processing chargebacks and the notes reflected the same type of complaint as she saw in the customer service reports: "customers complaining, saying they did not order this. . . . They didn't know about the charges, didn't know about the product, that type of thing." (*Id.* at 183.) The customer service database was also known as the Yellow database. (*Id.* at 27.)

81.     Ms. Marker reviewed the customer service notes in the Yellow database when she was issuing refunds. Consumers seeking a refund complained "that they had gotten more charges than they were anticipating, and different numbers of charges and products that they didn't sign up for." (*Id.* at 222.)

82.     Ms. Kramm also reviewed customer complaints when she helped respond to complaints from the BBB and state Attorneys General, and when she reviewed customer notes in IWorks customer sales database. Customers were complaining, "saying they did not order this. . . .They didn't know about the charges, didn't know about the product, that type of thing." (*Id.* at 182-83.)

83.     Ms. Marker reviewed and responded to consumer complaints from the BBB and State Attorneys General. She testified that The complaints she read included the word "scam . . . a lot. The word, uh — the words of 'I didn't know these other charges. I didn't know what I was buying. I wasn't told this was part of getting this. I was told it was a free CD.' " (*Id.* at 249-50.)

84.     Pursuant to the FTC's CID, IWorks produced complaints it received from the BBB (ECF No. 2000 at 186; Tr. Ex. 674) and complaints it received from State Attorneys General offices. (ECF No. 2000 at 191; Tr. Ex. 675.) Tr. Exs. 674 and 675 show that the complaints come from consumers in many different states.

///

85. Tr. Ex. 836 is a summary of the complaints IWorks received from the Better Business Bureaus. (ECF No. 2001 at 28; Tr. Ex. 836.)

86. Analysis of the BBB-related complaints, as set forth in summary exhibit Tr. Ex. 836, shows that 638 of the consumer communications forwarded by the BBB to IWorks complained about charges that had not been disclosed or that the consumer did not recognize. (ECF No. 2000 at 190; Tr. Ex. 836.)

87. Tr. Ex. 836 shows that the earliest complaint against Growing Rich With Google is September 14, 2007. (ECF No. 2001 at 35; Tr. Ex. 836.)

88. Analysis of the State Attorneys General complaints, as set forth in summary exhibit Tr. Ex. 837, shows that 55 of the communications forwarded by the State Attorneys General to IWorks complained about charges that had not been disclosed or that the consumer did not recognize. (ECF No. 2000 at 192-93; ECF No. 2001 at 40; Tr. Ex. 837.)

### 2. The Grant Sites Violate the FTC Act as Alleged in Count I

#### a. The Court Has Already Found that the Grant Sites Represent that Government Grants for Personal Needs Are Available.

89. The Court found that a consumer using the grant sites described in its SJ Order I, "and acting reasonably under the circumstances is likely to believe there are government grants available for personal expenses [and] that they are likely to receive money from said grants. . . ." (ECF No. 1586 at 26.)

90. The Court found that "[t]he sites present testimonial after testimonial where people claim they received money, sometimes checks in the mail in a matter of weeks, to do everything from buy household goods to pay overdue bills or stop foreclosure." (*Id.*)

91. Based on the above analysis, the Court finds that consumers acting reasonably are likely to understand from the grant sites that there are government grants available to pay for personal expenses.

///

///

///

### b. The Representation That Government Grants for Personal Needs Are Available Is False

92. David Bauer, the FTC government grant expert, testified via deposition (ECF No.1992-2) and his expert and supplemental expert reports (Tr. Exs. 178 and 179 respectively).[11]

93. Mr. Bauer has been working in grant seeking and other fund-raising since 1971. (Tr. Ex. 178 ¶ 10.) Mr. Bauer has written and published ten books and several articles on locating, applying for, and obtaining government, private, and corporate grants including the "How To" Grants Manual, which is published by the American Council on Education and is in its sixth edition. (*Id.* ¶ 20.)

94. Grants.gov is the federal government's central storehouse for information on more than 1,000 grant programs and it provides access to approximately $500 billion in annual awards. The site grants.gov states that "Grants are not benefits or entitlements. A federal grant is an award of financial assistance from a federal agency to a recipient to carry out a public purpose of support or stimulation authorized by a law of the United States. Federal grants are not federal assistance or loans to individuals." Grants.gov also warns "ATTENTION!! Grants-gov does not offer money for personal financial assistance or debt." (*Id.* ¶ 26.) The site explains that "Although there are many grants on Grants.gov, few of them are available to individuals and none of them are available for personal financial assistance." (*Id.* ¶ 29.)

95. Mr. Bauer states that federal grants are not an award to help individuals deal with personal financial difficulties, such as preventing foreclosures, paying a mortgage or other household expenses, fixing a car, buying Christmas presents, or covering emergency expenses. (*Id.* ¶ 26.) "The same is true for grants from state, county, and local governments—they are awarded to accomplish or support a public purpose, such as creation of an after-school program for economically-disadvantaged children." (*Id.* ¶ 27.)

---

[11]The parties stipulated that the testimony of the FTC's grant expert, David Bauer, and Defendants' expert, Beverly Browning, could testify via the highlighted portions of their depositions and via their declarations and expert reports submitted in connection with the summary judgment proceedings. (ECF No. 1993.)

96. Mr. Bauer also states that "[w]ith rare exception, government and private grants are awarded to organizations, such as state and local governments, education and research institutions, and non-profit organizations, and not to individuals." In his 30 years of experience in the grant field, Mr. Bauer has "never found any federal or state government grants awarded directly to individuals to pay for personal expenses/needs." (*Id.* ¶ 29.)

97. The Court noted in its SJ Order I that defendants' expert, Beverly Browning, contends that the consumers adopt a definition of grants broader than the one used by grants.gov. Ms. Browning states that to the layperson, a grant includes any program by which money or savings can be obtained. (ECF No. 1586 at 31.)

98. The Court has found that the sites represented that government grants for personal needs were generally available. The evidence from grants.gov and from Mr. Bauer shows that this representation is false. The Court finds that there are few government grants directly available to consumers for personal needs and those direct grants are only for individuals in very special and limited circumstances.

**3.      The Google Sale Sites Violate the FTC Act as Alleged in Counts III, IV, and V.**

**c.      Thirteen Google Sites Are Deceptive Under Counts IV and V.**

99. Defendants do not dispute that the content of 13 Google-related websites that are Tr. Exs. 111-123 violate Counts IV and/or V. (ECF No. 1794 at 2-3.) The Court denied summary judgment in light of Defendants' argument that these sites were from IWorks' development server, intelligroupmedia.com, and were not available for viewing by the public. (*Id.*)

100. The evidence shows that the 13 Google-related websites that violate Counts IV and/or Count V were available for viewing by the public; they were not hosted on an IWorks development server.

a. Tr. Ex. 111 was downloaded from the Internet by Google and produced by Google. Tr. Exs. 620, 464-A. Tr. Ex. 111 was hosted by Virgin Offers,

not the IWorks development server. (ECF No. 1635-2 at ¶ 19(a).) Tr. Ex. 111 was available to the viewing public because it was hosted by Virgin Offers and downloaded from the Internet by Google.

b. Tr. Ex. 112 was downloaded from the Internet by former FTC Investigator Sam Jacobson. (ECF No. 2001 at 74-75; Tr. Ex. 112.) Tr. Ex. 112 was not admitted during trial. However, Tr. Ex. 112 is substantively the same as Tr. Ex. 177, Tab 38. For instances, pages 1-2 of Tr. Ex. 112 and pages 3-4 of Tab 38 are the same; both bear the same date and time stamp (10/27/2009 at 9:21 AM). Page 3 of Tr. Ex. 112 is identical to page 6 of Tab 38. Page 4 of Tr. Ex. 112 is identical to Tab 38, page 7. The White Paper states that the sites in Appendix I are representative of IWorks "highest selling programs." (Tr. Ex. 177 at p. 42.) Tr. Ex. 112, substantively the same as the site at Tab 38, is an exemplar of one IWorks' highest selling programs and therefore was available for viewing by the public.

c. Tr. Ex. 113 was not admitted during trial. However, Tr. Ex. 113 is substantively identical to Tr. Ex. 177, Tab 36. They both bear the same date and time stamp (11/10/2009 at 12:41 PM). Tr. Ex. 113, substantively the same as the site at Tab 36, is an exemplar of one of IWorks' highest selling programs and therefore was available for viewing by the public.

d. Tr. Ex. 114 was produced by IWorks in response to a CID, as shown by the bates label. (ECF No. 2001 at 76-78; Tr. Ex. 114.) The printout of the excel file produced by IWorks that is Tr. Ex. 551 shows, at Row 21, that there were 34,098 sales from the site that is Tr. Ex. 114 between September 26, 2006 and March 21, 2008.[12] Tr. Ex. 114 was available to

///
///

---

[12]Tr. Ex. 551 was stipulated to by Defendants. (ECF 1997, *Master Exhibit List.*)

the viewing public because IWorks records show that there were 34,098 sales from the site.

e. Tr. Ex. 115 was produced by IWorks in response to a CID, as shown by the bates label. (ECF No. 2001 at 78-79; Tr. Ex. 115.) The printout of the excel file that is Tr. Ex. 551 shows, at Rows 43 and 45, that there were 40,645 sales from the site that is Tr. Ex. 115 between October 17, 2007 and March 6, 2008, and 245,874 sales from this same site between November 12, 2007 and November 3, 2009, for a total of 286,519 sales. Tr. Ex. 115 was available to the viewing public because IWorks records show that there 286,519 sales from the site.

f. Tr. Ex. 116 produced by IWorks in response to a CID, as shown by the bates label.[13] The printout of the excel file that is Tr. Ex. 551 shows, at Row 26, that there were 63,453 sales from the site that is Tr. Ex. 116 between April 24 and October 18, 2007. Tr. Ex. 116 was available to the viewing public because IWorks records show that there were 63,453 sales from the site.

g. Cathexis was considered an "in-house" broker specializing in the grant and Google products. (ECF No. 1999 at 55.) Cathexis produced the following sites that it hosted: Tr. Ex. 117, Tr. Ex. 118, Tr. Ex. 119, Tr. Ex. 120, Tr. Ex. 121, Tr. Ex. 122, and Tr. Ex. 123. (*See* Tr. Ex. 573; ECF No. 1389-10.) The sites were on the Cathexis server, not on the IWorks development server. The Cathexis sites, Tr. Exs. 117-123, were available for viewing by the public.

101. The Court finds that the Google sites that are Tr. Exs. 111-123 were available for viewing by the public. Some of the sites are exemplars of IWorks' highest

---

[13]Tr. Ex. 116 was not admitted at trial. However, counsel for IWorks stated that she would "stipulate to any exhibits that, for which the representation is made that it is an exact copy of a document that was produced in response to ROG 14." (ECF No. 2001 at 80.) In view of the stipulation, the Court is admitting Tr. Ex. 116.

selling programs. The FTC has shown that thousands of sales were generated from other of the Google sites. Defendants do not dispute that the content of the sites falls within the Court's prior ruling. The Google sites that are Tr. Exs. 111-123 violate the FTC Act as alleged in Counts IV and V.

### d. Fifteen Google Sites Are Deceptive Under Count III.

102.    Fifteen Google sites also violate the FTC Act as alleged in Count III. These 15 sites make reference to specific earnings the consumer can make by using the Google program: Tr. Exs. 111-114, 116-123, and 128-130.

103.    The Court found that these Google sites advertised hundreds of dollars in earnings a day (the Court held that the emails "simply do not support the earnings of hundreds of dollars a day advertised on the sites."). (ECF No. 1568 at 55.)

104.    The only substantiation IWorks provided to the FTC in its CID response are four emails from three individuals. (*Id.* at 53-54; Tr. Ex. 652.)

    a. The Court already found that the "emails provided in response to the FTC's CID request appear to be insufficient to substantiate the sites' earnings claims as they simply do not support the earnings of hundreds of dollars a day advertised on the sites." (ECF No. 1586 at 55.)

    b. The Court already found that IWorks has failed to explain what their earnings claims were actually based on apart from the four emails provided in response to the CID. (*Id.*)

    c. The Court already found that "the mere fact that the earnings claims happen to be true does not address the question of whether IWorks had a reasonable basis to make such earnings claims at the time they were made." (*Id.* at 55-56.)

105.    At trial, Defendants offered no additional substantiation that IWorks possessed at the time it made the earnings claims. The only substantiation in the record for the earnings claims are the four emails from the three individuals—and the Court has ruled that this amount of substantiation is insufficient.

106.    In order to prevail on Count III, the FTC has to show that the substantiation IWorks provided in response to the CID does not constitute a reasonable basis for the hundreds of dollars in earnings claims on defendants' Google sites.

107.    Based on the above findings, IWorks did not have a reasonable basis for the earnings claims and Tr. Exs. 111-114, 116-123, and 128-130 violate the FTC Act as alleged in Count III.

### 4.    IWorks' Billing of the Forced Upsells Was Unfair as Alleged in Count IX

108.    IWorks placed its products as forced Upsells on its own sales sites and on the sales sites of its third-party marketing partners and brokers. (ECF No. 1999 at 23.)

109.    The terms of the negative option forced Upsell memberships on the IWorks sale sites were inadequately disclosed. When Ms. Kramm reviewed the grant and Google sales sites, "sometimes the upsell would not be listed" or the disclosures were too small or were not accurate, or were not in the appropriate place. (*Id.* at 195.)

110.    The terms of the negative option forced Upsell memberships on the sites of IWorks' marketing partners were also inadequately disclosed.

>   a. Ms. Kramm reviewed many hundreds of sale sites. The major problem Ms. Kramm saw on the third-party marketing sites "would be the fact that the Upsells were not disclosed." (ECF No. 1999 at 99.) The most common problem on the sales sites of the marketing partners "was the fact that they — the Iworks Upsells were not disclosed." (*Id.* at 195.)
>
>   b. Ms. Marker testified that the problems associated with the sale sites included "the Upsells not being properly disclosed." (*Id.* at 235.)

111.    Because consumers could not opt out of the forced Upsells, they could not reasonably avoid the charges unless they declined to pay the small fee associated with the grant or Google product.

///

///

a. Ms. Kramm explained that on the sites she reviewed "it would have been impossible for [consumers] to opt out because they didn't know that they were going to be in the program." (*Id.* at 62.)

b. Ms. Marker testified that consumers could not opt out of the Upsells on the sites that she reviewed. (*Id.* at 234.)

112. Chargebacks due to undisclosed or poorly disclosed memberships from which consumers could not opt out provide no benefit to the electronic payment system that supports online commerce. (ECF No. 2000 at 60.) These types of chargebacks provide no benefit to consumers and, because they are a burden on the online payment system, provide no benefit to competition.

### 5. The Deceptive Sale Sites Were Widely Disseminated on the Internet.

113. Consumer complaints produced by IWorks and the BBB show that the IWorks sale sites were widely disseminated over the Internet. Tr. Exs. 636, 670-75.

a. IWorks received consumer complaints from BBB which were lodged by consumers all over the United States. Tr. Ex. 836 is a list of the complaints. (ECF No. 2000 at 188; Tr. Ex. 836.)

b. IWorks received consumer complaints from State Attorneys General lodged by consumers in different states. Tr. Ex. 837 is a list of the complaints. (ECF No. 2000 at 192; Tr. Ex. 837.)

### e. Sales Information Produced by IWorks and the Broker PVI Show the Sale Sites Were Widely Disseminated

114. IWorks produced a spreadsheet in response to Interrogatory 14 that included information about specific sale sites, including the first and last dates sales were generated from the site and the number of sales associated with the site. (ECF No. 2001 at 84-86, 95.)

115. According to the IWorks-produced excel file that is Tr. Ex. 551, there were 2,294,389 core grant memberships sold from grant-related sale sites. (Tr. Ex. 551.)

///

116.    According to the IWorks-produced excel file that is Tr. Ex. 551, there were 1,167,215 core grant memberships sold associated with the specific grant sale sites that IWorks produced. Defendants stipulated to Tr. Ex. 551, which is a spreadsheet provided in response to CID Interrogatory 14. (ECF 1997.)

117.    Defendants stated that Tr. Exs. 1-8 were among "the most popular landing and order pages for the Grant program." (ECF No. 86 at 10 (referring to defendants' preliminary injunction exhibits 1-8).)

118.    Defendants stated that Tr. Exs. 1-2 and 4, both grant-related sites, were "typical of what IWorks typically put out there for their ads" and "were associated with many sales." (ECF No. 233-7 at 110-14, 116-17 (referring to defendants' preliminary injunction exhibits 1 and 4).)

119.    Jeremy Johnson admitted that there were 133 million visits to IWorks sale sites. (ECF No. 233-1 ¶ 11(b).)

120.    According to Tr. Ex. 551, there were 84,074 sales from the sale sites in the category "Congratulations," including 82,758 sales from Tr. Ex. 24 between January 1, 2006 and December 31, 2009, and an additional 1,316 sales from Tr. Ex. 25 between January 1, 2006 and February 12, 2007 and December.[14]

121.    According to Tr. Ex. 551 and sales information from the broker PVI, Tr. Ex. 462,[15] there were 689,821 sales from the sale sites in the category "NOW!/FREE!", which includes Tr. Exs. 55, 57–69, 73 and 74, between January 1, 2006 and December 7, 2008.

122.    According to sales-related information on Tr. Ex. 462, there were a total of 56,210 sales from the sites in the category "In Two Weeks I Had a Check in hand for $100,000!" which includes Tr. Exs. 28–46, in 2007.

///

///

_____

[14]The categories correspond to those set forth in the FTC's Similar Sites Brief, Attachment A. (ECF No. 1635-1.)

[15]The Court admitted Tr. Ex. 462, the PVI Supplemental CID Response, on October 28, 2016. (ECF No. 1997.)

123. According to sales-related information on Tr. Ex. 462, there were a total of 38,010 sales from the sites in the category "You May Qualify for FREE Government Funding" which includes Tr. Exs. 47–54, between July 17 2007 and September 8, 2009.

124. According to sales-related information on Tr. Ex. 551, there were a total of 400,873 sales from the sites in the category "The Secret Behind Government Cash, which includes Tr. Exs. 76, 155-56, and 158, between April 19, 2006 and August 27, 2009.

125. According to sales-related information on Tr. Ex. 462, there were a total of 7,652 sales from the sites in the category "FREE MONEY GRANTS," which includes Tr. Exs. 94-98, between October 22, 2007 and December 7, 2008.

126. According to sales-related information on Tr. Ex. 462, there were a total of 1,904 sales from the sites in the category "FREE CASH GRANT-GUARANTEED" which includes Tr. Exs. 99-103, between October 8, 2007 and August 27, 2008.

127. According to sales-related information on Tr. Ex. 462, there were a total of 5,721 sales from the sites in the category "GOLD STANDARDS FOR ONLINE GRANTS & GUARANTEED DAILY GRANTS."

128. According to Tr. Ex. 462, at PVI 701-GrantADay v2, there were 5,705 sales from the sale site that is Tr. Ex. 104 from July 9, 2007 to February 18, 2008.

129. According to Tr. Ex. 462, at PVI 701-GrantADay v4, there were 16 sales from the sale site that is Tr. Ex. 105 from July 10 to September 17, 2007.

**f.      IWorks Sales Information for the Google Sites on Which the Court Has Not Ruled Show the Google Sites Were Widely Disseminated.**

130. Tr. Ex. 114 was produced by IWorks in response to a CID, as shown by the bates label. (ECF No. 2001 at 76-78.) The excel file that is Tr. Ex. 551, at Row 21, shows that there were 34,098 sales from Tr. Ex. 114 between September 26, 2006 and March 21, 2008.

131. Tr. Ex. 115 was produced by IWorks in response to a CID, as shown by the bates label. (ECF No. 2001 at 78-79.) Tr. Ex. 551 shows, at Rows 43 and 45, that there were 40,645 sales from Tr. Ex. 115 between October 17, 2007 and March 6, 2008, and

1 245,874 sales from this same site between November 12, 2007 and November 3, 2009,

2 for a total of 286,519 sales.

3 132. Tr. Ex. 116 was produced by IWorks in response to a CID, as shown by the

4 bates label. Tr. Ex. 116 was not admitted at trial. However, counsel for defendants

5 stipulated to the admissibility of any sale site produced by defendants in response to an

6 Interrogatory. (ECF No. 2001 at 80.) Tr. Ex. 116 was produced by IWorks in response to

7 CID Interrogatory 14, as shown by the bates label. Accordingly, the Court admits Tr. Ex.

8 116. Tr. Ex. 551 shows, at Row 26, that there were 63,453 sales from the site that is Tr.

9 Ex. 116 between April 24, 2007 and October 18, 2007.

10 133. Tr. Ex. 160 was produced by IWorks in response to a CID, as shown by the

11 bates label. (ECF No. 2001 at 80-81.) Tr. Ex. 551 shows, at Row 137, that there were

12 10,624 sales from the site that is Tr. Ex. 160 between September 28 and December 31,

13 2009.

14 134. Tr. Ex. 164 was produced by IWorks in response to a CID, as shown by the

15 bates label. (ECF No. 2001 at Trial at 81.) Tr. Ex. 551 shows, at Row 158, that there were

16 3,795 sales from the site that is Tr. Ex. 164 between January 14 and March 8, 2010.

17
## 6. The IWorks White Paper Shows that the Grant and Google Sites
18 Were Widely Disseminated.

19 135. The IWorks White Paper (Tr. Ex. 177) was admitted pursuant to the Court's

20 ruling on October 3, 2016. (ECF No. 1963.)

21 136. The IWorks White Paper was submitted on behalf of all defendants in this

22 action, including Jet Processing, Inc. and Terrason Spinks. Tr. Ex. 177 at 51-52. The sites

23 that are in Appendix I of the White Paper are typical and representative of sales sites from

24 which consumers purchased IWorks products and are a sample of order and landing

25 pages that are representative of IWorks' highest selling programs.

26 137. The sites that are in Appendix I of the White Paper are representative of

27 pages through which sales actually occurred, they are the most popular landing and order

28 ///

pages, and they are representative of IWorks' highest selling programs. As such, the sites that are in Appendix I were widely disseminated on the Internet. (Tr. Ex. 177 at 42.)

138.    Grant sites that the Court found deceptive under Counts II, VI, IV and/or V are substantially similar in terms of representations, graphics, font size, placement of the disclosures as certain sites in Appendix I of the White Paper (Tr. Ex. 177). The grant sites that are included in the White Paper are representative of IWorks' highest selling programs. As such, the grant sites the Court found violated the FTC Act that are substantially the same as those in the White Paper were widely disseminated.[16]

139.    The Court reserved the Google sites for trial. Some of the Google sites that are Trial Exhibits are also included in Appendix I of the White Paper. The Google sites below are authenticated because they are included as part of the White Paper, which was produced to the FTC by IWorks and has been admitted as Tr. Ex. 177. The Google sites, as the other sites in Appendix I, are representative of IWorks' highest selling programs. (Tr. Ex. 177 at 42.) As such, the Google sites below were widely disseminated.

      a.  Tr. Ex. 112 is substantially the same as the White Paper, Tab 38. Pages 1-3 of Tr. Ex. 112 have the same date and time stamp as pages 3,4, and 6 of Tab 39. (ECF No. 2001 at 70.) Tr. Ex. 112 is deceptive as alleged in Counts III and V.

      b.  Tr. Ex. 113 is substantially the same as the White Paper, Tab 36. Pages 1-3 of Tr. Ex. 113 have the same date and time stamp as pages 1-3 of Tab 36. Tr. Ex. 113 is deceptive as alleged in Counts III and V.

      c.  Tr. Ex. 114 is substantially the same as the White Paper, Tab 25. Tr. Ex. 114 is deceptive as alleged in Count V.

      d.  Tr. Ex. 115 is substantially the same as the White Paper, Tab 24. Tr. Ex. 115 is deceptive as alleged in Counts IV and V.

///

---

[16]The sites the Court found deceptive are listed in Attachment A to the Pretrial Order. (ECF No. 1961.)

e. Tr. Ex. 127 is substantially the same as the White Paper, Tab 26. Tr. Ex. 127 is deceptive as alleged in Counts III, IV, and V.

140.   Google sites that are Trial Exhibits that the Court did not review on summary judgment also violate the FTC Act. Some of these Google sites are included in Appendix I of the White Paper. These Google sites are authenticated because they are included as part of the White Paper, which was produced by IWorks and has been admitted as Tr. Ex. 177. These Google sites are representative of IWorks' highest selling programs. As such, they were widely disseminated.

a. Tr. Ex. 160 is substantially the same as the White Paper, Tr. Ex. 177, Tab 23. Tr. Ex. 160 is deceptive as alleged in Counts IV and V for the reasons set forth in the Court's analysis in SJ Order I of the grant sites.

b. Tr. Ex. 164 is identical to the White Paper, Tr. Ex. 177, Tab 28. Tr. Ex. 164 is deceptive as alleged in Counts IV and V for the reasons set forth in the Court's analysis in SJ Order I of the grant sites.

141.   There are grant and Google sites that are part of Appendix I of the White Paper but that are not Trial Exhibits and were not reviewed by the Court on summary judgment. These sites also violate the FTC Act. These grant and Google sites are authenticated because they are included as part of the White Paper, which was produced by IWorks and has been admitted as Tr. Ex. 177. These grant and Google sites are representative of IWorks' highest selling programs. As such, they were widely disseminated.

a. Tr. Ex. 177, Tab 6 is deceptive as alleged in Counts II, VI, IV, and V, based on the Court's analysis in SJ Order I.

b. Tr. Ex. 177, Tab 17 is deceptive as alleged in Counts II, VI, IV, and V, based on the Court's analysis in SJ Order I

c. Tr. Ex. 177, Tab 18 is deceptive as alleged in Counts II, VI, IV, and V, based on the Court's analysis in SJ Order I.

///

d. Tr. Ex. 177, Tab 22 is deceptive as alleged in Counts IV and V, based on the Court's analysis in SJ Order I.

e. Tr. Ex. 177, Tab 26 is deceptive as alleged in Counts III.

f. Tr. Ex. 177, Tab 28 is deceptive as alleged in Counts IV and V.

g. Tr. Ex. 177, Tab 30 is deceptive as alleged in Count V.

h. Tr. Ex. 177, Tab 34 is deceptive as alleged in Count III.

i. Tr. Ex. 177, Tab 35 is deceptive as alleged in Counts IV and V, based on the Court's analysis in SJ Order I

j. Tr. Ex. 177, Tab 37 deceptive as alleged in Counts IV and V, based on the Court's analysis in SJ Order I.

k. Tr. Ex. 177, Tab 39 is deceptive as alleged in Count III.

l. Tr. Ex. 177, Tab 40 is deceptive as alleged in Counts III and V.

**7. Sites Hosted on IWorks Development Server Generated Significant Sales and Hence Were Widely Disseminated.**

142. IWorks itself recognized that the pages it hosted on its development server and that it produced in response to CID Interrogatory No. 14 were representative of those from which sales were actually generated. As IWorks stated in its White Paper, "some of the pages iWorks produced in response to Interrogatory No. 14 of the CID were also taken from the intelligroupmedia server. However, these are pages that iWorks believed were actually representative of pages eventually used for sales purposes." (Tr. Ex. 177, n. 4.)

a. Tr. Ex. 177, Tabs 15, 17, 18, 30, 33, and 37 were on the intelligroupmedia server.

b. The sites that are at Tabs 15, 17, 18, 30, 33, and 37 are part of the White Paper and thus are among IWorks' most popular landing and order pages and are representative of IWorks' highest selling programs. As such, the sites that are at Tabs 15, 17, 18, 30, 33, and 37 were widely disseminated.

///

143. IWorks' witness Robert Vigil testified in his deposition about the number of sales from Google sites hosted on the IWorks development server as shown by Depo Ex. 1428. Depo Ex. 1428 has the same content as Tr. Ex. 551, but is presented in a different format.

    a. Vigil agreed that a site entitled Google Search Market Members listed on Depo Ex. 1428 was an intelligroupmedia site and that Depo Ex. 1428 showed that 10,417 products were sold from this site, although he hypothesized that all sales might have been cancelled during the trial period. (ECF 1992-24 at 40.) The sales related information for the Google Search Market Members site that generated 10,417 sales is also at Tr. Ex. 551, Row 115.

    b. Vigil agreed that a site entitled Google Search Market Members listed on Depo Ex. 1428 was an intelligroupmedia site and that Depo Ex. 1428 showed that 87,572 products were sold between June 17 and December 21, 2009, from this site. (ECF 1992-24 at 42-43.) The sales-related information for the Google Search Market Members site that generated 87,572 sales is also at Tr. Ex. 551, Row 117.

    c. Vigil agreed that a site entitled Google Click Money listed on Depo Ex. 1428 was an intelligroupmedia site and that Depo Ex. 1428 showed that 5661 products were sold between August 13 and December 31, 2009, from this site. (ECF 1992-24 at 44-45.) The sales-related information for the Google Click Money site that generated 5,661 sales is located at Tr. Ex. 551, Row 125.

**8. The Unreimbursed Consumer Injury Caused by the IWorks Sale Sites and Unfair Billing Practices is $280,911,870.36.**

144. All the grant and Google sites presented to the Court by the FTC and Defendants violate the FTC Act as alleged in one or more counts of the Amended Complaint, as set forth above.

145.     The IWorks sale sites that are Trial Exhibits are typical, and representative, of all the sales sites that members of the compliance team saw. (ECF No. 1999 at 99-100.)

146.     Defendants have not presented a single site that does not violate the FTC Act, let alone records proving any untainted sales.

147.     The website reviews, exhibits, and testimony by Ms. Kramm and Ms. Marker show that the IWorks Upsells were not disclosed or not adequately disclosed on the sites of IWorks' marketing partners. Consumers did not know they were being signed up for the Upsells at the time they purchased a product from the marketing partner.

148.     IWorks' business records show that the unreimbursed consumer injury associated with the IWorks grant and Google sale sites, and the forced Upsells on the IWorks sales sites and on those of IWorks' marketing partners, is $280,911,870.36. (ECF No. 2000 at 143-44; Tr. Ex. 495-A.)

149.     Using the figures and amounts in the spreadsheet provided by IWorks' witness, Robert Vigil, FTC forensic accountant Emil George calculated that the grant sale sites caused $111,185,219.08 in unreimbursed consumer harm during the years 2006-2009. (ECF No. 2000 at 138-39; Tr. Ex. 495-B.)

150.     Mr. George calculated that the combined chargeback and refund percentage for sales of the grant product was 21.95%. (ECF No. 2000 at 139-44.)

151.     Mr. George used the figures and amounts in the same Vigil spreadsheet to calculate that the sales from the Google sites caused $25,164,873.46 in unreimbursed consumer harm during the years 2006-2009. (ECF No. 2000 at 142; Tr. Ex. 495-C.)

152.     Mr. George calculated that the combined chargeback and refund percentage for sales of the Google product was 18.49%. (ECF No. 2000 at 143.)

153.     Mr. George used the figures and amounts in the same Vigil spreadsheet to calculate that the sales from the IWorks Upsells caused $144,561,777.82 in unreimbursed consumer harm. (ECF No. 2000 at 143-45; Tr. Ex. 495-D.)

///

1    154.   Mr. George combined the unreimbursed consumer injury from the grant and

2    Google sites, and from the Upsells to find the total unreimbursed consumer injury caused

3    by IWorks sale of its grant, Google, and forced Upsells is $280,911,870.36. (ECF No. 2000

4    at 144-45; Tr. Ex. 495-A.)

5    **IV.     CONCLUSIONS OF LAW**

6         **A.     Spink's Liability**

7              **1.     Injunctive Relief**

8         The legal standard to impose injunctive relief on an individual defendant requires a

9    Court to find that the individual (1) participated in the unlawful conduct or (2) had authority

10   to control the offending entity. *FTC v. Commerce Planet, Inc.* 815 F.3d 593, 600 (9th Cir.

11   2016).

12        The FTC has shown that Spinks controlled Jet Processing as its owner and sole

13   officer. He signed legal documents on behalf of Jet Processing that allowed IWorks to

14   charge the credit and debit cards of its customers for deceptively-sold products. He also

15   participated in the development of the Google Product and in the deceptive marketing of

16   the Google Product and the grant products. For these reasons, the FTC has shown that

17   Spinks both participated in the unlawful conduct and had authority to control Jet

18   Processing. Therefore, Spinks is liable for injunctive relief.

19              **2.     Monetary Relief**

20        The legal standard to hold an individual liable for monetary relief requires the Court

21   to find that the individual had knowledge that the corporation or one of its agents engaged

22   in dishonest or fraudulent conduct, that the misrepresentations were the type upon which

23   a reasonable consumer would rely, and that consumer injury resulted. *FTC v. Grant*

24   *Connect, LLC*, 763 F.3d at 1094, 1101 (9th Cir. 2014.) To satisfy the knowledge

25   requirement, the FTC must show that the individual defendant had knowledge of a material

26   misrepresentation, was recklessly indifferent to the truth or falsity of a misrepresentation,

27   or had an awareness of a high probability of fraud along with an intentional avoidance of

28   ///

the truth. *Id.* An individual's control or participation in corporate affairs may be probative of knowledge. *See FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 573 (7th Cir. 1989.)

The FTC has shown that Spinks either knew or should have known that IWorks was engaged in fraudulent conduct, was recklessly indifferent to the truth or falsity of such fraudulent conduct or he was aware of a high probability of fraud and intentionally avoided the truth. Spinks was, at one point or another, involved in designing products, online marketing, opening merchant accounts, and dealing with chargeback problems and consumer complaints. Spinks received a number of reports showing that consumers complained about IWorks' practices and participated in meetings with payment processors where the participants discussed the excessive chargebacks generated by IWorks' sales. Spinks saw, and had access to, sales sites and was at least generally aware of the ways in which the sites were misleading. While Spinks is correct that he may have been less involved with the IWorks enterprise than many of the other individual defendants, he nonetheless participated in and knew about the misleading sales sites, the excessive chargebacks problems and IWorks' attempt to avoid monitoring. Moreover, the Court questions Spinks' claim that he did not review some of the materials that he had access to that show consumer complaints and issues with excessive chargebacks. Even accepting Spinks' contention, Spinks either was recklessly indifferent to facts showing IWorks' deceptive scheme or was aware of the high probability as to the misrepresentations that the IWorks enterprise promoted and intentionally buried his head in the sand.

The misrepresentations disseminated by the IWorks' common enterprise were of a type upon which a reasonable consumer would rely on, and more than $280 million dollars in unreimbursed consumer injury resulted. Spinks is jointly and severally liable for the full amount of unreimbursed consumer injury, less any actual amount already paid to the FTC, by any other defendant, for consumer redress.

///

///

## B. Jet Processing's Liability

Jet Processing asks the Court to reconsider its ruling in SJ Order III holding that it was part of the common IWorks enterprise, or alternatively to exercise its equitable powers and decline to hold Jet Processing jointly and severally liable. (ECF No. 2006 at 7-8.) However, the Court finds that, though there has been some confusion on the FTC's part between Jet Processing and Jet Processing Utah, the record still contains sufficient evidence to support a finding that Jet Processing acted as part of a common IWorks enterprise. Jet Processing acquired merchant accounts for IWorks, opened bank accounts utilized by IWorks, and attempted to help Jeremy Johnson and IWorks avoid the consequences of high chargeback rates. As the Court found earlier, Jet Processing displayed the hallmarks of a common enterprise, including common control, shared office space and officers, and interconnection in a maze of companies. (ECF No. 1818 at 4.)

## C. Consumer Harm

The FTC has shown that IWorks' deceptive claims in the marketing of its grant and Google products, and of products sold as forced upsells, were widely disseminated and violated Section 5 of the FTC Act, 15 U.S.C. §45(a). The FTC has also shown that IWorks' practice of billing for its forced upsells on its own sale sites and on those of its marketing partners caused substantial injury that was not outweighed by countervailing benefits to consumers or competition and that consumers could not reasonably avoid.

Based on this showing, and the failure of Defendants to identify any untainted sales, the Court concludes that the consumer injury caused by IWorks equals the amount consumers paid for all sales associated with IWorks' grant and Google product sale sites, and with the upsells on IWorks' sites and the IWorks products sold as upsells on sites of IWorks' marketing partners. That amount excludes refunds and chargebacks already paid back to consumers.

Under the legal standard for imposing monetary relief on the corporate defendants, the FTC must make a reasonable approximation of the unreimbursed consumer injury caused by the IWorks common enterprise. The appropriate legal standard to calculate the

amount of unreimbursed consumer injury caused by the IWorks corporate defendants, acting as a common enterprise, is the revenue IWorks received less chargebacks and refunds. The FTC does not need to prove actual consumer reliance on the misrepresentations because the FTC is entitled, as a matter of law, to a presumption of reliance upon a showing that (1) a defendant made material misrepresentations in the marketing of its products, (2) the misrepresentations were widely disseminated, and (3) consumers purchased the products. *FTC v. Figgie Int'l Inc.*, 994 F.2d 595, 605-06 (9th Cir. 1993). The presumption of reliance applies here because IWorks made material misrepresentations in the marketing of its products, the misrepresentations were widely disseminated via the Internet, and numerous consumers purchased the products at issue. Applying the legal standard, the IWorks corporate enterprise led to unreimbursed consumer injury in the amount of $280,911,870, as reflected by IWorks' sale records.

## V.    CONCLUSION

The Court finds that the FTC has proven by a preponderance of evidence that it is entitled to a permanent injunction against Spinks and Jet Processing and a determination that the amount of consumer injury is $280,911,870 for which Spinks and Jet Processing are jointly and severally liable.

The FTC is directed to submit a proposed order granting the FTC's request for permanent injunction and monetary relief in compliance with LR 7-2(f) within ten (10) days.[17]

DATED THIS 16th day of August 2016.

_____
 MIRANDA M. DU
 UNITED STATES DISTRICT JUDGE

---

[17]The FTC submitted a proposed order with its post trial brief, but it does not appear that Defendants have had the opportunity address the proposed order as contemplated in LR 7-2(f). (ECF No. 2003-1.)